# In The Matter Of:

*CAROLINE CASEY, ET AL. v.*
*NEW HAMPSHIRE SECRETARY OF STATE, ET AL*

---

*MOTION HEARING*
*July 30, 2019*

---

**Duffy & McKenna Court Reporters, LLC**



P.O. Box 1658 Dover, NH  03821

**1-800-600-1000**

603-743-4949 | 603-743-4952 (fax)

www.dmreporting.com

dmreporting@stenosearch.com (Scheduling)
camille@stenosearch.com  (Billing/Production)

OUT-OF-TOWN DEPOSITIONS?



WWW.DEPOSPAN.COM

*Duffy & McKenna*
*Court Reporters, LLC*

DEPOSPAN'S TRUSTED LOCAL CONNECTION

*Min-U-Script® with Word Index*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                 *
CAROLINE CASEY, ET AL.,          *
              Plaintiffs,        *
                                 *
v.                               *      19-cv-00149-JL
                                 *      July 30, 2019
NEW HAMPSHIRE SECRETARY OF STATE,*      10:06 a.m.
ET AL.,                          *
              Defendants.        *
                                 *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:


For the Plaintiffs:        S. Amy Spencer, Esq.
                           Shaheen & Gordon, P.A.

                           Henry Klementowicz, Esq.
                           Gilles Bissonnette, Esq.
                           Julie Ebenstein, Esq.
                           ACLU of New Hampshire

For the Government:        Office of the Attorney General
                           Samuel Garland, Esq.
                           Anthony Galdieri, Esq.
                           Seth M. Zoracki, Esq.

Court Reporter:            Sharon Saalfield, LCR, RPR, CRR
                           Duffy & McKenna Court Reporters
                           P. O. Box 1658
                           Dover, New Hampshire 03821
                           (800) 600-1000

2

1                 P R O C E E D I N G S

2              THE CLERK:  The Court has before it for

3         consideration today a motion hearing in civil case

4         number 19-cv-149-JL, Caroline Casey, et al., versus

5         New Hampshire Secretary of State, et al.

6              THE COURT:  Good morning, everybody.

7              ATTORNEYS:  Good morning.

8              THE COURT:  This is a motion to dismiss hearing

9         based on standing and sufficiency of the complaint,

10        some arguments as to only the individual plaintiffs,

11        some as to the party.

12             And why don't counsel identify themselves for

13        the record and we'll get under way.

14             MR. GALDIERI:  Anthony Galdieri from the New

15        Hampshire Attorney General's office, for the

16        defendants.

17             THE COURT:  Good morning.

18             MR. GARLAND:  Sam Garland from the AG's office

19        for the defendants.

20             MR. ZORACKI:  Seth Zoracki, also for the

21        defendants, from the New Hampshire Attorney

22        General's office.

23             MR. KLEMENTOWICZ:  Henry Klementowicz from the

24        American Civil Liberties Union of New Hampshire on

25        behalf of Caroline Casey and Maggie Flaherty.

1              MS. SPENCER:  Amy Spencer from Shaheen and
2       Gordon on behalf of the New Hampshire Democratic
3       Party, Your Honor.
4              THE COURT:  Good morning.
5              MR. BISSONNETTE:  Good morning, Your Honor.
6       Gilles Bissonnette of the ACLU on behalf of Caroline
7       Casey and Maggie Flaherty.
8              MS. EBENSTEIN:  Good morning, Your Honor.
9       Julie Ebenstein on behalf of the plaintiffs.
10             THE COURT:  Thank you.  You're on behalf of
11      Casey and Flaherty?
12             MR. GALDIERI:  Yes, Your Honor.
13             THE COURT:  Thanks.  Okay.  AGO, your motion.
14             MR. GARLAND:  Thanks, Your Honor.  So I will be
15      arguing the standing portion of our motion and then
16      Attorney Zoracki is going to go after that.
17             So unless you have any questions, I was just
18      going to present the arguments in the order we
19      presented them in the motion, and proceed from
20      there.
21             We started with Ms. Casey and Ms. Flaherty.
22      The argument is that they do not have standing to
23      bring this action as individual plaintiffs because
24      they have not alleged an injury in fact as required
25      for Article III standing.  That injury in fact must

4

1          be concrete, particularized.  It must affect the

2          plaintiffs in a personal and individualized way.  In

3          their complaint, the individual plaintiffs reference

4          repeatedly --

5                THE COURT:  They don't own vehicles, right?

6                MR. GARLAND:  Correct, Your Honor.

7                THE COURT:  So registration is really off the

8          table.  It's about licensing.

9                MR. GARLAND:  Exactly.

10               THE COURT:  Everybody agree with that?

11               MR. KLEMENTOWICZ:  Yes.

12               THE COURT:  Okay.  Good.

13               MR. GARLAND:  Absolutely.  And so the licensing

14         requirement is under RSA 263:35.  That says any

15         nonresident driver of a motor vehicle who becomes a

16         bona fide resident has to get a license within 60

17         days of becoming a resident.  That's in the motor

18         vehicle code which has its own statutory definition

19         section.  It defines "driver."  It says that, "A

20         driver is a person who drives or is in actual

21         physical control of a motor vehicle."  It defines

22         "drive."  It says, "In all its moods and tenses,

23         shall mean to operate or be in actual physical

24         control of a motor vehicle."  And so as we presented

25         in our motion, it's someone who is actually driving

5

1           within the state.

2                There is no allegation in the individual

3           plaintiffs complaints that they are driving in the

4           state, that they have driven within the state, that

5           they intend to drive within the state in the

6           foreseeable future.

7                THE COURT:  What driver in the world only

8           drives in some states?

9                MR. GARLAND:  Well, I think, Your Honor, a

10          college student might.  I mean, a college student

11          who goes to --

12               THE COURT:  A student might, but a college

13          student also might drive in the state, right?

14               MR. GARLAND:  Conceivably, Your Honor, sure.

15          But I think if they want to have standing to bring a

16          federal lawsuit under Article III, they should

17          allege that they drive within the state, or at least

18          --

19               THE COURT:  Somebody's going to pull designated

20          driver duty at some point.  Everybody, right?  Every

21          college student is going to be a designated driver

22          some night.

23               MR. GARLAND:  I think that's conceivable as

24          well, Your Honor, but I'm not sure that that's

25          beyond the speculative level, right?  It has to be

6

1           concrete and particularized.  They have to actually

2           say that -- something more than that.  And that's

3           not in their complaint.

4                THE COURT:  True.  It's not -- it's true that

5           the complaint does not allege, "I drive in New

6           Hampshire and I" -- that's true.  I'm just not sure.

7           You're going to throw out a lawsuit because someone

8           is a driver, indisputably a driver, right, but they

9           haven't alleged that they're going to drive within,

10          necessarily within the borders of our state?  That's

11          not a fair inference?  A driver, a complaint stated

12          in federal litigation.

13               MR. GARLAND:  I think it's -- our position is

14          that it's a speculative inference to draw at this

15          point.  And obviously, 12(b) motions can't be

16          defeated on pure speculation, and so that's the

17          position we've taken with respect to that argument.

18               The other argument that they've raised in their

19          objection to the motion to dismiss is that basically

20          what 1264, HB 1264 does is it creates a requirement

21          either that you abstain from voting or that you

22          abstain from driving within the state.  I think

23          that's false equivalency.  There is a third option.

24          There are New Hampshire residents who may become

25          residents for voting purposes who do not drive

7

1      within the state.  And under a plain reading of the

2      statute and the definitions, those residents

3      wouldn't be under any obligation to get a driver's

4      license.

5           So the way that it's been presented in the

6      complaint, that it's an either-or decision:  You

7      abstain from voting or you abstain from driving.  I

8      guess you get a driver's license, which is the harm

9      they've alleged that'll be inflicted upon them.

10     That doesn't seem to be correct under a plain

11     reading of the statute.

12          So as the complaint is alleged right now,

13     without any affirmative allegation that they're

14     going to actually drive within the state, they could

15     very well fit within that third group of people.  I

16     mean, you can conceive of college students, you can

17     conceive of senior citizens, just to name a few,

18     that would be people who vote within the state, or

19     are registered to vote within the state, who have no

20     intention of driving within the state.  And under

21     the statute, that requires that it be an active --

22     you know, an active driver or an active driver

23     within the state.  Those people wouldn't be

24     obligated to get a driver's license.  So I think

25     something more is necessary to allege an injury in

1         fact here.

2              THE COURT:  So you're saying college students

3         who register to vote but have no intention of

4         driving in the state --

5              MR. GARLAND:  Correct.

6              THE COURT:  -- can vote without any impediment?

7              MR. GARLAND:  Yeah, no impediment, is our

8         position.

9              THE COURT:  Do you agree with that?

10              MR. KLEMENTOWICZ:  So, I think, Your Honor --

11              THE COURT:  Do you agree with that?

12              MR. KLEMENTOWICZ:  If they abstain from driving

13         under all circumstances, I agree that the law only

14         requires one to buy a New Hampshire driver's license

15         if one is going to drive, but I would frame it in

16         the context of you would have to voluntarily

17         relinquish your rights to drive in the state

18         indefinitely.

19              THE COURT:  Do you agree with that?

20              MR. GARLAND:  I don't think so, Your Honor.  I

21         think there's still the third group of people.  You

22         don't -- not everybody wants to drive.  Not

23         everybody has an intention of driving.

24              THE COURT:  So college students who have

25         licenses in the Commonwealth can be in that third

9

1          group of people?

2               MR. GARLAND:  I believe so.  If they're within

3          the state and they have no intention of driving

4          within the state, Your Honor.

5               I think, first, Hanover, you know, I mean, they

6          characterize Hanover as a very rural town where you

7          absolutely have to drive.  I don't think that's a

8          fair characterization.  Hanover is a county that has

9          plenty of things within the town, within the campus

10         and within the town around it that a person could

11         very happily exist there without ever needing to

12         drive anywhere, who could be picked up by their

13         parents and dropped off by their parents, or

14         carpooled home or something along those lines, and

15         so I think it's certainly conceivable.

16              THE COURT:  Well, then we would helicopter into

17         a (inaudible) modern parents would not count.

18         Here's the thing.  I think this argument, it's

19         interesting.  I think where it gets fully developed,

20         though, isn't at standing.  It's at merits.  I

21         understand how it's a standing argument, I do, and

22         how one might view it that way.

23              So college students who retain their licensure

24         in some other state don't suffer any impingement,

25         infringement on their right to vote under the

1               statutory regime.  That's what you're saying?

2                       MR. GARLAND:  If they don't intend to drive

3               within New Hampshire while they're here, correct.

4               And I think that's the allegation that's missing

5               from the complaint.

6                       THE COURT:  They don't intend to -- yeah.  I

7               mean, honestly, you know, I think this goes to your

8               argument.  I wouldn't be surprised if the majority,

9               over half of Dartmouth and UNH students, never drive

10              a vehicle in New Hampshire in their four years here.

11              But a lot also do.  I don't know if it's an

12              unreasonable inference to suggest that a licensed --

13              a licensed driver, someone who is licensed

14              somewhere, will drive and intend to drive in New

15              Hampshire.

16                      But, okay, I understand your argument.

17                      MR. GARLAND:  Our position is it's an

18              allegation that should be there, if that's the

19              intention, Your Honor.

20                      THE COURT:  But see, look, they've said, "Well,

21              Judge, if you don't think our complaint is

22              sufficiently -- sufficiently established a standing,

23              we'll amend it."  I'm not -- I've never been a fan

24              of the "if you're going to dismiss my complaint,

25              I'll amend it" argument.  I don't allow it.  I'm not

1         sure if it's necessary here.  It just doesn't seem

2         like an unreasonable inference at this stage of the

3         litigation that licensed drivers, drivers licensed

4         in other states intend to drive in the State of New

5         Hampshire while they're here for a four-year --

6         well, roughly four-year period, or any period of

7         collegiate study.  Anyway, go ahead.

8              MR. GARLAND:  I'll proceed on to the Secretary

9         of State.  And so both the individual of the

10        plaintiffs, if you infer that there's an actual

11        injury, in fact, alleged, and the Democratic Party,

12        we feel do not have standing to allege -- to bring

13        these claims against the Secretary of State.  And

14        that's under the second and third requirements

15        standing, that the injury be fairly traceable to the

16        challenged conduct of the defendant, that is likely

17        to be redressed by a favorable judicial decision.

18        That requires a sufficient direct causal connection,

19        cannot be overly attenuated, and that's what we

20        think exists here, Your Honor.

21             THE COURT:  I don't understand -- you know

22        what, I understand your arguments.  I'm not sure I

23        agree with them.  I definitely understand them.  But

24        I don't see the point of what does it get you if the

25        Secretary of State is dismissed from the case?  If I

1           find standing and the Secretary of State is

2           dismissed from the case on a traceability argument,

3           I mean, I don't understand what difference it makes

4           if the Secretary of State is a defendant in the case

5           or not.  The case will still proceed.  It's against

6           the government, in essence, of the State of New

7           Hampshire.

8               Why -- is your argument about the Secretary of

9           State, which seems to me, just a total -- sort of an

10          illusory argument, a red herring.  What does it get

11          you?  Suppose I said, "I find standing but yes, Bill

12          Gardner's dismissed."  Is it a discovery thing?

13              MR. GARLAND:  Yes, Your Honor.  I think that's

14          probably the most direct way that it matters.  I

15          mean, it could impact the ways through which the

16          plaintiffs could get discovery in this case.  What

17          we are seeking --

18              THE COURT:  So if I grant that, what I buy

19          myself is a lot of discovery litigation.  When they

20          want to depose Bill Gardner, you would object.  Is

21          that the way that goes?  Because that's not going to

22          happen.

23              MR. GARLAND:  We would certainly work with

24          opposing counsel, Your Honor, to work through any

25          disputes we have over that one.

1              THE COURT:  You say that, but you also just

2         told me the reason you want Gardner dismissed from

3         the case for discovery.  So it doesn't sounds like

4         you want to work with him.  It sounds like you want

5         to block him on that issue.

6              I mean, if I told you right now they're going

7         to get full-blown discovery anyway because it's

8         clear what the motivation of this statute was -- and

9         it is, clear, right?  It's not unclear.

10             I think you're right.  This is a motor vehicle

11        statute amendment, clearly, but it wasn't motivated

12        by -- it wasn't motivated by any intention to

13        regulate the rules of the road, right?

14             MR. GARLAND:  So I think the Secretary of

15        States are our client, Your Honor.  We have to raise

16        whatever arguments we can raise on behalf of our

17        clients.  We have a viable legal argument as to why

18        he should not be a defendant in this case, and so I

19        think just from that standpoint, we're obligated to

20        raise it.

21             I do think the way it could most directly

22        impact this case is from a discovery standpoint.

23        That's certainly -- I think regardless of whether or

24        not you said there were full -- there would be

25        full-blown discovery, we would have to raise this

14

1          argument on behalf of our client.

2                    THE COURT:  You'd have to because -- when you

3          say he's your client, he's not a private citizen who

4          is paying his legal bills and you need to eliminate

5          the burdens of litigation.  He's the Secretary of

6          State, and you're going to be here anyway, right?

7                    MR. GARLAND:  But he is named in a federal

8          lawsuit, Your Honor.  I mean, that --

9                    THE COURT:  He's named in his official

10         capacity.

11                   MR. GARLAND:  True.  Yes.  Yeah.

12                   THE COURT:  It could be anybody, right?  I

13         mean, the argument that "he's our client, we must

14         protect him," his life isn't going to change except

15         he might show up for a deposition and produce some

16         discovery.  This whole argument about -- because you

17         haven't alleged similar arguments about the Attorney

18         General or any other state official.  It's just the

19         Secretary of State.  Any relief -- any equitable

20         relief the Court can order, the State's going to

21         have to implement, whether it's Secretary of State

22         Gardner doing it or some other state official,

23         right?

24                   Is there any real -- is there any real upshot

25         in this?  Any real practical significance outside of

1          this litigation and what I allow for discovery?  Is

2          there any practical significance whatsoever to

3          dismissing the Secretary of State from the case, or

4          not?

5               MR. GARLAND:  I'm going to have to think about

6          that, Your Honor.

7               THE COURT:  I'll take that as a "no" until

8          you --

9               MR. GARLAND:  Okay.  Fair enough.

10              THE COURT:  I don't mean that to be flip.

11              MR. GARLAND:  Right.

12              THE COURT:  I'm just saying because I can't

13         think of any.  If somebody can at counsel table,

14         chime in, because -- please.

15              MR. GALDIERI:  Your Honor, there's a difference

16         between the Attorney General and the Secretary of

17         State.  Attorney General has to implement and

18         enforce the law.  1264 amends statutory definitions.

19         And he would instruct agencies on the interpretation

20         of those, how they flow into other statutes, and he

21         would be an official who could be sued in this

22         case.

23              THE COURT:  I'm with you.

24              MR. GALDIERI:  And a judgment could be enforced

25         against him.  The Secretary of State doesn't enforce

1           this law.  He doesn't implement this law.  He has

2           nothing to do with this law.

3                THE COURT:  Wasn't he going to share -- isn't

4           he going to share voter registration information to

5           facilitate the implementation of this law?

6                MR. GALDIERI:  I don't understand that to be

7           the case.  What he maintains is a voter registration

8           database that's --

9                THE COURT:  How is the State going to ensure

10          that those who register to vote also follow through

11          and change their driver's licenses or register their

12          vehicles, unless the Secretary of State shares

13          information with other executive branch agencies?

14               MR. GALDIERI:  I do not believe -- I do not

15          believe the Secretary of State will be sharing that

16          information to enforce this law.

17               THE COURT:  Then how is the statute going to be

18          enforced?  How is it going to work?

19               MR. GALDIERI:  Well, that's a question for the

20          Department of Safety, the director of motor

21          vehicles.

22               THE COURT:  Aren't you here representing the

23          state government?

24               MR. GALDIERI:  We are here representing the

25          Attorney General and the Secretary of State.  The

1          Department of Motor Vehicles hasn't been sued.

2          Their statutes have not been challenged as

3          unconstitutional.

4                THE COURT:  Their statutes?

5                MR. GALDIERI:  Well, the statutes that they

6          interpret, the statutes that they issue their

7          regulations under to determine how they operate.

8                THE COURT:  You're sitting here telling me

9          today that we have a statute that connects voter

10         registration with vehicle registration and driver

11         licensure, and the information won't be shared

12         between the state agencies?  I ask you again, then.

13         And I know that I guess other departments and

14         agencies haven't been sued, but I expect the

15         Attorney General's office to be -- to explain to me

16         how the state laws are going to work, all right?

17              I started at this by trying to ask what

18         difference it makes whether the Secretary of State

19         is in the case?  You couldn't answer it.  So now

20         you're telling me, as a half answer, what the AG's

21         role is, the Attorney General, which I think is a

22         perfectly accurate answer that you provided, but it

23         doesn't answer the question about how voter

24         registration information, all right, which triggers

25         an obligation in other executive branch agencies to

1           register a vehicle and to apply for a license.

2                How could it possibly work without the

3           Secretary of State sharing that information, or at

4           least making it available, allowing access by other

5           state agencies?

6                MR. GALDIERI:  Well, the voter registration

7           database is highly confidential.  There are a few

8           provisions in the statute that allows it to be

9           shared for very specific reasons, but it's otherwise

10          privileged from being sought in litigation, and it

11          cannot be shared with other agencies and other

12          individuals in the state.  That's RSA 654:45.

13               THE COURT:  Sure.

14               MR. GALDIERI:  My recollection is unclear as I

15          stand here now as to whether there's something in

16          there about the Department of Motor Vehicles, but I

17          don't understand that to be the case, that the

18          Secretary of State is going to be sharing

19          information with the Department of Motor Vehicles.

20               THE COURT:  Then how does the statutory regime

21          work?

22               MR. GALDIERI:  Well, the statutory regime is

23          not connected to voting.  It has nothing to do --

24          there's no connection in the statutory language that

25          says if you get a license --

19

1              THE COURT:  Sure.

2              MR. GALDIERI:  If you register to vote, you

3         have to get a license.  That connection is not

4         there.

5              THE COURT:  Yeah.  I think that's how I read

6         it, too.  I'm just -- which might be -- that might

7         be exactly what ends up carrying the day at the end

8         of the day here, because I'm not sure I see the

9         burden.

10             But at the standing stage, right, when

11        someone's alleged injury in fact, I mean, they have

12        alleged information sharing, right, in their

13        complaint, and I don't know how else the statutory

14        regime would work without information sharing.

15        Unless someone -- unless information is shared

16        between these agencies, I'm not sure how one could

17        ever monitor the residency requirement to vote.

18        Does anyone have an answer for that?

19             MR. GALDIERI:  Well, the residency requirement

20        is checked at voter registration to prove your

21        qualifications, and if you're a resident, you get to

22        register to vote.

23             THE COURT:  Yeah.

24             MR. GALDIERI:  The licensure requirement is

25        separate and it's connected to your view of when you

20

1         are a resident of this state.

2              THE COURT:  But if it turns out that I admit a

3         declaration that subjects me to -- there is a

4         penalty for declaring myself a resident yet not

5         obtaining a license and registering my vehicle.

6         There is a penalty for that, right?

7              MR. GALDIERI:  There is a penalty in the motor

8         vehicle statutes.

9              THE COURT:  How would one go about -- let's

10        assume in the motor vehicle statute I was prosecuted

11        for not having a -- for not having a license or for

12        having a vehicle not registered in New Hampshire

13        when it should have been.  I'll admit, I'm not sure

14        how that would come about.  But this scheme would

15        expose one to that, wouldn't it?  If I've declared

16        my residency to vote, yet I haven't undertaken the

17        obligations that come with residency, and I was

18        prosecuted for it, right, couldn't my registration

19        to vote be evidence against me in that criminal case

20        for having declared residency yet not obtained a

21        license or registered my vehicle?

22             MR. GALDIERI:  It could be evidence.  It

23        doesn't mean that the day that you registered to

24        vote, you were a resident of the state.  It could be

25        90 days earlier you were a resident of the state

21

1          based on all your actions and --

2               THE COURT:  But it could be evidence.  How

3          could it be presented if there's no information

4          sharing?  Where is the prosecutorial authority to

5          get -- we can't both talk at the same time.

6               MR. GALDIERI:  Sorry.

7               THE COURT:  That's okay.  If it can be

8          evidence, it seems to me there must be availability

9          of that registration information, right?  It's got

10         to be available to state prosecutor -- state

11         prosecuting authorities somehow.

12              MR. GALDIERI:  They would go to -- they could

13         go to the town clerk's office and subpoena the

14         documents.

15              THE COURT:  The voter registration boards?

16              MR. GALDIERI:  Yes.  The hard copy documents.

17         They are exempt from 91(a) but they aren't exempt

18         from subpoena power.

19              THE COURT:  Okay.

20              MR. GARLAND:  I think what I'd add to that,

21         Your Honor, is that you're going to hear quite a

22         bit, I think, later on from both sides about whether

23         this is actually a legend law, but one thing that no

24         one seems to dispute on the other side is that this

25         doesn't change the eligibility to vote.  It doesn't

1     change the requirements for registering to vote.  It

2     doesn't change how you cast the ballot.  It's just

3     things that may happen after the fact.  And it's

4     "may," still, under these circumstances, collateral

5     consequences.

6          So the Secretary, nothing changes about the

7     Secretary's role in this process.  And so if there

8     was information sharing about someone who should

9     have been -- become a resident and registering to

10    vote was evidence of that even prior to this law

11    going into effect -- and I understand it changes the

12    dynamic slightly but that could still be evidence

13    prior to this law going into effect.

14         The Secretary's role is the same.  There's

15    nothing about 1264 that changes anything about that.

16    So I think that's the point I think that I would add

17    to this is that the Secretary's role is unchanged by

18    virtue of 1264.

19         They could try to get around it, I think, by

20    focusing on advocacy on behalf of this law.  I don't

21    think that has any bearing on whether he can enforce

22    this law or he has any role, and so I don't know

23    that that argument has much traction.

24         The other thing --

25         THE COURT:  Just goes to motivation.  It

23

1          doesn't go to anything but motivation, but it goes

2          to motivation.

3               MR. GARLAND:  From a standing standpoint.  I'm

4          not sure that that --

5               THE COURT:  I'm not sure it matters.

6               MR. GARLAND:  From a standing standpoint,

7          right?  Because you have no role in how this law --

8          there would be no redressability, I don't think,

9          directed toward him, even if he had a motivation for

10         this law to go into effect.  It doesn't make it more

11         likely that any authority that he has extends to --

12              THE COURT:  Let me try it this way, then.  The

13         Secretary of State's job is to administer the state

14         election laws, right?  Right?

15              MR. GARLAND:  Right.  Yes, Your Honor.

16              THE COURT:  Does that involve in any way,

17         shape, or form, managing, compiling, maintaining,

18         distributing -- any of the above, any one of the

19         above -- voter registration information?  Or is that

20         all maintained in the state -- in the town, the town

21         halls and the town offices?

22              MR. GALDIERI:  So, Your Honor, I can answer

23         that question.  That information is in paper form,

24         hard copy form, at the town clerk's office.  It's

25         entered into a centralized voter registration

1    database.

2              THE COURT:  At the Secretary of State's office?

3              MR. GALDIERI:  At the Secretary of State's

4    office where it is locked down and can only -- it is

5    privileged.  It is highly confidential.  It can only

6    be released to specific identified persons.

7              THE COURT:  So can the Attorney General's

8    office represent to me in court today -- this could

9    move the needle on standing.

10             Can you represent to me in court today that the

11   Secretary of State's office is prohibited from or

12   will not share voter registration information with

13   any law enforcement authority that might enforce

14   these motor vehicle laws?  Can you say that today?

15   If you can say that, that makes a difference for

16   standing.

17             MR. GALDIERI:  Not having that statute in front

18   of me, I cannot say that with a hundred percent

19   certainty, no, Your Honor.

20             THE COURT:  All right.  Thank you.  That's an

21   honest answer.  Do you want to say something?  I saw

22   you on your feet as if you wanted to say something.

23             MR. KLEMENTOWICZ:  Well, my recollection is

24   that the handmarked checklists that are kept at the

25   town level are eventually sent to the state

25

1          archives, and I was trying to determine if the state

2          archives are in control of the Secretary of State's

3          office.

4               THE COURT:  Well, Mr. Galdieri has already

5          conceived there is a centralized database in the

6          voter registration information, so that doesn't seem

7          to be --

8               MR. KLEMENTOWICZ:  I don't think the archive

9          checklists are covered by the same statutory secrecy

10         protections.

11              THE COURT:  I see.

12              MR. KLEMENTOWICZ:  Because the checklists

13         themselves are public information.

14              THE COURT:  What do you say about that?

15              MR. GALDIERI:  There are public checklists that

16         have a certain amount of public information on them

17         that are available at the municipal level and would

18         ultimately be archived.

19              THE COURT:  Where are the checklists?  Where

20         are they?

21              MR. KLEMENTOWICZ:  The checklists where you go

22         to register to vote, Your Honor, there's a sheet

23         that the ballot inspector is marking your name down

24         and checking off with a ruler in line.

25              THE COURT:  Oh, yeah.

1                  MR. KLEMENTOWICZ:  That's the checklist.

2                  THE COURT:  Right.

3                  MR. KLEMENTOWICZ:  And there is a notation, I

4          believe, on the checklist that says -- that

5          indicates that someone has voted using an

6          out-of-state driver's license.

7                  THE COURT:  So what about that information,

8          Mr. Galdieri?  You didn't mention that.

9                  MR. GALDIERI:  No, that's correct.  That is a

10         portion -- that is public information under our

11         state law.  It's available at the town and municipal

12         level.  It's available in archives.  The Secretary

13         of State, I believe, is authorized to pull only that

14         public information from the database and provide it

15         to certain limited entities like political

16         parties.

17                 THE COURT:  But if I'm a Keene State student

18         and my name's on that list, that means I registered

19         to vote, right?

20                 MR. GALDIERI:  If you showed up to vote and you

21         registered to vote, yes.

22                 THE COURT:  Right.  So that would mean if I was

23         allowed to vote, that I represented myself as

24         someone who's a resident of the State of New

25         Hampshire, right?  So I've represented myself as a

1          resident.  If that information is shared with the

2          state prosecutorial authority and I haven't followed

3          through, I haven't got a New Hampshire driver's

4          license or registered my vehicle, that could be

5          evidence used against me in a criminal case, right?

6                  MR. GALDIERI:  That could be.  Those public

7          records could be.

8                  THE COURT:  Yeah.  All right.  Now, by the way,

9          this, to me, doesn't necessarily constitute a burden

10         on the right to vote.  I'm just trying to flush out

11         if there's standing.

12                 Okay.  Okay.  I keep interrupting you,

13         Mr. Garland.  I'm sorry.

14                 MR. GARLAND:  It's fine.  It's like I'm a

15         tennis bank here.

16                 Just a couple more points I'd like to make

17         quickly, Your Honor.  Another argument that the

18         defendants have made is that there could be

19         potential confusion based on the information that

20         the Secretary of State provides to training election

21         officials and educating the public.  There's no

22         claim in this case, and they certainly -- there are

23         other lawsuits pending.  There have been prior

24         lawsuits that have claimed that laws create a

25         confusion and that's the burden on the right to

1          vote.  That's not a claim in this lawsuit, so I

2          think that's a bit of a red herring as well.

3               There's discussion of the Secretary of State's

4          obligation under RSA 654:12(5)(d) which requires the

5          statutory requirement that can send letters to

6          people under certain circumstances, usually people

7          who register to vote via affidavit as opposed to

8          showing up with the actual documentation of their

9          domicile.  That statute is unchanged by 1264, and it

10          said previously that a -- that it be sent to people

11          who use these domicile affidavits, and it would say,

12          "You may have a collateral consequence," and one of

13          them might be having to get a driver's license.

14          That hasn't changed and it still may be just a

15          collateral consequence.

16               And so I think that based on all of that -- and

17          I understand what your particular concern is here,

18          Your Honor, but I think based on all of that, that

19          there isn't anything that the Secretary of State has

20          done here to cause harm, and there's no way that an

21          order would be directed towards the Secretary of

22          State would redress it.  I think that the Attorney

23          General, and then unnamed state officials --

24               THE COURT:  But this Court could order --

25          suppose the plaintiff prevailed here.  This Court

29

1          could order that the Secretary of State share no --
2          whether it's the checklists that are archived or the
3          virtually compiled information from the town
4          offices.  If this Court ordered the Secretary of
5          State not to share that information with any law
6          enforcement authority enforcing the motor vehicle
7          laws, right, regarding licensure and registration,
8          that's a redress for the injury, isn't it?
9               MR. GARLAND:  Yes, I suppose, in terms of
10          enforcement of the actual criminal penalty here.
11               THE COURT:  So what just happened to
12          redressability argument?
13               MR. GARLAND:  I'm going to have to think about
14          that, Your Honor.
15               MR. GALDIERI:  Your Honor, I would be concerned
16          that the Secretary of State can't actually enforce
17          that, but those are public documents held by local
18          town officials.
19               THE COURT:  Secretary of State can -- sure.
20          But the Secretary of State can certainly be enjoined
21          from sharing its information.  The electronic
22          information compiled from the -- as you described
23          them, compiled from each of the town offices, and
24          the archived checklists.
25               MR. GALDIERI:  I don't believe the electronic

30

1          list that they sell can be sold to law enforcement.

2          I believe it can only be sold to political entities

3          like the Democratic Party, the Republican Party,

4          certain limited entities.

5               THE COURT:  Sounds like it wouldn't really

6          know, though.  I mean, it sounds like we're doing

7          our best to recall, but sounds like we're grasping

8          at straws.  Not grasping at straws.  I don't mean to

9          characterize you as desperate.  I'm saying that we

10         -- because you might not have anticipated this line,

11         you might -- we don't really know what the various

12         forms of information are, but we do have the

13         archived checklists, right?  So let's just keep it

14         with that.

15              If this Court ordered that, "Secretary of

16         State, you may not share that information with any

17         state law enforcement authority enforcing the motor

18         vehicle laws pertaining to licensure or

19         registration," that would be redress for the injury.

20         It would protect the Keene State student from having

21         to deal with that information at his or her trial

22         for failing to register or failing to have a

23         license.  That sounds like redressability to me.

24              Anyway, and I -- I guess you know, I wonder.

25         Here's what my real question was when I first

31

1          started asking what difference does this make?

2          Whether or not the Secretary of State was in the

3          case.  I know I wouldn't feel constrained issuing an

4          order that just says, "The State of New Hampshire

5          shall not," or, "The State of New Hampshire shall,"

6          and I would trust the Attorney General's office --

7          you're all very able representatives of the AG -- to

8          notify the agencies involved not to violate the

9          court order.

10              So I just don't view this Court's power and its

11         ability to address these injuries as limited by

12         which state -- I was going to say bureaucrat, but I

13         didn't mean to say that -- which state official is a

14         defendant in the case.

15              Okay.  Standing.  Anything else?

16              MR. GARLAND:  The very last argument I would

17         make, a point I would make with respect to that,

18         Your Honor, and then I'll sit -- I've been up here

19         for a while -- is I think that actually cuts in

20         favor of our position on that.  I mean, if there's

21         no reason to believe that the Secretary of State, as

22         a state official, is not going to comply with an

23         order that this Court issues that's going to

24         promulgate misinformation or not going to update

25         information that's on the website, or things along

1          those lines, then it's not clear to me how he would

2          need to be -- I mean, that seems to be pure

3          speculation as to a public official not doing what a

4          public official would be required to do by a court

5          order.

6               We address that a little bit in our filings,

7          and I would just close on that.

8               THE COURT:  Mr. Garland, tell me a little bit

9          about your three groups again.  I want to make sure

10         I understand them.

11              MR. GARLAND:  Yes.

12              THE COURT:  Tell me group one, group two, group

13         three, so I can keep track.

14              MR. GARLAND:  Yes, absolutely.  So that goes

15         back to the injury portion of it in that the first

16         group -- so the way that opposing counsel explained

17         it is you either have to abstain from registering to

18         vote or you have to abstain from driving within the

19         state.

20              So you have the people who choose to register

21         the vote.  You have the people who would choose to

22         drive and don't want to pay the driver's license --

23         obtain the New Hampshire driver's license.

24              Well, what that's missing then is that third

25         group of people who live within the State of New

33

1      Hampshire, at least for a sufficient amount of time

2      to become residents here, that want to vote within

3      the state and become residents with the desire to

4      vote, or become residents for any other number of

5      reasons, but in this case it's focused on becoming a

6      resident by virtue of registering to vote, but have

7      no intention whatsoever of driving within the state,

8      either because they are students who do not have a

9      car and have public transportation available to

10     them, they are elderly, they do not want to drive,

11     they may not be able to get a driver's license.  Any

12     number of reasons.  Those individuals would be under

13     no obligation under the statute to obtain a driver's

14     license when they have no present intention of

15     driving within the state.  So that's the third group

16     of people.

17          THE COURT:  The third group then is a resident,

18     a resident of the state, who wishes to vote but does

19     not wish to drive.

20          MR. GARLAND:  Exactly.  Exactly.

21          THE COURT:  Okay.

22          MR. GARLAND:  Thank you, Your Honor.

23          MR. KLEMENTOWICZ:  Would you like me to turn to

24     standing and Attorney Spencer, or would you prefer

25     to hear the state's merits?

1            THE COURT:  I'll stick with standing.  I'm

2       sorry.

3            MR. KLEMENTOWICZ:  If I may, with the Court's

4       indulgence, I think it might be helpful to set up,

5       to frame the law, what it does --

6            THE COURT:  You approach this how you wish.

7       I'm happy to listen.

8            MR. KLEMENTOWICZ:  Thank you.  So prior to July

9       1, 2019 when HB 1264 came into effect, New Hampshire

10      had statutorily defined domiciliaries and residents,

11      and they were not the same group.  And so every

12      person who was a resident was a domiciliary, but not

13      every domiciliary was a resident.  So it's the

14      people in that missing sliver who are the ones who

15      are directly impacted by HB 1264, which removed from

16      the definition of resident for the indefinite future

17      and made the two the same.

18           On the standing -- so as a result, when one

19      goes and registers to vote, one is not only

20      declaring domicile, and now residence, but also

21      manifesting it and creating domicile and residence,

22      because the definition for domicile turns on

23      maintaining a single continuous presence for

24      domestic social and civil purposes relevant to

25      participating in self-government.

35

```
1              So the act of voting, registering to vote, is
2       participating in democratic self-governance, the
3       prime way most people do that, and so it functions
4       as the manifestation of the intent to do that, as
5       well as an announcement to the State that New
6       Hampshire is your home.
7              So on standing, there are three requirements,
8       of course.  There's the injury and effect, there's
9       causation, and there's redressability.
10             So the injury to our clients is, I think, clear
11      as licensed drivers from other states who live in
12      New Hampshire and are now required to choose either
13      not to drive or to buy a New Hampshire driver's
14      license.  They have to either spend $50 and take a
15      round trip ticket -- trip to the nearest DMV, which
16      from Dartmouth is either, I think, North Haverhill
17      or Claremont, 45 minutes each way, we'll say, there
18      and back, without, of course -- and they need to do
19      that to update their driver's license.  And if they
20      wait more than the 60-day period, they are not
21      legally permitted to drive to the DMV to update
22      their license.
23             THE COURT:  Doesn't everybody in New Hampshire
24      have to drive a long way to get their license pretty
25      much, unless you live in the little southeast
```

36

```
1              triangle of the state?  Everybody's got to drive 45
2              minutes to get their license.
3                   MR. KLEMENTOWICZ:  Well, I think typically one
4              can renew a license online.
5                   THE COURT:  I think that's true.
6                   MR. KLEMENTOWICZ:  But I looked this up, and my
7              understanding is that to transfer your license to
8              New Hampshire for the first time, you have to
9              physically go to the DMV.
10                  THE COURT:  Okay.
11                  MR. KLEMENTOWICZ:  And I think, though, this
12             doesn't, to my knowledge, apply to our clients, but
13             people who are not U.S. citizens or people with
14             different immigration statuses might have to go to
15             the main DMW in Concord, so there are some people
16             for whom it could be a long drive.
17                  So there's the drive and there's the expense.
18             If our clients own a car, or for anyone else who
19             owns a car, they -- regardless of whether they drive
20             it or not, they would have to register it in the
21             state, and as Your Honor knows, New Hampshire has a
22             very expensive car registration system, which can
23             cost hundreds of dollars, and, unlike our neighbor
24             to the south, is required to be done annually.
25                  So our position is being forced to choose to
```

1          relinquish their otherwise statutory entitlement to

2          drive, or paying monies to the state, is an injury

3          sufficient to get them in the door.  Because

4          standing doesn't require a huge burden; it requires

5          a trifle of an injury, and that's what this is.

6               In the alternative, we argue that as your

7          questions --

8               THE COURT:  But I thought we established,

9          though, that the registration part of this for the

10         plaintiffs in this case is off the table.

11              MR. KLEMENTOWICZ:  Our clients do not have to

12         register the cars.  They don't own cars, right.

13              THE COURT:  Right.  You're saying your clients.

14         You mean -- you represent the college kids.  College

15         students.  I'm sorry.

16              MR. KLEMENTOWICZ:  The two college students,

17         yes.  Ms. Casey, who is in the back of the room, and

18         Ms. Flaherty.

19              THE COURT:  All right.

20              MR. KLEMENTOWICZ:  They do not have to register

21         cars.  They don't own cars.  But they would have to

22         either agree never to drive for the two years in

23         which they live in New Hampshire -- two more

24         remaining years before they're graduating in 2021 --

25         or they have to pay money to the state.  So that's

38

1           the injury.

2                 THE COURT:  Suppose -- but it's not unlawful to

3           drive in New Hampshire with a license from another

4           state.

5                 MR. KLEMENTOWICZ:  Now it will be under HB

6           1264.

7                 THE COURT:  That's my question.  Now it will

8           be?

9                 MR. KLEMENTOWICZ:  Yeah, so there's a penalty

10          provision that the state cites in their pleadings

11          that says it's a fine to be an out-of-state -- I'll

12          pull up the statute, make sure I'm reading this

13          correctly for Your Honor.

14                THE COURT:  Yes.

15                MR. KLEMENTOWICZ:  "Unless otherwise provided

16          in statute, any person convicted of a violation

17          under any provision of this" --

18                THE COURT:  Slow down.  You're reading for the

19          record.

20                MR. KLEMENTOWICZ:  I apologize.  "Or any rule

21          made under authority thereof shall be fined $50 plus

22          penalty assessment for a first offense.  For any

23          subsequent offense" --

24                THE COURT:  When you're reading for the record,

25          you have to slow down.

1           MR. KLEMENTOWICZ:  Okay.  I apologize.

2           THE COURT:  But I'm still not clear.  I'm

3      trying to figure out how this actually gets proven

4      in court, because that's all that matters.  The only

5      way this becomes a burden is if somebody's actually

6      burdened by it and injured by it.  And if I'm a

7      Massachusetts-licensed driver, driving with a

8      Massachusetts license, nobody can give me a citation

9      unless what?  Unless I declare residency?

10          MR. KLEMENTOWICZ:  Right.  So RSA 263:35 says,

11     "Any nonresident driver of a motor vehicle who holds

12     a valid driver's license in another jurisdiction

13     upon the establishment of a bona fide residency in

14     the state" --

15          THE COURT:  Right.

16          MR. KLEMENTOWICZ:  -- "shall have a maximum of

17     60 days from the date his residency was established

18     to obtain a driver's license issued by the State of

19     New Hampshire."

20          THE COURT:  And the way -- a couple questions.

21     The way one would establish a bona fide residency,

22     is of course, registering to vote.

23          MR. KLEMENTOWICZ:  Yes.

24          THE COURT:  Is there any other way?

25          MR. KLEMENTOWICZ:  There may be for some

1               people.  Obviously, purchasing a driver a license, I

2          think, can function as a declaration of residency as

3          well.

4               THE COURT:  But as a practical matter, how does

5          one expose oneself to prosecution for this offense?

6               MR. KLEMENTOWICZ:  So I would first

7          respectfully contest the premise of your question.

8               THE COURT:  I had a feeling you were going to

9          do that, but go ahead.

10               MR. KLEMENTOWICZ:  Which is the burdens will

11          only arise if one is prosecuted for this.

12               THE COURT:  Sure.  Because there's a chilling

13          effect also.

14               MR. KLEMENTOWICZ:  There's a chilling effect.

15               THE COURT:  But chill aside.  Chill aside.

16               MR. KLEMENTOWICZ:  Chill is real, but chill

17          aside.

18               THE COURT:  I know chill's real, but I'm the

19          judge.  I get to put aside what I want to put aside.

20          We'll put the chill aside.

21               MR. KLEMENTOWICZ:  Yes.

22               THE COURT:  I'm saying that how does one

23          really -- and it's not to say that the wrong answer

24          to this question forfeits standing.  Don't go there.

25          I'm just asking.

41

```
 1              MR. KLEMENTOWICZ:  Yeah.
 2              THE COURT:  I can't imagine a situation where
 3         the Keene college student is pulled over, for what?
 4         I mean, I can't imagine any road officer or trooper
 5         having knowledge of bona fide residency
 6         requirements -- they're going to issue traffic
 7         violations, moving violations and the like, but
 8         residency violations?  Registration violations?
 9         Licensure violations?  I mean, someone produces a
10         license, they produce a license.  When and how does
11         this become a real prosecution, a real case,
12         chilling aside?
13              MR. KLEMENTOWICZ:  Sure.  So I think that
14         there's a couple ways that this could happen, and
15         since we're focusing only on standing right now --
16              THE COURT:  Yeah.
17              MR. KLEMENTOWICZ:  -- I'll talk about the
18         driver's license component, but I do think it can be
19         enforced in a different way than the car
20         registration requirement because you don't need to
21         drive so you can be pulled -- that would be easier
22         to enforce.  So a person is driving and gets pulled
23         over and the trooper says, "License and
24         registration," and you hand it -- the person hands
25         it to the police officer and they say, "Where do you
```

42

1          live?  Is this your address?"

2                THE COURT:  Yes.

3                MR. KLEMENTOWICZ:  "Oh, I live in" -- I don't

4          know the names.

5                THE COURT:  "I live in Keene.  Why is your tag

6          from Connecticut?"

7                MR. KLEMENTOWICZ:  "How long have you lived

8          here?"  And you're off to the races.  And then a --

9                THE COURT:  That's a good answer vis-a-vis the

10         registration.  It makes sense.

11               MR. KLEMENTOWICZ:  The license.

12               THE COURT:  Well, the registration.  The

13         license -- oh, yeah, the license, too, because, "How

14         long have you lived here?"

15               MR. KLEMENTOWICZ:  Yes.

16               THE COURT:  Right.  The question only comes up,

17         though -- well, I thought you were making the point

18         that the question only comes up when the officer

19         sees the out-of-state tag on the car, but even

20         examining the license, it could also result in the

21         same question.

22               MR. KLEMENTOWICZ:  Yes, yes.  And then I would

23         say that the other ways that this will impact people

24         in addition to chill is voter confusion, which is a

25         burden that could come in, and I don't think we know

1          yet how --

2               THE COURT:  But again, how does the officer get

3          to bona fide residency, looking at an out-of-state

4          tag on a car on an out-of-state license in the hand?

5          How does the officer get to, "Well, you've declared

6          a bona fide residency"?

7               MR. KLEMENTOWICZ:  So they first ask you where

8          you live.

9               THE COURT:  I live in Keene.  You play the

10         officer.  I'll play the driver.  "I live in Keene."

11              MR. KLEMENTOWICZ:  Right.  So I don't think

12         that you get cited for it at the roadside.

13              THE COURT:  Might happen down the road.

14              MR. KLEMENTOWICZ:  It could.  I think that

15         that's -- I don't really do criminal law, but I

16         think it's possible that that's probable cause to

17         get a warrant, if you need one, to examine -- I

18         don't think you would need a warrant to examine the

19         checklist.  And the officer could just go and say,

20         "I saw this person.  They told me they've lived in

21         Keene for three months.  I wonder if they've

22         declared residency by a registering to vote."

23              THE COURT:  This gets pretty attenuated but I

24         do see your argument.

25              MR. KLEMENTOWICZ:  Okay.

44

```
 1              THE COURT:  It just seems like a remote
 2         possibility, but I think -- I think we may disagree
 3         on how remote the possibility is.  I view it as a
 4         remote possibility, but again, I -- I'm much more
 5         comfortable addressing that down the road on the
 6         merits of this litigation than I am declaring that
 7         your clients don't have standing.
 8              MR. KLEMENTOWICZ:  Well, in that case, I'll
 9         move on --
10              THE COURT:  Okay.
11              MR. KLEMENTOWICZ:  -- to the role of the
12         Secretary of State in this litigation.  I think, as
13         Your Honor has pointed out, I don't think it makes a
14         practical difference whether the Secretary of
15         State -- I don't think it's going to change the
16         course of the litigation significantly, or the
17         orders that the Court can grant, if you grant the
18         motion.  But I will just point out that the
19         defendant has been the defendant in a series of
20         election law challenges in the State of New
21         Hampshire in the past 10 years, including before
22         this Court in the First Circuit involving laws that
23         he also did not personally administer, so the
24         Rideout versus Gardner case which is a ballot selfie
25         case.  It was a violation-level offense like this,
```

45

1          and that would presumably also be directly

2          prosecuted by police officers and prosecutors.  And

3          the First Circuit has the same obligation to examine

4          its own jurisdiction that you did.  I don't remember

5          a discussion of the standing in that case.

6               THE COURT:  Yeah.  Were there any cases where

7          the issue was actually litigated?

8               MR. KLEMENTOWICZ:  Not to my knowledge.

9               THE COURT:  I was sort of surprised about that

10         in the briefing.  I found myself asking why am I

11         even thinking about this?  This seems like a red

12         herring to me, this idea of let's eliminate one of

13         the official capacity defendants from the case.

14              And I think, look, I think we got an honest

15         answer from the AG that it's part of discovery.  It

16         may also be about politics, I don't know, but it's

17         at least about discovery.

18              Okay.  That's a fair answer.  But I think

19         there's -- I think, based on your allegations in the

20         complaint, it may be based -- your allegations may

21         be based, as the defense points out, on a flawed

22         understanding of how the statutory regime would

23         work.  You've alleged it, and that's -- at the

24         complaint stage, I think that's what I need to deal

25         with.

46

1           MR. KLEMENTOWICZ:  I'd also like to turn
2      briefly to the three groups of people --
3           THE COURT:  Yes.
4           MR. KLEMENTOWICZ:  -- who are impacted by the
5      law.  And I'm sure there will be more discussion on
6      this on the merits.
7           THE COURT:  That's based on your framework that
8      one has to choose between voting or driving.  It
9      takes that rubric and says there's a third category
10     who doesn't have to choose.  And I assume you don't
11     agree that this third group exists, right?
12          MR. KLEMENTOWICZ:  I think that his third group
13     is the same as the second group.
14          THE COURT:  Okay.
15          MR. KLEMENTOWICZ:  I think there's -- or first
16     group.  His third group was people who never
17     intended to drive and so aren't actually
18     relinquishing anything by relinquishing their right
19     to drive, and I think that that really is the same
20     as the second group, which is people who --
21          THE COURT:  Choose to vote, right?
22          MR. KLEMENTOWICZ:  -- choose to vote and choose
23     not to register their car for whatever reason,
24     whether it's because they don't want to drive, or
25     because they can't afford to buy a New Hampshire

47

1          driver's license.  I think they're the same group.

2               THE COURT:  Or register a vehicle.

3               MR. KLEMENTOWICZ:  Right.  And I would say

4          that -- and this will be true when we discuss it on

5          the merits as well, but this is a 21-B:1 motion

6          which is challenged just to the sufficiency of the

7          allegations, not the accuracy of them, and so it's

8          really a matter for discovery and factual evidence.

9          Because I may be wrong.  Those groups may be

10         different, or one may be bigger than the other, and

11         we won't know until we start looking at it.

12              And I don't think I have anything else on

13         standing.

14              MS. SPENCER:  Just very, very briefly, Your

15         Honor.

16              THE COURT:  There's no need to rush anybody.

17         We're here to -- I'm here to hear arguments, so

18         present them.

19              MS. SPENCER:  Just very briefly on standing,

20         Your Honor.

21              To Your Honor's point, what difference would it

22         make, the New Hampshire Democratic Party's standing

23         to maintain this lawsuit has not been challenged,

24         and you only need one party with standing to

25         maintain the lawsuit.  So we agree with everything

48

1           that the ACLU has said.  We agree that their

2           individual plaintiffs are outstanding.  However,

3           even if they didn't, we do, and so it wouldn't

4           matter.

5                Thank you, Your Honor.  Unless you have any

6           questions?

7                THE COURT:  No.

8                MS. SPENCER:  Thank you, Your Honor.

9                THE COURT:  Give me one second.  All right.  I

10          want to hear your sufficiency arguments as well but

11          I need to take a very brief recess, just two or

12          three minutes.

13                (Recess taken.)

14                THE COURT:  All right.

15                MR. ZORACKI:  So good morning, Your Honor.  As

16          to the sufficiency of the constitutional claim of

17          the plaintiffs complaint, the State's position is

18          straightforward, HB 1264 does not burden or bridge

19          the right to vote.  It does not affect the

20          eligibility of voters -- of persons to vote in New

21          Hampshire.  It doesn't change anything about the

22          registration and qualifications of voters.

23                THE COURT:  That's a meritory argument.  We

24          need folks on whether they allege that it bridges

25          the right to vote, not whether it does, right?

1           MR. ZORACKI:  Well, I think that's right, but

2      as a matter of law, it doesn't change any of those

3      things.  People who are qualified to vote before HB

4      1264 came into effect are still qualified to vote.

5           THE COURT:  Yes.

6           MR. ZORACKI:  That's because voting is

7      controlled by the domicile statute.  That's RSA

8      654:1.  Nothing about that statute changed by HB

9      1264.  So I think it's entirely appropriate for the

10     Court to address that as a matter of law at this

11     stage of the case.

12          Now, it is establishing residency.  The

13     plaintiffs often challenge that position.  They

14     suggest that after 1264, it's the act of registering

15     to vote that triggers the obligation to get a

16     driver's license or register your car.

17          Our position is that does not correctly state

18     the law.  It is establishing residency in New

19     Hampshire that is demonstrating an intent to make

20     New Hampshire your principal place of physical

21     presence that triggers the obligation.

22          THE COURT:  Right, but it's true that before,

23     registering to vote could not incur that obligation,

24     and today, registering to vote can trigger that

25     obligation, right?

1           MR. ZORACKI:  So registering to vote today

2      could be an indicator -- well, registering to vote

3      today is an indicator of residency, yes.

4           THE COURT:  It didn't used to be until -- not

5      the same way it is now, based on the change in the

6      statute.

7           MR. ZORACKI:  I think that's fair, yes, Your

8      Honor.

9           THE COURT:  So isn't that the end of the

10      conversation?

11           MR. ZORACKI:  No, because once a person

12      establishes the residency in the state, there are

13      certain basic --

14           THE COURT:  And now the person establishes the

15      residency by registering to vote.  Registering to

16      vote now has a consequence it didn't have previously

17      to the enactment of the statute, right?  It has

18      ramifications with respect to the enforcement of

19      motor vehicle laws.

20           MR. ZORACKI:  Potentially.  It's one -- it's an

21      indicator that that person has decided to choose New

22      Hampshire as their place of residence.

23           THE COURT:  It's not an indicator.  It's

24      conclusive evidence.

25           MR. ZORACKI:  Yes, because the two definitions

1          are equivalent now.

2               THE COURT:  So it's not an indicator.  It's

3          actually -- it's the establishment of residency.  So

4          now registering to vote exposes me to criminal

5          prosecution in a way that it did not before; yes or

6          no?  It can be with an explanation, but yes or no.

7               MR. ZORACKI:  Yes, but --

8               THE COURT:  But?

9               MR. ZORACKI:  The fact that that person has

10         decided to become a resident in the State of New

11         Hampshire and has then gone and registered to vote

12         after deciding to become a resident, that is what

13         triggers the obligation.

14              THE COURT:  I see what you're saying.  You're

15         saying that it's residency which might be

16         established, irrespective of a registration of vote,

17         that actually triggers this -- that actually

18         triggers this obligation.

19              MR. ZORACKI:  Yes, Your Honor.

20              THE COURT:  I see.

21              MR. ZORACKI:  Now, and so -- and once a person

22         establishes residency in the state, there are

23         certain basic incidental features of residency that

24         come along with that.  Getting a driver's license is

25         one of them.  Registering your car, if you have one.

1           Serving on jury duty, paying taxes, and the like.

2           So a college student here from out-of-state is free

3           to choose his or her place of residence, and all

4           that HB 1264 requires is that he or she do so

5           consistently, and ensures that voters and residents

6           are now placed on equal footing as New Hampshire

7           citizens.

8               Now, I want to address the fact that this is a

9           facial challenge to HB 1264 --

10              THE COURT:  Yes.

11              MR. ZORACKI:  -- and why this is an improper

12          facial challenge.  So HB 1264 is a definitional

13          section of "resident" and it applies throughout all

14          of New Hampshire revised statutes.  At the very

15          least, the plaintiffs must show that HB 1264 does

16          not have plainly legitimate sweep.  And they can't

17          do that, and that's because they seek a declaratory

18          judgment that HB 1264 is unconstitutional.  They

19          don't make any attempt to show that HB 1264's

20          application throughout all the applicable statutory

21          chapters is unconstitutional, and for that reason,

22          their facial at that fails.

23              Now, as we argue in the papers, our position is

24          HB 1264 doesn't alter the voting requirements in New

25          Hampshire, and therefore, you don't even need to get

53

1          to an Anderson verdict type-analysis.  But even if

2          this Court does engage in that analysis, our

3          position is HB 1264 still easily withstands that

4          scrutiny because it imposes, at most, only a minimal

5          right to vote.  As Your Honor pointed out before,

6          getting a driver's license --

7               THE COURT:  Wait.  Are you still in your sweep

8          of the statutory argument or have you moved on to

9          something else?

10              MR. ZORACKI:  I've moved on.

11              THE COURT:  What have you moved on to?

12              MR. ZORACKI:  So I'm getting into the Anderson

13         verdict framework.

14              Even if the Court were to engage in that

15         analysis and construe this as a law that affects

16         voting, we still withstand that scrutiny.

17              THE COURT:  But again, it's -- it sounds like a

18         merits argument to me.  This is a motion to dismiss.

19         You know -- go ahead.

20              MR. ZORACKI:  So our position is that obtaining

21         a driver's license, registering -- or registering

22         your car, these are just basic features of residency

23         that everyone has to do as residents of New

24         Hampshire.  There was nothing -- you know, these are

25         not difficult to meet.  It simply requires college

54

1                    students and other allegedly affected voters meet

2                    the same standards as any other person that -- meet

3                    the standard that any other person that's required

4                    to vote.

5                         So as the Supreme Court -- I think what the

6                    Supreme Court did in Crawford, albeit that was on a

7                    factual record, when you consider the broad

8                    application of HB 1264 to all New Hampshire voters,

9                    it imposes only a minimal burden on New Hampshire

10                   voters.

11                        Now, it's also important -- getting to the

12                   State's interest.  So our position, it's at most a

13                   minimal burden.  I think they've alleged in their --

14                   or they've said in their objection, in the 2016

15                   election, it impacted perhaps somewhere in the

16                   neighborhood of 5,000 voters would be potentially

17                   impacted by this.  That's a very small percentage of

18                   the overall New Hampshire population.  I think it's

19                   less than one half of one percent.  So viewed in

20                   that context, this is a very minimal burden and it's

21                   a common feature of residency to have to go get a

22                   driver's license.

23                        THE COURT:  And you don't measure burden by how

24                   many people are affected, do you?  You measure

25                   burden by the effect on each potential voter, right?

1            MR. ZORACKI:  Well, I think in Crawford, the

2       Court -- one of the things they pointed out was the

3       broad application of the law to --

4            THE COURT:  If only 10 African Americans live

5       in our state and the state passes a statute that

6       says some type of racial barrier, it wouldn't matter

7       because only 10 people are affected?

8            MR. ZORACKI:  I think that's true.  That's

9       race.  I think that's a totally different scheme and

10      analysis.

11           THE COURT:  Well, it's a classification of

12      person, but the right to vote is fundamental.  It

13      doesn't seem to me that the number of people

14      affected -- you were trying to tell me where it

15      matters.  Go ahead.  I interrupted you.

16           MR. ZORACKI:  Well, in Crawford, this is one of

17      the things that the Court pointed to, is that they

18      pointed out to the broad application across all

19      voters is a relevant question.  Here, the allegation

20      is it's very minimal.  There's very few people

21      affected by this.

22           THE COURT:  I think that's true.

23           MR. ZORACKI:  Now, so our position.  It's a

24      minimal burden and it's supported by very compelling

25      state interests.  What HB 1264 does is put residents

56

1          and voters on equal footing as New Hampshire

2          citizens.  That's what HB 1264 was designed to do.

3          Prior to HB -- prior to the law, it kind of had the

4          separate class of voters, college students among

5          them, but there may be others -- there are others,

6          including other transitory persons who are in New

7          Hampshire.  And what HB 1264 does, it ensures a

8          community of interest across all voters, and ensures

9          that they're all treated equally.

10              So our position.  There's a strong state

11         interest here, there's no dispute that New Hampshire

12         has a strong interest in regulating residents who

13         operate and drive motor vehicles on New Hampshire

14         roadways.

15              THE COURT:  But that's not what the statute

16         does.  I'm trying to -- you know, tell me how the

17         statute is going to work.  We tried talking about

18         that a little bit with standing.  How does this --

19         how does this statutory regime now -- which puts

20         voters and residents on an equal footing, I agree.

21         It's enforced through the motor vehicle laws.  Tell

22         me how this statutory regime is going to be

23         enforced.  What's going to change?

24              MR. ZORACKI:  From an election point of view,

25         nothing.  Under the election laws, nothing changes.

57

1              And that's our position, and that's why we think

2              this case can be resolved at the motion to dismiss

3              stage.

4                   THE COURT:  How is it going to -- how is it

5              going to change the enforcement of motor vehicle

6              laws?

7                   MR. ZORACKI:  I think that's a difficult

8              question to answer in the abstract without a

9              concrete case in front of us.

10                  THE COURT:  Okay.  If you want, we can do that.

11             Do you want to start doing that?  I can just start

12             coming up with roadside interactions that you can --

13             I don't think you're going to have an answer for

14             that because I don't think you know.  I don't think

15             anybody here knows how the law -- the motor vehicle

16             laws are going to change.  I think that me and

17             Mr. Klementowicz were coming up with some fanciful

18             examples.  I didn't mean to suggest they were

19             fanciful, but not-that-likely scenarios.

20                  Here's the thing.  If we can't think of any way

21             this law changed election laws and we can't think of

22             any ways this law changed motor vehicle laws, what

23             is this law and what does it do?  According to you,

24             nothing changes.  Nothing changes.  So what's going

25             on here, except maybe some people being discouraged

58

1          from voting.

2                    MR. ZORACKI:  I think there's certainly a

3          potential, the potential that if the person becomes

4          a resident and they become subject to, you know, all

5          of the incidence of residency, including getting a

6          driver's license, registering their car.  There are

7          scenarios, I think, that where -- you know, in

8          roadside encounters and otherwise.  Sure, I mean,

9          that could -- conceivably, we could come up with

10         scenarios, as we did before, where this law's

11         enforced that way.  I think that's how it would end

12         up getting enforced, in those situations.

13                    THE COURT:  Okay.  How?  I mean, I think -- I

14         think what Mr. Klementowicz was speaking about as

15         the possibility -- and I don't even think he was

16         suggesting this was very likely, but the possibility

17         that one is driving with a license, an out-of-state

18         license, or with an out-of-state registered vehicle,

19         and either during the interaction with the officer

20         makes a disclosure that the driver has lived

21         in-state for a substantial period of time, that

22         might lead to a charge of -- because the person not

23         driving an unregistered vehicle and the person is

24         not an unlicensed driver unless the definition of an

25         unlicensed driver is someone who has lived in -- is

1           a resident but holds an out-of-state license.

2                MR. ZORACKI:  I mean, we are talking about

3           enforcement, but when the legislature passes a law

4           that is designed to, you know, treat all residents

5           and voters equally, I think it's -- the legislature

6           can expect that people are going to follow that law

7           and that, you know, once -- once they become a

8           resident, they're registered to vote here, and

9           they're a resident, they're expected to follow --

10          it's expected that residents are going to follow the

11          law and pay the required fees as a -- or obtain

12          their driver's license, pay car registration fees.

13               THE COURT:  That's true.  There's really no

14          question that the legislature was attempting,

15          through motor vehicle regulation, but what the

16          legislature was attempting to impact here was our

17          elections, to ensure that -- I forget the term you

18          used -- to ensure that it's like an invested

19          electorate, right?  It's meant to have an impact on

20          our elections as opposed to our rules of the road.

21               MR. ZORACKI:  I think what the legislative

22          record shows, the committee report that the Court

23          can take judicial notice of, doesn't reflect that.

24          It reflects the purpose of this law was to equalize

25          these two previously separate classes of voters.

1           They've now made them equal.  I think that is what

2           the purpose of this law was.

3               THE COURT:  Just for some sense of cosmic logic

4           and equilibrium in the universe or to impact our

5           elections?

6               MR. ZORACKI:  There's nothing showing in the

7           registry of record that reflects that.  The purpose

8           of this law was to equate the two, and I think

9           that's --

10              THE COURT:  To what end?  To what end?

11              MR. ZORACKI:  To ensure a community interest of

12          voters so that there's not a separate class of

13          voters.

14              THE COURT:  Election laws.  Election laws,

15          right?  It's not because it's going to make them

16          better drivers on the roads that they declared

17          themselves residents.  If they declared themselves

18          residents, it's going to make sure that our

19          electorate, the motive of the law, is people are

20          invested in the community.  It's to affect our

21          elections.

22              MR. ZORACKI:  It's to ensure that all voters

23          and residents are treated the same.  That's the

24          point of it.

25              THE COURT:  Again, so just for equity's sake,

1           this is an equity statute meant to make sure we're

2           treating everybody the same.  It's not to improve

3           the state of our elections in our electorate as

4           making sure it's more constituted in the view of the

5           legislature of people who are invested in the

6           community.  It's not that?

7                MR. ZORACKI:  I think those are one and the

8           same.  And I think some of what your question, I

9           think, gets to is the motivations of --

10               THE COURT:  Yeah.

11               MR. ZORACKI:  -- the various legislators, but

12          as the Supreme Court said, the plurality in

13          Crawford, if a law is supported by valid neutral

14          justifications --

15               THE COURT:  Sure.

16               MR. ZORACKI:  -- those justifications shouldn't

17          be just disregarded simply because partisan

18          interests may have provided one motivation for the

19          votes of individual legislators.

20               THE COURT:  Sure.

21               MR. ZORACKI:  Now, unless the Court has any

22          further question on the 14th Amendment argument, I'd

23          like to move to the 26th Amendment argument.

24               THE COURT:  Motivations matter there, don't

25          they?

1           MR. ZORACKI:  Well, under the plain text of the

2      26th Amendment, a state cannot deny or abridge the

3      right to vote on account of age.  And our position,

4      as we've gone through, is this has no effect on the

5      eligibility, voter eligibility or the voting

6      process, so there's no denial or abridgement of the

7      right to vote.

8           THE COURT:  Do you deny that it impacts the

9      right to vote with a greater degree for younger

10      voters than it does for older voters?

11           MR. ZORACKI:  I don't -- I don't think

12      that's --

13           THE COURT:  Haven't the plaintiffs alleged

14      that?

15           MR. ZORACKI:  They've alleged that.  And I

16      mean, I think their allegations have sort of

17      evolved.  Originally it was college students but

18      transitory voters, medical residents, others.

19           THE COURT:  Do you have some reason to believe

20      that the numbers of transitory voters and medical

21      residents comes close to the numbers of college

22      students involved, the younger voters?

23           MR. ZORACKI:  I don't -- I don't know.

24           THE COURT:  All right.

25           MR. ZORACKI:  But I think one -- two of the

1           cases that they, I think, rely on, or talk about

2           most in our papers was Walgren and a Florida case

3           called Detzner.

4                THE COURT:  Yes.

5                MR. ZORACKI:  Those are clearly different cases

6           where you had election officials making decisions

7           that were specifically targeted at college students.

8           So in Walgren, it was scheduling an election during

9           a college recess.

10               In Detzner, it was a Florida official's

11          decision to prevent a university building from being

12          used as an early voting place.

13               So those are clearly just targeted at college

14          students, and that's it.  And there's a law saying

15          that college students are a proxy for younger

16          voters.  Here we don't have that.  Here we have a

17          law that applies statewide.  It's going to affect

18          young voters in the 18 to 21 category, regardless of

19          whether or not they're college students.

20               THE COURT:  Yes.

21               MR. ZORACKI:  And as we lay out in our papers,

22          that takes us out of the 26th Amendment framework,

23          and they fail to see a claim on that basis.

24               THE COURT:  Thank you.

25               MR. KLEMENTOWICZ:  I'm sorry, I wasn't sure if

64

```
 1              he was moving on to his 24th Amendment.
 2                   THE COURT:  No, he sat.  That's the universal
 3              signal for "I'm done talking."
 4                   MR. KLEMENTOWICZ:  Understood.
 5                   THE COURT:  I don't mean to be a wise guy.  Not
 6              the universal signal; it's just the courtroom
 7              signal, right, for "I'm done talking."  That's our
 8              universe here.
 9                   MR. KLEMENTOWICZ:  So --
10                   THE COURT:  This dispute here between
11              misdemeanor and violation, you say this exposes
12              nonresidents to misdemeanor prosecution, and they
13              say it's only a violation law.  Do you contest their
14              view that it's only a violation-level offense?
15                   MR. KLEMENTOWICZ:  I think that they're right,
16              that is a violation-level offense --
17                   THE COURT:  Okay.
18                   MR. KLEMENTOWICZ:  -- but I don't think it
19              matters because --
20                   THE COURT:  Understood.  But it is a violation.
21                   MR. KLEMENTOWICZ:  I think that's right.  The
22              Rideout case, the ballot selfie case, was a
23              violation offense as well.
24                   THE COURT:  I don't think it matters for
25              standing but you can probably see it might matter
```

1          down the road, right?

2               MR. KLEMENTOWICZ:  I can see that it might

3          matter down the road but I don't think that --

4               THE COURT:  No pun intended.

5               MR. KLEMENTOWICZ:  -- it can be addressed

6          without a factual record --

7               THE COURT:  I don't think we disagree about

8          that.

9               MR. KLEMENTOWICZ:  -- to get into.

10              First, I'd like to take the facial challenge

11         versus as-applied piece.  And I pulled up a quote

12         from Judge McCafferty in the Saucedo case, which was

13         the signature mismatch case that she had where a

14         similar claim was raised.  And the Court in that

15         case wrote that, "Therefore, in practice, a facial

16         challenge is best understood as a challenge to the

17         terms of the statute, not hypothetical applications,

18         and is resolved simply by applying the relevant

19         constitutional test to the challenge statute."

20              So the idea is if voting rights law violate --

21         if a law violates the Anderson verdict standard or

22         any other 26th Amendment, 24th Amendment, there's no

23         set of circumstances in which that law can be valid,

24         and so it's unconstitutional.

25              I'd also like to respond sort of separately to

1          the claim that plaintiffs need to show that every

2          single definition of "resident" in the RSAs needs to

3          burden the right to vote to be unconstitutional.

4          And I think about that by way of analogy to an

5          example.  If the State had hypothetically passed a

6          law that said anyone who is interacting with any

7          governmental official needs to pay $5, well, that

8          would obviously impact a lot of different services

9          in the government.  And it may not be

10         unconstitutional to charge someone $5 for a library

11         card, but it's a pretty explicit poll tax.  And the

12         fact that the State has done it in a way so that it

13         impacts every interaction with the government and

14         not just voting, doesn't save it from judicial

15         scrutiny.

16              Turning next to the Anderson verdict standard.

17              The State's -- sorry, the defendants' first

18         argument is that the Anderson verdict simply doesn't

19         apply because this is not an election law, and I

20         think the Court has a good handle on that.  But I

21         would just point out that the language from Burdick

22         which is cited in the State's memorandum in support

23         of its motion on page 22, which notes that,

24         "Anderson/Burdick is the appropriate standard for

25         evaluating a claim that state law burdens the right

1    to vote."

2        And that's the question, is whether it burdens

3    the right to vote, not where it's codified in the

4    statutes.  And if that were the question, then one

5    would look at the ample legislative record and the

6    statements of the sponsors from Senator Innes who

7    said, "If you are from Boston and you're up here

8    eight months out of the year and you're registered

9    to vote there, you shouldn't be able to vote

10   here."  Or Senator Carson who said, "Stop drive-by

11   voting in NH.  The student being interviewed

12   actually makes the case for the legislation.  He

13   wants to keep his out-of-state driver's license and

14   drive his out-of-state registered car because he

15   doesn't live in NH, but wants to vote in our state

16   elections."

17       So I think it's pretty clear that the

18   Anderson/Burdick framework is an appropriate

19   standard to evaluate this case.

20       So that then turns to the next inquiry which is

21   how burdensome is it and where on the sliding scale

22   of Anderson/Burdick evaluation scrutiny does this

23   case fall?

24       So when you plead that the burdens are severe,

25   the burdens -- $50 to purchase a driver's license,

1          hundreds of dollars to register your car, we think

2          that there could be around 5,000 people, at least as

3          of 2017, who were impacted.  We don't know really

4          who those people are right now, whether they're a

5          particular group or not.  We allege that they are,

6          but that's for discovery and for evidence.

7              THE COURT:  Doesn't that seem incongruous,

8          though?  Incongruous.  Doesn't that seem

9          perfectly -- this isn't a standing argument or

10         standing or even a sufficiency argument, so I'm just

11         asking.  Doesn't it seem completely reasonable that

12         the State would expect a person who declares himself

13         or herself a resident, and who drives and owns a

14         vehicle, to at least participate in the State's

15         public fisc enough to contribute that few hundred

16         bucks to do one's share as a resident?  Does it

17         really make -- doesn't that make sense?

18            MR. KLEMENTOWICZ:  That's what the law was

19         before HB 1264, because it was always the case that

20         residents had to pay to register their car, but

21         what --

22            THE COURT:  What wasn't the case was you had to

23         be a resident to vote.  You had to have domicile to

24         vote.

25            MR. KLEMENTOWICZ:  That's right.  So I do

69

```
 1              think --
 2                    THE COURT:  So I'm asking about the real --
 3              when you sort of put aside the whole anger about
 4              drive-by voting, the rational response to drive-by
 5              voting is that, you know, one might expect the
 6              person who declares oneself a resident, and who
 7              drives and owns a vehicle, should contribute.  And
 8              that's part of the citizen -- that's part and parcel
 9              to the rights and obligations of a citizen that come
10              with voting.
11                    MR. KLEMENTOWICZ:  Well, so I --
12                    THE COURT:  No?
13                    MR. KLEMENTOWICZ:  I think it's the "that come
14              with voting" part that's --
15                    THE COURT:  That come with voting by a person
16              who owns vehicle and drives.  That's what I'm
17              saying.
18                    MR. KLEMENTOWICZ:  But it's the "that comes
19              with voting" part that I think is the real crux of
20              our case here --
21                    THE COURT:  Okay.
22                    MR. KLEMENTOWICZ:  -- because it's -- these
23              obligations are encouraged.  You do need to own a
24              vehicle in order to have to register a vehicle.  I
25              agree with that.  But if you own a vehicle and you
```

70

1         register to vote in New Hampshire, now you have --

2         now you have to pay to register your car.  And

3         that's hundreds of dollars.  And that requirement

4         that you register your car and pay those $200

5         springs directly from the decision you made to

6         register to vote and to vote in New Hampshire.

7              Now, there may be other ways that you can

8         establish residency.

9              THE COURT:  So I should be able to -- it's not

10        constitutionally permissible for a state to say,

11        "No, it's not okay for you to pay to drive in

12        another state and pay to register a vehicle in

13        another state and contribute to the upkeep of their

14        roads and bridges, but vote in this state."  That's

15        an unconstitutional distinction to make?

16             MR. KLEMENTOWICZ:  So I think that the way to

17        think about it is inside the Anderson/Burdick

18        framework, at least in this challenge, which is what

19        is the severity of the burden, and if it's a severe

20        burden.  If it is, as we allege, $50, hundreds of

21        dollars, round-trip ticket to DMV, trip to the town

22        clerk's office --

23             THE COURT:  That all sounds very burdensome,

24        okay, to a destitute person who may live in our

25        state, actually reside here, but it doesn't sound

71

1          that burdensome to a person who owns and drives a

2          car, does it?  I'm asking you.

3               MR. KLEMENTOWICZ:  I think you need evidence on

4          that.

5               THE COURT:  Like I said, this isn't really a

6          sufficiency argument.  I'm just having the

7          conversation.  Because I think you can see where

8          we're going here.

9               MR. KLEMENTOWICZ:  I can.

10               THE COURT:  I think your lawsuit's going to go

11          on.  But it's a problem.  It's a problem because

12          it's not the same to say to the person who lives --

13          you know, to the disabled veteran, okay, who doesn't

14          own a car, doesn't drive, lives in Harbor Homes in

15          Nashua and really walks three or four blocks a day

16          and that's his universe, right?  That sounds

17          burdensome if that person wants to vote.  It doesn't

18          sound very burdensome to a person who owns and

19          drives a car.

20               MR. KLEMENTOWICZ:  So here are the people who I

21          think that it actually would be burdensome to:  Is a

22          young college student who doesn't own a car, but is

23          licensed to drive and may be called upon, as Your

24          Honor said, to be a designated driver on a frat

25          party back to his house to make sure that people --

72

1          you know.  And that person, to that person, $50 may

2          be a lot.  And I think there are a lot of people who

3          drive in New Hampshire to whom $50 is a lot.

4               So I also think that the people who are

5          burdened are going to be the people who -- to whom

6          $50 is a lot and who decide not to vote, because

7          they don't want to incur the risk of arrest for

8          civil or criminal violation-level offenses,

9          involvement with the police, or --

10              THE COURT:  But again, those are a violation.

11         Those are violation-level exposure.

12              MR. KLEMENTOWICZ:  Yes, yes, but they're

13         treated in state court on a criminal docket, I would

14         imagine.

15              THE COURT:  Oh, yes.  Yeah.

16              MR. KLEMENTOWICZ:  And it's, you know,

17         embarrassing being in front of -- I would imagine.

18              So I do think that those are the burdens.  But

19         just to walk through the theory, I think this case

20         is governed directly by the Cruz versus Melecio case

21         which was the First Circuit case involving the

22         political group in Puerto Rico that wanted to get

23         onto the ballot, and have alleged that the scheme of

24         requiring a certain number of signatures that had to

25         be notarized by an attorney violated

73

1           Anderson/Burdick.  And the Cruz court said, "Given

2           the nature of the inquiry," which is that they've

3           alleged sufficient facts to find that it's a severe

4           burden, "We can't look past that on a motion to

5           dismiss."

6                That's the same result reached by Judge

7           Barbadoro in the Libertarian Party of New Hampshire

8           case versus Gardner where he says, "I can't predict

9           if the parties are going to be able to prove that

10          it's a burden or that it's unreasonable."

11               And by the way, to the legislative intent

12          question and the State's justification, I think

13          there is an argument that probably will be addressed

14          down the line that at least the high levels of

15          Anderson/Burdick scrutiny, the justification offered

16          in defense of the law has to be the actual

17          justification and not one invented post hoc in

18          response to litigation.  I checked the Guare versus

19          State of New Hampshire case for the New Hampshire

20          Supreme State Court for that proposition.  And so I

21          think there will be evidence and maybe ensuring a

22          community of interest is an appropriate compelling

23          state interest, but as the Dunn court recognized,

24          it's also one that's susceptible to abuse.

25               And Newburger versus Peterson from this court

1           found likewise and struck down the durational

2           residency requirement saying that that wasn't

3           sufficiently tailored to advance that interest.  Our

4           argument will be, later down the line, that neither

5           is this.

6                THE COURT:  Yes, I understand.

7                MR. KLEMENTOWICZ:  If I can just have a moment?

8                Oh, and as to the number of people, I know that

9           that was mentioned earlier, the number of people who

10          are impacted, the Saucedo, the signature mismatch

11          case with Judge McCafferty involved, I think, around

12          300 disenfranchised votes that were discarded, which

13          is obviously fewer than 5000, so if you look at the

14          character and magnitude that it can, it can be

15          relevant that it impacts a large swath of people,

16          but it doesn't have to.  And I think this probably,

17          the evidence will show, eventually does impact

18          enough people.

19               THE COURT:  Yeah, I think the argument -- no

20          disrespect intended, but I think the argument that

21          the State of New Hampshire, that affecting 5,000

22          voters is not sufficiently impactful.  It's just

23          unpersuasive.  5,000 is a lost votes in New

24          Hampshire.

25               MR. KLEMENTOWICZ:  Four times the margin of

1          victory between -- in the U.S. senate race in 2016.

2               You asked what is the law and what does it do

3          to opposing counsel.  I think we plead in the

4          complaint that the purpose and effect of the laws

5          can be to scare young voters away from voting, and

6          that's why it was passed and that's what it's going

7          to do.  And I think perhaps that's why nobody really

8          knows how it's going to be enforced is because that

9          wasn't its true motivation when it was passed, which

10         I think is a nice segue to the --

11              THE COURT:  Look, I don't think anybody here

12         would dispute, either side, that when you boil it

13         down, the purpose of the law is to discourage or

14         prevent nonresidents from voting, right?  I mean,

15         one must be -- one must be a resident to vote.  One

16         should be a resident to vote, and must declare

17         oneself a resident at the time of the registration

18         of voting.

19              I don't know if I characterize it as scaring

20         people or intimidating people not to vote.  It's

21         just ensuring that people who aren't really

22         residents don't vote.  The question is, is the way

23         we've defined that lawful?  When I say "we," I mean

24         the State of New Hampshire.  Lawful.

25              MR. KLEMENTOWICZ:  And was there a further

1            purpose of making it difficult -- more difficult or

2            more burdensome for young voters to vote.

3                 THE COURT:  What if it was -- what if it was to

4            make young voters -- what if it was to make it more

5            burdensome for young voters to vote who are not

6            residents of our state?

7                 MR. KLEMENTOWICZ:  I think --

8                 THE COURT:  That's permissible, isn't it?

9                 MR. KLEMENTOWICZ:  I'd have to think about it

10           but I would -- tentatively I would say no.

11                THE COURT:  You'd say not permissible?

12                MR. KLEMENTOWICZ:  Not permissible to target

13           young voters as a class.

14                THE COURT:  Young voters who are not residents,

15           is my question.

16                MR. KLEMENTOWICZ:  Right, but that still is a

17           distinction between all voters who are not

18           residents.

19                THE COURT:  I see.

20                MR. KLEMENTOWICZ:  And so under the 26th

21           Amendment, the Walgren two-part exam has said that

22           the -- it's difficult to imagine that the people

23           who --

24                THE COURT:  It's just that the only

25           nonresidents who are trying to vote really are

1           younger, right?  I mean, in reality.  It's not like

2           there's -- you talked about, what is it, transient

3           population and medical.  I mean, I don't know

4           anybody who's focused on that as a practical

5           matter.

6                MR. KLEMENTOWICZ:  Yeah, so the Newburger

7           versus Peterson case gives other examples of people

8           who fall within this durational residency, though.

9           It says, "A newly arrived executive with a firm

10          intention to retire to his Florida cottage at age

11          65" --

12               THE COURT:  The durational -- this Court's

13          already rejected that.

14               MR. KLEMENTOWICZ:  Right, but this is -- it's a

15          similar -- it's the same group of people who are

16          targeted because this is imposing -- it's removing

17          the durational requirement from residency, right?

18          So it's going to impact the same group of people.

19          It's just in Newburger they tried to move domicile

20          up, and here they tried to move residents down.

21               We principally advance a challenge on the basis

22          of targeting young voters in part because that's who

23          we think the legislature is aiming at, and in part

24          because they are a constitutionally protected class

25          for the purposes of voting under the 26th Amendment.

1           And so the Detzner case, which cites a couple

2      other cases including One Wisconsin Institute versus

3      Thompson which is at 198 F. Supp. 3d 896 from the

4      Western District of Wisconsin, and Lee versus

5      Virginia State Board of Elections, 188 F. Supp. 3d

6      577, Eastern District of Virginia, talk about how

7      the Arlington Heights framework is increasingly

8      being adopted by courts as the proper framework to

9      consider challenges under the 26th Amendment.

10          And the Arlington Heights framework focuses on

11     whether there's a discriminatory end, a legal

12     purpose behind the law, and if it is, that law's

13     struck down.  And so the sources that the Court has

14     to examine for that are the legislative history, the

15     groups impacted, the legislative intent, and the

16     history of attempts by the state or by governmental

17     officials to target those groups in the past.  And

18     we lay those out into our complaint.  And I'm not

19     going to get into all of them, but I will mention

20     some of them.

21          I read you two quotes from two of the senators.

22     There's more.  There's a quote from Representative

23     Moffett in our complaint.  There's a long history in

24     New Hampshire going back at least to Peterson, but

25     more recently with the law that was challenged in

1       the Guare decision, the law that was challenged in

2       the League of Women Voters case (inaudible) from

3       2017, and this bill, all targeted at young voters,

4       nonresident voters, nondomiciliary voters as a

5       class.  College student voters, for example.

6            The -- Judge Brown from Hillsborough County

7       Superior Court North in the order on preliminary

8       injunction that he issued in 2018 noted that the

9       senate bill three was going to cause especially long

10      registration lines, especially in Durham and

11      Hanover.  And so that is, of course, a targeting of

12      young and college student voters as a class.

13           And this is -- I'll just say that this is a

14      highly factually intensive inquiry that can't be

15      resolved (inaudible).

16           So I will turn to the 24th Amendment claim and

17      just note that this is a law that requires one to

18      purchase a driver's license or a car registration if

19      you drive a car as a result of voting.  It's

20      literally fees being paid to the Treasury that are

21      incurred because of a decision made to register to

22      vote.  And I'd cite the Harman case for the

23      proposition that the 24th Amendment prohibits

24      sophisticated as well as simple poll tax schemes and

25      for the quote that, "It hits owners' procedural

80

1          requirements which effectively handicap exercise of

2          those claiming their constitutional immunity as

3          well."

4               So it's a sophisticated way to do it.  I don't

5          think there's any denial about that, but it's money

6          flowing from the decision that's made to register to

7          vote.

8               So if I could have a minute to just confer with

9          counsel?

10              THE COURT:  Sure.

11              MR. KLEMENTOWICZ:  That's all I have.

12              THE COURT:  Thank you.  Let me ask.

13     Ms. Spencer, let me ask you something.

14              MS. SPENCER:  Yes, Your Honor.

15              THE COURT:  You've asserted standing on behalf

16     of the members and candidates of the party, but you

17     didn't name any.  Are you claiming standing as an

18     institution or on behalf of members?

19              MS. SPENCER:  Both.  Both, Your Honor.  And

20     it's well -- it's unchallenged and it's well

21     established that political parties have standing to

22     challenge the constitutionality of state laws --

23              THE COURT:  Yes, yes.

24              MS. SPENCER:  -- both on behalf of its members

25     and on its own behalf.

1           THE COURT:  I guess it's moot.  There's clear

2       authority for that.

3           MS. SPENCER:  We're, in fact, involved.  I'd

4       like to just make a few comments.

5           THE COURT:  Sure.

6           MS. SPENCER:  First, the New Hampshire

7       Democratic Party concurs with everything that the

8       ACLU has said, but to address a couple pointed

9       issues that Your Honor raised, what's really going

10      on here, right?  I think that the Court has a good

11      handle on the fact that this is a law that affects

12      voting on Anderson/Burdick is a proper analysis.

13      But to go back to at the motion to dismiss stage,

14      the relevant inquiry, as you've pointed out, is what

15      we properly pleaded in the complaint.

16          And we properly pleaded in the complaint that

17      the Republicans in the legislature passed HB 1264 to

18      burden the right to vote.  We've alleged in the

19      complaint that 2016 was a close election and that

20      the Republican legislature's solution to that was to

21      enact HB 1264 to intimidate students from

22      registering to vote, confuse them, and effectively

23      suppress their vote.  The legislature thought that

24      if they could burden the right to vote of college

25      students, they could change the outcome of the next

82

1          election.

2                And contrary to what the State has said in the

3          complaint, we allege that the legislative record

4          actually bears that out. As Attorney Klementowicz

5          cited, we have alleged six different statements from

6          Republican senators, as well as a statement on

7          Facebook from Representative Michael Moffett, where

8          he said specifically, and I quote, "Many

9          out-of-state college students in Durham, Plymouth,

10         Keene, Manchester, and Henniker and Hanover

11         registered late and most voted Democrat. Ayotte had

12         her reelection stolen from her by out-of-staters and

13         Clinton's razor-thin victory was stolen as well."

14               There are other similar statements that I

15         won't -- well, I will mention a couple, because

16         several of them were on the senate floor.

17               Senator William Gannon stated on the senate

18         floor that a UNH student who graduated from high

19         school in another state does not, "Really have skin

20         in the game."

21               And Senator Andy Sanborn expressly explained

22         that the bill was designed to ensure that if you're

23         going to participate in New Hampshire elections,

24         that you have some long-term vested interest in the

25         state.

1          So as part of the Anderson/Burdick analysis, we

2          additionally allege and, under Cruz, are entitled to

3          take discovery on that precise interest, because we

4          believe that there is evidence not only that the

5          purported interest can be abused, but that it may

6          not actually have been the real interest, which

7          under Cruz is what must be weighed against the

8          burden in this case.

9          And additionally, that those burdens that we're

10          entitled to discovery on as well.  The financial

11          burden that Your Honor mentioned, I couldn't --

12          college students who are driving, you know, a

13          20-year-old car, who are struggling to pay for food,

14          which is an issue right now, and tuition.

15          THE COURT:  So it's not reasonable for the New

16          Hampshire legislature to want their automobile

17          registration funds to help maintain New Hampshire

18          roads instead of Massachusetts roads?  That seems

19          reasonable to me.

20          MS. SPENCER:  So New Hampshire has a domicile

21          statute, and the domicile statute addresses the

22          connections that the students have to have to the

23          state in order to vote, but these students pay into

24          the state in other ways.  They, well, one, pay large

25          sums of money to New Hampshire institutions to

84

```
1              attend school.  They go to New Hampshire
2              restaurants.  They buy books, clothes in New
3              Hampshire.
4                   THE COURT:  So what's the commitment of a
5              student who asserts domicile under 654:1?  What's
6              the degree of commitment vis-a-vis the degree of
7              commitment for residency, the residency declaration
8              when you vote?
9                   MS. SPENCER:  I'm not sure I understand the
10             question, Your Honor.  The domicile statute --
11                  THE COURT:  I guess I don't understand why you
12             raise domicile?  What's that about?
13                  MS. SPENCER:  That --
14                  THE COURT:  You mean the old law?
15                  MS. SPENCER:  Yes, Your Honor, the old law.
16             That's right.
17                  THE COURT:  Okay.
18                  MS. SPENCER:  And unless Your Honor has any
19             other questions specifically directed at New
20             Hampshire or the party, I don't want to burden
21             time.
22                  THE COURT:  I don't think I do, no.  You
23             answered my question about standing for the party.
24                  MS. SPENCER:  Thank you, Your Honor.
25                  THE COURT:  Just give me a moment.
```

1          MR. ZORACKI:  Sure.

2          THE COURT:  I guess this is for you,

3     Mr. Klementowicz, right?  21:6 defines a resident --

4     defines a resident, right?  "Except that no person

5     shall be deemed to be a resident who claims

6     residence in any other state for any other

7     purpose."

8          That applies to your clients, doesn't it?

9          MR. KLEMENTOWICZ:  Well, so --

10         THE COURT:  Don't your students claim residence

11    in other states for other purposes?

12         MR. KLEMENTOWICZ:  So my understanding is that

13    you establish residence in a state and you keep it

14    until you establish residency in another state.

15         THE COURT:  Yes.

16         MR. KLEMENTOWICZ:  And so prior to 1264 when

17    they registered to vote, they weren't establishing

18    residence in another -- or they were keeping their

19    residence in their home state because they had not

20    established a new residence in New Hampshire because

21    they did not have an intent to remain for the

22    indefinite future.

23         THE COURT:  Don't your clients claim residency

24    in other states than New Hampshire?

25         MR. KLEMENTOWICZ:  I think that the residency

1          in other states may not be the same definition as it

2          is in New Hampshire, and so it may be some states

3          have switched the residents and domicile terms, so

4          some states may --

5               THE COURT:  Try this way, then.  Don't your

6          clients claim residency, as defined by our state, in

7          other states?

8               MR. KLEMENTOWICZ:  They certainly did at the

9          time that the lawsuit was filed and at the time they

10          registered to vote.

11               THE COURT:  So that's a "yes."  All right.

12               MR. KLEMENTOWICZ:  Yes.

13               THE COURT:  What else are they supposed to

14          define?  Let me try it this way.  Don't your clients

15          also maintain residency in other states as defined

16          by those other states?

17               MR. KLEMENTOWICZ:  I don't know.

18               THE COURT:  Okay.  But certainly as defined by

19          our state.  All right.

20               MR. KLEMENTOWICZ:  I don't know.  And I don't

21          know whether they would be able to maintain

22          residency in another state under 1264 now that

23          they -- resident and domicile are the same because

24          they have claimed domicile in New Hampshire.  So

25          there's an argument to be made that that

1           automatically makes them residents of New Hampshire

2           which vacates their claim of residency in another

3           state.

4                THE COURT:  By registering to vote or by

5           registering a car and getting a license?

6                MR. KLEMENTOWICZ:  By registering to vote and

7           then July 1, 2019, making 1264 operative.

8                THE COURT:  I didn't understand that.  What do

9           you mean?

10               MR. KLEMENTOWICZ:  July 1, 2019, is when --

11               THE COURT:  The effective date.

12               MR. KLEMENTOWICZ:  Yes.  And that was the date

13          that the definition of residence became the

14          definition of domicile.  So they had been

15          domiciliaries then by operation of law.

16               THE COURT:  They're residents.

17               MR. KLEMENTOWICZ:  Yes.

18               THE COURT:  All right.  Mr. Zoracki, you wanted

19          to say something?

20               MR. ZORACKI:  Yes.  Just very briefly.  I think

21          this is clear based on the prior discussion, but in

22          response to some of the things that Attorney Spencer

23          had mentioned.  There are obviously two separate

24          statutes.  We have domicile in RSA 654:1 is what

25          controls the voting.  And if I may just briefly?

1            THE COURT:  Wait a minute.  Say that again.

2            MR. ZORACKI:  Domicile.  The definition of

3       domicile in RSA 654:1 that controls whether or not a

4       person can vote in New Hampshire.

5            THE COURT:  All right.

6            MR. ZORACKI:  And that's the word used

7       throughout the election statutes.

8            THE COURT:  But to register to vote, one must

9       declare oneself a resident, which is the same as --

10       now the same as a domiciliary, right?

11            MR. ZORACKI:  That's right, yes.  And if I may

12       just briefly respond?  I was planning to rest my

13       papers with respect to the 24th Amendment poll tax

14       claim.  "The poll tax is a broad-based levy imposed

15       on persons as a condition of obtaining a ballot."

16       That's not what we have here.  There's no

17       requirement that a voter demonstrate that the fees

18       that we're talking about have been paid as a

19       condition of obtaining a ballot.  And if this were

20       construed as a poll tax, that would lead to

21       illogical results.  So the driver's license fees and

22       the car registration fees that most residents of New

23       Hampshire pay would not be considered a poll tax,

24       but with respect to this class of voters that are

25       affected by -- allegedly affected by HB 1264, that

1           would be a poll tax.  Our position is that's just an

2           illogical result and doesn't support a 24th

3           Amendment claim.

4                THE COURT:  Let me ask you this.  Can be

5           anybody.  Let me ask you this.  I'm going to ask

6           both sides.  Can someone be a resident -- as of July

7           1, under 21:6.  Can somebody be a resident of New

8           Hampshire and a resident of another state?

9                MR. GALDIERI:  That's an interesting question,

10          Your Honor.  I think --

11               THE COURT:  If so, when?

12               MR. GALDIERI:  I believe that the intent would

13          be that no, they can't, but 654:1 does contain a

14          definition, different definition, perhaps, than RSA

15          21:6.  And when somebody registers to vote, they

16          swear that they're domiciled in the state consistent

17          with RSA 654:1, not with RSA 21:6.  But those

18          definitions, though they might sound different, in

19          practical application appear now to equate.

20               THE COURT:  I take that as a "no," one may not

21          be a resident of another -- there's no certainty as

22          to -- for one to be a resident of another state and

23          a resident of New Hampshire under 21:6.

24               MR. GALDIERI:  I believe that is certainly the

25          intent of the 12 -- 1264.

1                    THE COURT:  That sounds -- respectfully, it

2          sounds like a dodge.  Whether it's the intent,

3          what's the law?  Can one be -- when and under what

4          circumstances can one be a resident of New Hampshire

5          after July 1, with the definition under 21:6, and a

6          resident of another state?

7                MR. GALDIERI:  I don't think they can under

8          21:6.

9                THE COURT:  All right.  You agree?

10               MR. KLEMENTOWICZ:  I hadn't thought that much

11         about this, but I think that that's probably true

12         under RSA 21:6.  I don't know if another state would

13         allow people to be residents of another state and

14         New Hampshire, but it does look like New Hampshire

15         doesn't allow someone to be a resident of another

16         state as well.

17               THE COURT:  All right.  Mr. Garland,

18         Mr. Galdieri, are there any cases -- drawing the

19         distinction you've made between different

20         departments of the government and redressability and

21         as it pertains to same, is there any authority for

22         this idea of delineating compartmentalizing

23         different state functions, different state agencies

24         that you've asked me to sort of countenance in an

25         order dismissing Mr. Gardener?  I'm not aware of it,

1          but if there is some, direct me to it, please.

2              MR. GARLAND:  Your Honor, I'm having trouble

3          finding it.  I'm sorry about that.  There were at

4          least two cases that we cited in the initial brief

5          in this motion.

6              THE COURT:  Are you talking about -- let me see

7          here.  Baylor versus Lombardi or Duit Construction

8          versus Bennett?  Those seem to be like private

9          actors.  I'm not sure.

10             MR. GARLAND:  I believe -- I'm sorry, Your

11         Honor.  I didn't read these this morning and I

12         really should have.  But my understanding, subject

13         to correcting the record if I'm wrong, is that those

14         cases focused, or the least one of those cases

15         focused on the fact that they basically sued the

16         wrong governmental entity, that this governmental

17         entity doesn't enforce the law in question, and

18         therefore, he didn't have standing to bring a claim

19         against that governmental entity.

20             Again, I didn't read them this morning, so

21         subject to that caveat.

22             THE COURT:  Okay.  What can you tell me now, if

23         anything -- and I realize it might be nothing --

24         about the way in which the State of New Hampshire

25         enforces licensure and auto registration?  Because

**92**

1            I'm still trying to get to -- and I honestly think

2            this isn't the big picture.  I think this analysis

3            inures to your favor.  I'm trying to see what way --

4            not for standing, because I do think there's

5            potentially information sharing between departments

6            and I think that helps confirm standing in general

7            and it confirms standing as against the Secretary of

8            State's office.  But big picture I'm sort of

9            thinking now.

10                I'm trying to understand how this works.  And

11           maybe I've been told how it works.  The theory is

12           not what's going to happen on the roads.  The theory

13           is what's going to happen in the minds of college

14           students who want to vote.

15                But getting back to the roads, because that's

16           where the burdens really are, or at least some of

17           the burdens are.  Do you have any real understanding

18           or way you can explain about how these laws are

19           enforced now by DMV, licensure and auto

20           registration, and how that might change under the

21           new statutory regime?

22                MR. GALDIERI:  I don't believe we have a clear

23           picture.  My understanding of that is for their

24           purposes, not much has changed.  I think,

25           practically speaking, what we see is before HB 1264,

1          there's a -- part of the definition stated to be a

2          resident you've got to be here for the indefinite --

3          manifest an intent to be here for an indefinite

4          future, and that was the part that was struck down

5          in Newburger.

6              I think if we go back in time, what you'll find

7          is that the Department of Motor Vehicles is not

8          denying anyone a license because they come in when

9          they're 16, but say, you know, "When I'm 80 years

10         old I'm going to retire and go to Florida."

11             So practically speaking, I'm not sure they were

12         granting or denying licenses based on the indefinite

13         future language that's been removed.  And

14         practically speaking, when you're out on the road, I

15         think this provision is ultimately enforced very

16         little --

17             THE COURT:  If at all.

18             MR. GALDIERI:  -- if at all.  It would have to

19         be a very unique constellation of circumstances.

20             THE COURT:  For the new regime to be

21         enforced.

22             MR. GALDIERI:  Right.  To even bring a

23         violation to the light.

24             THE COURT:  I mean, it's not infrequent that

25         people are cited for driving without a license or

94

1              driving an unregistered vehicle.  The question is,

2              is a person driving an out-of-state tagged vehicle

3              or with an out-of-state license could ever

4              eventually be prosecuted for being a resident or a

5              domicile here, yet having documents on the vehicle

6              and on the license that are from a different

7              jurisdiction.  It just -- that just seems to be very

8              unlikely.

9                   MR. GALDIERI:  Right, because they're still

10             nonresident drivers within the state.  And the motor

11             vehicle code even has a provision in it that

12             predates 1264 that if you're a nonresident driver

13             and you're here with a motor vehicle for more than

14             six months, you have to go get a license from the

15             DMV, so --

16                  THE COURT:  Evidence of having registered to

17             vote, though, might be admissible in that trial,

18             although I don't think there could be a penalty

19             assessed for having voted, unless you did it in a

20             very -- unless you draw the chain of inferences.

21                  MR. GALDIERI:  Correct.

22                  THE COURT:  You vote here.  You have the wrong

23             documents.  That's not really the way the law would

24             work.  I'm just trying to play it out.

25                  MR. GALDIERI:  And it wouldn't be definitive

1          evidence either, because somebody could register to

2          vote and before they would have to get a license,

3          say, you know, I'm -- "In 30 more days, I'm going --

4          I've now got a job in Wisconsin and I'm going to be

5          moving there.  I don't consider myself to be a

6          resident of the State of New Hampshire anymore," and

7          ultimately change their status because that's

8          ultimately it's vested within them to change their

9          status, and move to Wisconsin and never get a

10          driver's license here, but have registered and have

11          voted here.

12              THE COURT:  I get it.  I give you the last word

13          if you want it.

14              MR. KLEMENTOWICZ:  No, but I do have a timing

15          issue that I'd like to discuss.

16              THE COURT:  Like a procedural issue?

17              MR. KLEMENTOWICZ:  Yes.

18              THE COURT:  Me, too.  I'm going to -- we don't

19          need to do that on the record now.  I'm going to --

20          we've been going a long time here.  Let me give her

21          a break.  We're off the record.

22              (Discussion off record.)

23              (Whereupon, the motion hearing was concluded at

24          12:13 p.m.)

25

96

CERTIFICATE

1

2       I, Sharon G. Saalfield, a Licensed Shorthand

3   Reporter for the State of New Hampshire, Certified Shorthand

4   Reporter for the Commonwealth of Massachusetts, Registered

5   Professional Reporter and Certified Realtime Reporter, do

6   hereby certify that the foregoing is a true and accurate

7   transcript of my stenographic notes of the proceeding taken at

8   the place and on the date hereinbefore set forth to the best

9   of my skill and ability under the conditions present at the

10  time.

11      I further certify that I am neither attorney or

12  counsel for, nor related to or employed by any of the parties

13  to the action in which this proceeding was taken, and further

14  that I am not a relative or employee of any attorney or

15  counsel employed in this case, nor am I financially interested

16  in this action.

17      The foregoing certification of this transcript does
    not apply to any reproduction of the same by any means unless
18  under the direct control and/or direction of the certifying
    reporter.

19

20

21

22

23      _____
        Sharon G. Saalfield,
24      NH Lic. No. 147, CSR, RPR, CRR

25

## $

**$200 (1)**
    70:4
**$5 (2)**
    66:7,10
**$50 (7)**
    35:14;38:21;67:25;70:20;
    72:1,3,6

## A

**ability (1)**
    31:11
**able (6)**
    31:7;33:11;67:9;70:9;
    73:9;86:21
**above (2)**
    23:18,19
**abridge (1)**
    62:2
**abridgement (1)**
    62:6
**Absolutely (3)**
    4:13;9:7;32:14
**abstain (7)**
    6:21,22;7:7,7;8:12;32:17,
    18
**abstract (1)**
    57:8
**abuse (1)**
    73:24
**abused (1)**
    83:5
**access (1)**
    18:4
**According (1)**
    57:23
**account (1)**
    62:3
**accuracy (1)**
    47:7
**accurate (1)**
    17:22
**ACLU (3)**
    3:6;48:1;81:8
**across (2)**
    55:18;56:8
**act (2)**
    35:1;49:14
**action (1)**
    3:23
**actions (1)**
    21:1
**active (3)**
    7:21,22,22
**actors (1)**
    91:9
**actual (6)**
    4:20,23;11:10;28:8;
    29:10;73:16
**actually (18)**

**4:25;6:1;7:14;21:23;**
**29:16;31:19;39:3,5;45:7;**
**46:17;51:3,17,17;67:12;**
**70:25;71:21;82:4;83:6**
**add (2)**
    21:20;22:16
**addition (1)**
    42:24
**additionally (2)**
    83:2,9
**address (6)**
    31:11;32:6;42:1;49:10;
    52:8;81:8
**addressed (2)**
    65:5;73:13
**addresses (1)**
    83:21
**addressing (1)**
    44:5
**administer (2)**
    23:13;44:23
**admissible (1)**
    94:17
**admit (2)**
    20:2,13
**adopted (1)**
    78:8
**advance (2)**
    74:3;77:21
**advocacy (1)**
    22:20
**affect (4)**
    4:1;48:19;60:20;63:17
**affected (7)**
    54:1,24;55:7,14,21;88:25,
    25
**affecting (1)**
    74:21
**affects (2)**
    53:15;81:11
**affidavit (1)**
    28:7
**affidavits (1)**
    28:11
**affirmative (1)**
    7:13
**afford (1)**
    46:25
**African (1)**
    55:4
**AG (2)**
    31:7;45:15
**again (9)**
    17:12;32:9;43:2;44:4;
    53:17;60:25;72:10;88:1;
    91:20
**against (8)**
    11:13;12:5;15:25;20:19;
    27:5;83:7;91:19;92:7
**age (2)**
    62:3;77:10
**agencies (10)**
    15:19;16:13;17:12,14,25;

**18:5,11;19:16;31:8;90:23**
**AGO (1)**
    3:13
**agree (13)**
    4:10;8:9,11,13,19;11:23;
    37:22;46:11;47:25;48:1;
    56:20;69:25;90:9
**AG's (2)**
    2:18;17:20
**ahead (4)**
    11:7;40:9;53:19;55:15
**aiming (1)**
    77:23
**al (2)**
    2:4,5
**albeit (1)**
    54:6
**allegation (5)**
    5:2;7:13;10:4,18;55:19
**allegations (4)**
    45:19,20;47:7;62:16
**allege (9)**
    5:17;6:5;7:25;11:12;
    48:24;68:5;70:20;82:3;83:2
**alleged (16)**
    3:24;6:9;7:9,12;11:11;
    14:17;19:11,12;45:23;
    54:13;62:13,15;72:23;73:3;
    81:18;82:5
**allegedly (2)**
    54:1;88:25
**allow (4)**
    10:25;15:1;90:13,15
**allowed (1)**
    26:23
**allowing (1)**
    18:4
**allows (1)**
    18:8
**along (3)**
    9:14;31:25;51:24
**alter (1)**
    52:24
**alternative (1)**
    37:6
**although (1)**
    94:18
**always (1)**
    68:19
**amend (2)**
    10:23,25
**amendment (15)**
    13:11;61:22,23;62:2;
    63:22;64:1;65:22,22;76:21;
    77:25;78:9;79:16,23;88:13;
    89:3
**amends (1)**
    15:18
**American (1)**
    2:24
**Americans (1)**
    55:4
**among (1)**

**56:4**
**amount (2)**
    25:16;33:1
**ample (1)**
    67:5
**Amy (1)**
    3:1
**analogy (1)**
    66:4
**analysis (6)**
    53:2,15;55:10;81:12;
    83:1;92:2
**Anderson (5)**
    53:1,12;65:21;66:16,18
**Anderson/Burdick (8)**
    66:24;67:18,22;70:17;
    73:1,15;81:12;83:1
**Andy (1)**
    82:21
**anger (1)**
    69:3
**announcement (1)**
    35:5
**annually (1)**
    36:24
**answered (1)**
    84:23
**Anthony (1)**
    2:14
**anticipated (1)**
    30:10
**anymore (1)**
    95:6
**apologize (2)**
    38:20;39:1
**appear (1)**
    89:19
**applicable (1)**
    52:20
**application (5)**
    52:20;54:8;55:3,18;89:19
**applications (1)**
    65:17
**applies (3)**
    52:13;63:17;85:8
**apply (3)**
    18:1;36:12;66:19
**applying (1)**
    65:18
**approach (1)**
    34:6
**appropriate (4)**
    49:9;66:24;67:18;73:22
**archive (1)**
    25:8
**archived (4)**
    25:18;29:2,24;30:13
**archives (3)**
    25:1,2;26:12
**argue (2)**
    37:6;52:23
**arguing (1)**
    3:15

**argument (34)**
3:22;6:17,18;9:18,21;
10:8,16,25;12:2,8,10;13:17;
14:1,13,16;22:23;27:17;
29:12;31:16;43:24;48:23;
53:8,18;61:22,23;66:18;
68:9,10;71:6;73:13;74:4,19,
20;86:25
**arguments (7)**
2:10;3:18;11:22;13:16;
14:17;47:17;48:10
**arise (1)**
40:11
**Arlington (2)**
78:7,10
**around (4)**
9:10;22:19;68:2;74:11
**arrest (1)**
72:7
**arrived (1)**
77:9
**Article (2)**
3:25;5:16
**as-applied (1)**
65:11
**aside (8)**
40:15,15,17,19,19,20;
41:12;69:3
**asserted (1)**
80:15
**asserts (1)**
84:5
**assessed (1)**
94:19
**assessment (1)**
38:22
**assume (2)**
20:10;46:10
**attempt (1)**
52:19
**attempting (2)**
59:14,16
**attempts (1)**
78:16
**attend (1)**
84:1
**attenuated (2)**
11:19;43:23
**Attorney (16)**
2:15,21;3:16;14:17;
15:16,17;16:25;17:15,21;
24:7;28:22;31:6;33:24;
72:25;82:4;87:22
**ATTORNEYS (1)**
2:7
**authorities (1)**
21:11
**authority (9)**
21:4;23:11;24:13;27:2;
29:6;30:17;38:21;81:2;
90:21
**authorized (1)**
26:13

**auto (2)**
91:25;92:19
**automatically (1)**
87:1
**automobile (1)**
83:16
**availability (1)**
21:8
**available (6)**
18:4;21:10;25:17;26:11,
12;33:9
**aware (1)**
90:25
**away (1)**
75:5
**Ayotte (1)**
82:11

**B**

**back (8)**
32:15;35:18;37:17;71:25;
78:24;81:13;92:15;93:6
**ballot (7)**
22:2;25:23;44:24;64:22;
72:23;88:15,19
**bank (1)**
27:15
**Barbadoro (1)**
73:7
**barrier (1)**
55:6
**based (12)**
2:9;21:1;27:19;28:16,18;
45:19,20,21;46:7;50:5;
87:21;93:12
**basic (3)**
50:13;51:23;53:22
**basically (2)**
6:19;91:15
**basis (2)**
63:23;77:21
**Baylor (1)**
91:7
**bearing (1)**
22:21
**bears (1)**
82:4
**became (1)**
87:13
**become (10)**
6:24;22:9;33:2,3,4;41:11;
51:10,12;58:4;59:7
**becomes (2)**
4:15;39:5;58:3
**becoming (2)**
4:17;33:5
**behalf (12)**
2:25;3:2,6,9,10;13:16;
14:1;22:20;80:15,18,24,25
**behind (1)**
78:12
**Bennett (1)**

**91:8**
**best (2)**
30:7;65:16
**better (1)**
60:16
**beyond (1)**
5:25
**big (2)**
92:2,8
**bigger (1)**
47:10
**Bill (5)**
12:11,20;79:3,9;82:22
**bills (1)**
14:4
**BISSONNETTE (2)**
3:5,6
**bit (5)**
21:22;28:2;32:6,8;56:18
**block (1)**
13:5
**blocks (1)**
71:15
**Board (1)**
78:5
**boards (1)**
21:15
**boil (1)**
75:12
**bona (6)**
4:16;39:13,21;41:5;43:3,
6
**books (1)**
84:2
**borders (1)**
6:10
**Boston (1)**
67:7
**both (7)**
11:9;21:5,22;80:19,19,
24;89:6
**branch (2)**
16:13;17:25
**break (1)**
95:21
**bridge (1)**
48:18
**bridges (2)**
48:24;70:14
**brief (2)**
48:11;91:4
**briefing (1)**
45:10
**briefly (6)**
46:2;47:14,19;87:20,25;
88:12
**bring (5)**
3:23;5:15;11:12;91:18;
93:22
**broad (3)**
54:7;55:3,18
**broad-based (1)**
88:14

**Brown (1)**
79:6
**bucks (1)**
68:16
**building (1)**
63:11
**burden (23)**
19:9;27:9,25;37:4;39:5;
42:25;48:18;54:9,13,20,23,
25;55:24;66:3;70:19,20;
73:4,10;81:18,24;83:8,11;
84:20
**burdened (2)**
39:6;72:5
**burdens (10)**
14:5;40:10;66:25;67:2,
24,25;72:18;83:9;92:16,17
**burdensome (8)**
67:21;70:23;71:1,17,18,
21;76:2,5
**Burdick (1)**
66:21
**bureaucrat (1)**
31:12
**buy (5)**
8:14;12:18;35:13;46:25;
84:2

**C**

**called (2)**
63:3;71:23
**came (2)**
34:9;49:4
**campus (1)**
9:9
**can (58)**
7:16,16;8:6,25;13:16;
14:20;15:13;21:7;22:21;
23:22;24:4,5,7,10,14,15;
28:5;29:19,20;30:1,2;
32:13;36:4,22;39:8;40:2;
41:18,21;44:17;49:24;51:6;
57:2,10,11,12;59:6,23;
64:25;65:2,5,23;70:7;71:7,
9;74:7,14,14;75:5;83:5;
88:4;89:4,6,7;90:3,4,7;
91:22;92:18
**candidates (1)**
80:16
**capacity (2)**
14:10;45:13
**car (27)**
33:9;36:18,19,22;41:19;
42:19;43:4;46:23;49:16;
51:25;53:22;58:6;59:12;
67:14;68:1,20;70:2,4;71:2,
14,19,22;79:18,19;83:13;
87:5;88:22
**card (1)**
66:11
**Caroline (3)**
2:4,25;3:6

**carpooled (1)**
9:14
**carrying (1)**
19:7
**cars (4)**
37:12,12,21,21
**Carson (1)**
67:10
**case (53)**
2:3;11:25;12:2,4,5,16;
13:3,18,22;15:3,22;16:7;
17:19;18:17;20:19;27:5,22;
31:3,14;33:5;37:10;41:11;
44:8,24,25;45:5,13;49:11;
57:2,9;63:2;64:22,22;65:12,
13,15;67:12,19,23;68:19,
22;69:20;72:19,20,21;73:8,
19;74:11;77:7;78:1;79:2,
22;83:8
**cases (8)**
45:6;63:1,5;78:2;90:18;
91:4,14,14
**Casey (6)**
2:4,25;3:7,11,21;37:17
**cast (1)**
22:2
**category (2)**
46:9;63:18
**causal (1)**
11:18
**causation (1)**
35:9
**cause (3)**
28:20;43:16;79:9
**caveat (1)**
91:21
**centralized (2)**
23:25;25:5
**certain (7)**
25:16;26:15;28:6;30:4;
50:13;51:23;72:24
**certainly (9)**
9:15;12:23;13:23;27:22;
29:20;58:2;86:8,18;89:24
**certainty (2)**
24:19;89:21
**chain (1)**
94:20
**challenge (10)**
49:13;52:9,12;65:10,16,
16,19;70:18;77:21;80:22
**challenged (6)**
11:16;17:2;47:6,23;
78:25;79:1
**challenges (2)**
44:20;78:9
**change (16)**
14:14;16:11;21:25;22:1,
2;44:15;48:21;49:2;50:5;
56:23;57:5,16;81:25;92:20;
95:7,8
**changed (5)**
28:14;49:8;57:21,22;

**changes (6)**
22:6,11,15;56:25;57:24,
24
**chapters (1)**
52:21
**character (1)**
74:14
**characterization (1)**
9:8
**characterize (3)**
9:6;30:9;75:19
**charge (2)**
58:22;66:10
**checked (2)**
19:20;73:18
**checking (1)**
25:24
**checklist (3)**
26:1,4;43:19
**checklists (9)**
24:24;25:9,12,15,19,21;
29:2,24;30:13
**chill (6)**
40:15,15,16,16,20;42:24
**chilling (3)**
40:12,14;41:12
**chill's (1)**
40:18
**chime (1)**
15:14
**choose (11)**
32:20,21;35:12;36:25;
46:8,10,21,22,22;50:21;
52:3
**Circuit (3)**
44:22;45:3;72:21
**circumstances (6)**
8:13;22:4;28:6;65:23;
90:4;93:19
**citation (1)**
39:8
**cite (1)**
79:22
**cited (5)**
43:12;66:22;82:5;91:4;
93:25
**cites (2)**
38:10;78:1
**citizen (3)**
14:3;69:8,9
**citizens (4)**
7:17;36:13;52:7;56:2
**civil (4)**
2:3,24;34:24;72:8
**claim (15)**
27:22;28:1;48:16;63:23;
65:14;66:1,25;79:16;85:10,
23;86:6;87:2;88:14;89:3;
91:18
**claimed (2)**
27:24;86:24
**claiming (2)**

**92:24**
**claims (2)**
11:13;85:5
**Claremont (1)**
35:17
**class (7)**
56:4;60:12;76:13;77:24;
79:5,12;88:24
**classes (1)**
59:25
**classification (1)**
55:11
**clear (9)**
13:8,9;32:1;35:10;39:2;
67:17;81:1;87:21;92:22
**clearly (3)**
13:11;63:5,13
**CLERK (1)**
2:2
**clerk's (3)**
21:13;23:24;70:22
**client (4)**
13:15;14:1,3,13
**clients (11)**
13:17;35:10;36:12,18;
37:11,13;44:7;85:8,23;86:6,
14
**Clinton's (1)**
82:13
**close (3)**
32:7;62:21;81:19
**clothes (1)**
84:2
**code (2)**
4:18;94:11
**codified (1)**
67:3
**collateral (3)**
22:4;28:12,15
**college (29)**
5:10,10,12,21;7:16;8:2,
24;9:23;37:14,14,16;41:3;
52:2;53:25;56:4;62:17,21;
63:7,9,13,15,19;71:22;79:5,
12;81:24;82:9;83:12;92:13
**collegiate (1)**
11:7
**comfortable (1)**
44:5
**coming (2)**
57:12,17
**comments (1)**
81:4
**commitment (3)**
84:4,6,7
**committee (1)**
59:22
**common (1)**
54:21
**Commonwealth (1)**
8:25
**community (5)**
56:8;60:11,20;61:6;73:22

**compartmentalizing (1)**
90:22
**compelling (2)**
55:24;73:22
**compiled (3)**
29:3,22,23
**compiling (1)**
23:17
**complaint (21)**
2:9;4:3;6:3,5,11;7:6,12;
10:5,21,24;19:13;45:20,24;
48:17;75:4;78:18,23;81:15,
16,19;82:3
**complaints (1)**
5:3
**completely (1)**
68:11
**comply (1)**
31:22
**component (1)**
41:18
**conceivable (2)**
5:23;9:15
**Conceivably (2)**
5:14;58:9
**conceive (2)**
7:16,17
**conceived (1)**
25:5
**concern (1)**
28:17
**concerned (1)**
29:15
**concluded (1)**
95:23
**conclusive (1)**
50:24
**Concord (1)**
36:15
**concrete (3)**
4:1;6:1;57:9
**concurs (1)**
81:7
**condition (2)**
88:15,19
**conduct (1)**
11:16
**confer (1)**
80:8
**confidential (2)**
18:7;24:5
**confirm (1)**
92:6
**confirms (1)**
92:7
**confuse (1)**
81:22
**confusion (3)**
27:19,25;42:24
**connected (2)**
18:23;19:25
**Connecticut (1)**
42:6

connection (1)
  11:18;18:24;19:3
connections (1)
  83:22
connects (1)
  17:9
consequence (3)
  28:12,15;50:16
consequences (1)
  22:5
consider (3)
  54:7;78:9;95:5
consideration (1)
  2:3
considered (1)
  88:23
consistent (1)
  89:16
consistently (1)
  52:5
constellation (1)
  93:19
constitute (1)
  27:9
constituted (1)
  61:4
constitutional (3)
  48:16;65:19;80:2
constitutionality (1)
  80:22
constitutionally (2)
  70:10;77:24
constrained (1)
  31:3
Construction (1)
  91:7
construe (1)
  53:15
construed (1)
  88:20
contain (1)
  89:13
contest (2)
  40:7;64:13
context (2)
  8:16;54:20
continuous (1)
  34:23
contrary (1)
  82:2
contribute (3)
  68:15;69:7;70:13
control (3)
  4:21,24;25:2
controlled (1)
  49:7
controls (2)
  87:25;88:3
conversation (2)
  50:10;71:7
convicted (1)
  38:16
copy (2)

21:16;23:24
correcting (1)
  91:13
correctly (2)
  38:13;49:17
cosmic (1)
  60:3
cost (1)
  36:23
cottage (1)
  77:10
counsel (6)
  2:12;12:24;15:13;32:16;
  75:3;80:9
count (1)
  9:17
countenance (1)
  90:24
county (2)
  9:8;79:6
couple (6)
  27:16;39:20;41:14;78:1;
  81:8;82:15
course (3)
  35:8,18;39:22;44:16;
  79:11
Court (270)
  2:2,6,8,17;3:4,10,13;4:5,
  7,10,12;5:7,12,19;6:4;8:2,6,
  9,11,19,24;9:16;10:6,20;
  11:21;12:18;13:1;14:2,9,12,
  20;15:7,10,12,23;16:3,9,17,
  22;17:4,8;18:13,20;19:1,5,
  23;20:2,9;21:2,7,15,19;
  22:25;23:5,12,16;24:2,7,8,
  10,20;25:4,11,14,19,25;
  26:2,7,17,22;27:8;28:24,24,
  25;29:4,11,19;30:5,15;31:9,
  23;32:4,8,12;33:17,21;34:1,
  6;35:23;36:5,10;37:8,13,19;
  38:2,7,14,18,24;39:2,4,15,
  20,24;40:4,8,12,15,18,22;
  41:2,16;42:2,5,9,12,16;
  43:2,9,13,23;44:1,10,17,22;
  45:6,9;46:3,7,14,21;47:2,
  16;48:7,9,14,23;49:5,10,22;
  50:4,9,14,23;51:2,8,14,20;
  52:10;53:2,7,11,14,17;54:5,
  6,23;55:2,4,11,17,22;56:15;
  57:4,10;58:13;59:13,22;
  60:3,10,14,25;61:10,12,15,
  20,21,24;62:8,13,19,24;
  63:4,20,24;64:2,5,10,17,20,
  24;65:4,7,14;66:20;68:7,22;
  69:2,12,15,21;70:9,23;71:5,
  10;72:10,13,15;73:1,20,23,
  25;74:6,19;75:11;76:3,8,11,
  14,19,24;77:12;78:13;79:7;
  80:10,12,15,23;81:1,5,10;
  83:15;84:4,11,14,17,22,25;
  85:2,10,15,23;86:5,11,13,
  18;87:4,8,11,16,18;88:1,5,
  8;89:4,11,20;90:1,9,17;

91:6,22;93:17,20,24;94:16,
  22;95:12,16,18
courtroom (1)
  64:6
courts (1)
  78:8
Court's (3)
  31:10;34:3;77:12
covered (1)
  25:9
Crawford (4)
  54:6;55:1,16;61:13
create (1)
  27:24
creates (1)
  6:20
creating (1)
  34:21
criminal (7)
  20:19;27:5;29:10;43:15;
  51:4;72:8,13
crux (1)
  69:19
Cruz (4)
  72:20;73:1;83:2,7
cuts (1)
  31:19

D

Dartmouth (2)
  10:9;35:16
database (5)
  16:8;18:7;24:1;25:5;
  26:14
date (3)
  39:17;87:11,12
day (4)
  19:7,8;20:23;71:15
days (4)
  4:17;20:25;39:17;95:3
deal (2)
  30:21;45:24
decide (1)
  72:6
decided (2)
  50:21;51:10
deciding (1)
  51:12
decision (7)
  7:6;11:17;63:11;70:5;
  79:1,21;80:6
decisions (1)
  63:6
declaration (3)
  20:3;40:2;84:7
declaratory (1)
  52:17
declare (3)
  39:9;75:16;88:9
declared (6)
  20:15,20;43:5,22;60:16,
  17

declares (2)
  68:12;69:6
declaring (3)
  20:4;34:20;44:6
deemed (1)
  85:5
defeated (1)
  6:16
defendant (6)
  11:16;12:4;13:18;31:14;
  44:19,19
defendants (5)
  2:16,19,21;27:18;45:13
defendants' (1)
  66:17
defense (2)
  45:21;73:16
define (1)
  86:14
defined (5)
  34:10;75:23;86:6,15,18
defines (4)
  4:19,21;85:3,4
definitely (1)
  11:23
definition (13)
  4:18;34:16,22;58:24;
  66:2;86:1;87:13,14;88:2;
  89:14,14;90:5;93:1
definitional (1)
  52:12
definitions (4)
  7:2;15:18;50:25;89:18
definitive (1)
  94:25
degree (3)
  62:9;84:6,6
delineating (1)
  90:22
Democrat (1)
  82:11
Democratic (6)
  3:2;11:11;30:3;35:2;
  47:22;81:7
demonstrate (1)
  88:17
demonstrating (1)
  49:19
denial (2)
  62:6;80:5
deny (2)
  62:2,8
denying (2)
  93:8,12
Department (5)
  16:20;17:1;18:16,19;93:7
departments (3)
  17:13;90:20;92:5
depose (1)
  12:20
deposition (1)
  14:15
described (1)

29:22
**designated (3)**
5:19,21;71:24
**designed (3)**
56:2;59:4;82:22
**desire (1)**
33:3
**desperate (1)**
30:9
**destitute (1)**
70:24
**determine (2)**
17:7;25:1
**Detzner (3)**
63:3,10;78:1
**developed (1)**
9:19
**difference (7)**
12:3;15:15;17:18;24:15;
31:1;44:14;47:21
**different (13)**
36:14;41:19;47:10;55:9;
63:5;66:8;82:5;89:14,18;
90:19,23,23;94:6
**difficult (5)**
53:25;57:7;76:1,1,22
**direct (3)**
11:18;12:14;91:1
**directed (3)**
23:9;28:21;84:19
**directly (5)**
13:21;34:15;45:1;70:5;
72:20
**director (1)**
16:20
**disabled (1)**
71:13
**disagree (2)**
44:2;65:7
**discarded (1)**
74:12
**disclosure (1)**
58:20
**discourage (1)**
75:13
**discouraged (1)**
57:25
**discovery (15)**
12:12,16,19;13:3,7,22,25;
14:16;15:1;45:15,17;47:8;
68:6;83:3,10
**discriminatory (1)**
78:11
**discuss (2)**
47:4;95:15
**discussion (5)**
28:3;45:5;46:5;87:21;
95:22
**disenfranchised (1)**
74:12
**dismiss (7)**
2:8;6:19;10:24;53:18;
57:2;73:5;81:13

**dismissed (4)**
11:25;12:2,12;13:2
**dismissing (2)**
15:3;90:25
**dispute (4)**
21:24;56:11;64:10;75:12
**disputes (1)**
12:25
**disregarded (1)**
61:17
**disrespect (1)**
74:20
**distinction (3)**
70:15;76:17;90:19
**distributing (1)**
23:18
**District (2)**
78:4,6
**DMV (6)**
35:15,21;36:9;70:21;
92:19;94:15
**DMW (1)**
36:15
**docket (1)**
72:13
**documentation (1)**
28:8
**documents (5)**
21:14,16;29:17;94:5,23
**dodge (1)**
90:2
**dollars (4)**
36:23;68:1;70:3,21
**domestic (1)**
34:24
**domicile (21)**
28:9,11;34:20,21,22;
49:7;68:23;77:19;83:20,21;
84:5,10,12;86:3,23,24;
87:14,24;88:2,3;94:5
**domiciled (1)**
89:16
**domiciliaries (2)**
34:10;87:15
**domiciliary (3)**
34:12,13;88:10
**done (5)**
28:20;36:24;64:3,7;66:12
**door (1)**
37:3
**down (15)**
24:4;25:23;38:18,25;
43:13;44:5;65:1,3;73:14;
74:1,4;75:13;77:20;78:13;
93:4
**draw (2)**
6:14;94:20
**drawing (1)**
90:18
**drive (42)**
4:22;5:5,13,17;6:5,9,25;
7:14;8:15,17,22;9:7,12;
10:2,9,14,14;11:4;32:22;

33:10,19;35:13,21,24;36:1,
16,17,19;37:2,22;38:3;
41:21;46:17,19,24;56:13;
67:14;70:11;71:14,23;72:3;
79:19
**drive-by (3)**
67:10;69:4,4
**driven (1)**
5:4
**driver (22)**
4:15,19,20;5:7,20,21;6:8,
8,11;7:22,22;10:13;17:10;
39:7,11;40:1;43:10;58:20,
24,25;71:24;94:12
**drivers (5)**
11:3,3;35:11;60:16;94:10
**driver's (30)**
7:3,8,24;8:14;16:11;26:6;
27:3;28:13;32:22,23;33:11,
13;35:13,19;39:12,18;
41:18;47:1;49:16;51:24;
53:6,21;54:22;58:6;59:12;
67:13,25;79:18;88:21;
95:10
**drives (7)**
4:20;5:8;68:13;69:7,16;
71:1,19
**driving (21)**
4:25;5:3;6:22;7:7,20;8:4,
12,23;9:3;32:18;33:7,15;
39:7;41:22;46:8;58:17,23;
83:12;93:25;94:1,2
**dropped (1)**
9:13
**Duit (1)**
91:7
**Dunn (1)**
73:23
**durational (4)**
74:1;77:8,12,17
**Durham (2)**
79:10;82:9
**during (2)**
58:19;63:8
**duty (2)**
5:20;52:1
**dynamic (1)**
22:12

**E**

**earlier (2)**
20:25;74:9
**early (1)**
63:12
**easier (1)**
41:21
**easily (1)**
53:3
**Eastern (1)**
78:6
**EBENSTEIN (2)**
3:8,9

33:10,19;35:13,21,24;36:1,
16,17,19;37:2,22;38:3;
41:21;46:17,19,24;56:13;
67:14;70:11;71:14,23;72:3;
79:19
**educating (1)**
27:21
**effect (11)**
22:11,13;23:10;34:9;
35:8;40:13,14;49:4;54:25;
62:4;75:4
**effective (1)**
87:11
**effectively (2)**
80:1;81:22
**eight (1)**
67:8
**either (10)**
6:21;32:17;33:8;35:12,
14,16;37:22;58:19;75:12;
95:1
**either-or (1)**
7:6
**elderly (1)**
33:10
**election (15)**
23:14;27:20;44:20;54:15;
56:24,25;57:21;60:14,14;
63:6,8;66:19;81:19;82:1;
88:7
**elections (8)**
59:17,20;60:5,21;61:3;
67:16;78:5;82:23
**electorate (3)**
59:19;60:19;61:3
**electronic (2)**
29:21,25
**eligibility (4)**
21:25;48:20;62:5,5
**eliminate (2)**
14:4;45:12
**else (6)**
19:13;31:15;36:18;47:12;
53:9;86:13
**embarrassing (1)**
72:17
**enact (1)**
81:21
**enactment (1)**
50:17
**encounters (1)**
58:8
**encouraged (1)**
69:23
**end (6)**
19:7;50:9;58:11;60:10,
10;78:11
**ends (1)**
19:7
**enforce (8)**
15:18,25;16:16;22:21;
24:13;29:16;41:22;91:17
**enforced (11)**
15:24;16:18;41:19;56:21,
23;58:11,12;75:8;92:19;
93:15,21
**enforcement (8)**
24:13;29:6,10;30:1,17;

50:18;57:5;59:3
**enforces (1)**
    91:25
**enforcing (2)**
    29:6;30:17
**engage (2)**
    53:2,14
**enjoined (1)**
    29:20
**enough (3)**
    15:9;68:15;74:18
**ensure (6)**
    16:9;59:17,18;60:11,22;
    82:22
**ensures (3)**
    52:5;56:7,8
**ensuring (2)**
    73:21;75:21
**entered (1)**
    23:25
**entirely (1)**
    49:9
**entities (3)**
    26:15;30:2,4
**entitled (2)**
    83:2,10
**entitlement (1)**
    37:1
**entity (3)**
    91:16,17,19
**equal (4)**
    52:6;56:1,20;60:1
**equalize (1)**
    59:24
**equally (2)**
    56:9;59:5
**equate (2)**
    60:8;89:19
**equilibrium (1)**
    60:4
**equitable (1)**
    14:19
**equity (1)**
    61:1
**equity's (1)**
    60:25
**equivalency (1)**
    6:23
**equivalent (1)**
    51:1
**especially (2)**
    79:9,10
**essence (1)**
    12:6
**establish (4)**
    39:21;70:8;85:13,14
**established (6)**
    10:22;37:8;39:17;51:16;
    80:21;85:20
**establishes (3)**
    50:12,14;51:22
**establishing (3)**
    49:12,18;85:17

**establishment (2)**
    39:13;51:3
**et (2)**
    2:4,5
**evaluate (1)**
    67:19
**evaluating (1)**
    66:25
**evaluation (1)**
    67:22
**even (12)**
    22:10;23:9;42:19;45:11;
    48:3;52:25;53:1,14;58:15;
    68:10;93:22;94:11
**eventually (3)**
    24:25;74:17;94:4
**everybody (7)**
    2:6;4:10;5:20;8:22,23;
    35:23;61:2
**Everybody's (1)**
    36:1
**everyone (1)**
    53:23
**evidence (16)**
    20:19,22;21:2,8;22:10,
    12;27:5;47:8;50:24;68:6;
    71:3;73:21;74:17;83:4;
    94:16;95:1
**evolved (1)**
    62:17
**Exactly (4)**
    4:9;19:7;33:20,20
**exam (1)**
    76:21
**examine (4)**
    43:17,18;45:3;78:14
**examining (1)**
    42:20
**example (2)**
    66:5;79:5
**examples (2)**
    57:18;77:7
**except (3)**
    14:14;57:25;85:4
**executive (3)**
    16:13;17:25;77:9
**exempt (2)**
    21:17,17
**exercise (1)**
    80:1
**exist (1)**
    9:11
**exists (2)**
    11:20;46:11
**expect (4)**
    17:14;59:6;68:12;69:5
**expected (2)**
    59:9,10
**expense (1)**
    36:17
**expensive (1)**
    36:22
**explain (2)**

17:15;92:18
**explained (2)**
    32:16;82:21
**explanation (1)**
    51:6
**explicit (1)**
    66:11
**expose (2)**
    20:15;40:5
**exposes (2)**
    51:4;64:11
**exposure (1)**
    72:11
**expressly (1)**
    82:21
**extends (1)**
    23:11

**F**

**Facebook (1)**
    82:7
**facial (5)**
    52:9,12,22;65:10,15
**facilitate (1)**
    16:5
**fact (12)**
    3:24,25;8:1;11:11;19:11;
    22:3;51:9;52:8;66:12;81:3,
    11;91:15
**facts (1)**
    73:3
**factual (3)**
    47:8;54:7;65:6
**factually (1)**
    79:14
**fail (1)**
    63:23
**failing (2)**
    30:22,22
**fails (1)**
    52:22
**fair (5)**
    6:11;9:8;15:9;45:18;50:7
**fairly (1)**
    11:15
**fall (2)**
    67:23;77:8
**false (1)**
    6:23
**fan (1)**
    10:23
**fanciful (2)**
    57:17,19
**favor (2)**
    31:20;92:3
**favorable (1)**
    11:17
**feature (1)**
    54:21
**features (2)**
    51:23;53:22
**federal (3)**

5:16;6:12;14:7
**feel (2)**
    11:12;31:3
**feeling (1)**
    40:8
**fees (6)**
    59:11,12;79:20;88:17,21,
    22
**feet (1)**
    24:22
**few (5)**
    7:17;18:7;55:20;68:15;
    81:4
**fewer (1)**
    74:13
**fide (6)**
    4:16;39:13,21;41:5;43:3,
    6
**figure (1)**
    39:3
**filed (1)**
    86:9
**filings (1)**
    32:6
**financial (1)**
    83:10
**find (4)**
    12:1,11;73:3;93:6
**finding (1)**
    91:3
**fine (2)**
    27:14;38:11
**fined (1)**
    38:21
**firm (1)**
    77:9
**first (14)**
    9:5;30:25;32:15;36:8;
    38:22;40:6;43:7;44:22;
    45:3;46:15;65:10;66:17;
    72:21;81:6
**fisc (1)**
    68:15
**fit (1)**
    7:15
**Flaherty (5)**
    2:25;3:7,11,21;37:18
**flawed (1)**
    45:21
**flip (1)**
    15:10
**floor (2)**
    82:16,18
**Florida (4)**
    63:2,10;77:10;93:10
**flow (1)**
    15:20
**flowing (1)**
    80:6
**flush (1)**
    27:10
**focused (4)**
    33:5;77:4;91:14,15

**focuses (1)**
78:10
**focusing (2)**
22:20;41:15
**folks (1)**
48:24
**follow (4)**
16:10;59:6,9,10
**followed (1)**
27:2
**food (1)**
83:13
**footing (3)**
52:6;56:1,20
**forced (1)**
36:25
**foreseeable (1)**
5:6
**forfeits (1)**
40:24
**forget (1)**
59:17
**form (3)**
23:17,23,24
**forms (1)**
30:12
**found (2)**
45:10;74:1
**four (3)**
10:10;71:15;74:25
**four-year (2)**
11:5,6
**frame (2)**
8:15;34:5
**framework (8)**
46:7;53:13;63:22;67:18;
70:18;78:7,8,10
**frat (1)**
71:24
**free (1)**
52:2
**front (3)**
24:17;57:9;72:17
**full (1)**
13:24
**full-blown (2)**
13:7,25
**fully (1)**
9:19
**function (1)**
40:2
**functions (2)**
35:3;90:23
**fundamental (1)**
55:12
**funds (1)**
83:17
**further (2)**
61:22;75:25
**future (5)**
5:6;34:16;85:22;93:4,13

## G

**GALDIERI (43)**
2:14,14;3:12;15:15,24;
16:6,14,19,24;17:5;18:6,14,
22;19:2,19,24;20:7,22;21:6,
12,16;23:22;24:3,17;25:4,
15;26:8,9,20;27:6;29:15,25;
89:9,12,24;90:7,18;92:22;
93:18,22;94:9,21,25
**game (1)**
82:20
**Gannon (1)**
82:17
**Gardener (1)**
90:25
**Gardner (5)**
12:20;13:2;14:22;44:24;
73:8
**Gardner's (1)**
12:12
**GARLAND (42)**
2:18,18;3:14;4:6,9,13;
5:9,14,23;6:13;8:5,7,20;9:2;
10:2,17;11:8;12:13,23;
13:14;14:7,11;15:5,9,11;
21:20;23:3,6,15;27:13,14;
29:9,13;31:16;32:8,11,14;
33:20,22;90:17;91:2,10
**General (7)**
14:18;15:16,17;16:25;
17:21;28:23;92:6
**General's (5)**
2:15,22;17:15;24:7;31:6
**gets (5)**
9:19;39:3;41:22;43:23;
61:9
**Gilles (1)**
3:6
**Given (1)**
73:1
**gives (1)**
77:7
**goes (7)**
5:11;10:7;12:21;22:25;
23:1;32:14;34:19
**Good (11)**
2:6,7,17;3:4,5,8;4:12;
42:9;48:15;66:20;81:10
**Gordon (1)**
3:2
**governed (1)**
72:20
**government (5)**
12:6;16:23;66:9,13;90:20
**governmental (5)**
66:7;78:16;91:16,16,19
**graduated (1)**
82:18
**graduating (1)**
37:24
**grant (3)**

12:18;44:17,17
**granting (1)**
93:12
**grasping (2)**
30:7,8
**greater (1)**
62:9
**group (22)**
7:15;8:21;9:1;32:12,12,
12,16,25;33:15,17;34:11;
46:11,12,13,16,16,20;47:1;
68:5;72:22;77:15,18
**groups (5)**
32:9;46:2;47:9;78:15,17
**Guare (2)**
73:18;79:1
**guess (6)**
7:8;17:13;30:24;81:1;
84:11;85:2
**guy (1)**
64:5

## H

**half (3)**
10:9;17:20;54:19
**halls (1)**
23:21
**Hampshire (82)**
2:5,15,21,24;3:2;6:6,24;
8:14;10:3,10,15;11:5;12:7;
20:12;26:25;27:3;31:4,5;
32:23;33:1;34:9;35:6,12,13,
23;36:8,21;37:23;38:3;
39:19;44:21;46:25;47:22;
48:21;49:19,20;50:22;
51:11;52:6,14,25;53:24;
54:8,9,18;56:1,7,11,13;
70:1,6;72:3;73:7,19,19;
74:21,24;75:24;78:24;81:6;
82:23;83:16,17,20,25;84:1,
3,20;85:20,24;86:2,24;87:1;
88:4,23;89:8,23;90:4,14,14;
91:24;95:6
**hand (2)**
41:24;43:4
**handicap (1)**
80:1
**handle (2)**
66:20;81:11
**handmarked (1)**
24:24
**hands (1)**
41:24
**Hanover (5)**
9:5,6,8;79:11;82:10
**happen (6)**
12:22;22:3;41:14;43:13;
92:12,13
**happened (1)**
29:11
**happily (1)**
9:11

**happy (1)**
34:7
**Harbor (1)**
71:14
**hard (2)**
21:16;23:24
**harm (2)**
7:8;28:20
**Harman (1)**
79:22
**Haverhill (1)**
35:16
**HB (25)**
6:20;34:9,15;38:5;48:18;
49:3,8;52:4,9,12,15,18,19,
24;53:3;54:8;55:25;56:2,3,
7;68:19;81:17,21;88:25;
92:25
**hear (4)**
21:21;33:25;47:17;48:10
**hearing (3)**
2:3,8;95:23
**Heights (2)**
78:7,10
**held (1)**
29:17
**helicopter (1)**
9:16
**help (1)**
83:17
**helpful (1)**
34:4
**helps (1)**
92:6
**Henniker (1)**
82:10
**Henry (1)**
2:23
**Here's (3)**
9:18;30:25;57:20
**herring (3)**
12:10;28:2;45:12
**herself (1)**
68:13
**high (2)**
73:14;82:18
**highly (3)**
18:7;24:5;79:14
**Hillsborough (1)**
79:6
**himself (1)**
68:12
**history (3)**
78:14,16,23
**hits (1)**
79:25
**hoc (1)**
73:17
**holds (2)**
39:11;59:1
**home (3)**
9:14;35:6;85:19
**Homes (1)**

71:14
**honest (2)**
    24:21;45:14
**honestly (2)**
    10:7;92:1
**Honor (54)**
    3:3,5,8,12,14;4:6;5:9,14,
    24;8:10,20;9:4;10:19;
    11:20;12:13,24;13:15;14:8;
    15:6,15,21;21;23:15,22;
    24:19;25:22;27:17;28:18;
    29:14,15;31:18;33:22;
    36:21;38:13;44:13;47:15,
    20;48:5,8,15;50:8;51:19;
    53:5;71:24;80:14,19;81:9;
    83:11;84:10,15,18,24;
    89:10;91:2,11
**Honor's (1)**
    47:21
**house (1)**
    71:25
**huge (1)**
    37:4
**hundred (2)**
    24:18;68:15
**hundreds (4)**
    36:23;68:1;70:3,20
**hypothetical (1)**
    65:17
**hypothetically (1)**
    66:5

## I

**idea (3)**
    45:12;65:20;90:22
**identified (1)**
    24:6
**identify (1)**
    2:12
**III (2)**
    3:25;5:16
**illogical (2)**
    88:21;89:2
**illusory (1)**
    12:10
**imagine (5)**
    41:2,4;72:14,17;76:22
**immigration (1)**
    36:14
**immunity (1)**
    80:2
**impact (9)**
    12:15;13:22;42:23;59:16,
    19;60:4;66:8;74:17;77:18
**impacted (7)**
    34:15;46:4;54:15,17;
    68:3;74:10;78:15
**impactful (1)**
    74:22
**impacts (3)**
    62:8;66:13;74:15
**impediment (2)**

8:6,7
**impingement (1)**
    9:24
**implement (3)**
    14:21;15:17;16:1
**implementation (1)**
    16:5
**important (1)**
    54:11
**imposed (1)**
    88:14
**imposes (2)**
    53:4;54:9
**imposing (1)**
    77:16
**improper (1)**
    52:11
**improve (1)**
    61:2
**inaudible (3)**
    9:17;79:2,15
**incidence (1)**
    58:5
**incidental (1)**
    51:23
**including (4)**
    44:21;56:6;58:5;78:2
**incongruous (2)**
    68:7,8
**increasingly (1)**
    78:7
**incur (2)**
    49:23;72:7
**incurred (1)**
    79:21
**indefinite (5)**
    34:16;85:22;93:2,3,12
**indefinitely (1)**
    8:18
**indicates (1)**
    26:5
**indicator (5)**
    50:2,3,21,23;51:2
**indisputably (1)**
    6:8
**individual (7)**
    2:10;3:23;4:3;5:2;11:9;
    48:2;61:19
**individualized (1)**
    4:2
**individuals (2)**
    18:12;33:12
**indulgence (1)**
    34:4
**infer (1)**
    11:10
**inference (4)**
    6:11,14;10:12;11:2
**inferences (1)**
    94:20
**inflicted (1)**
    7:9
**information (33)**

16:4,13,16;17:11,24;18:3,
    19;19:12,14,15;21:3,9;22:8;
    23:19,23;24:12;25:6,13,16;
    26:7,10,14;27:1,19;29:3,5,
    21,22;30:12,16,21;31:25;
    92:5
**infrequent (1)**
    93:24
**infringement (1)**
    9:25
**initial (1)**
    91:4
**injunction (1)**
    79:8
**injured (1)**
    39:6
**injuries (1)**
    31:11
**injury (14)**
    3:24,25;7:25;11:11,15;
    19:11;29:8;30:19;32:15;
    35:8,10;37:2,5;38:1
**Innes (1)**
    67:6
**inquiry (4)**
    67:20;73:2;79:14;81:14
**inside (1)**
    70:17
**inspector (1)**
    25:23
**in-state (1)**
    58:21
**instead (1)**
    83:18
**Institute (1)**
    78:2
**institution (1)**
    80:18
**institutions (1)**
    83:25
**instruct (1)**
    15:19
**intend (5)**
    5:5;10:2,6,14;11:4
**intended (3)**
    46:17;65:4;74:20
**intensive (1)**
    79:14
**intent (9)**
    35:4;49:19;73:11;78:15;
    85:21;89:12,25;90:2;93:3
**intention (9)**
    7:20;8:3,23;9:3;10:19;
    13:12;33:7,14;77:10
**interacting (1)**
    66:6
**interaction (2)**
    58:19;66:13
**interactions (1)**
    57:12
**interest (12)**
    54:12;56:8,11,12;60:11;
    73:22,23;74:3;82:24;83:3,5,

6
**interesting (2)**
    9:19;89:9
**interests (2)**
    55:25;61:18
**interpret (1)**
    17:6
**interpretation (1)**
    15:19
**interrupted (1)**
    55:15
**interrupting (1)**
    27:12
**interviewed (1)**
    67:11
**intimidate (1)**
    81:21
**intimidating (1)**
    75:20
**into (13)**
    9:16;15:20;22:11,13;
    23:10,25;34:9;49:4;53:12;
    65:9;78:18,19;83:23
**inures (1)**
    92:3
**invented (1)**
    73:17
**invested (3)**
    59:18;60:20;61:5
**involve (1)**
    23:16
**involved (4)**
    31:8;62:22;74:11;81:3
**involvement (1)**
    72:9
**involving (2)**
    44:22;72:21
**irrespective (1)**
    51:16
**issue (7)**
    13:5;17:6;41:6;45:7;
    83:14;95:15,16
**issued (2)**
    39:18;79:8
**issues (2)**
    31:23;81:9
**issuing (1)**
    31:3

## J

**job (2)**
    23:13;95:4
**Judge (6)**
    10:21;40:19;65:12;73:6;
    74:11;79:6
**judgment (2)**
    15:24;52:18
**judicial (3)**
    11:17;59:23;66:14
**Julie (1)**
    3:9
**July (5)**

34:8;87:7,10;89:6;90:5
**jurisdiction (3)**
39:12;45:4;94:7
**jury (1)**
52:1
**justification (3)**
73:12,15,17
**justifications (2)**
61:14,16

## K

**Keene (8)**
26:17;30:20;41:3;42:5;
43:9,10,21;82:10
**keep (5)**
27:12;30:13;32:13;67:13;
85:13
**keeping (1)**
85:18
**kept (1)**
24:24
**kids (1)**
37:14
**kind (1)**
56:3
**KLEMENTOWICZ (106)**
2:23,23;4:11;8:10,12;
24:23;25:8,12,21;26:1,3;
33:23;34:3,8;36:3,6,11;
37:11,16,20;38:5,9,15,20;
39:1,10,16,23,25;40:6,10,
14,16,21;41:1,13,17;42:3,7,
11,15,22;43:7,11,14,25;
44:8,11;45:8;46:1,4,12,15,
22;47:3;57:17;58:14;63:25;
64:4,9,15,18,21;65:2,5,9;
68:18,25;69:11,13,18,22;
70:16;71:3,9,20;72:12,16;
74:7,25;75:25;76:7,9,12,16,
20;77:6,14;80:11;82:4;
85:3,9,12,16,25;86:8,12,17,
20;87:6,10,12,17;90:10;
95:14,17
**knowledge (3)**
36:12;41:5;45:8
**knows (3)**
36:21;57:15;75:8

## L

**language (3)**
18:24;66:21;93:13
**large (2)**
74:15;83:24
**last (2)**
31:16;95:12
**late (1)**
82:11
**later (2)**
21:22;74:4
**law (65)**
8:13;15:18;16:1,1,2,5,16;
21:23;22:10,13,20,22;23:7,
10;24:13;26:11;29:5;30:1,
17;34:5;43:15;44:20;46:5;
49:2,10,18;53:15;55:3;
56:3;57:15,21,22,23;59:3,6,
11,24;60:2,8,19;61:13;
63:14,17;64:13;65:20,21,
23;66:6,19,25;68:18;73:16;
75:2,13;78:12,25;79:1,17;
81:11;84:14,15;87:15;90:3;
91:17;94:23
**lawful (2)**
75:23,24
**laws (19)**
17:16;23:14;24:14;27:24;
29:7;30:18;44:22;50:19;
56:21,25;57:6,16,21,22;
60:14,14;75:4;80:22;92:18
**law's (2)**
58:10;78:12
**lawsuit (7)**
5:16;6:7;14:8;28:1;47:23,
25;86:9
**lawsuits (2)**
27:23,24
**lawsuit's (1)**
71:10
**lay (2)**
63:21;78:18
**lead (2)**
58:22;88:20
**League (1)**
79:2
**least (13)**
5:17;18:4;33:1;45:17;
52:15;68:2,14;70:18;73:14;
78:24;91:4,14;92:16
**Lee (1)**
78:4
**legal (3)**
13:17;14:4;78:11
**legally (1)**
35:21
**legend (1)**
21:23
**legislation (1)**
67:12
**legislative (6)**
59:21;67:5;73:11;78:14,
15;82:3
**legislators (2)**
61:11,19
**legislature (9)**
59:3,5,14,16;61:5;77:23;
81:17,23;83:16
**legislature's (1)**
81:20
**legitimate (1)**
52:16
**less (1)**
54:19
**letters (1)**
28:5
**level (4)**
5:25;24:25;25:17;26:12
**levels (1)**
73:14
**levy (1)**
88:14
**Libertarian (1)**
73:7
**Liberties (1)**
2:24
**library (1)**
66:10
**license (63)**
4:16;7:4,8,24;8:14;18:1,
25;19:3;20:5,11,21;26:6;
27:4;28:13;30:23;32:22,23;
33:11,14;35:14,19,22,24;
36:2,4,7;38:3;39:8,12,18;
40:1;41:10,10,18,23;42:11,
13,13,20;43:4;47:1;49:16;
51:24;53:6,21;54:22;58:6,
17,18;59:1,12;67:13,25;
79:18;87:5;88:21;93:8,25;
94:3,6,14;95:2,10
**licensed (7)**
10:12,13,13;11:3,3;
35:11;71:23
**licenses (3)**
8:25;16:11;93:12
**licensing (2)**
4:8,13
**licensure (8)**
9:23;17:11;19:24;29:7;
30:18;41:9;91:25;92:19
**life (1)**
14:14
**light (1)**
93:23
**likely (3)**
11:16;23:11;58:16
**likewise (1)**
74:1
**limited (3)**
26:15;30:4;31:11
**line (4)**
25:24;30:10;73:14;74:4
**lines (3)**
9:14;32:1;79:10
**list (2)**
26:18;30:1
**listen (1)**
34:7
**literally (1)**
79:20
**litigated (1)**
45:7
**litigation (10)**
6:12;11:3;12:19;14:5;
15:1;18:10;44:6,12,16;
73:18
**little (5)**
32:6,8;35:25;56:18;93:16
**live (13)**
32:25;35:11,25;37:23;
42:1,3,5;43:8,9,10;55:4;
67:15;70:24
**lived (5)**
42:7,14;43:20;58:20,25
**lives (2)**
71:12,14
**local (1)**
29:17
**locked (1)**
24:4
**logic (1)**
60:3
**Lombardi (1)**
91:7
**long (7)**
35:24;36:16;42:7,14;
78:23;79:9;95:20
**long-term (1)**
82:24
**look (7)**
10:20;45:14;67:5;73:4;
74:13;75:11;90:14
**looked (1)**
36:6
**looking (2)**
43:3;47:11
**lost (1)**
74:23
**lot (7)**
10:11;12:19;66:8;72:2,2,
3,6

## M

**Maggie (2)**
2:25;3:7
**magnitude (1)**
74:14
**main (1)**
36:15
**maintain (5)**
47:23,25;83:17;86:15,21
**maintained (1)**
23:20
**maintaining (2)**
23:17;34:23
**maintains (1)**
16:7
**majority (1)**
10:8
**makes (8)**
12:3;17:18;24:15;42:10;
44:13;58:20;67:12;87:1
**making (6)**
18:4;42:17;61:4;63:6;
76:1;87:7
**managing (1)**
23:17
**Manchester (1)**
82:10
**manifest (1)**
93:3

**manifestation (1)**
35:4
**manifesting (1)**
34:21
**many (2)**
54:24;82:8
**margin (1)**
74:25
**marking (1)**
25:23
**Massachusetts (2)**
39:8;83:18
**Massachusetts-licensed (1)**
39:7
**matter (10)**
40:4;47:8;48:4;49:2,10;
55:6;61:24;64:25;65:3;77:5
**matters (6)**
12:14;23:5;39:4;55:15;
64:19,24
**maximum (1)**
39:16
**may (30)**
6:24;22:3,4;28:12,14;
30:16;33:11;34:3;39:25;
44:2;45:16,20,20;47:9,9,10;
56:5;61:18;66:9;70:7,24;
71:23;72:1;83:5;86:1,2,4;
87:25;88:11;89:20
**maybe (3)**
57:25;73:21;92:11
**McCafferty (2)**
65:12;74:11
**mean (35)**
4:23;5:10;7:16;9:5;10:7;
12:3,15;13:6;14:8,13;
15:10;19:11;20:23;26:22;
30:6,8;31:13,20;32:2;
37:14;41:4,9;57:18;58:8,
13;59:2;62:16;64:5;75:14,
23;77:1,3;84:14;87:9;93:24
**means (1)**
26:18
**meant (2)**
59:19;61:1
**measure (2)**
54:23,24
**medical (3)**
62:18,20;77:3
**meet (3)**
53:25;54:1,2
**Melecio (1)**
72:20
**members (3)**
80:16,18,24
**memorandum (1)**
66:22
**mention (3)**
26:8;78:19;82:15
**mentioned (3)**
74:9;83:11;87:23
**meritory (1)**
48:23

**merits (6)**
9:20;33:25;44:6;46:6;
47:5;53:18
**Michael (1)**
82:7
**might (23)**
5:10,12,13;9:22;14:15;
19:6,6;24:13;28:13;30:10,
11;34:4;36:14;43:13;51:15;
58:22;64:25;65:2;69:5;
89:18;91:23;92:20;94:17
**minds (1)**
92:13
**minimal (6)**
53:4;54:9,13,20;55:20,24
**minute (2)**
80:8;88:1
**minutes (3)**
35:17;36:2;48:12
**misdemeanor (2)**
64:11,12
**misinformation (1)**
31:24
**mismatch (2)**
65:13;74:10
**missing (3)**
10:4;32:24;34:14
**modern (1)**
9:17
**Moffett (2)**
78:23;82:7
**moment (2)**
74:7;84:25
**money (3)**
37:25;80:5;83:25
**monies (1)**
37:2
**monitor (1)**
19:17
**months (3)**
43:21;67:8;94:14
**moods (1)**
4:22
**moot (1)**
81:1
**more (16)**
6:2;7:25;23:10;27:16;
35:20;37:23;44:4;46:5;
61:4;76:1,2,4;78:22,25;
94:13;95:3
**morning (9)**
2:6,7,17;3:4,5,8;48:15;
91:11,20
**most (8)**
12:14;13:21;35:3;53:4;
54:12;63:2;82:11;88:22
**motion (16)**
2:3,8;3:13,15,19;4:25;
6:19;44:18;47:5;53:18;
57:2;66:23;73:4;81:13;
91:5;95:23
**motions (1)**
6:15

**motivated (2)**
13:11,12
**motivation (7)**
13:8;22:25;23:1,2,9;
61:18;75:9
**motivations (2)**
61:9,24
**motive (1)**
60:19
**motor (25)**
4:15,17,21,24;13:10;
16:20;17:1;18:16,19;20:7,
10;24:14;29:6;30:17;39:11;
50:19;56:13,21;57:5,15,22;
59:15;93:7;94:10,13
**move (6)**
24:9;44:9;61:23;77:19,
20;95:9
**moved (3)**
53:8,10,11
**moving (3)**
41:7;64:1;95:5
**much (5)**
22:23;35:25;44:4;90:10;
92:24
**municipal (2)**
25:17;26:11
**must (10)**
3:25;4:1;14:13;21:8;
52:15;75:15,15,16;83:7;
88:8
**myself (6)**
12:19;20:4;26:23,25;
45:10;95:5

## N

**name (3)**
7:17;25:23;80:17
**named (2)**
14:7,9
**names (1)**
42:4
**name's (1)**
26:18
**Nashua (1)**
71:15
**nature (1)**
73:2
**nearest (1)**
35:15
**necessarily (2)**
6:10;27:9
**necessary (2)**
7:25;11:1
**need (7)**
14:4;32:2;35:18;41:20;
43:17,18;45:24;47:16,24;
48:11,24;52:25;66:1;69:23;
71:3;95:19
**needing (1)**
9:11
**needle (1)**

**24:9**
**needs (2)**
66:2,7
**neighbor (1)**
36:23
**neighborhood (1)**
54:16
**neither (1)**
74:4
**neutral (1)**
61:13
**New (85)**
2:5,14,21,24;3:2;6:5,24;
8:14;10:3,10,14;11:4;12:6;
20:12;26:24;27:3;31:4,5;
32:23,25;34:9;35:5,12,13,
23;36:8,21;37:23;38:3;
39:19;44:20;46:25;47:22;
48:20;49:18,20;50:21;
51:10;52:6,14,24;53:23;
54:8,9,18;56:1,6,11,13;
70:1,6;72:3;73:7,19,19;
74:21,23;75:24;78:24;81:6;
82:23;83:15,17,20,25;84:1,
2,19;85:20,20,24;86:2,24;
87:1;88:4,22;89:7,23;90:4,
14,14;91:24;92:21;93:20;
95:6
**Newburger (4)**
73:25;77:6,19;93:5
**newly (1)**
77:9
**next (3)**
66:16;67:20;81:25
**NH (2)**
67:11,15
**nice (1)**
75:10
**night (1)**
5:22
**nobody (2)**
39:8;75:7
**nondomiciliary (1)**
79:4
**nonresident (5)**
4:15;39:11;79:4;94:10,12
**nonresidents (3)**
64:12;75:14;76:25
**North (2)**
35:16;79:7
**notarized (1)**
72:25
**notation (1)**
26:3
**note (1)**
79:17
**noted (1)**
79:8
**notes (1)**
66:23
**notice (1)**
59:23
**notify (1)**

31:8
**not-that-likely (1)**
57:19
**number (7)**
2:4;33:4,12;55:13;72:24;
74:8,9
**numbers (2)**
62:20,21

**O**

**object (1)**
12:20
**objection (2)**
6:19;54:14
**obligated (2)**
7:24;13:19
**obligation (11)**
7:3;17:25;28:4;33:13;
45:3;49:15,21,23,25;51:13,
18
**obligations (3)**
20:17;69:9,23
**obtain (4)**
32:23;33:13;39:18;59:11
**obtained (1)**
20:20
**obtaining (4)**
20:5;53:20;88:15,19
**obviously (5)**
6:15;40:1;66:8;74:13;
87:23
**off (7)**
4:7;9:13;25:24;37:10;
42:8;95:21,22
**offense (7)**
38:22,23;40:5;44:25;
64:14,16,23
**offenses (1)**
72:8
**offered (1)**
73:15
**office (14)**
2:15,18,22;17:15;21:13;
23:24;24:2,4,8,11;25:3;
31:6;70:22;92:8
**officer (8)**
41:4,25;42:18;43:2,5,10,
19;58:19
**officers (1)**
45:2
**offices (3)**
23:21;29:4,23
**official (10)**
14:9,18,22;15:21;31:13,
22;32:3,4;45:13;66:7
**officials (5)**
27:21;28:23;29:18;63:6;
78:17
**official's (1)**
63:10
**often (1)**
49:13

**old (3)**
84:14,15;93:10
**older (1)**
62:10
**once (4)**
50:11;51:21;59:7,7
**one (52)**
8:14,15;9:22;12:25;
19:16;20:9,15;21:23,24;
23:18;28:12;32:12;34:18,
19;36:3;39:21;40:5,11,22;
43:17;45:12;46:8;47:10,24;
48:9;50:20;51:25,25;54:19,
19;55:2,16;58:17;61:7,18;
62:25;67:4;69:5;73:17,24;
75:15,15,15;78:2;79:17;
83:24;88:8;89:20,22;90:3,
4;91:14
**ones (1)**
34:14
**one's (1)**
68:16
**oneself (1)**
40:5;69:6;75:17;88:9
**online (1)**
36:4
**only (22)**
2:10;5:7;8:13;24:4,5;
26:13;30:2;34:19;39:4;
40:11;41:15;42:16,18;
47:24;53:4;54:9;55:4,7;
64:13,14;76:24;83:4
**onto (1)**
72:23
**operate (3)**
4:23;17:7;56:13
**operation (1)**
87:15
**operative (1)**
87:7
**opposed (2)**
28:7;59:20
**opposing (3)**
12:24;32:16;75:3
**option (1)**
6:23
**order (13)**
3:18;14:20;28:21,24;
29:1;31:4,9,23;32:5;69:24;
79:7;83:23;90:25
**ordered (2)**
29:4;30:15
**orders (1)**
44:17
**Originally (1)**
62:17
**others (3)**
56:5,5;62:18
**otherwise (4)**
18:9;37:1;38:15;58:8
**out (19)**
6:7;20:2;27:10;39:3;
44:13,18;45:21;53:5;55:2,

18;63:21,22;66:21;67:8;
78:18;81:14;82:4;93:14;
94:24
**outcome (1)**
81:25
**out-of-state (14)**
26:6;38:11;42:19;43:3,4;
52:2;58:17,18;59:1;67:13,
14;82:9;94:2,3
**out-of-staters (1)**
82:12
**outside (1)**
14:25
**outstanding (1)**
48:2
**over (4)**
10:9;12:25;41:3,23
**overall (1)**
54:18
**overly (1)**
11:19
**own (11)**
4:5,18;36:18;37:12,21;
45:4;69:23,25;71:14,22;
80:25
**owners' (1)**
79:25
**owns (6)**
36:19;68:13;69:7,16;
71:1,18

**P**

**page (1)**
66:23
**paid (2)**
79:20;88:18
**paper (1)**
23:23
**papers (4)**
52:23;63:2,21;88:13
**parcel (1)**
69:8
**parents (3)**
9:13,13,17
**part (11)**
37:9;45:15;69:8,8,14,19;
77:22,23;83:1;93:1,4
**participate (2)**
68:14;82:23
**participating (2)**
34:25;35:2
**particular (2)**
28:17;68:5
**particularized (2)**
4:1;6:1
**parties (3)**
26:16;73:9;80:21
**partisan (1)**
61:17
**party (12)**
2:11;3:3;11:11;30:3,3;
47:24;71:25;73:7;80:16;

81:7;84:20,23
**Party's (1)**
47:22
**passed (4)**
66:5;75:6,9;81:17
**passes (2)**
55:5;59:3
**past (3)**
44:21;73:4;78:17
**pay (14)**
32:22;37:25;59:11,12;
66:7;68:20;70:2,4,11,12;
83:13,23,24;88:23
**paying (3)**
14:4;37:2;52:1
**penalty (7)**
20:4,6,7;29:10;38:9,22;
94:18
**pending (1)**
27:23
**people (51)**
7:15,18,23;8:21;9:1;28:6,
6,10;32:20,21,25;33:16;
34:14;35:3;36:13,13,15;
40:1;42:23;46:2,16,20;
49:3;54:24;55:7,13,20;
57:25;59:6;60:19;61:5;
68:2,4;71:20,25;72:2,4,5;
74:8,9,15,18;75:20,20,21;
76:22;77:7,15,18;90:13;
93:25
**percent (2)**
24:18;54:19
**percentage (1)**
54:17
**perfectly (2)**
17:22;68:9
**perhaps (3)**
54:15;75:7;89:14
**period (4)**
11:6,6;35:20;58:21
**permissible (4)**
70:10;76:8,11,12
**permitted (1)**
35:21
**person (31)**
4:20;9:10;34:12;38:16;
41:22,24;43:20;50:11,14,
21;51:9,21;54:2,3;55:12;
58:3,22,23;68:12;69:6,15;
70:24;71:1,12,17,18;72:1,1;
85:4;88:4;94:2
**personal (1)**
4:2
**personally (1)**
44:23
**persons (4)**
24:6;48:20;56:6;88:15
**pertaining (1)**
30:18
**pertains (1)**
90:21
**Peterson (3)**

73:25;77:7;78:24
**physical (3)**
  4:21,23;49:20
**physically (1)**
  36:9
**picked (1)**
  9:12
**picture (3)**
  92:2,8,23
**piece (1)**
  65:11
**place (4)**
  49:20;50:22;52:3;63:12
**placed (1)**
  52:6
**plain (3)**
  7:1,10;62:1
**plainly (1)**
  52:16
**plaintiff (1)**
  28:25
**plaintiffs (15)**
  2:10;3:9,23;4:2,3;5:3;
  11:10;12:16;37:10;48:2,17;
  49:13;52:15;62:13;66:1
**planning (1)**
  88:12
**play (3)**
  43:9,10;94:24
**plead (2)**
  67:24;75:3
**pleaded (2)**
  81:15,16
**pleadings (1)**
  38:10
**please (2)**
  15:14;91:1
**plenty (1)**
  9:9
**plurality (1)**
  61:12
**plus (1)**
  38:21
**Plymouth (1)**
  82:9
**pm (1)**
  95:24
**point (11)**
  5:20;6:15;11:24;22:16;
  31:17;42:17;44:18;47:21;
  56:24;60:24;66:21
**pointed (7)**
  44:13;53:5;55:2,17,18;
  81:8,14
**points (2)**
  27:16;45:21
**police (3)**
  41:25;45:2;72:9
**political (4)**
  26:15;30:2;72:22;80:21
**politics (1)**
  45:16
**poll (7)**

66:11;79:24;88:13,14,20,
23;89:1
**population (2)**
  54:18;77:3
**portion (3)**
  3:15;26:10;32:15
**position (18)**
  6:13,17;8:8;10:17;31:20;
  36:25;48:17;49:13,17;
  52:23;53:3,20;54:12;55:23;
  56:10;57:1;62:3;89:1
**possibility (5)**
  44:2,3,4;58:15,16
**possible (1)**
  43:16
**possibly (1)**
  18:2
**post (1)**
  73:17
**potential (4)**
  27:19;54:25;58:3,3
**Potentially (3)**
  50:20;54:16;92:5
**power (2)**
  21:18;31:10
**practical (6)**
  14:25;15:2;40:4;44:14;
  77:4;89:19
**practically (3)**
  92:25;93:11,14
**practice (1)**
  65:15
**precise (1)**
  83:3
**predates (1)**
  94:12
**predict (1)**
  73:8
**prefer (1)**
  33:24
**preliminary (1)**
  79:7
**premise (1)**
  40:7
**presence (2)**
  34:23;49:21
**present (3)**
  3:18;33:14;47:18
**presented (4)**
  3:19;4:24;7:5;21:3
**presumably (1)**
  45:1
**pretty (4)**
  35:24;43:23;66:11;67:17
**prevailed (1)**
  28:25
**prevent (2)**
  63:11;75:14
**previously (3)**
  28:10;50:16;59:25
**prime (1)**
  35:3
**principal (1)**

49:20
**principally (1)**
  77:21
**prior (8)**
  22:10,13;27:23;34:8;
  56:3,3;85:16;87:21
**private (2)**
  14:3;91:8
**privileged (2)**
  18:10;24:5
**probable (1)**
  43:16
**probably (5)**
  12:14;64:25;73:13;74:16;
  90:11
**problem (2)**
  71:11,11
**procedural (2)**
  79:25;95:16
**proceed (3)**
  3:19;11:8;12:5
**process (2)**
  22:7;62:6
**produce (2)**
  14:15;41:10
**produces (1)**
  41:9
**prohibited (1)**
  24:11
**prohibits (1)**
  79:23
**promulgate (1)**
  31:24
**proper (2)**
  78:8;81:12
**properly (2)**
  81:15,16
**proposition (2)**
  73:20;79:23
**prosecuted (5)**
  20:10,18;40:11;45:2;94:4
**prosecuting (1)**
  21:11
**prosecution (4)**
  40:5;41:11;51:5;64:12
**prosecutor (1)**
  21:10
**prosecutorial (2)**
  21:4;27:2
**prosecutors (1)**
  45:2
**protect (2)**
  14:14;30:20
**protected (1)**
  77:24
**protections (1)**
  25:10
**prove (2)**
  19:20;73:9
**proven (1)**
  39:3
**provide (1)**
  26:14

**provided (3)**
  17:22;38:15;61:18
**provides (1)**
  27:20
**provision (4)**
  38:10,17;93:15;94:11
**provisions (1)**
  18:8
**proxy (1)**
  63:15
**public (12)**
  25:13,15,16;26:10,14;
  27:6,21;29:17;32:3,4;33:9;
  68:15
**Puerto (1)**
  72:22
**pull (3)**
  5:19;26:13;38:12
**pulled (4)**
  41:3,21,22;65:11
**pun (1)**
  65:4
**purchase (2)**
  67:25;79:18
**purchasing (1)**
  40:1
**pure (2)**
  6:16;32:2
**purported (1)**
  83:5
**purpose (8)**
  59:24;60:2,7;75:4,13;
  76:1;78:12;85:7
**purposes (5)**
  6:25;34:24;77:25;85:11;
  92:24
**put (5)**
  40:19,19,20;55:25;69:3
**puts (1)**
  56:19

---

**Q**

---

**qualifications (2)**
  19:21;48:22
**qualified (2)**
  49:3,4
**quickly (1)**
  27:17
**quite (1)**
  21:21
**quote (4)**
  65:11;78:22;79:25;82:8
**quotes (1)**
  78:21

---

**R**

---

**race (2)**
  55:9;75:1
**races (1)**
  42:8
**racial (1)**

55:6
**raise (5)**
    13:15,16,20,25;84:12
**raised (3)**
    6:18;65:14;81:9
**ramifications (1)**
    50:18
**rational (1)**
    69:4
**razor-thin (1)**
    82:13
**reached (1)**
    73:6
**read (4)**
    19:5;78:21;91:11,20
**reading (5)**
    7:1,11;38:12,18,24
**real (12)**
    14:24,24,25;30:25;40:16,
    18;41:11,11;69:2,19;83:6;
    92:17
**reality (1)**
    77:1
**realize (1)**
    91:23
**really (20)**
    4:7;30:5,11;40:23;43:15;
    46:19;47:8;59:13;68:3,17;
    71:5,15;75:7,21;76:25;
    81:9;82:19;91:12;92:16;
    94:23
**reason (5)**
    13:2;31:21;46:23;52:21;
    62:19
**reasonable (3)**
    68:11;83:15,19
**reasons (3)**
    18:9;33:5,12
**recall (1)**
    30:7
**recently (1)**
    78:25
**recess (3)**
    48:11,13;63:9
**recognized (1)**
    73:23
**recollection (2)**
    18:14;24:23
**record (13)**
    2:13;38:19,24;54:7;
    59:22;60:7;65:6;67:5;82:3;
    91:13;95:19,21,22
**records (1)**
    27:7
**red (3)**
    12:10;28:2;45:11
**redress (3)**
    28:22;29:8;30:19
**redressability (5)**
    23:8;29:12;30:23;35:9;
    90:20
**redressed (1)**
    11:17

**reelection (1)**
    82:12
**reference (1)**
    4:3
**reflect (1)**
    59:23
**reflects (2)**
    59:24;60:7
**regarding (1)**
    29:7
**regardless (3)**
    13:23;36:19;63:18
**regime (9)**
    10:1;18:20,22;19:14;
    45:22;56:19,22;92:21;
    93:20
**register (28)**
    8:3;16:10,11;18:1;19:2,
    22;25:22;28:7;30:22;32:20;
    36:20;37:12,20;46:23;47:2;
    49:16;68:1,20;69:24;70:1,2,
    4,6,12;79:21;80:6;88:8;
    95:1
**registered (17)**
    7:19;20:12,21,23;26:18,
    21;27:4;51:11;58:18;59:8;
    67:8,14;82:11;85:17;86:10;
    94:16;95:10
**registering (24)**
    20:5;22:1,9;32:17;33:6;
    35:1;39:22;43:22;49:14,23,
    24;50:1,2,15,15;51:4,25;
    53:21,21;58:6;81:22;87:4,5,
    6
**registers (2)**
    34:19;89:15
**registration (34)**
    4:7;16:4,7;17:10,10,24;
    18:6;19:20;20:18;21:9,15;
    23:19,25;24:12;25:6;29:7;
    30:19;36:22;37:9;41:8,20,
    24;42:10,12;48:22;51:16;
    59:12;75:17;79:10,18;
    83:17;88:22;91:25;92:20
**registry (1)**
    60:7
**regulate (1)**
    13:13
**regulating (1)**
    56:12
**regulation (1)**
    59:15
**regulations (1)**
    17:7
**rejected (1)**
    77:13
**released (1)**
    24:6
**relevant (5)**
    34:24;55:19;65:18;74:15;
    81:14
**relief (2)**
    14:19,20

**relinquish (2)**
    8:17;37:1
**relinquishing (2)**
    46:18,18
**rely (1)**
    63:1
**remain (1)**
    85:21
**remaining (1)**
    37:24
**remember (1)**
    45:4
**remote (3)**
    44:1,3,4
**removed (2)**
    34:15;93:13
**removing (1)**
    77:16
**renew (1)**
    36:4
**repeatedly (1)**
    4:4
**report (1)**
    59:22
**represent (3)**
    24:8;10;37:14
**Representative (2)**
    78:22;82:7
**representatives (1)**
    31:7
**represented (2)**
    26:23,25
**representing (2)**
    16:22,24
**Republican (3)**
    30:3;81:20;82:6
**Republicans (1)**
    81:17
**require (1)**
    37:4
**required (6)**
    3:24;32:4;35:12;36:24;
    54:3;59:11
**requirement (11)**
    4:14;6:20;19:17,19,24;
    28:5;41:20;70:3;74:2;
    77:17;88:17
**requirements (6)**
    11:14;22:1;35:7;41:6;
    52:24;80:1
**requires (8)**
    7:21;8:14;11:18;28:4;
    37:4;52:4;53:25;79:17
**requiring (1)**
    72:24
**reside (1)**
    70:25
**residence (11)**
    34:20,21;50:22;52:3;
    85:6,10,13,18,19,20;87:13
**residency (40)**
    19:17,19;20:16,17,20;
    39:9,13,17,21;40:2;41:5,8;

43:3,6,22;49:12,18;50:3,12,
15;51:3,15,22,23;53:22;
54:21;58:5;70:8;74:2;77:8,
17;84:7,7;85:14,23,25;86:6,
15,22;87:2
**resident (48)**
    4:16,17;19:21;20:1,4,24,
    25;22:9;26:24;27:1;33:6,
    17,18;34:12,13,16;51:10,
    12;52:13;58:4;59:1,8,9;
    66:2;68:13,16,23;69:6;
    75:15,16,17;85:3,4,5;86:23;
    88:9;89:6,7,8,21,22,23;
    90:4,6,15;93:2;94:4;95:6
**residents (30)**
    6:24,25;7:2;33:2,3,4;
    34:10;52:5;53:23;55:25;
    56:12,20;59:4,10;60:17,18,
    23;62:18,21;68:20;75:22;
    76:6,14,18;77:20;86:3;87:1,
    16;88:22;90:13
**resolved (3)**
    57:2;65:18;79:15
**respect (5)**
    6:17;31:17;50:18;88:13,
    24
**respectfully (2)**
    40:7;90:1
**respond (2)**
    65:25;88:12
**response (3)**
    69:4;73:18;87:22
**rest (1)**
    88:12
**restaurants (1)**
    84:2
**result (5)**
    34:18;42:20;73:6;79:19;
    89:2
**results (1)**
    88:21
**retain (1)**
    9:23
**retire (2)**
    77:10;93:10
**revised (1)**
    52:14
**Rico (1)**
    72:22
**Rideout (2)**
    44:24;64:22
**right (99)**
    4:5;5:13,20,25;6:8;7:12;
    9:25;13:6,9,10,13;14:6,12,
    23;15:11;17:16,24;19:10,
    12;20:6,18;21:9;23:7,14,14,
    15;24:20;26:2,19,22,25;
    27:5,8,10,25;29:7;30:13;
    37:12,13,19;39:10,15;
    41:15;42:16;43:11;46:11,
    18,21;47:3;48:9,14,19,25,
    25;49:1,22,25;50:17;53:5;
    54:25;55:12;59:19;60:15;

Case 1:19-cv-00149-JL   Document 63   Filed 10/25/19   Page 111 of 115
CAROLINE CASEY, ET AL. v.
NEW HAMPSHIRE SECRETARY OF STATE, ET AL

MOTION HEARING
July 30, 2019

62:3,7,9,24;64:7,15,21;
65:1;66:3,25;67:3;68:4,25;
71:16;75:14;76:16;77:1,14,
17;81:10,18,24;83:14;
84:16;85:3,4;86:11,19;
87:18;88:5,10,11;90:9,17;
93:22;94:9
**rights (3)**
8:17;65:20;69:9
**risk (1)**
72:7
**road (8)**
13:13;41:4;43:13;44:5;
59:20;65:1,3;93:14
**roads (6)**
60:16;70:14;83:18,18;
92:12,15
**roadside (3)**
43:12;57:12;58:8
**roadways (1)**
56:14
**role (7)**
17:21;22:7,14,17,22;
23:7;44:11
**room (1)**
37:17
**roughly (1)**
11:6
**round (1)**
35:15
**round-trip (1)**
70:21
**RSA (11)**
4:14;18:12;28:4;39:10;
49:7;87:24;88:3;89:14,17,
17;90:12
**RSAs (1)**
66:2
**rubric (1)**
46:9
**rule (1)**
38:20
**ruler (1)**
25:24
**rules (2)**
13:13;59:20
**rural (1)**
9:6
**rush (1)**
47:16

**S**

**Safety (1)**
16:20
**sake (1)**
60:25
**Sam (1)**
2:18
**same (24)**
21:5;22:14;25:9;34:11,
17;42:21;45:3;46:13,19;
47:1;50:5;54:2;60:23;61:2,

8;71:12;73:6;77:15,18;
86:1,23;88:9,10;90:21
**Sanborn (1)**
82:21
**sat (1)**
64:2
**Saucedo (2)**
65:12;74:10
**save (1)**
66:14
**saw (2)**
24:21;43:20
**saying (5)**
8:2;10:1;15:12;30:9;
37:13;40:22;51:14,15;
63:14;69:17;74:2
**scale (1)**
67:21
**scare (1)**
75:5
**scaring (1)**
75:19
**scenarios (3)**
57:19;58:7,10
**scheduling (1)**
63:8
**scheme (3)**
20:14;55:9;72:23
**schemes (1)**
79:24
**school (2)**
82:19;84:1
**scrutiny (5)**
53:4,16;66:15;67:22;
73:15
**second (4)**
11:14;46:13,20;48:9
**secrecy (1)**
25:9
**Secretary (42)**
2:5;11:8,13,25;12:1,4,8;
13:14;14:5,19,21;15:3,16,
25;16:12,15,25;17:18;18:3,
18;22:6;23:13;24:2,3,11;
25:2;26:12;27:20;28:3,19,
21;29:1,4,16,19,20;30:15;
31:2,21;44:12,14;92:7
**Secretary's (3)**
22:7,14,17
**section (2)**
4:19;52:13
**seek (1)**
52:17
**seeking (1)**
12:17
**seem (8)**
7:10;11:1;25:6;55:13;
68:7,8,11;91:8
**seems (8)**
12:9;21:8,24;32:2;44:1;
45:11;83:18;94:7
**sees (1)**
42:19

**segue (1)**
75:10
**self-governance (1)**
35:2
**self-government (1)**
34:25
**selfie (2)**
44:24;64:22
**sell (1)**
30:1
**senate (4)**
75:1;79:9;82:16,17
**Senator (4)**
67:6,10;82:17,21
**senators (2)**
78:21;82:6
**send (1)**
28:5
**senior (1)**
7:17
**sense (3)**
42:10;60:3;68:17
**sent (2)**
24:25;28:10
**separate (5)**
19:25;56:4;59:25;60:12;
87:23
**separately (1)**
65:25
**series (1)**
44:19
**services (1)**
66:8
**Serving (1)**
52:1
**set (2)**
34:4;65:23
**Seth (1)**
2:20
**several (1)**
82:16
**severe (3)**
67:24;70:19;73:3
**severity (1)**
70:19
**Shaheen (1)**
3:1
**shall (6)**
4:23;31:5,5;38:21;39:16;
85:5
**shape (1)**
23:17
**share (7)**
16:3,4;24:12;29:1,5;
30:16;68:16
**shared (5)**
17:11;18:9,11;19:15;27:1
**shares (1)**
16:12
**sharing (9)**
16:15;18:3,18;19:12,14;
21:4;22:8;29:21;92:5
**sheet (1)**

25:22
**show (5)**
14:15;52:15,19;66:1;
74:17
**showed (1)**
26:20
**showing (2)**
28:8;60:6
**shows (1)**
59:22
**side (2)**
21:24;75:12
**sides (2)**
21:22;89:6
**signal (3)**
64:3,6,7
**signature (2)**
65:13;74:10
**signatures (1)**
72:24
**significance (2)**
14:25;15:2
**significantly (1)**
44:16
**similar (4)**
14:17;65:14;77:15;82:14
**simple (1)**
79:24
**simply (4)**
53:25;61:17;65:18;66:18
**single (2)**
34:23;66:2
**sit (1)**
31:18
**sitting (1)**
17:8
**situation (1)**
41:2
**situations (1)**
58:12
**six (2)**
82:5;94:14
**skin (1)**
82:19
**sliding (1)**
67:21
**slightly (1)**
22:12
**sliver (1)**
34:14
**Slow (2)**
38:18,25
**small (1)**
54:17
**social (1)**
34:24
**sold (2)**
30:1,2
**solution (1)**
81:20
**somebody (2)**
15:13;89:7,15;95:1
**Somebody's (2)**

5:19;39:5
**somehow (1)**
  21:11
**someone (12)**
  4:25;6:7;10:13;19:15;
  22:8;26:5,24;41:9;58:25;
  66:10;89:6;90:15
**someone's (1)**
  19:11
**somewhere (2)**
  10:14;54:15
**sophisticated (2)**
  79:24;80:4
**Sorry (8)**
  21:6;27:13;34:2;37:15;
  63:25;66:17;91:3,10
**sort (7)**
  12:9;45:9;62:16;65:25;
  69:3;90:24;92:8
**sought (1)**
  18:10
**sound (3)**
  70:25;71:18;89:18
**sounds (11)**
  13:3,4;30:5,6,7,23;53:17;
  70:23;71:16;90:1,2
**sources (1)**
  78:13
**south (1)**
  36:24
**southeast (1)**
  35:25
**speaking (3)**
  58:14;92:25;93:11,14
**specific (2)**
  18:9;24:6
**specifically (3)**
  63:7;82:8;84:19
**speculation (2)**
  6:16;32:3
**speculative (2)**
  5:25;6:14
**SPENCER (19)**
  3:1,1;33:24;47:14,19;
  48:8;80:13,14,19,24;81:3,6;
  83:20;84:9,13,15,18,24;
  87:22
**spend (1)**
  35:14
**sponsors (1)**
  67:6
**springs (1)**
  70:5
**stage (6)**
  11:2;19:10;45:24;49:11;
  57:3;81:13
**stand (1)**
  18:15
**standard (5)**
  54:3;65:21;66:16,24;
  67:19
**standards (1)**
  54:2

**standing (44)**
  2:9;3:15,22,25;5:15;9:20,
  21;10:22;11:12,15;12:1,11;
  19:10;23:3,6;24:9,16;
  27:11;31:15;33:24;34:1,18;
  35:7;37:4;40:24;41:15;
  44:7;45:5;47:13,19,22,24;
  56:18;64:25;68:9,10;80:15,
  17,21;84:23;91:18;92:4,6,7
**standpoint (4)**
  13:19,22;23:3,6
**start (3)**
  47:11;57:11,11
**started (3)**
  3:21;17:17;31:1
**State (154)**
  2:5;5:1,4,4,5,13,17;6:10,
  22;7:1,14,18,19,20,23;8:4,
  17;9:3,4,24;11:4,9,13,25;
  12:1,4,6,9;14:6,18,19,21,22;
  15:3,17,25;16:9,12,15,23,
  25;17:12,16,18;18:3,5,12,
  18;20:1,24,25;21:10,10;
  23:13,20;24:25;25:1;26:11,
  13,17,24;27:2,20;28:19,22,
  23;29:1,5,16,19,20;30:16,
  17,20;31:2,4,5,12,13,21,22;
  32:19,25;33:3,7,15,18;35:5;
  36:1,21;37:2,25;38:4,10;
  39:14,18;44:12,15,20;
  49:17;50:12;51:10,22;55:5,
  5,25;56:10;61:3;62:2;66:5,
  12,25;67:15;68:12;70:10,
  12,13,14,25;72:13;73:19,
  20,23;74:21;75:24;76:6;
  78:5,16;80:22;82:2,19,25;
  83:23,24;85:6,13,14,19;
  86:6,19,22;87:3;89:8,16,22;
  90:6,12,13,16,23,23;91:24;
  94:10;95:6
**stated (3)**
  6:11;82:17;93:1
**statement (1)**
  82:6
**statements (3)**
  67:6;82:5,14
**states (12)**
  5:8;11:4;13:15;35:11;
  85:11,24;86:1,2,4,7,15,16
**State's (15)**
  14:20;23:13;24:2,3,11;
  25:2;28:3;33:25;48:17;
  54:12;66:17,22;68:14;
  73:12;92:8
**statewide (1)**
  63:17
**status (2)**
  95:7,9
**statuses (1)**
  36:14
**statute (27)**
  7:2,11,21;13:8,11;16:17;
  17:9;18:8;20:10;24:17;

28:9;33:13;38:12,16;49:7,
  8;50:6,17;55:5;56:15,17;
  61:1;65:17,19;83:21,21;
  84:10
**statutes (10)**
  15:20;17:2,4,5,6;20:8;
  52:14;67:4;87:24;88:7
**statutorily (1)**
  34:10
**statutory (16)**
  4:18;10:1;15:18;18:20,
  22,24;19:13;25:9;28:5;
  37:1;45:22;52:20;53:8;
  56:19,22;92:21
**stick (1)**
  34:1
**still (13)**
  8:21;12:5;22:4,12;28:14;
  39:2;49:4;53:3,7,16;76:16;
  92:1;94:9
**stolen (2)**
  82:12,13
**Stop (1)**
  67:10
**straightforward (1)**
  48:18
**straws (2)**
  30:8,8
**strong (2)**
  56:10,12
**struck (3)**
  74:1;78:13;93:4
**struggling (1)**
  83:13
**student (15)**
  5:10,10,12,13,21;26:17;
  30:20;41:3;52:2;67:11;
  71:22;79:5,12;82:18;84:5
**students (24)**
  7:16;8:2,24;9:23;10:9;
  33:8;37:15,16;54:1;56:4;
  62:17,22;63:7,14,15,19;
  81:21,25;82:9;83:12,22,23;
  85:10;92:14
**study (1)**
  11:7
**subject (3)**
  58:4;91:12,21
**subjects (1)**
  20:3
**subpoena (2)**
  21:13,18
**subsequent (1)**
  38:23
**substantial (1)**
  58:21
**sued (4)**
  15:21;17:1,14;91:15
**suffer (1)**
  9:24
**sufficiency (6)**
  2:9;47:6;48:10,16;68:10;
  71:6

**sufficient (4)**
  11:18;33:1;37:3;73:3
**sufficiently (4)**
  10:22,22;74:3,22
**suggest (3)**
  10:12;49:14;57:18
**suggesting (1)**
  58:16
**sums (1)**
  83:25
**Superior (1)**
  79:7
**Supp (2)**
  78:3,5
**support (2)**
  66:22;89:2
**supported (2)**
  55:24;61:13
**Suppose (4)**
  12:11;28:25;29:9;38:2
**supposed (1)**
  86:13
**suppress (1)**
  81:23
**Supreme (4)**
  54:5,6;61:12;73:20
**sure (32)**
  5:14,24;6:6;11:1,22;
  18:13;19:1,8,16;20:13;23:4,
  5;29:19;32:9;38:12;40:12;
  41:13;46:5;58:8;60:18;
  61:1,4,15,20;63:25;71:25;
  80:10;81:5;84:9;85:1;91:9;
  93:11
**surprised (2)**
  10:8;45:9
**susceptible (1)**
  73:24
**swath (1)**
  74:15
**swear (1)**
  89:16
**sweep (2)**
  52:16;53:7
**switched (1)**
  86:3
**system (1)**
  36:22

---

**T**

**table (3)**
  4:8;15:13;37:10
**tag (3)**
  42:5,19;43:4
**tagged (1)**
  94:2
**tailored (1)**
  74:3
**talk (4)**
  21:5;41:17;63:1;78:6
**talked (1)**
  77:2

CAROLINE CASEY, ET AL. v.
NEW HAMPSHIRE SECRETARY OF STATE, ET AL

MOTION HEARING
July 30, 2019

**talking (6)**
56:17;59:2;64:3,7;88:18;
91:6
**target (2)**
76:12;78:17
**targeted (4)**
63:7,13;77:16;79:3
**targeting (2)**
77:22;79:11
**tax (7)**
66:11;79:24;88:13,14,20,
23;89:1
**taxes (1)**
52:1
**telling (2)**
17:8,20
**tennis (1)**
27:15
**tenses (1)**
4:22
**tentatively (1)**
76:10
**term (1)**
59:17
**terms (3)**
29:9;65:17;86:3
**test (1)**
65:19
**Thanks (2)**
3:13,14
**that'll (1)**
7:9
**theory (3)**
72:19;92:11,12
**therefore (3)**
52:25;65:15;91:18
**thereof (1)**
38:21
**thinking (2)**
45:11;92:9
**third (12)**
6:23;7:15;8:21,25;11:14;
32:24;33:15,17;46:9,11,12,
16
**Thompson (1)**
78:3
**though (9)**
9:20;30:6;36:11;37:9;
42:17;68:8;77:8;89:18;
94:17
**thought (4)**
37:8;42:17;81:23;90:10
**three (8)**
32:9,13;35:7;43:21;46:2;
48:12;71:15;79:9
**throughout (3)**
52:13,20;88:7
**throw (1)**
6:7
**ticket (2)**
35:15;70:21
**times (1)**
74:25

**timing (1)**
95:14
**today (8)**
2:3;17:9;24:8,10,14;
49:24;50:1,3
**told (4)**
13:2,6;43:20;92:11
**total (1)**
12:9
**totally (1)**
55:9
**toward (1)**
23:9
**towards (1)**
28:21
**town (14)**
9:6,9,10;21:13;23:20,20,
21,24;24:25;26:11;29:3,18,
23;70:21
**traceability (1)**
12:2
**traceable (1)**
11:15
**track (1)**
32:13
**traction (1)**
22:23
**traffic (1)**
41:6
**training (1)**
27:20
**transfer (1)**
36:7
**transient (1)**
77:2
**transitory (3)**
56:6;62:18,20
**transportation (1)**
33:9
**Treasury (1)**
79:20
**treat (1)**
59:4
**treated (3)**
56:9;60:23;72:13
**treating (1)**
61:2
**trial (2)**
30:21;94:17
**triangle (1)**
36:1
**tried (3)**
56:17;77:19,20
**trifle (1)**
37:5
**trigger (1)**
49:24
**triggers (6)**
17:24;49:15,21;51:13,17,
18
**trip (3)**
35:15,15;70:21
**trooper (2)**

41:4,23
**trouble (1)**
91:2
**True (12)**
6:4,4,6;14:11;36:5;47:4;
49:22;55:8,22;59:13;75:9;
90:11
**trust (1)**
31:6
**try (4)**
22:19;23:12;86:5,14
**trying (11)**
17:17;25:1;27:10;39:3;
55:14;56:16;76:25;92:1,3,
10;94:24
**tuition (1)**
83:14
**turn (3)**
33:23;46:1;79:16
**Turning (1)**
66:16
**turns (3)**
20:2;34:22;67:20
**two (14)**
32:12;34:17;37:16,22,23;
48:11;50:25;59:25;60:8;
62:25;78:21,21;87:23;91:4
**two-part (1)**
76:21
**type (1)**
55:6
**type-analysis (1)**
53:1
**typically (1)**
36:3

**U**

**ultimately (4)**
25:18;93:15;95:7,8
**unchallenged (1)**
80:20
**unchanged (2)**
22:17;28:9
**unclear (2)**
13:9;18:14
**unconstitutional (7)**
17:3;52:18,21;65:24;
66:3,10;70:15
**under (36)**
2:13;4:14;5:16;7:1,3,10,
20;8:13;9:25;11:14;17:7;
22:4;24:6,10;28:4,6;33:12,
13;38:5,17,21;56:25;62:1;
76:20;77:25;78:9;83:2,7;
84:5;86:22;89:7,23;90:3,5,
7,12;92:20
**Understood (3)**
64:4,20;65:16
**undertaken (1)**
20:16
**UNH (2)**
10:9;82:18

**Union (1)**
2:24
**unique (1)**
93:19
**universal (2)**
64:2,6
**universe (3)**
60:4;64:8;71:16
**university (1)**
63:11
**unlawful (1)**
38:2
**unless (14)**
3:17;16:12;19:15,15;
35:25;38:15;39:9,9;48:5;
58:24;61:21;84:18;94:19,
20
**unlicensed (2)**
58:24,25
**unlike (1)**
36:23
**unlikely (1)**
94:8
**unnamed (1)**
28:23
**unpersuasive (1)**
74:23
**unreasonable (3)**
10:12;11:2;73:10
**unregistered (2)**
58:23;94:1
**up (18)**
9:12;14:15;19:7;26:20;
28:8;31:18;34:4;36:6;
38:12;42:16,18;57:12,17;
58:9,12;65:11;67:7;77:20
**update (3)**
31:24;35:19,21
**upkeep (1)**
70:13
**upon (3)**
7:9;39:13;71:23
**upshot (1)**
14:24
**use (1)**
28:11
**used (5)**
27:5;50:4;59:18;63:12;
88:6
**using (1)**
26:5
**usually (1)**
28:6

**V**

**vacates (1)**
87:2
**valid (3)**
39:12;61:13;65:23
**various (2)**
30:11;61:11
**vehicle (39)**

4:15,18,21,24;10:10;
13:10;17:10;18:1;20:5,8,10,
12,21;24:14;27:4;29:6;
30:18;39:11;47:2;50:19;
56:21;57:5,15,22;58:18,23;
59:15;68:14;69:7,16,24,24,
25;70:12;94:1,2,5,11,13
**vehicles (8)**
4:5;16:12,21;17:1;18:16,
19;56:13;93:7
**verdict (5)**
53:1,13;65:21;66:16,18
**versus (12)**
2:4;44:24;65:11;72:20;
73:8,18,25;77:7;78:2,4;
91:7,8
**vested (2)**
82:24;95:8
**veteran (1)**
71:13
**via (1)**
28:7
**viable (1)**
13:17
**victory (2)**
75:1;82:13
**view (7)**
9:22;19:25;31:10;44:3;
56:24;61:4;64:14
**viewed (1)**
54:19
**violate (2)**
31:8;65:20
**violated (1)**
72:25
**violates (1)**
65:21
**violation (7)**
38:16;64:11,13,20,23;
72:10;93:23
**violation-level (5)**
44:25;64:14,16;72:8,11
**violations (5)**
41:7,7,8,8,9
**Virginia (2)**
78:5,6
**virtually (1)**
29:3
**virtue (2)**
22:18;33:6
**vis-a-vis (2)**
42:9;84:6
**voluntarily (1)**
8:16
**vote (97)**
7:18,19;8:3,6;9:25;16:10;
19:2,17,22;20:16,19,24;
21:25;22:1,10;25:22;26:19,
20,21,23;27:10;28:1,7;
32:18,21;33:2,4,6,18;34:19;
35:1;39:22;43:22;46:21,22;
48:19,20,25;49:3,4,15,23,
24;50:1,2,15,16;51:4,11,16;

53:5;54:4;55:12;59:8;62:3,
7,9;66:3;67:1,3,9,9,15;
68:23,24;70:1,6,6,14;71:17;
72:6;75:15,16,20,22;76:2,5,
25;79:22;80:7;81:18,22,23,
24;83:23;84:8;85:17;86:10;
87:4,6;88:4,8;89:15;92:14;
94:17,22;95:2
**voted (2)**
26:5;82:11;94:19;95:11
**voter (15)**
16:4,7;17:9,23;18:6;
19:20;21:15;23:19,25;
24:12;25:6;42:24;54:25;
62:5;88:17
**voters (40)**
48:20,22;52:5;54:1,8,10,
16;55:19;56:1,4,8,20;59:5,
25;60:12,13,22;62:10,10,
18,20,22;63:16,18;74:22;
75:5;76:2,4,5,13,14,17;
77:22;79:2,3,4,4,5,12;88:24
**votes (3)**
61:19;74:12,23
**voting (28)**
6:21,25;7:7;18:23;35:1;
46:8;49:6;52:24;53:16;
58:1;62:5;63:12;65:20;
66:14;67:11;69:4,5,10,14,
15,19;75:5,14,18;77:25;
79:19;81:12;87:25

# W

**wait (3)**
35:20;53:7;88:1
**Walgren (3)**
63:2,8;76:21
**walk (1)**
72:19
**walks (1)**
71:15
**wants (4)**
8:22;67:13,15;71:17
**warrant (2)**
43:17,18
**way (36)**
2:13;4:2;7:5;9:22;12:14,
21;13:21;23:12,16;27:8;
28:20;32:16;35:3,17,24;
39:5,20,21,24;41:19;50:5;
51:5;57:20;58:11;66:4,12;
70:16;73:11;75:22;80:4;
86:5,14;91:24;92:3,18;
94:23
**ways (6)**
12:15;41:14;42:23;57:22;
70:7;83:24
**website (1)**
31:25
**weighed (1)**
83:7
**weren't (1)**

85:17
**Western (1)**
78:4
**What's (9)**
56:23;57:24;81:9;84:4,5,
12;90:3;92:12,13
**whatsoever (2)**
15:2;33:7
**Whereupon (1)**
95:23
**whole (2)**
14:16;69:3
**who's (2)**
26:24;77:4
**William (1)**
82:17
**Wisconsin (4)**
78:2,4;95:4,9
**wise (1)**
64:5
**wish (2)**
33:19;34:6
**wishes (1)**
33:18
**within (29)**
4:16;5:1,4,5,17;6:9,10,22;
7:1,14,15,18,19,20,23;9:2,4,
9,9,10;10:3;32:18,25;33:2,
7,15;77:8;94:10;95:8
**without (9)**
7:13;8:6;9:11;18:2;
19:14;35:18;57:8;65:6;
93:25
**withstand (1)**
53:16
**withstands (1)**
53:3
**Women (1)**
79:2
**wonder (2)**
30:24;43:21
**word (2)**
88:6;95:12
**work (11)**
12:23,24;13:4;16:18;
17:16;18:2,21;19:14;45:23;
56:17;94:24
**works (2)**
92:10,11
**world (1)**
5:7
**wrong (5)**
40:23;47:9;91:13,16;
94:22
**wrote (1)**
65:15

# Y

**year (1)**
67:8
**years (5)**
10:10;37:22,24;44:21;

93:9
**young (11)**
63:18;71:22;75:5;76:2,4,
5,13,14;77:22;79:3,12
**younger (4)**
62:9,22;63:15;77:1

# Z

**ZORACKI (48)**
2:20,20;3:16;48:15;49:1,
6;50:1,7,11,20,25;51:7,9,19,
21;52:11;53:10,12,20;55:1,
8,16,23;56:24;57:7;58:2;
59:2,21;60:6,11,22;61:7,11,
16,21;62:1,11,15,23,25;
63:5,21;85:1;87:18,20;88:2,
6,11

# 1

**1 (5)**
34:9;87:7,10;89:7;90:5
**10 (3)**
44:21;55:4,7
**12 (1)**
89:25
**12:13 (1)**
95:24
**1264 (34)**
6:20,20;15:18;22:15,18;
28:9;34:9,15;38:6;48:18;
49:4,9,14;52:4,9,12,15,18,
24;53:3;54:8;55:25;56:2,7;
68:19;81:17,21;85:16;
86:22;87:7;88:25;89:25;
92:25;94:12
**1264's (1)**
52:19
**12b (1)**
6:15
**14th (1)**
61:22
**16 (1)**
93:9
**18 (1)**
63:18
**188 (1)**
78:5
**198 (1)**
78:3
**19-cv-149-JL (1)**
2:4

# 2

**2016 (3)**
54:14;75:1;81:19
**2017 (2)**
68:3;79:3
**2018 (1)**
79:8
**2019 (3)**

34:9;87:7,10
**2021 (1)**
 37:24
**20-year-old (1)**
 83:13
**21 (1)**
 63:18
**21:6 (8)**
 85:3;89:7,15,17,23;90:5,
 8,12
**21-B1 (1)**
 47:5
**22 (1)**
 66:23
**24th (6)**
 64:1;65:22;79:16,23;
 88:13;89:2
**263:35 (2)**
 4:14;39:10
**26th (7)**
 61:23;62:2;63:22;65:22;
 76:20;77:25;78:9

### 3

**30 (1)**
 95:3
**300 (1)**
 74:12
**3d (2)**
 78:3,5

### 4

**45 (2)**
 35:17;36:1

### 5

**5,000 (4)**
 54:16;68:2;74:21,23
**5000 (1)**
 74:13
**577 (1)**
 78:6

### 6

**60 (2)**
 4:16;39:17
**60-day (1)**
 35:20
**65 (1)**
 77:11
**654:1 (6)**
 49:8;84:5;87:24;88:3;
 89:13,17
**654:125d (1)**
 28:4
**654:45 (1)**
 18:12

### 8

**80 (1)**
 93:9
**896 (1)**
 78:3

### 9

**90 (1)**
 20:25
**91a (1)**
 21:17