UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                  *
CAROLINE CASEY AND                *
MAGGIE FLAHERTY                   *   19-cv-149-JL
                                  *   November 21, 2019
                                  *   1:30 p.m.
            v.                    *
                                  *
NEW HAMPSHIRE SECRETARY OF        *
STATE, ET AL.                     *
                                  *
* * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF MOTION HEARING
AFTERNOON SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

APPEARANCES:

For the Plaintiffs:        Henry Klementowicz, Esq.
                           Gilles R. Bissonnette, Esq.
                           Julie A. Ebenstein, Esq.
                           Theresa J. Lee, Esq.
                           American Civil Liberties Union


For the Defendants:        Anthony Galdieri, Esq.
                           Samuel R. V. Garland, Esq.
                           Seth Michael Zoracki, Esq.
                           Office of Attorney General (NH)


                           William E. Christie, Esq.
                           Shaheen & Gordon



Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

I N D E X

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| DAVID SCANLAN: | | | | |
| By Mr. Christie | | 03 | | 12 |
| By Mr. Zoracki | | | 11 | |

```
 1                   P R O C E E D I N G S
 2             THE COURT:  The witness is still under oath.
 3             Mr. Christie, you can proceed.
 4             MR. CHRISTIE:  Thank you, your Honor.
 5                   CONTINUED CROSS-EXAMINATION
 6   BY MR. CHRISTIE:
 7        Q.   Mr. Scanlan, I think you should have Exhibit
 8   11 in front of you, which is the November 7th letter, if
 9   I turned to the right page during the break.
10        A.   Yes.
11        Q.   I just want to ask you a couple more questions
12   about that and then we'll move on.
13             Paragraph one of the letter states, "HB 1264
14   amended New Hampshire's statutory definitions of
15   resident and residence.  As a result of the amendment,
16   resident and residence now have the same meanings as
17   domiciliary and domicile."
18             Did I read that correctly?
19        A.   Yes.
20        Q.   Okay.  But before we took the break we
21   established that 1264 did not change the definition in
22   RSA 259:88, right?
23        A.   259:88 reads what it says, but it's a motor
24   vehicle statute.
25        Q.   And the Secretary of State's brief filed with
```

1   the supreme court did not claim that HB 1264 changed

2   that definition, right?

3         A.    I don't believe it said specifically that 1264

4   changed the definition of the motor vehicle statute.

5         Q.    It says that it only changed the definition of

6   the resident and residency in chapter 21, right?

7         A.    Yes.

8         Q.    It does not say it changed the definition in

9   chapter 259?

10        A.    Right.

11        Q.    This letter doesn't say that, right?

12        A.    This letter does not.

13        Q.    Okay.  Paragraph 2 of the letter says:  As has

14  been previously communicated in written guidance and at

15  election official training, HB 1264 made no changes to

16  New Hampshire's election laws.  Did I read that

17  correctly?

18        A.    Yes.

19        Q.    All right.  And it goes on, but I just want to

20  focus on, "As has been previously communicated."

21              Do those previous communications include the

22  September 18th letter that is in evidence as Plaintiffs'

23  8?

24        A.    Yes.

25        Q.    Okay.  And so the November 7th letter, was

1  that letter intended to rescind the September 18th

2  letter?

3        A.   No.

4        Q.   Okay.  Then again in paragraph 3 of the

5  November 7th letter it states:  Any number of actions

6  can indicate that an individual has established a

7  particular place as his or her domicile.  Registering to

8  vote requires that an individual has established a

9  domicile here and therefore the individual is a New

10 Hampshire resident.  Correct?

11       A.   Yes.

12       Q.   All right.  But as I think we established

13 before the break, RSA 259:88 states that if you declare

14 a residency in another state, RSA 21:6 doesn't apply to

15 you, right?

16            MR. ZORACKI:  Objection.  Asks for a legal

17 conclusion about something in the motor vehicle code.

18            THE COURT:  I actually thought we established

19 that before the break.  That's the question, did you

20 establish before the break that statute 259:88 states

21 that if you declare a residency in another state the

22 statute doesn't apply to you?

23            THE WITNESS:  The statute says what it says.

24 I don't know that we established anything beyond that.

25            THE COURT:  All right.

1      Q.    The statute 259:88 says --

2            THE COURT:  He really isn't equipped to give

3      you an opinion about that.  It says what it says.

4            MR. CHRISTIE:  All right.  I'll just ask --

5      Q.    259:88 says, "Resident shall mean a resident

6      of the state as defined in RSA 21:6, except that no

7      person shall be deemed to be a resident who claims

8      residence in any other state for any purpose."  Correct?

9      A.    That's what the statute says.

10     Q.    All right.  And that language is not

11     identified here in paragraph 3 of the November 7, 2019,

12     letter, right?

13     A.    That's right.

14           THE COURT:  Is it your position, Mr. Christie,

15     the plaintiffs' position, that that status, claiming

16     residency in another state, applies to the other lawsuit

17     you testified earlier?

18           MR. CHRISTIE:  Yes.

19           THE COURT:  I'm not sure of your position on

20     that, Mr. Galdieri.  It seems like certain of your

21     questions were to establish that, but I'm not sure what

22     your position is on the legal import of what you

23     established.

24           MR. GALDIERI:  Well, I don't know how you can

25     say that that status even exists in the state of

1    Arkansas.  We have no idea if somebody can do that in

2    the state of Arkansas.

3              THE COURT:  Can be a resident for, like,

4    health insurance purposes?

5              MR. GALDIERI:  For motor vehicle, but you get

6    to pick around the country.  I want to be a resident

7    here for voting, a resident here for motor vehicle

8    purposes, a resident here for health insurance purposes.

9    I think you ought to know what the law in the other

10   state is to even know if you could begin to do that.

11             THE COURT:  All right.  So despite what you

12   elicited from her during your cross, it is not your

13   position that she has the status of a person who has

14   residence in another state because you think that that's

15   a question that requires more information?

16             MR. GALDIERI:  Yes, and she has answered that

17   she has no idea whether she can have that status with

18   respect to Arkansas.

19             THE COURT:  I see.  All right.  You can

20   respond if you want.  I wanted to know your positions

21   and you've told me, but if you want to respond, it's

22   okay.

23             MR. CHRISTIE:  Well, we'll wait for argument.

24             THE COURT:  Okay.

25        Q.   And then I'd like to go back to Plaintiffs'

1  12, which I think you were shown on your direct

2  examination.  Do you have it?

3       A.   Yes.

4       Q.   Okay.  Great.  And this do you understand to

5  be a printout, strike that, a screenshot of a page from

6  the Secretary of State's website, at least the first

7  page of the document?

8       A.   Yes, sir.

9       Q.   All right.  And the date of this -- and it's I

10  think agreed upon that when you click on the voting as a

11  college student link, the attached -- the document that

12  follows the screenshot is the document that at one time

13  was on the Secretary of State's website?

14       A.   Yes.

15       Q.   All right.  And this document on the footer is

16  dated November 7, 2018?

17       A.   Yes.

18       Q.   And on page 4 of the document it says, it has

19  the question, "Is domicile the same as resident," right?

20       A.   Yes.

21       Q.   And the answer according to this document was

22  that domicile and resident have different meanings,

23  right?

24       A.   Yes.

25       Q.   And that is the document that was on the

1    Secretary of State's website up until last week?

2         A.   Yes.

3         Q.   So if a student trying to figure out whether

4    the definition of resident and domicile checked the

5    Secretary of State's website as late as last week, it

6    would have been told by the Secretary of State's Office

7    that the definition of domicile and resident are

8    different, right?

9         A.   They would have seen this on the page.

10        Q.   This is the information that would have been

11   published to them by the Secretary of State's Office,

12   right?

13        A.   This would have been on the website of the

14   Secretary of State's Office.

15        Q.   All right.  And that's the same information

16   that would have been published to an election law

17   official who looked on the website for the answer to

18   this question, right?

19        A.   That's what they would have seen if they

20   looked at this page.

21        Q.   And it is the same answer that would have been

22   published to anyone who accessed the New Hampshire

23   Secretary of State's website, that resident and domicile

24   have different definitions?

25        A.   If they looked at this page up until a week

1    ago.

2        Q.   Right.  And Exhibit 13 was the --

3             THE COURT:  What do you mean up until a week

4    ago, until the letter was posted?

5             THE WITNESS:  Then that page on the website

6    was changed.

7             THE COURT:  That was a week ago or two weeks

8    ago?

9             THE WITNESS:  It was about a week ago.

10            THE COURT:  Okay.

11       Q.   It was in response to the filings in this

12   lawsuit, right?

13       A.   It was changed as a result of this process.

14       Q.   It was changed so you could come here today

15   and testify that that language is no longer on your

16   website?

17       A.   I don't know that that's the case.  It was

18   changed within the last week.

19       Q.   Right.  But prior to last week that's the

20   language that was on there, right?

21       A.   Yes.

22       Q.   And then on Exhibit 13 is the document that's

23   currently on the website, right?

24       A.   Yes.

25       Q.   And the date of that document in the footer is

1   July 2019?

2       A.   Yes.

3       Q.   When was this document created?

4       A.   I don't know.

5       Q.   And the first paragraph on the document says,

6   "This guidance was revised on November 7, 2018."  Do you

7   see that?

8       A.   I see that.

9       Q.   But that's not accurate, right?

10      A.   This guidance would have been revised within

11  the last week and that's probably the date that should

12  be on there.

13      Q.   Okay.  Thank you.

14           THE COURT:  Redirect?

15                    REDIRECT EXAMINATION

16  BY MR. ZORACKI:

17      Q.   Deputy Scanlan, there were some questions

18  about Ann Shump on cross.  Who is Ann Shump?

19      A.   Ann Shump is a supervisor of the checklist in

20  the town of Durham.

21      Q.   Okay.  And has Ann Shump ever called you to

22  ask any questions or express any confusion about HB

23  1264?

24      A.   Not that I can recall.

25      Q.   Does the Secretary of State's Office provide

 1   guidance to local election officials on how the state

 2   motor vehicle laws might impact New Hampshire voters?

 3        A.   No.

 4        Q.   Why not?

 5        A.   Because we're not familiar with other

 6   statutes.  We're responsible for administering the

 7   election laws, not the motor vehicle laws.

 8             MR. ZORACKI:  Thank you.  Nothing further,

 9   your Honor.

10             MR. CHRISTIE:  Just one follow-up question,

11   Judge.

12                    RECROSS-EXAMINATION

13   BY MR. CHRISTIE:

14        Q.   Do you know if Ms. Shump contacted Bud Fitch

15   at your office regarding confusion?

16        A.   I don't know if she did or not.

17        Q.   If she said that in her declaration, would you

18   have any reason to dispute that?

19        A.   No.

20             MR. CHRISTIE:  Okay.  Thank you.

21             THE COURT:  Have you or anyone else in your

22   office had any discussions with election officials in

23   the city of Keene regarding this change in the law that

24   we're here talking about today?

25             THE WITNESS:  Outside of our training

1  sessions, and usually we go to the Keene area to do one,

2  no, we haven't had any one-on-one discussions with the

3  city of Keene.

4         THE COURT:  Well, I don't know if it needs to

5  be one-on-one.  I'm asking about the type of confusion

6  that was expressed by the clerk from the Town of

7  Hanover, have you had any -- and I'm asking, you know,

8  any similar interactions with them where they inquired

9  about confusion surrounding this issue?

10         THE WITNESS:  No.

11         THE COURT:  What about the Town of Plymouth?

12         THE WITNESS:  No.

13         THE COURT:  No?  All right.  I think there's

14  4,000 plus college students in Plymouth.  There's 3,000

15  plus in Keene.  I'm curious about that.  Why the

16  emphasis on UNH and Dartmouth?

17         MR. CHRISTIE:  Because the evidence, I think

18  it's in the record, is because that's where the

19  overwhelming same-day registrations take place is in

20  Hanover and Durham.  It's overwhelming.

21         MR. KLEMENTOWICZ:  Not only that, but I think

22  there are higher rates of out-of-state usage of ID in

23  those particular colleges versus Keene and --

24         THE COURT:  That also makes sense.  Many more

25  in-state students at Keene and Plymouth.

1           MR. GALDIERI:  And, your Honor, I would just

2    add to that discussion that I believe Clerk McClain and

3    Supervisor Shump probably don't support this piece of

4    legislation.

5           THE COURT:  So you think it's motivated

6    confusion?

7           MR. GALDIERI:  It could be.

8           THE COURT:  Okay.

9           MR. CHRISTIE:  Well, I would suggest that Mr.

10   Scanlan supports the legislation so would have an

11   incentive to minimize confusion if we're going to get

12   into that.

13          THE COURT:  Okay.  All right then.  Thank you.

14          All right.  I don't want to take a lunch break

15   right after we took a break, so let's keep on going.

16          Argument.  It's your motion.

17          MR. KLEMENTOWICZ:  Thank you, your Honor.

18          Good afternoon, your Honor.

19          So we're here on our motion for preliminary

20   injunction limited to Count 1 of our complaint, the

21   Anderson-Burdick framework, specifically as it relates

22   to the issue of confusion and the burden that that

23   imposes on voters.

24          First, the standard.  Anderson-Burdick is a

25   sliding scale.  So the first part of the inquiry is you

1   look at the character and magnitude of the burden and
2   then you evaluate what level of scrutiny must be applied
3   to the law.
4           THE COURT:  Yeah.
5           MR. KLEMENTOWICZ:  So first, if it's an
6   unreasonable and discriminatory -- I'm sorry --
7   unreasonable or discriminatory law, it's -- let me start
8   that again.  I'm sorry.
9           If it's a reasonable and nondiscriminatory
10  law, you go with the lowest level of balance and what
11  the Crawford plurality described as:  However slight a
12  burden may appear, it must be justified by relevant and
13  legitimate state interest sufficiently weighty to
14  justify the limitations.  That's at the low end, the
15  sufficiently weighty language.
16          At the high end is strict scrutiny where the
17  burden is severe.  And then in the middle if it's less
18  than severe but higher than reasonable and
19  nondiscriminatory, there's a sliding scale analysis.
20  The Guare Court has used intermediate scrutiny.  Other
21  courts have come to slightly --
22          THE COURT:  If I understood your briefing
23  correctly, the level of burden -- the burdensomeness
24  dictates the level of scrutiny.
25          MR. KLEMENTOWICZ:  Yes.

1          THE COURT:  Okay.  It just sounds like what

2    you're advancing is sort of circular.  If it's

3    discriminatory -- that's not the analysis.  The analysis

4    is the level of burden.  So we're talking about the

5    burden on the right to vote, and the burden you're

6    talking about is confusion.

7          MR. KLEMENTOWICZ:  Yes, but if you look at the

8    language from Anderson-Burdick that justifies the lowest

9    level of scrutiny, it's to reasonable and

10   nondiscriminatory burdens.

11         So I think that there's a lot of support, the

12   idea that a discriminatory law requires higher scrutiny.

13   So for that I refer the Court to -- there's Obama for

14   America versus --

15         THE COURT:  Okay.

16         MR. KLEMENTOWICZ:  Obama for America versus

17   Husted considers a discriminatory impact on military or

18   nonmilitary people for heightened scrutiny.

19         There's a new case from the Northern District

20   of Florida from November 15th.  That's Jacobson versus

21   Lee, a 2019 Northern District of Florida, that notes

22   higher levels of scrutiny because the law in question

23   targeted Democrats.

24         There was the League of Women Voters of

25   Florida versus Detzner.

1               Libertarian Party of New Hampshire versus

2     Gardner, which was a case from Judge Barbadoro from 2014

3     --

4               THE COURT:  Yeah.

5               MR. KLEMENTOWICZ:  -- where he wrote that, "To

6     avoid heightened scrutiny, a law must be

7     nondiscriminatory and reasonable."

8               So that's the first step of the inquiry.  So

9     one looks at the burdens.

10              Let me just state at the outset that per an

11    agreement that we have with the defendants, we're not

12    relying on the declaration from Ms. Corriveau in this

13    case.  We're relying on the other six affidavits from

14    the individual voters plus Michael Herron's, plus

15    Elizabeth Wester, plus Ann Shump, plus Elizabeth

16    McClain.

17              So at the outset, I think if the Court finds

18    that RSA 259:88 means what it says that it means, that

19    what we advance that it means, we're immediately in the

20    land implicated by Guare because the state is advising

21    people of the wrong law.  So RSA 259:88 says that the

22    definition for motor vehicle purposes of resident is the

23    general definition of residence except that a person --

24    except it does not include people who may claim

25    residence in another state for another purpose.

1          That section, as the except clause, as is

2    consistent with New Hampshire Supreme Court's

3    well-settled principles of statutory construction, has

4    to mean something, and what it means is what it says.

5    If you claim residency in another state for any other

6    purpose, you're not required -- you're not a resident

7    under the motor vehicle code.

8          If that's what the Court thinks is likely to

9    happen when the case gets certified to the New Hampshire

10   Supreme Court, then the state's guidance, the September

11   18th letter, the November 7th letter, all the

12   communications that have been coming out of the

13   Secretary of State's Office are wrong because as was

14   identified on cross-examination of Deputy Secretary of

15   State Scanlan, and as identified just from looking at

16   the documents, they don't mention RSA 259:88.  They

17   don't inform people that if they claim residency in

18   another state for another purpose they're not obligated

19   to get a New Hampshire driver's license, and that's

20   precisely the same confusion that was examined by the

21   Court in Guare.

22          THE COURT:  So I would say it arguably

23   supports your confusion argument, arguably undermines

24   your investigation of a fee burden argument because if

25   it identifies the college students, many of them won't

 1   be required to pay these investigation fees.

 2           Do you follow what I'm saying?

 3           MR. KLEMENTOWICZ:  I do follow what you're

 4   saying, and I don't think that's wrong.  Obviously the

 5   only question before the Court right now is the

 6   confusion and that's why, because it depends on what the

 7   law means.

 8           THE COURT:  Okay.

 9           MR. KLEMENTOWICZ:  So the supreme court in

10   Guare examined a legal background in which the

11   registration form told essentially people who were

12   registering to vote that they had to comply with the

13   obligations of residency, which includes the obligation

14   to register a car or a driver's license, and the reason

15   that that was struck down by the Guare Court is because

16   it was confusing and inaccurate.  It inaccurately stated

17   the law.  It told voters the wrong thing.  The Court

18   applied intermediate scrutiny and found the burdens were

19   not sufficiently supported by state interests, and

20   that's exactly the case here if your Honor agrees with

21   us about what 259:88 means.

22           That's consistent with the legislative history

23   that we've provided the Court which shows that this

24   language was requested by the DMV in 1985 to address the

25   problems of people registering their car in New

1    Hampshire but claiming residence in multiple states.

2            By the way, you know, the language says that

3    it accepts people who claim residency in another state.

4    It doesn't say people who are residents in another

5    state.  It's a little bit more permissive.  And I think

6    that that is probably built in to account for the

7    situation where a person may think that they're a

8    resident of Arkansas for motor vehicle purposes but

9    maybe they're not.

10            And that's also consistent, by the way, with

11   the Colly decision, which we attached to our pleadings,

12   which was one of the cases -- the case that we were able

13   to locate to date where a judge actually examined the

14   meaning of RSA 259:88 in a motor vehicle prosecution

15   context.

16            THE COURT:  That was interesting, yeah.

17            MR. KLEMENTOWICZ:  Yeah, specifically pointed

18   out the statute and used it in acquitting the defendant,

19   because in that case I guess, you know, there was a

20   reasonable doubt whether that person believed that they

21   had residence in another state.

22            THE COURT:  Yeah.

23            MR. KLEMENTOWICZ:  By the way, and I'll get to

24   this later in our argument, but if you pull at the

25   thread of RSA 259:88, not only are you making the

1    confusion more and more evident, but you're also

2    weakening the commensurate state interest because if RSA

3    259:88 doesn't actually require people to get driver's

4    licenses, then it doesn't really advance any of the

5    interests that the state says that it does.  And so all

6    it's doing is confusing people through its operation.

7            In addition, the guidance that the state has

8    provided to local election officials is

9    self-contradictory and unclear.  So obviously it admits

10   mention of a key residency definition that's central to

11   the analysis.  And part of the reason why the Court is

12   going to certify this case over to the New Hampshire

13   Supreme Court is to certify -- I'm sorry -- to get the

14   complete resolution of the meaning of that exact

15   statute.  And I submit that if this Court feels the

16   question is sufficiently weighty and open that the Court

17   can't resolve it, how is an individual voter supposed

18   to?

19           So in addition to that confusion, the letters

20   are from --

21           THE COURT:  It's not that I don't think the

22   Court could resolve it.  Mr. Galdieri has been telling

23   me in his brief, and all along, it's a simple question

24   that the Court can easily -- it's not that I don't think

25   the Court could resolve it.  It's just not this Court's

1    function to resolve it.  It's the New Hampshire Court's

2    function to resolve that.

3         I differ with Mr. Galdieri that it's as simple

4    as he points out, but I do understand his point.  Our

5    Court doesn't routinely sort of predict what the New

6    Hampshire Supreme Court will do with an issue.  I'm not

7    sure this is the appropriate situation for that, but

8    it's just not that I think it's so difficult, it's that

9    I think it's better decided by the highest court in the

10   jurisdiction to interpret the New Hampshire law.

11        Anyway, it's not really germane to your point,

12   I'm sorry for interrupting, but your point is well taken

13   about lay people trying to interpret.

14        MR. KLEMENTOWICZ:  There are other problems

15   with the September 18th and November 7th letters.  For

16   example, they are contradictory with each other in at

17   least three ways that I can count.  The first is that

18   the September 18th letter instructs local election

19   officials that election officials are neither authorized

20   nor trained to provide legal guidance on laws other than

21   election laws, which is essentially guidance to people

22   like Clerk McClain saying, don't answer the question

23   when asked, and the November 7, 2019, letter is silent.

24   And I think its silence is actually deafening because

25   some local election officials may interpret that as, I'm

1   allowed to answer the question.

2           Betsy McClain testified that she thinks she

3   understands whether people are required to get driver's

4   licenses if they register to vote, but I'm not sure if

5   it was clear from her testimony whether she understands

6   if she's allowed to provide that guidance.

7           THE COURT:  I'm not sure I agree with you

8   that's contradictory, but I see your point.

9           MR. KLEMENTOWICZ:  Or inconsistent maybe is a

10  better word.

11          Second, the guidance attached to the September

12  18th letter writes that domicile under RSA 654:1 and the

13  definition of resident under RSA 21:6 may be equivalent,

14  whereas the November 7th letter says that as a result of

15  the amendment, resident and residence now have the same

16  meanings as domicile and domiciliary.  On one hand

17  there's wiggle room, it's unclear whether the two

18  actually are the same, and in another letter they're

19  explicitly linked together.

20          The same attachment says in the last sentence

21  that individual circumstances may vary and this

22  obligation should be determined on a case-by-case basis.

23  There's no such language in the November 7th letter, and

24  that's an important distinction.  It seems like we're

25  quibbling over words, but I don't think that we are

1    because there's presumably a category of people who are

2    unclear whether they need to get New Hampshire driver's

3    licenses because they've registered to vote.

4            And if they look at the November 7th guidance

5    they say, well, definitely I do, maybe, because now one

6    who has, you know, establishes domicile has established

7    residence, and registering to vote requires that a

8    person is now a resident and obligations for new

9    residents have not changed.

10           Under the motor vehicle code an individual has

11    60 days upon establishing residence to obtain a New

12    Hampshire driver's license if they drive in the state

13    and to register a vehicle if they own a vehicle in the

14    state.

15           On the other hand, if they look at the

16    September 18th guidance they think, well, maybe I don't,

17    because individual circumstances may vary and this

18    obligation should be determined on a case-by-case basis.

19    It's not clear who's making that determination, what

20    those -- how individual circumstances could vary,

21    whether there are voters who don't need to get a

22    driver's license because they voted.  There's a category

23    of voters who do not under the September 18th letter and

24    who do under the November 7th letter.

25           In addition, the November 7th letter was, as

1  the Court noted, addressed and sent after our

2  preliminary injunction filings came in.  We don't

3  exactly know what its implication has been everywhere,

4  but as your Honor has previously said, you have no

5  problem finding there was at least a period of confusion

6  when people were operating under the September 18th

7  letter.  We don't know to what extent that bell can be

8  unrung by the November 7th letter, there hasn't been

9  time to do that kind of investigation, but I submit that

10  even up until a week ago --

11          THE COURT:  That doesn't seem like that's

12  something that required research or -- I mean, if it's

13  clarified to a reasonable degree of certainty that a

14  speaker of the English language can understand, it's

15  been clarified, right?

16          MR. KLEMENTOWICZ:  I don't think so, because I

17  think that if someone reads the September 18th letter

18  and comes away with one opinion, they may never see the

19  new letter.  There could be a category of people who

20  interacted -- who looked at the website, the Secretary

21  of State's website that said domicile and residence are

22  different, up until apparently a week ago, and who came

23  away with information that would be totally different

24  from what it is if they were to check now.

25          We can't assume that everyone who saw, who got

1    guidance from the Secretary of State's Office or a local

2    election official who was relying on that guidance has

3    now come into interaction with the November 7th letter.

4              THE COURT:  Probably hasn't, but that's not

5    the question.  The question is whether they will by the

6    presidential primary, right?  It's not really whether

7    they have been disabused of their misapprehension as of

8    now; it's whether it can be by the election.

9              MR. KLEMENTOWICZ:  Well, I think the question

10   is have they been confounded and has that infringed upon

11   their right to vote in any way.  So if they saw the

12   letter --

13             THE COURT:  I'm supposed to find that there's

14   been enough people confounded by this as of right now to

15   grant you an injunction?

16             MR. KLEMENTOWICZ:  So we've submitted -- you

17   look at the Anderson-Burdick framework, and the

18   question is how much is the --

19             THE COURT:  Everybody you've given me an

20   affidavit for is registered to vote.  They're all going

21   to vote.

22             MR. KLEMENTOWICZ:  Mary Catherine Suskie

23   testified that she tried to unregister to vote when she

24   found out about the law.

25             THE COURT:  And she testified that she's going

1   to vote in Arkansas.  She's going to vote.

2          MR. KLEMENTOWICZ:  She has a right to vote in

3   New Hampshire, right, under --

4          THE COURT:  Well, says you.  Actually, yeah,

5   says the law, right?  The domicile, that's a good point.

6          MR. KLEMENTOWICZ:  Right.  Students have a

7   right to vote if they meet the qualifications for

8   domicile in New Hampshire under RSA 654:1 1(a) I think

9   it is.  And if she is discouraged from exercising that

10  right to vote in New Hampshire that she otherwise wanted

11  to by this law, that's because of the burden.  She

12  testified she would like to.  She's not sure if she

13  could.

14         THE COURT:  I mean, it's not that I think

15  that's a crazy position.  It's just that -- is there

16  authority for that proposition that the right to vote,

17  you know, if one -- the right to vote in one

18  jurisdiction over another, that that's what the right

19  stands for?

20         If someone says, there's a question about

21  whether I can vote in New Hampshire, but I'm certainly

22  going to vote somewhere else, that's still a burden on

23  the right to vote?  Is there authority for that

24  proposition?

25         MR. KLEMENTOWICZ:  So as I'm thinking about

1    that, I think the answer is, it happens all the time in

2    voting rights cases where a legal situation may prevent

3    someone from voting in the state where they live.

4           For example, in a felony disenfranchisement

5    case, people who are disenfranchised in one state if

6    they move to another state may not be disenfranchised.

7           It's a bad example as I'm saying it because

8    there are special protections under the Constitution for

9    disenfranchising felons, but once they can prevent

10   someone from voting in that state and they can go to

11   another state and vote, their rights have still been

12   infringed.

13          THE COURT:  Yeah, but this isn't going to

14   another state and vote.  This is just get an absentee

15   ballot and vote.  It's just like --

16          MR. KLEMENTOWICZ:  Well, you can vote for

17   different offices.  They have a different governor in

18   Arkansas.  They have different senators.  They have

19   different representatives.  She testified that she lives

20   in New Hampshire, that that's her community.  She

21   presumably drives a motor vehicle in Concord.  She uses

22   police department services, fire department services.

23   Presumably she wants to have a say in the local

24   governance in New Hampshire in addition to voting for

25   president, and voting for president is the only thing

1    that's equivalent whether she votes in Arkansas or she

2    votes here.  If she wants to have a say in who her state

3    rep is, voting in Arkansas doesn't help.  She's not

4    being operated on by their laws in the same way, just

5    for motor vehicle purposes.

6            So I do think that it is a burden, because

7    she's potentially lost the ability to vote for her

8    representation in Concord.

9            THE COURT:  I'm not sure where we are in your

10   analysis.  Are we still in what level of scrutiny or are

11   we in this doesn't survive scrutiny?  I think that's

12   where we are, right?

13           MR. KLEMENTOWICZ:  So I think we're in what's

14   the magnitude of the burden.  So the magnitude of the

15   burden is, number one, if the state is wrong about what

16   RSA 259:88 means, the burden is that they've been

17   inaccurately telling people the law, that's precisely

18   the situation in Guare, intermediate scrutiny, it won't

19   survive.

20           Even if they're not wrong, the law -- the

21   guidance that they've submitted has been at least

22   somewhat inconsistent as to whether local election

23   officials are allowed to tell people about the

24   obligation from registering to vote that ties to these

25   motor vehicle obligations, and the witnesses who

1   submitted testimony in this case, which by the way

2   includes witnesses who are election officials in the

3   state of New Hampshire that have the two biggest, I

4   think, universities in the state of New Hampshire,

5   probably the highest rates -- I don't know this --

6   probably the highest rates of out-of-state ID usage in

7   the state, or close to, top ten at least, probably some

8   of the highest rates of same-day voter registration.

9   They've testified that people are going to be confused

10  and potentially discouraged from voting because they're

11  unclear about the obligations that --

12          THE COURT:  Well, what's the remedy for that?

13  What's the remedy for confusion?

14          MR. KLEMENTOWICZ:  The remedy for confusion in

15  this case is an order from the Secretary of State's

16  Office and to the Attorney General's Office saying:  You

17  cannot use evidence of voter history or voter

18  registration to prosecute people for failing to update

19  their license --

20          THE COURT:  That's not the remedy for

21  confusion.  That's not what we're here litigating about.

22  The remedy for confusion is information, clarification,

23  right?

24          MR. KLEMENTOWICZ:  And then posting that order

25  on the Secretary of State's website, distributing it to

1  the public.

2          THE COURT:  Which they did.  I considered

3  ordering them to do that once I read your briefing,

4  ordering them to clarify it and post it, but they did

5  it.  They did it the day after your papers were due,

6  which was irksome, but they did it and -- you're not

7  just asking for clarification.  You're asking for

8  clarification under the interpretation of the law that

9  you -- also eliminating what you say is the other burden

10 in the case that isn't part of this injunction

11 proceeding.  I mean, the remedy for confusion is

12 clarification, and I don't know how it's anything else.

13 How could it be anything else?

14          MR. KLEMENTOWICZ:  So the remedy for confusion

15 is to clarify what people's obligations are.  Right now

16 -- first of all, people's obligations under the law are

17 completely unclear, because under RSA 259:88 if they

18 claim residency for any other purpose in any other

19 state, they're not obligated to get New Hampshire

20 driver's licenses, and they've been told that they are.

21          So, sure, the state posted on their website a

22 letter that gives people wrong advice and that is

23 inconsistent with previous guidance that they have

24 disseminated.

25          So it's also important to remember that the

1    remedy for confusion, just clarifying the law is not

2    enough, because you also have to remind people that they

3    can't have their confusion used against them.

4                THE COURT:  But let me look at this letter

5    again.  The clarifying letter, the November 7th letter.

6    That's Plaintiffs' Exhibit 11, right?

7                MR. KLEMENTOWICZ:  Yes.

8                THE COURT:  I think I'm persuaded that the

9    state has clarified the meaning of the legislative

10   change, but your point is that, well, they haven't

11   clarified the meaning of, what is it, 259:88 and its

12   effect, right?

13               MR. KLEMENTOWICZ:  Right.

14               THE COURT:  That's not addressed here in this

15   November 7th letter, right?

16               MR. KLEMENTOWICZ:  It's not mentioned at all

17   in this November 7 letter.

18               THE COURT:  Okay.  And you just said a minute

19   ago that's an incorrect statement of the law.  You said

20   that's just wrong advice.

21               MR. KLEMENTOWICZ:  Yes.

22               THE COURT:  Well, isn't your remedy there in

23   state court?  Why is your remedy -- if you need a

24   clarification on that, why is your remedy in U.S.

25   District Court?

 1          MR. KLEMENTOWICZ:  Because if they're telling

 2   people the wrong law, they're violating the

 3   Anderson-Burdick framework, because the Anderson-Burdick

 4   framework -- okay.  You start with the burdens and you

 5   balance them against the state interests, which by the

 6   way, there's no evidence that supports any of the

 7   state's interests.  Even if the burden is minimal as the

 8   Court is suggesting, they still have to -- well,

 9   actually, I don't think you are suggesting that, but

10   even if the burden were minimal, they still have to

11   support it by sufficient state interests.  That's what

12   the Crawford majority says.

13          So the Anderson-Burdick framework provides a

14   federal court vehicle under the First Amendment and the

15   Fourteenth Amendment for a plaintiff to challenge any

16   burden on the right to vote because it's interfering

17   with the rights protected by the United States

18   Constitution, right?  So to the extent that it does,

19   you're entitled to a federal remedy.  And an inaccurate

20   statement of the law, as the Guare Court found, is an

21   inaccurate statement of the law, which is confusion and

22   a burden on the right to vote that's not supportable by

23   any state interest because --

24          THE COURT:  What case found?

25          MR. KLEMENTOWICZ:  Guare versus State.

```
1              THE COURT:  Guare?

2              MR. KLEMENTOWICZ:  Right.  There's other cases

3    that stand for the proposition that confusion on the

4    right to vote is an Anderson-Burdick violation under the

5    First and Fourteenth Amendment.

6              THE COURT:  Yeah, I haven't found any cases

7    that describe the type of confusion that you're

8    describing.  They've all been about confusing ballots or

9    like specific voter information, logistics.  I haven't

10   found that -- either the ones you cited or anywhere else

11   suggesting that a statutory regime that one might deem

12   confusing is a burden on the right to vote.

13             MR. KLEMENTOWICZ:  I think the question is,

14   what's the context in which the confusion arises.

15   Because if it arises in the context of registering to

16   vote, it can be a burden on the right to vote.

17             So in this case what the evidence --

18             THE COURT:  Say that again.  What?

19             MR. KLEMENTOWICZ:  If the confusion arises in

20   the context of someone trying to register to vote or

21   someone trying to vote, it can be a burden on the right

22   to vote, and that's what the evidence establishes

23   happened in this case.  The affiants who submitted

24   testimony said that they were confused about whether

25   registering to vote creates these other obligations.
```

1           THE COURT:  That's an interesting contextual

2   argument.  Yeah, I get it.  That's been your position

3   throughout this litigation.

4           The problem is though -- I mean, I'm not aware

5   of the context test.  I've seen the cases that you

6   cited.  The cases that you cited talk about malice.

7   They don't talk about someone who says, I don't

8   understand the law of domicile, or residency in this

9   state, and therefore I'm confused.

10           I haven't seen authority for that proposition.

11   And I guess your answer is, and I don't mean to be

12   dismissive of it, is basically if it arises in the

13   context of registering to vote, that's a burden.

14           MR. KLEMENTOWICZ:  That's part of it.  The

15   other case is the <u>Guare</u> case which is, again, precisely

16   the same situation here where people are being told --

17   now, albeit it's on a voter registration form, but the

18   confusion from the inaccurate statement of law was what

19   the motor vehicle obligations that arose from a decision

20   to register to vote were.

21           So that's the exact same type of confusion

22   that we're talking about.  Obviously that's a state

23   court, but they said when the legislature or a form or

24   the government is inaccurately telling people what the

25   obligations that are going to flow from registering to

1    vote are, even if those obligations are motor vehicle

2    obligations, that's still an Anderson-Burdick violation.

3            So I think, number one, there's an evidentiary

4    showing.  The town clerk in Hanover, the chair of the

5    supervisors of the checklist in Durham, both testified

6    that these questions are going to arise and they're

7    going to arise in the context of voting.

8            Ann Shump said -- so she writes, "Based upon

9    my professional experience, I believe that this law will

10   cause questions and confusion at the polls on election

11   day and could cause qualified voters to refrain from

12   voting in Durham.  I also believe that these extra

13   questions I expect about motor vehicle requirements will

14   cause delays at the registration tables at the polling

15   place and in turn longer registration lines."

16           If anyone is in a position to know how people

17   in these college towns are going to react to this law,

18   it's local election officials from the towns with the

19   highest number of college students.  So local election

20   officials who work in Hanover and Durham are the ones in

21   a position to know how potential voters, especially

22   college students, are going to react to this law.

23           In addition, I think it's clear from HB 1264

24   that the only thing that it does, if it does anything at

25   all, is tie the act of registering to vote with these

1    potential DMV obligations, because it merely serves to

2    align the definition of domicile with residency under

3    RSA 21:6 and 21:6-a, and the only thing that that does

4    is tie these obligations together.  It is a voting law.

5    What the law did was make these obligations spring from

6    the decision to vote.

7              So we've talked a little bit about the

8    confusion.  We've talked about how it's inconsistent

9    with RSA 259:88, how the state's argument would make the

10   except clause -- the state's interpretation of RSA

11   259:88 would make the except clause surplusage and in

12   contradiction of state court canons of statutory

13   construction and the legislative history.

14             We've talked a little bit about the

15   declarations from the other voters.  There's a

16   declaration that was submitted by the Warren for New

17   Hampshire campaign, State Director Elizabeth Webster,

18   who testifies that -- let me just pull up her

19   declaration -- who testified that the campaign had

20   prepared educational materials concerning the process of

21   registering to vote but were advised not to use them

22   until the issues of the application of the exceptions

23   contained in the definition of residency in the motor

24   vehicle code were addressed and clarified.

25             She notes that the lack of clarity from the

1    Secretary of State's Office has left a lot of confusion

2    in college campuses across the state, and it's extremely

3    unclear what happens after students vote if they have an

4    NH license -- if they do not have an NH license and

5    drive a car anyway in New Hampshire.

6                THE COURT:  You don't have to go over the

7    evidence.  I have the evidence.  The hard part of this

8    case are not the facts.  It's the law.

9                You're basically saying -- I've got two

10   problems with this idea regarding section 255:88 (sic),

11   and the other is -- the question is what do I certify.

12   It's not that I don't think they're good questions.  I

13   obviously do.  That's why I'm sending them to the New

14   Hampshire Supreme Court.

15               As far as I know, you didn't make these

16   arguments in the supreme court on the first opinion,

17   right?  These arguments, which I think are good

18   statutory construction arguments, mostly involving the

19   rule against implied appeals or the rule against

20   surplusage, all that, because these -- what these

21   statutory construction arguments amount to is an

22   interpretation of the law that it didn't achieve what it

23   was meant to achieve; that it didn't add burdens to,

24   didn't add domestication requirements to those who

25   register to vote as college students, but I don't see

1   where you made those arguments in the state court.  Did

2   you?

3            MR. KLEMENTOWICZ:  So let me just start by

4   saying I wasn't with --

5            THE COURT:  It doesn't matter.  It doesn't

6   matter.

7            MR. KLEMENTOWICZ:  But importantly, I think my

8   clients didn't submit briefs in the state supreme court.

9   I don't think they can be prejudiced by the briefs that

10  were submitted in the state supreme court when --

11           THE COURT:  You can't be prejudiced.  I'm just

12  asking.  I'm asking a question.

13           The supreme court I don't think has ever heard

14  these arguments.  It certainly didn't address it in its

15  opinion.

16           MR. KLEMENTOWICZ:  I'm not aware that the

17  supreme court heard these statutory construction

18  interpretations, but I do think that it's important

19  because -- okay.  So just assume for a second that RSA

20  259:88 means what we think that it means, right, and

21  that the New Hampshire Supreme Court after the question

22  is certified is going to rule that there's an entire

23  class of plaintiffs who do not need to get New Hampshire

24  driver's licenses, right?  Those people --

25           THE COURT:  People who have maintained a

1    residence in any other state for any reason.

2            MR. KLEMENTOWICZ:  Right.  Those people will

3    have been subjected to months of confusion and some of

4    whom may have decided that they didn't want to vote

5    because they didn't want to get a New Hampshire driver's

6    license and they thought that they had to if they did

7    register to vote, some of whom may have gone ahead and

8    bought New Hampshire driver's licenses anyway just

9    because they were following the wrong advice.  Now

10   they're spending money that they didn't have to because

11   of the confusion by the state, right?

12           They've been subjected to the state telling

13   them wrong information about the consequences of voting,

14   which can in turn deter them from voting, right, or

15   diminish their rights.

16           THE COURT:  They've registered and paid the

17   fees and they're going to be deterred from voting.

18           MR. KLEMENTOWICZ:  So some of them have

19   registered and paid their fees.

20           THE COURT:  I'm just taking the example you

21   just gave.

22           MR. KLEMENTOWICZ:  Right, but some of them I

23   think -- one of my examples was people who may have

24   decided against registering to vote in New Hampshire

25   because they didn't want to pay the fees and they

1    thought that they had to but they didn't.

2            THE COURT:  Let me try it this way.  I do see

3    your point.  Is there authority, though, for the

4    proposition that -- I guess the question is does the

5    Eleventh Amendment permit this Court to enjoin state

6    officials' conduct based on an incorrect interpretation

7    of state law?  That's the question, right?  What's the

8    authority for that proposition?

9            MR. KLEMENTOWICZ:  Okay.  So the Eleventh

10   Amendment permits a federal court to issue relief

11   against state agencies in their official capacity to

12   enjoin them to conform their actions with federal law.

13           THE COURT:  Yeah.

14           MR. KLEMENTOWICZ:  So in this case, a court

15   can enjoin a state actor to comply with Anderson-Burdick

16   and its protections under the First and Fourteenth

17   Amendment on a prospective basis without running into

18   the Eleventh Amendment.  That's Ex Parte Young.

19           THE COURT:  Yeah, I think I can enjoin this

20   conduct -- I can enjoin the state's officious conduct

21   based on an incorrect interpretation of state law if I

22   also find that that interpretation violates the Federal

23   Constitution.  I think that's clear.  I think that's

24   where you're going, right?

25           MR. KLEMENTOWICZ:  Right.

 1              So confusion -- so there's case law that

 2    suggests that confusion to the extent that it causes a

 3    burden on the right to vote is cognizable under the

 4    Anderson-Burdick framework.  So that's Guare, right,

 5    where people were being told incorrectly that they had

 6    to get a New Hampshire driver's license as a consequence

 7    of registering to vote; that Part 1, Article 11 claimed

 8    that the New Hampshire Supreme Court brought the

 9    Anderson-Burdick framework forward and used that, right?

10              So there's the Purcell case from the U.S.

11    Supreme Court which talks in the context of injunctions

12    issuing too close to an election that confusion can be a

13    burden.

14              Most commonly it arises in the context of

15    ballot layout, but there's nothing that says that it has

16    to, and the defendants provide no cases that say that it

17    has to.  And if there were one, I'm sure they would have

18    found it.  They're talented lawyers.  They would have

19    cited a case that says it has to be a ballot case, it

20    has to have happened at the ballot box.

21              That's not what the law says.  The law says if

22    the law causes a burden on the right to vote.  And so

23    our argument that we're presenting to you is, consistent

24    with the evidence, this confusion over whether people

25    have to get driver's licenses because they register to

1    vote, this confusion arises as a consequence of

2    registering to vote.  It doesn't hit all of New

3    Hampshire rights equally.

4              We know from Dr. Herron's report in his

5    affidavit, which we provided to the Court, that there

6    are over 8,000 people who used out-of-state ID in 2016

7    in the general election.  We know that they were

8    overwhelmingly young people and college students.  We

9    know that they were more likely to be undeclared and

10   Democrats then Republicans.  We know that it's hitting

11   these discrete subgroups, including, you know,

12   constitutionally suspect classes differently.

13             So let me just call up Dr. Herron's affidavit.

14   So this is document 72-7.

15             THE COURT:  Yeah.

16             MR. KLEMENTOWICZ:  So going to page 9, for

17   example.

18             THE COURT:  Who are we talking about?

19             MR. KLEMENTOWICZ:  We're talking about the

20   discriminatory burden.

21             THE COURT:  No, what document?

22             MR. KLEMENTOWICZ:  Oh, I'm sorry.  72-7.

23             THE COURT:  In English what are you talking

24   about?

25             MR. KLEMENTOWICZ:  This is Michael Herron's

1    declaration.  Dr. Herron is a professor of government

2    and quantitative social sciences who performed an

3    analysis of the categories of people who used

4    out-of-state identification when they registered to

5    vote.

6              He writes that his algorithm undercounts the

7    rate of college student voters because it only bases it

8    if people have their dorm names in their registration

9    address.  But even with this conservative algorithm we

10   can see, for example, that in the 2016 general election

11   approximately 24 percent of college students used

12   out-of-state ID.  For non-college students that rate was

13   closer to 1 percent.  On figure 6 we can see that the

14   rate of usage of out-of-state ID was around 12 percent

15   for people who were 18, 19, and 20, and 21, but then as

16   soon as you get to about 25, the rate of usage of

17   out-of-state ID drops to about 2 percent, where it

18   stays.

19             He does an analysis of the rates of usage of

20   Democrats and Republicans and undeclared and shows that

21   Democrats and undeclared use out-of-state ID at a

22   significantly higher rate than do Republicans.

23             These are burdens of confusion that are

24   subjected on voters about whether they need to get New

25   Hampshire driver's licenses if they drive.  They don't

1  fall evenly.  They fall upon suspected class --

2  protected classes at higher rates.  They burden the

3  right to vote by --

4             THE COURT:  -- protecting classes.

5             MR. KLEMENTOWICZ:  Well, political

6  affiliation, right, young people.

7             THE COURT:  Yeah.  Young people?  What do you

8  mean, by like the amendments?

9             MR. KLEMENTOWICZ:  Yes.  People who are under

10  21 who are protected actually by the 26th Amendment.

11             So we know that there's a burden, we know that

12  it's discriminatory in its effect, and we know that it

13  arises in the context of voting.  And we know from the

14  people who work in college towns where out-of-state

15  users of ID -- where users of out-of-state ID are most

16  likely to live or at least in the top ten towns

17  probably, Hanover and Durham, that it's going to cause

18  confusion at the polls and potentially cause people not

19  to exercise the right to vote.  We know it's going to be

20  discriminatory.

21             So we look at the burden, and then we weigh

22  it against the state's interest, like why is the state

23  doing this, what interest does the state have in the

24  law, but also what interest does the state have in using

25  the evidence that we're seeking to enjoin from in

1  prosecutions when they haven't been doing that

2  historically to prove residence, what interest do they

3  have in telling people likely what the wrong law is, and

4  in confusing voters, because that's the challenged

5  conduct.  So what interest does the state have in

6  telling people that they have to get a license to vote

7  if they don't?

8          So the interests that the state advances are

9  that the law removes confusion.  So I think this is

10 pretty contrary to the weight of the evidence.  I think

11 there's ample evidence from Clerk McClain, from Ann

12 Shump, from the individuals from the Warren campaign

13 that in fact HB 1264, its interplay with RSA 259:88 and

14 the way it's been implemented introduce confusion,

15 right?

16         There's nothing saying that people -- there's

17 no evidence saying -- and the state has had

18 opportunities to put on evidence of their interest and

19 have chosen to leave one side of the scale empty.

20         There's similarly no evidence that this is

21 improving public perception in elections.  Again, people

22 could be concerned, you know, the view of the electorate

23 could be that the New Hampshire legislature is trying to

24 fence people out from the electorate.  That's voter

25 suppression.  That's making it more difficult to vote.

1    That's decreasing confidence in the elections because

2    people are being fenced out.

3             THE COURT:  Well, what about something simple

4    like we want people who vote in our state to contribute

5    to the upkeep of its roads and bridges so we have them

6    domesticate their license and registration because they

7    live and drive here?  Does that seem crazy to you?

8             MR. KLEMENTOWICZ:  So there's no evidence that

9    this law actually does that, right, or that it's doing

10   it any more than it was before.  We have no idea if the

11   state is making more money than they were before in

12   registration fees.

13            THE COURT:  The law is fairly on the books.

14            MR. KLEMENTOWICZ:  True, but the state has an

15   opportunity to advance evidence in support of their

16   contentions and at most they could say, you know, maybe

17   more people are buying New Hampshire driver's licenses

18   but maybe not, maybe all that's happening is people are

19   choosing not to vote in New Hampshire, right?  And this

20   community of interest standard, by the way, is the type

21   of thing that courts have questioned and we cite this

22   all over our brief --

23            THE COURT:  Suppose -- let's just take your

24   example.  Suppose one chose not to vote because one

25   said, well, I don't want to make a contribution to the

1  roads where I live and drive.  Is that impermissible

2  voter suppression?  It sounds like you're saying it is.

3          MR. KLEMENTOWICZ:  I am saying that it is.

4          THE COURT:  Okay.

5          MR. KLEMENTOWICZ:  I don't think that the

6  state has an interest in fencing out qualified voters

7  because they're unwilling to pay, which is another way

8  of putting what your Honor just said.

9          THE COURT:  Not the way I put it, but I guess

10  it is another way.

11          MR. KLEMENTOWICZ:  But RSA 654:1-a says that

12  these people, college students who meet the definition

13  of domicile are entitled to vote.

14          The case law says that the public interest is

15  served when more qualified voters vote.  That's in the

16  public interest is to increase turnout rates.

17          THE COURT:  That's a good point.

18          MR. KLEMENTOWICZ:  To get people out from the

19  franchise isn't in the public interest.

20          THE COURT:  It's easy to forget that there is

21  a statute that basically domiciles college students in

22  our state, and that's a judgment that the legislature

23  has made.

24          MR. KLEMENTOWICZ:  That's right.

25          THE COURT:  All right.

1          MR. KLEMENTOWICZ:  And so to the extent that

2     it's the state's or the legislature's goal to impose

3     fees upon people who are choosing to vote, that's the

4     type of fencing out that courts have looked at with

5     skepticism and that's why this kind of community of

6     interest idea is viewed with such skepticism in courts,

7     because you could just as easily say, well, maybe the

8     state just wants to make it so that only people who are

9     committed enough to pay $100 to register to vote -- I

10    mean, it's a very slippery slope.  That's a more

11    explicit poll tax, but it's the same idea as what's

12    happening here where the state has said, we only want

13    people who are willing to pay to vote here.

14          So I think if you look at the interests that

15    the state has advanced, you'll see that they are, number

16    one, not supported by any evidence; number two, weak;

17    and number three, there's no evidence that these were

18    the actual -- except I think from the confusion

19    suggested interests that these were the actual interests

20    considered by the legislature when they passed the law.

21          So if you look at the Guare case again, the

22    Guare Court suggests that under intermediate scrutiny

23    they won't look at (inaudible) justifications for the

24    law.  And so I think if you look at the law and say

25    people are being told the wrong thing, right, what the

1    law likely is is RSA -- you know, RSA 259:88 likely

2    doesn't require this category of probably 8,000 people,

3    many of whom are young, many of whom are college

4    students, from paying this money to register to vote.

5    It probably doesn't.  The state is telling them that it

6    does.  Right?  That's incorrect legal advice.  That's

7    confusing, discouraging --

8              THE COURT:  Say that again.  I didn't follow

9    that.  The state is telling people X that's incorrect.

10   What is X?

11             MR. KLEMENTOWICZ:  X is that by registering to

12   vote, now they have to get a New Hampshire driver's

13   license to drive.

14             THE COURT:  Okay.  The point is 255:88 maybe

15   means that they don't.

16             MR. KLEMENTOWICZ:  Right.  It maybe means that

17   they don't.  But if they are, if it does, they're being

18   burdened with this confusion because they're being told

19   the wrong advice and either discouraged from registering

20   to vote in New Hampshire, as is their statutory right,

21   or they're being forced to spend this extra money.

22             And the problem is this confusion, the wrong

23   legal advice, inaccurately stating the law, is precisely

24   the type of unconstitutional burden under

25   Anderson-Burdick that the Guare Court has identified.

1              THE COURT:  You say it's precisely the type,

2      but you don't give me any examples.  That's the problem.

3              MR. KLEMENTOWICZ:  Guare, right?

4              THE COURT:  There's a huge difference.

5              MR. KLEMENTOWICZ:  Okay.

6              THE COURT:  But Guare is similar.  It is.

7              MR. KLEMENTOWICZ:  Yeah.  But if Guare is

8      right, that it's a violation of the Anderson-Burdick

9      framework to inaccurately tell people what the law is,

10     then it follows that it's not a violation of the

11     Eleventh Amendment to enjoin people from telling people

12     the wrong legal advice.

13             And so if your Honor thinks that the New

14     Hampshire Supreme Court would probably say that RSA

15     259:88 means that college students don't have to get New

16     Hampshire driver's licenses, then it's required under

17     Anderson-Burdick to correct that confusion and it's

18     authorized to do so under the Eleventh Amendment.  And

19     the way to remedy that confusion is to issue an order

20     saying you have to interpret the law and administer it

21     consistent with what I think the New Hampshire Supreme

22     Court would say, which is that people who register to

23     vote in New Hampshire who claim residency in another

24     state for another purpose don't have to comply with

25     these motor vehicle obligations, and the only way to

1    make that so, the best way to make that so is by barring
2    the use, as your Honor suggested, of this type of
3    evidence in these prosecutions.
4            THE COURT:  You can suggest it, but the state
5    didn't agree to do it.
6            MR. KLEMENTOWICZ:  They didn't.
7            THE COURT:  And I still don't understand why.
8    I do understand why.  I shouldn't have said that.  They
9    explained why.
10           MR. KLEMENTOWICZ:  But I think the key is if
11   it's curing the violation of the Anderson-Burdick
12   framework, it's within Ex Parte Young, right?  So if the
13   confusion -- let me try this again.  I'm sorry.
14           If the state is wrong about RSA 259:88,
15   they're telling people the wrong thing, that's
16   confusing.  That's burdening the right to vote because
17   it's discouraging people from voting potentially.
18   That's unconstitutional.  Telling them to interpret the
19   law correctly is the only injunction that can issue to
20   address that confusion.
21           THE COURT:  Why are you so focused on 259:88
22   both in the evidence presentation and in the argument
23   and not on the student domicile statute?  Isn't that
24   another statute that means nothing if this statutory
25   regime is what the state says it is or what you

1    originally said it was, right?

2          It seems to me that if -- it seems to me

3    there's a student domicile statute that says students

4    can vote.

5          MR. GALDIERI:  There is.  There is.

6          THE COURT:  One might argue, and you saw my

7    certification proposal, if that's interpreted to mean

8    that these New Hampshire fees don't apply to students,

9    then there's no burden on the right to vote, right?  Do

10   you follow that?

11         MR. GALDIERI:  I'm sorry?

12         THE COURT:  I don't think it's an argument

13   that anyone is really gravitating around.  One of the

14   certification questions is the student domicile statute.

15   That statute alone might mean students don't need to pay

16   these fees because they're a student.  A student could

17   say, I'm a college student, I'm a domicile here.  It

18   says right here in the law.  I don't need anything else

19   to vote.  I can't be required to pay these fees.

20         You're not making that argument is what you're

21   telling me now.  Is that an argument you're going to

22   make in the supreme court.

23         MR. KLEMENTOWICZ:  It is an argument that

24   we're --

25         THE COURT:  Then why aren't you making it now?

1          MR. KLEMENTOWICZ:  Because I think that RSA

2     259:88 is a better argument.

3          THE COURT:  More explicit?

4          MR. KLEMENTOWICZ:  I just think it is.

5          A couple other smaller points that I want to

6     make just to respond to what the state raised in their

7     brief.  They talk in their papers about how people who

8     are nonresidents are nonetheless required in some

9     circumstances to get New Hampshire driver's licenses.

10          THE COURT:  Yeah, I was just about to ask you

11     about that.  It would seem to apply to your UNH law

12     student witness.

13          MR. KLEMENTOWICZ:  Yeah.  I think that's a

14     tortured reading of the statue.  So RSA 259:67 is the

15     statute that defines nonresident, and what it says is

16     that, except as provided in paragraph 2 which is not

17     relevant:  Any person whose legal residence is in some

18     state, district, or country other than New Hampshire but

19     not a resident, having a regular abode or place of

20     business within the state for more than six months in

21     any year shall be deemed a resident -- and this is the

22     key point -- as to all vehicles principally used in

23     connection with such abode or place of business, and the

24     director for the purposes of registration shall

25     determine what vehicles are so used.

1          That's a statute about vehicle registration.

2 It says nothing about -- it doesn't say that people are

3 residents for the purpose of licensing.  It says if

4 you're a resident of Massachusetts and you have a store

5 in New Hampshire and your store has a car, that car has

6 to have New Hampshire tags.  It doesn't say that you

7 have to have a New Hampshire license to drive it.

8          THE COURT:  No, no.

9          MR. KLEMENTOWICZ:  Right.  So then you look at

10 RSA 263:36 which says:  No owner of a pleasure vehicle

11 and no nonresident or driver thereof holding a license

12 to drive in the state, district, or country in which he

13 resides shall be required to obtain a license to drive

14 such vehicle in any state.

15          I think that's pretty clear that if you have a

16 license to drive in another state and you're a

17 nonresident, you don't have to get a New Hampshire

18 driver's license.

19          THE COURT:  What about vehicle registration?

20          MR. KLEMENTOWICZ:  Vehicle registration is

21 maybe different, but it also says that the director for

22 the purposes of registration shall determine what

23 vehicles are so used.  It doesn't say how that works,

24 whether the director has to determine that your vehicle

25 is used principally in New Hampshire.

1                But in any event, there's a large category of

2      people who have cars that may or may not be principally

3      used in New Hampshire and so would still be burdened by

4      having to domesticate a registration.

5                THE COURT:  What's the statutory cite again?

6                MR. KLEMENTOWICZ:  The statute?

7                THE COURT:  Yeah, for the one we just talked

8      about.

9                MR. KLEMENTOWICZ:  259:67(1), which is about

10     nonresident registrations, and 263:36 and also 38, which

11     are about pleasure vehicle drivers.

12               THE COURT:  Hold on.  259:67, shall be deemed

13     a resident as to all vehicles principally used in

14     connection with such abode or place of business, and the

15     director for the purposes of registration shall

16     determine what vehicles are so used.

17               It's basically saying the director will

18     determine if you have to register the vehicles, right?

19               MR. KLEMENTOWICZ:  Yes.  It's silent about

20     licenses.

21               THE COURT:  It's silent about licenses, but it

22     says:  Shall be deemed to be a resident, and, as to all

23     vehicles.  I'm not sure what that means.

24               MR. KLEMENTOWICZ:  Well, I would think you

25     would have to -- I mean, practically, if you're

1    driving -- I mean, what, are you going to have to switch

2    licenses depending on what vehicle you're driving?  That

3    doesn't really make sense.  I'm not sure you're even

4    allowed to have two licenses.

5            But if you're using a vehicle principally used

6    in connection with that abode, you use a New Hampshire

7    license; if you're using a different vehicle, you use an

8    out-of-state license?  I don't think that's what the

9    statute really is about.

10           THE COURT:  Okay.

11           MR. KLEMENTOWICZ:  I don't know if your Honor

12   is interested in hearing about Younger abstention.  I

13   can talk about it.  They raised it in their objection.

14           THE COURT:  I hear about it all the time.  I

15   know it very well.  You don't need to talk about that.

16           MR. KLEMENTOWICZ:  Okay.  Just the key point

17   on that is that the federal court plaintiffs are not

18   parties to the state court actions, so Younger

19   abstention only applies where they're really intertwined

20   with the state court parties, who we don't even know if

21   they exist or who they are.  There's no way for us to

22   know if they're so intertwined.

23           Could I have a minute?

24           THE COURT:  All right.

25           MR. KLEMENTOWICZ:  Your Honor, my co-counsel

 1   has a Florida case.

 2              THE COURT:  I'm happy to listen.

 3              MS. EBENSTEIN:  Your Honor, with apologies, I

 4   can't write my notes properly right now.  There's a case

 5   out of Florida, League of Women Voters v. Browning.

 6   It's 863 F.Supp. 2d 1155, and I would just refer you to

 7   1164.

 8              That case relates here -- it has to do with a

 9   law in Florida that regulated third-party voter

10   registration organizations where the state was giving

11   people who wanted to undertake voter registration from

12   the registration organization side --

13              THE COURT:  Third-party voter registration

14   organization.  What is that?

15              MS. EBENSTEIN:  The League of Women Voters

16   being a good example.  They go out and voluntarily --

17              THE COURT:  Oh, sure.

18              MS. EBENSTEIN:  So it gave a form that those

19   volunteers, for groups like the League of Women Voters

20   had to sign, and in that form it misstated what the law

21   was.

22              And so while the Court didn't specify voter

23   confusion or third-party voter registration organization

24   confusion, it had to do with the state misstating the

25   law and preventing people from undertaking registration,

1   registering and voting on that basis.

2           THE COURT:  Right.  But all this argumentation

3   you're advancing right now, and I guess it's an obvious

4   point I should have raised earlier, it's all based on my

5   agreement that it's likely that the New Hampshire

6   Supreme Court will say that this exhibit, November 7,

7   the November 7th letter, Exhibit 11, misstates the law

8   because it doesn't make reference to or explain RSA,

9   what is it, 625:88?

10          MR. KLEMENTOWICZ:  259:88.

11          THE COURT:  I'm sorry.  259:88.  That's the

12  argument, right?

13          MR. KLEMENTOWICZ:  I think that's the cleanest

14  argument, but I think that there's ample evidence that

15  even if the New Hampshire Supreme Court wouldn't find

16  that, voters are still being confused.  I think that

17  there's still evidence from Elizabeth McClain and from

18  Ann Shump and the six individuals who we had, including

19  Ms. Suskie, you know, who tried to deregister.

20          But even if the state isn't wrong about RSA

21  259:88, I think people are still confused about their

22  obligations and they're not being sufficiently --

23          THE COURT:  Give me that cite again for

24  Florida.

25          MS. EBENSTEIN:  Sure.  It's League of Women

1    <u>Voters of Florida v. Browning</u>, 863 F.Supp. 2d 1155, and

2    it's at 1164.  It's from the Northern District of

3    Florida in 2012.

4              THE COURT:  Who's the judge?  Do you know?

5              MS. EBENSTEIN:  Hinkle.

6              THE COURT:  And your point is, if I understand

7    you correctly, it's not that it's a voter confusion

8    case, but it is a case about -- it's a case about

9    misinformation I guess, an incorrect interpretation of

10   the law being disseminated on third-party voter

11   registration organization forms.

12             MS. EBENSTEIN:  Even more specifically, your

13   Honor, it's a case where it says that what is required

14   of third-party volunteers is so vague and it's misstated

15   on a particular form they have to sign that -- it's an

16   Anderson-Burdick case.  It burdens the right to vote

17   because they can't -- based on the law, they can't

18   follow it correctly or they'll be chilled from

19   undertaking election-related activities because they

20   can't follow this law.

21             THE COURT:  How old is that case?

22             MS. EBENSTEIN:  2012.

23             THE COURT:  Thank you.

24             MS. EBENSTEIN:  Sure.  Thank you.

25             THE COURT:  All right.  Are you all set, Mr.

1    Klementowicz?  Are you all set?

2              MR. KLEMENTOWICZ:  Yes.  Thank you.

3              THE COURT:  Jadean, how long have we been

4    going?

5              THE CLERK:  You have like another twenty

6    minutes or so.

7              THE COURT:  Okay.

8              MR. GALDIERI:  Thank you, your Honor.  I would

9    just like to start with a brief point that I think

10   highlights one of our main arguments, and it just

11   references the last case that was presented to you,

12   League of Women Voters versus Browning.  I haven't read

13   that whole case, but the way it was described is that

14   there are laws in Florida that permit third-party voter

15   registration organizations to register people to vote

16   and that is part of the election laws of the state.

17             What we have in this case is a law that

18   changes two definitions in RSA 21, which is the

19   statutory construction chapter of all of the New

20   Hampshire RSAs, it's like the Dictionary Act in the

21   federal code, and it removes four words.

22             And the plaintiffs' argument is the removal of

23   those four words when and if those definitions enter the

24   motor vehicle code make my motor vehicle obligations to

25   the state uncertain and that therefore places a burden

1    on my right to vote.

2           I have read no case applying Anderson-Burdick

3    to any statute that operates like that, any statute that

4    is a basic part of being a resident of the state, a

5    person, a citizen is obligated to do something and that

6    Anderson-Burdick applies to that scenario, and the

7    Anderson-Burdick cases talk very clearly about the

8    voting process, the voter registration process, about

9    ballots, ability to get on the ballots, access to the

10   election system, not laws and rules and regulations that

11   exist outside of the system may affect a person's

12   decision to legally change their domicile and are part

13   of that calculous but do not impact their ability to

14   register to vote or vote.

15          If they would like to be domiciled in New

16   Hampshire, they can come in and be domiciled here and be

17   subject to all the same civic rights, duties, and

18   obligations as the citizens of New Hampshire.  If they

19   say, I don't want to be part of that community, I don't

20   want to have those obligations, they can vote where they

21   came from and maintain their status in the communities

22   where they came from where they don't mind being part of

23   those rights, duties and obligations.

24          So that is the main difference between the law

25   in this case, and the law in this case does not fence

1   out voters from the franchise.  The term "fencing out
2   voters" means it excludes them from being able to vote
3   anywhere at all.  They can't vote.  That's not what this
4   law does.  This law may complicate their decision about
5   whether or not they would want to change their legal
6   domicile, but that does not fence them out from voting.
7   They get to vote somewhere if they choose.
8           Our position in this case obviously is that HB
9   1264 is not confusing, that the statutory construction
10  analysis works under well-settled principles of
11  statutory construction, and that this confusion theory
12  that the plaintiffs have advanced now in mid-October is
13  not legally cognizant.  There's no case law to support
14  it.
15          The one case that touches on confusion related
16  to how laws operate, there's the Washington Republican
17  Party case from the Ninth Circuit and there's an
18  argument made that the way the election laws and
19  regulations operate would confuse people, and the Ninth
20  Circuit thought it was wholly implausible that
21  individuals would be diving into the nuances of the
22  election code and that would be causing --
23          THE COURT:  Yeah, a separate --
24          MR. GALDIERI:  -- any sort of actual
25  confusion.  This case is also not like the Guare, the

1    State versus Guare in the New Hampshire Supreme Court.

2            That was a case about a registration form.

3    That registration form is part of the election process

4    people encounter when they register to vote.  And this

5    law is not that.  You don't encounter it during the

6    election process.  As most of the declarations reveal,

7    there are many people in the declarations that

8    plaintiffs have submitted not aware of 1264 when they go

9    to register to vote and that's because it's not part of

10   the process.

11           Ms. Suskie is an interesting witness in a few

12   senses.  I think the most notable sense is Ms. Suskie's

13   testimony establishes that she's in New Hampshire for

14   the indefinite future.  If 1264 were enjoined, she would

15   still be a resident of this state.  She has no intent to

16   go back to Arkansas, she doesn't know when she's leaving

17   New Hampshire, and she's domiciled here.  She meets the

18   pre-1264 test to be a resident and would have to get a

19   license under the preexisting motor vehicle regulations.

20           And I think the point your Honor raised

21   earlier that the remedy for confusion is clarification,

22   I think that is exactly correct.

23           Since this confusion argument has been raised

24   and put out there -- one of the issues that I see in

25   this case is that we're responding to confusion that

1     manifests itself not by folks coming in and saying, hey,

2     we're really confused about this, this, and this, do you

3     think we could, I don't know, put some kind of a very

4     specific guidance form together or something we can get

5     together?

6            It manifests itself in the media.  It

7     manifests itself in the declaration.  You know, we're on

8     certification and the plaintiffs are demanding that all

9     three agencies speak in one voice because we have people

10    out there who seem like they have an agenda to call the

11    DMV and ask Lorrie at the DMV, do you know about 1264,

12    and Lorrie may know and she may not know and she's a

13    lower-level employee at the DMV.  And they say, oh,

14    you're not all on the same page, there's too much

15    confusion, and so that confusion gets addressed, but

16    then that's not good enough.  That's causing more

17    confusion.  And, you know, every time we try to clarify

18    that clarification and address the confusion, they come

19    back and say, well, that's not good enough.

20           You know, one of the steps we're going to be

21    taking is doing a list of FAQs to get a little more

22    brand-aware.  Those aren't fully out yet and developed,

23    but we're planning on putting them out.

24           THE COURT:  That's important to me.  When?  Do

25    you know the timetable?

1          MR. GALDIERI:  I don't know the timetable.  I

2     know we have a draft now, I know that, and so we can get

3     those out --

4          THE COURT:  Are you prepared to make a couple

5     representations about it if I ask?  Because it's

6     important to me.  I mean, one of the questions I was

7     going to ask you today, because I happen to think the

8     likely remedy for confusion is clarification, and I

9     think that this November 7th letter here clarifies to a

10    degree, but plaintiffs' counsel have pointed out some

11    issues with it.  Like, for example, the section 88

12    question, are you going to address that in the

13    frequently asked questions?

14          MR. GALDIERI:  259:88?

15          THE COURT:  Yeah.

16          MR. GALDIERI:  And what would be the question?

17          THE COURT:  What its effect is on all of this.

18    If a person claims residency in another state like the

19    witness we heard from, what is the impact of that on the

20    right to vote or at least on the registration -- is a

21    person in that situation required to declare residency

22    and then undertake the obligations, because that's

23    confusing.

24          MR. GALDIERI:  So part of the November 7th

25    letter --

```
 1              THE COURT:  Yeah.

 2              MR. GALDIERI:  -- is the analysis, the

 3    analysis that's been presented to you in the briefs, but

 4    in a manner where we know our audience is not the Court,

 5    our audience is local election officials or other

 6    people.

 7              THE COURT:  Yeah.

 8              MR. GALDIERI:  I think one of the concerns is

 9    as you start loading guidance up with all these

10    statutory references and talking about all the

11    intricacies of the statutes, you get into a place

12    where regular people --

13              THE COURT:  You might confuse it more.

14              MR. GALDIERI:  Right.  I mean, part of this

15    analysis is an understanding that that is how 259:88

16    works.  259:88 says you're a resident as defined in

17    21:6, which now means a domiciliary, except if you have

18    a residence, which now means a domicile, in another

19    state, and you can only have one domicile.  So if your

20    domicile is here, you can't have a domicile in another

21    state.  If you're a domiciliary here, you --

22              THE COURT:  So that statute means nothing

23    then.  It actually means nothing.  It's statutory

24    language that has no application to any person.

25              MR. GALDIERI:  Well, it means you're a
```

1    domiciliary here unless you're a domiciliary in another

2    state.  Then you're a nonresident.  And you're only a

3    nonresident until you've been here for more than six

4    months driving around, and then you're deemed a resident

5    under the code as to all of the vehicles you're driving

6    in connection with your abode.

7          THE COURT:  You probably think that made it

8    clearer, but I'm not sure if it did.  I thought you were

9    going to go in a different direction there, because then

10   you're only a resident vis-a-vis certain vehicles, and

11   resident is supposed to equal domicile.  And you can

12   definitely -- under that statute, that last one, you can

13   be a resident in more than one state as to different

14   vehicles.  I think that's what that statute has to mean.

15         No?  You don't agree?

16         MR. GALDIERI:  You may be able to do that.  I

17   think the purpose of the nonresident provision of the

18   statute is if you are present in New Hampshire and for

19   more than six months you're driving on our roads and our

20   highways, our statute requires you to get a driver's

21   license here, if you're driving here more than anywhere

22   else, and we have an interest in regulating you and

23   maintaining the safety of our roadways.  I think that is

24   the common sense approach to that provision.  And the

25   plaintiffs would like to live in a world where that has

1   no effect and as long as you're a nonresident, you could

2   be a nonresident here for eight months out of the year

3   for the next 20 years, you never have to get a license

4   to drive in New Hampshire.

5           THE COURT:  Let me grab the statute that we

6   were talking about you said before we jumped onto that.

7           GALDIERI:  Sure.

8           THE COURT:  Because I think you were talking

9   about 259:88.  My question to you, however, was are you

10  going to address a frequently asked question about its

11  application to this, and your point really was, you

12  know, getting into the weeds like that, not necessary

13  and not necessarily helpful, right?

14          MR. GALDIERI:  Correct.

15          THE COURT:  259:88.  Resident shall mean --

16  which you say means the same as domicile now, right?

17  Domiciliary, right?

18          MR. GALDIERI:  Yeah.

19          THE COURT:  Shall mean a resident of the state

20  as defined in RSA 21:6, except that no person shall be

21  deemed to be a resident who claims residence in any

22  other state for any purpose.

23          But it seems clear that students under the

24  student domicile statute who register to vote and

25  declare residency can claim residence in another state

1  for another purpose.  If they can't, that statute means

2  nothing.

3          MR. GALDIERI:  Well, if an individual student

4  who registers to vote is declaring that New Hampshire is

5  the one place more than any other where they participate

6  in democratic self-government for domestic, social,

7  civil purposes -- that's not an exact recitation, but

8  those words are generally in the statute.

9          THE COURT:  I'm with you.

10         MR. GALDIERI:  And the question is, is that

11 definition equate or pretty much synonymous with the

12 definition under RSA 21:6 and 21:6-a, which is that a

13 resident or inhabitant or both of this state shall be a

14 person who is domiciled or has a place of abode or both

15 in this state and who has through all of his actions

16 demonstrated a current intent to designate that place of

17 abode as his principal place of physical presence to the

18 exclusion of all others.  That's what it says.

19         Those definitions are -- they don't use the

20 same words but they are extraordinarily similar in their

21 consequences.

22         THE COURT:  But 259:88 seems to say that you

23 can fit that definition of domiciliary/resident, which

24 is now equal, right?

25         MR. GALDIERI:  Yep.

1          THE COURT:  Except that no person shall be

2    deemed to be a resident who claims residence in any

3    other state for any reason.  It sounds like what you're

4    saying to me is a person who fits the definition of

5    resident/domiciliary under 21:6 could never be deemed to

6    be a resident anyway of any other state for any purpose,

7    right?

8          MR. GALDIERI:  They could if they're a

9    domiciliary of another state.

10          THE COURT:  If they're a domiciliary of

11    another state, they couldn't be a domiciliary or

12    resident of the state of New Hampshire.

13          MR. GALDIERI:  Correct.  And the term

14    "residence" is defined in 21:6.  It also appears in the

15    definition of domicile within the motor vehicle code.

16    It is somebody who takes up residence.

17          So, I mean, our guidance would reflect our

18    legal interpretation of the law that RSA 21:6-a informs

19    what the word "residence" means now in RSA 259:88 and it

20    now means domicile.

21          THE COURT:  Yeah.  I've dragged you into this

22    statutory interpretation question anyway and it's,

23    frankly, much more germane to the whole certified

24    question than it is to this whole analysis.

25          MR. GALDIERI:  But I think the FAQs, your

1    Honor, would be targeted at more so trying to help a

2    town clerk like Ms. McClain who says, somebody asks me

3    now that I've registered to vote, do I need to get a

4    driver's license.  So I think you have to get a little

5    more granular than just yes or no but, you know, how

6    does that interaction play out?  Do you drive in New

7    Hampshire?  No.  Okay.  So then you don't have --

8              THE COURT:  So that's the type of thing that

9    the FAQs are going to address?

10             MR. GALDIERI:  That's my understanding.

11   There's going to be some more granular information about

12   how you can answer certain questions with perhaps

13   certain conditions, provisional, you know, language

14   about it.

15             THE COURT:  And tell me again, even though I

16   know I just asked you this, but what do you think the

17   timetable is for that?

18             MR. GALDIERI:  I don't know exactly what the

19   timetable is, but I can move it.  I can get it --

20             THE COURT:  But there's a draft in play and

21   it's under discussion?

22             MR. GALDIERI:  There's a draft that has just

23   been circulated.  I can't purport to have a mastery of

24   it but --

25             THE COURT:  Okay.  Move on.  I'm good.

 1              MR. GALDIERI:  Okay.  And it goes to, you

 2    know, the, you know, in some part we have to be reserved

 3    and measured and very correct in how we put out the

 4    guidance so that we don't create problems.  One of the

 5    fears is you're going to provide somebody with a

 6    document that gives a simple answer and it's going to

 7    overlook the fact that that individual has done

 8    something else before registering to vote that

 9    establishes their residency, and then they've been told

10    by a town official they don't need to do anything for 60

11    days, and that's not correct.  And so those FAQs will

12    try to be shaped to try to ensure that we don't run into

13    those issues where we can be accused of having officials

14    giving advice that turns out to be incorrect because of

15    people's particular circumstances.

16              THE COURT:  I understand.

17              MR. GALDIERI:  The plaintiffs talk a lot about

18    the Anderson-Burdick balancing test, and the test under

19    Anderson-Burdick is for the Court to look at the

20    character of the burden and the magnitude of the burden.

21              The character of the burden in this case is an

22    indirect, very indirect attenuated burden.  It is based

23    mostly on speculation and conjecture that a certain

24    group of people who Dr. Herron has possibly quantified

25    are all going to be confused.  And we have no evidence

1    that they're all going to be confused, but that's the

2    speculation and that's the conjecture, and that's the

3    character of the burden.

4            And when we look to the magnitude of the

5    burden, the magnitude is very slight.  The magnitude of

6    the burden, if you look at Dr. Herron's affidavit, is an

7    extraordinarily small amount of the electorate would be

8    predicted to confront this, and even that number is

9    underinclusive because you don't know how many of those

10   people don't drive, don't own a motor vehicle here.  You

11   don't know a number of their circumstances.

12           And the Court in Crawford found explicitly

13   that just because an election regulation, this is not an

14   election regulation, but just because an election

15   regulation places a burden on some voters does not

16   permit a sort of facial challenge where you can show

17   success on the merits because it doesn't extend

18   basically to substantially or a significant portion of

19   the electorate.

20           And the voter confusion cases that are cited,

21   that is the tenor of those cases.  It is widespread

22   voter confusion.  And you can show widespread voter

23   confusion in those cases because everybody who registers

24   to vote will encounter the form.  Everyone who takes a

25   ballot will encounter the ballot.  This law does not

1 have the same effect. This law is on its face a

2 neutral, nondiscriminatory law. The burden is indirect,

3 it's attenuated, the magnitude of it is small.

4 Under those circumstances, if Anderson-Burdick

5 were to apply, the burden would be minimal. The burden

6 would be slight, as the First Circuit has found in the

7 Werme case and has talked about a similarly slight

8 burden in the Barr case. And once the burden is slight,

9 the justifications need only be rationally related to

10 the legislation.

11 THE COURT: Yep.

12 MR. GALDIERI: And we would argue that our

13 justifications are more than rationally related to the

14 legislation; they are in fact compelling state

15 interests.

16 Eliminating the confusion that has persisted

17 and existed since -- in recent years about whether

18 nonresidents, it sounds like nonresidents can vote in

19 New Hampshire, eliminating that confusion from our

20 jurisprudence, from our -- from the way our law operates

21 is a significant and compelling government interest

22 creating, ensuring a community of interest that everyone

23 who declares this place as their home and drives on the

24 roads and engages in all the activities in New Hampshire

25 contributes the same, has the same rights and duties,

1    they're the people that are going to be serving as

2    jurors, that they all are part of the same community of

3    interest.

4           And the really remarkable thing about this

5    case is that in 1972 in _Newburger_ this Court -- a

6    three-judge panel of this Court told New Hampshire that

7    an indefinite intent to remain element is irrational,

8    and it's irrational because, you know, somebody who, you

9    know, is very good at planning and knows in two years

10   they're going to leave this state, and somebody who

11   doesn't know that, they're treated differently.  One

12   gets to register to vote; the other one doesn't.

13          THE COURT:  What was the upshot of that case,

14   the legislative -- I mean, you gave me the history, but

15   what happened as a result?  Because the indefinite --

16   the intent to stay indefinitely in the future was only

17   recently removed from the statute.

18          MR. GALDIERI:  So _Newburger_ talks about our

19   common law domicile.  That is our common law domicile.

20   And if you look at what's in RSA 21:6 and 21:6-a, it is

21   our common law of domicile.

22          THE COURT:  How old are those statutes, the

23   ones that were -- well, that's domicile.  Okay.

24          MR. GALDIERI:  They're not that old but

25   they're old.

1          THE COURT:  Yeah.

2          MR. GALDIERI:  But 21:6 and 21:6-a essentially

3   enshrine what was our common law domicile.  So in New

4   Hampshire you have -- and what makes New Hampshire sort

5   of different than other states is you have a status of

6   being a nonresident domiciled, you know, for voting

7   purposes and then super domiciled.  You're domiciled,

8   but you're here for the indefinite future.

9          You don't have a category of people who are

10  necessarily just resident in the state as the term is

11  commonly used in other places and in other contexts.

12         So New Hampshire goes in and removes those

13  four words and in doing so removes the same types of

14  irrationalities that would pervade other statutes.

15         And, for example, I don't understand the

16  Department of Safety to ever require as putting a

17  requirement in place to get a driver's licence that

18  somebody, you know, sign an affidavit saying they're

19  here for the indefinite future.  That would create

20  absurd results.  Somebody would move here from another

21  state, say, I'm only here for three years and I need to

22  get a New Hampshire license because my California

23  license expired, and they would say, well, are you here

24  for the indefinite future?  No.  You can't get a license

25  here.

1          That's not a rational result.  That's not just

2    how business is done practically.  That requirement as

3    it develops sort of in the common law domicile is not

4    really a requirement that is within the common law taken

5    literally and rigidly.

6          THE COURT:  All right.  Hold on.  We need to

7    take a break for the reporter, but I have more questions

8    for both of you so I don't want to adjourn yet.

9          So we'll take a little break.

10          MR. GALDIERI:  Okay.

11          THE COURT:  Thanks.

12          (RECESS)

13          THE COURT:  Mr. Galdieri, please proceed.

14          MR. GALDIERI:  Your Honor, I was going to move

15    into a segment of our argument that's related to Ex

16    Parte Young and have Attorney Garland deliver that part

17    if that's okay.

18          THE COURT:  That is okay.

19          MR. GALDIERI:  Thank you.

20          MR. GARLAND:  Thank you, your Honor.

21          So we've obviously raised a specific Ex Parte

22    Young Eleventh Amendment argument in our objection, but

23    there's one thing I'd like to touch upon first based

24    upon a question you asked.

25          You asked Mr. Klementowicz whether can,

1    consistent with the Eleventh Amendment, a federal court

2    order a state official from making incorrect statements

3    of state law.  And the response, which I think you

4    agreed with, was, sure, if it also violates the Federal

5    Constitution, right?

6                    But there are I think three --

7                    THE COURT:  If the incorrect statement of

8    state law would violate the Constitution if true.

9                    MR. GARLAND:  Correct.  That's right.  Yeah,

10   I'll leave it at that.  I'll concede that point for now.

11                   I think there are three hurdles, though, that

12   you're going to need to get over to even get there, and

13   I don't think that you can, and so I think for that

14   reason alone the Eleventh Amendment bars the claim that

15   they are trying to bring now.

16                   First, you're going to have to find that the

17   sort of confusion that they're relying on here is

18   cognizable in the first place.  As you raised and as

19   we've raised in our objection, and Attorney Galdieri

20   touched upon, we're not aware of any case saying that

21   two different statutes and an ambiguity in how they

22   operate is cognizable in terms of a Fourteenth Amendment

23   claim.

24                   THE COURT:  Yep.

25                   MR. GARLAND:  In fact, there is a remedy for

1  that, as you noted, and that's a state court declaratory

2  judgment action.

3        And really, I mean, thinking about what this

4  remedy would look like, you're saying there are two

5  different statutes, they are confusing, it's ambiguous

6  as to how they operate.  Federal court, strike down one

7  of the statutes.  We're not aware of anything that

8  supports you having the authority to do that,

9  respectfully, consistent with the Eleventh Amendment.

10        But even if you can get beyond that, you have

11  to assume, too, that the law operates in a particular

12  way, in the way that opposing counsel and the plaintiffs

13  have maintained at least since their amended complaint.

14        But I'm not sure that you can get to that

15  either because by virtue of certifying those questions

16  in the supreme court, I think you're asking the supreme

17  court to weigh in on that, the New Hampshire Supreme

18  Court as the authority.

19        I'm not aware -- and I haven't dug deep on

20  this, so forgive me if there is precedent, but I'm not

21  aware of any precedent that a federal court in the

22  course of certifying questions to a state court can

23  weigh into those questions and say it's likely going to

24  resolve in a particular way and then grant an injunction

25  for a part of that proceeding.

1          So I just want to raise that as another hurdle

2     that you would have to get over in order to get there.

3          THE COURT:  Except you haven't dug deep and

4     you don't have any authority for that, right?  I just

5     don't think the law of certification is that well

6     developed, frankly, but -- it's not that I disagree with

7     you, it's just I'm not worried about it.

8          MR. GARLAND:  Fair enough.

9          But then the third hurdle that I would flag is

10    that then you would also have to find that this

11    confusion, if it is cognizable and you're willing to

12    construe the law in the particular way, also violates

13    the Constitution, and we simply don't think that it

14    does.

15         THE COURT:  Is sufficiently burdensome.

16         MR. GARLAND:  Exactly.  That there's a

17    likelihood of success on that, that they've demonstrated

18    that today.  And for all the reasons that Attorney

19    Galdieri said, all the reasons that we've laid out in

20    our objection, I don't think it does.

21         But I think a greater point here and what this

22    emphasizes is --

23         THE COURT:  I don't know.  I appreciate you

24    highlighting the three hurdles and all, but like the

25    question itself kind of incorporates all of that.  The

1    way I think this is constitutionally permissible under

2    the Eleventh Amendment, I don't think anybody disagrees,

3    is if -- we call it confusion, but if Exhibit 11 here

4    from the plaintiff, the November 7th letter, if it

5    provided an incorrect interpretation of state law and

6    that interpretation if true would be unconstitutional, I

7    don't think the Eleventh Amendment would prohibit me

8    from issuing an injunction to alleviate it.  I think all

9    those three hurdles are implicit.  Maybe the second one

10   is not because it has nothing to do with the U.S.

11   Constitution, but the first and third, aren't they part

12   of that standard?

13          MR. GARLAND:  You're right, your Honor, but I

14   think that provides a good segue into the second point

15   that I wanted to make which flows into the argument we

16   have raised in our objection.

17          They're not asking for the sort of relief you

18   just described there.  The relief they're asking for is

19   two-fold, but they're related.  They want an order from

20   this Court that the state of New Hampshire not use voter

21   registrations, voter history, in enforcement actions

22   under the two motor vehicle provisions, right, and then

23   they want some sort of dissemination from the Secretary

24   of State's Office that we're not going to do that, that

25   the state is not going to do that.

1           And as we flagged in our objection, there are

2   two problems with that.  The first one may be more of an

3   academic one, but I think it's a meaningful problem.

4   They're asking for that relief against the state itself.

5   They say New Hampshire.  They say state.

6           THE COURT:  You have to slow down, Sam.

7           MR. GARLAND:  Sorry.

8           And they can't do that consistent with the

9   Eleventh Amendment.  And so at least as requested,

10  they're saying you order the state of New Hampshire, you

11  order New Hampshire, and we've cited case law to make

12  clear that that's not something that's compatible with

13  the Eleventh Amendment.

14          THE COURT:  By the way, how many cases since

15  this statute has been enacted has the state utilized

16  voter registration information in enforcing those

17  violation level offenses for domestication of licenses

18  and registration?

19          MR. GARLAND:  Since the statute has been

20  enacted, I'm not aware of any.

21          THE COURT:  Which is why you shouldn't have

22  agreed to it to begin with, frankly, but I understand.

23  The AG was clear on principle that was not something he

24  was willing to do, but it added a level of complication

25  to this lawsuit based on so-called principle that is

1   becoming very time-consuming for all of you, because

2   this is not information that's ever been used in these

3   violation level prosecutions.  The idea that it's some

4   kind of burden on the state is just implausible.  It's

5   unnecessarily obstructive.

6           It doesn't mean it's not your right to stand

7   by it, it doesn't, but it really is, you know, it's like

8   in your brief you say, oh, we have no way of knowing, we

9   have no way of knowing if this has been done.  That's of

10  course ridiculous.  I mean, you have a way of knowing.

11  In the same way you have ElectioNet to communicate with

12  your election officers, I feel pretty strongly -- it's

13  been a long time since I worked in that office, but I

14  bet you can be in touch with every police department in

15  this state and get a response within 72 hours on any

16  question you want, and you could ask the question, do

17  you have any cases of these violations where you're

18  using voter registration information or how many of

19  these cases do you have in general.  You did give me

20  some numbers on that, which was helpful, but the idea

21  you tell me you're not in a position to know that, that

22  doesn't seem plausible to me.

23          MR. GARLAND:  My understanding, your Honor, is

24  that would require that we go to every municipality if

25  they're enforcing it.  I don't think in the way that

1    elections exist that --

2              THE COURT:  You don't have an e-mail group for

3    the -- the U.S. Attorney's Office, the Criminal

4    Division, doesn't have -- we used to do it by fax when I

5    was there.  We could fax every police department in the

6    state.  We went "beep," and the letters went out, right?

7    I'm not saying it worked very well, but I am saying that

8    it doesn't seem impossible to at least put everybody on

9    notice of something and ask for a response.  And I

10   realize a hundred percent responses are not realistic,

11   but I think the information is available.  Certainly

12   it's available in the context of a litigation.

13             Tell me what you were going to tell me.

14             MR. GARLAND:  So that goes more to Younger,

15   which I wasn't going to get deep into because you

16   expressed that you were on good footing for that, but I

17   think that it does touch upon the second Eleventh

18   Amendment issue, right, if we get beyond the state is

19   the only entity that relief is actually requested

20   against.

21             While there is no indication that this sort of

22   evidence has been used since 1264 went into effect, I

23   don't think there is any dispute, and we talked about

24   this before the previous hearing, that that evidence

25   could be relevant whether or not 1264 were in effect,

1  whether a person is registered to vote, whether a

2  person's voting history was in the state would be

3  relevant -- could be relevant.  I should say could be.

4          THE COURT:  We agree.

5          MR. GARLAND:  And I think the problem, though,

6  with the relief that's requested, your Honor, is that if

7  you say, yeah, I think it's likely that 1264 violates

8  the Constitution and you -- the injunction they're

9  seeking doesn't really have anything to do with that.

10  It's not bringing any state official's conduct into

11  conformity with that alleged violation.  It's saying do

12  something -- don't do something that you could do

13  irrespective of whether this law exists.  It goes beyond

14  the scope of the federal violation they're alleging

15  here, and so I think that is actually more

16  fundamental --

17          THE COURT:  Doesn't that require me to view

18  their case as you want me to view it, as a facial

19  challenge as opposed to as an applied challenge, because

20  the injunction could be narrowly tailored to, you know,

21  you can't use it against college students or some kind

22  of -- it could be a narrowly tailored injunction or

23  temporary order, couldn't it?

24          MR. GARLAND:  I still think that would have

25  the same problem, your Honor, because it could be used

1   against college students even before.  I mean, the

2   argument that they've raised which I think --

3         THE COURT:  You just don't know if it ever had

4   in the history of the state.

5         MR. GARLAND:  I don't, and I admit that.  I

6   admit that, but I think the problem remains.  And the

7   argument that the other side has raised, which I think

8   you rightfully rejected at our last proceeding, was,

9   well, this is now conclusive evidence, and of course

10  it's not.  That's up to the trier of fact.

11        But they haven't asked for you to impose some

12  sort of relief that says what sort of weight this

13  evidence can be given and I, frankly, don't think you

14  can.  I think that is getting much closer to _Younger_ if

15  a federal court is saying this sort of evidence should

16  be given, you know, a certain sort of weight.  Again,

17  they haven't requested that, though.

18        THE COURT:  I know, but even in habeas court,

19  right, in a habeas proceeding somebody could come into

20  court and say, I was convicted on a coerced confession.

21  This Court can say, I agree, I grant the writ of habeas,

22  and I don't have to release the person from

23  incarceration.  I can say, I order a retrial, but you

24  can't use that evidence.  That's an example of -- I

25  don't know why _Younger_ abstention prohibits me from

1　temporarily saying you can't use certain evidence in a

2　criminal case when it was unlawfully obtained in the

3　context of that criminal prosecution.

4　　　　　If this is an unconstitutional burden, and I

5　know we're kind of back to the burden -- the fee burden

6　or the registration to vote and ensuing obligations

7　burden, which is not the burden they're talking about

8　today, the plaintiffs, but still we were just talking

9　about the temporary order, which is the point you've

10　raised.  I don't know why it's beyond the Court's power

11　to do that, to say evidence that there's a likelihood

12　was obtained unlawfully under the Federal Constitution

13　or that use of it would be unlawful under the Federal

14　Constitution may not be used in state proceedings

15　because to do so might violate the Federal Constitution.

16　Do you understand what I'm saying?

17　　　　　MR. GARLAND:  I do, your Honor.  The two

18　things -- the same response I think to both of those,

19　though, is it's not clear why 1264 is making the way

20　that that information would be communicated.  It changes

21　how that communication would happen.  It's not clear why

22　1264 is -- how that is allowing someone to use

23　information in a prosecution that they couldn't

24　previously, and I think that's the problem.

25　　　　　That's not a _Younger_ problem.  That's an _Ex_

1    Parte Young problem.  Ex Parte Young is narrow.  It

2    requires that you issue prospective injunctive relief to

3    make a state official conform to the Constitution.  If a

4    state official could do something notwithstanding or

5    irrespective of the constitutional violation alleged,

6    and I believe that's the case here, could, then it's not

7    clear to me how the relief they've requested is

8    compatible with Ex Parte Young, and that's the point I'm

9    trying to make.

10                THE COURT:  I understand.  All right.

11                MR. GARLAND:  That's all I have on that.

12                Thank you, your Honor.

13                THE COURT:  All right.  Mr. Galdieri, anything

14   else you wanted to say?

15                MR. GALDIERI:  I don't, your Honor.  I would

16   rest on our briefing.

17                THE COURT:  The 259:67 issue, right, sort of

18   the newer statute you brought to my attention, the one

19   that you say requires college students anyway to

20   domesticate at least their registrations, and maybe

21   registration and license, with respect to their

22   residence that is attached to vehicles that are

23   associated with their New Hampshire abode, right?

24                MR. GALDIERI:  Yes.

25                THE COURT:  Similar question that I just asked

1  Mr. Garland.  Do we know of any situation ever where a

2  college student has been required to do that, to

3  domesticate the registration or a license with respect

4  to vehicles maintained, you know, near a college dorm or

5  college housing?  Has that ever happened?

6         MR. GALDIERI:  I do not know a specific

7  instance of a college student.  I think what you're

8  touching on is the fact that these laws are probably

9  pretty difficult to enforce if not practically

10  difficult, but they exist, and that is a question

11  ultimately in this case that will go to what the burden

12  is.  And if it's unclear, I think our position would be

13  that if you're going to certify questions over, it may

14  be a question you certify.

15         THE COURT:  Yeah, we're going to include it.

16  We're going to include it.  My big question is, we don't

17  really have to figure this out now, but I want to

18  certify it soon now, but my new, what I'm thinking

19  through now is whether -- we are going to include that

20  issue -- is whether to include this new state

21  constitutional argument, right?  I wouldn't even

22  consider it except it's the New Hampshire Constitution

23  so it's sort of a similar, but it's also much broader

24  than these other sort of narrow questions.  Anyway,

25  that's just an aside.  You don't need to respond.  Okay.

1            Okay.  So you don't know of any of those, but

2    your point is that that's not really dispositive or even

3    helpful.  It goes to the burden.

4            MR. GALDIERI:  It goes to the burden.  If

5    remaining a nonresident but being here for over six

6    months requires the same monetary obligations and brings

7    with it the same specter of enforcement, the burden

8    hasn't -- there's been no increase or change in the

9    burden to anyone and it's unrelated to voting.  It's

10   simply related to your presence in the state.

11           THE COURT:  I want to pull one or more of

12   these statutes up just for a second here.  There's so

13   many statutes in play here, I know that's part of your

14   confusion argument, but --

15           All right.  Mr. Klementowicz, do you want to

16   respond?

17           MR. KLEMENTOWICZ:  Your Honor, I have some

18   rebuttal, but Attorney Christie is going to respond for

19   the Democratic Party.

20           MR. CHRISTIE:  Thank you.

21           Just to respond.  Just to tie up some loose

22   ends, first of all, I think there's oftentimes an

23   argument raised in these cases that, well, addressing

24   the burden to vote and the person can just vote where

25   they came from.

1             THE COURT:  I'm the one who raised that, yeah.

2             MR. CHRISTIE:  Yeah, and Mr. Galdieri raised

3     it in his argument as well.

4             That oftentimes is not the case.  And the

5     assumption is, well, even under the old law if someone

6     is domiciled here in New Hampshire but they're a

7     resident of another state --

8             THE COURT:  We're talking about college

9     students, though.  So I understand your point and I

10    appreciate you raising it, but let's be real.  Can you

11    think of any circumstances where college students just

12    can't get an absentee ballot in the town where they live

13    before they went to college and vote?

14            MR. CHRISTIE:  I don't think there's ever been

15    a survey done to establish --

16            THE COURT:  Right, and you have the burden

17    here so -- it looks like one of your colleagues wants to

18    chime in.

19            MS. LEE:  I just have a specific example of

20    some sort of brief notice.  In the past just -- this is

21    obviously a limited example, but individuals whose

22    parents have gotten divorced, once they moved to college

23    and then no longer live in the state where the student

24    lived prior to going to college.

25            THE COURT:  So neither parent lives in the old

1    state.

2              MS. LEE:  Uh-huh.  And that's just one example

3    I know from like other practice.

4              THE COURT:  Sure.  I take you at your word,

5    and I don't have any doubt that ACLU lawyers can come up

6    with a few other horrific stories, but the real question

7    is here, you know -- I don't know if that student or

8    that student's problem would rise to the level of

9    requiring an injunction on the enforcement of a state

10   law.  It just seems like a big ask.  And you say --

11   you're right.  There are certain places where there

12   might not be that right to vote in the state of origin

13   or prior state, but it doesn't seem like that's a very

14   widespread problem among college students.  I don't

15   know.

16             MR. CHRISTIE:  The point I'm trying to make,

17   Judge, is that the representation from the state that a

18   student who came from Oklahoma who's domiciled here in

19   New Hampshire can just vote in Oklahoma, they don't know

20   if that's true or not.

21             THE COURT:  Do you have any reason to believe

22   that's not true?  I don't.

23             MR. CHRISTIE:  I have no reason to believe it

24   is true.

25             THE COURT:  Well, I have plenty of reason to

1  believe it is true, I mean, because you hear about it

2  all the time.  College students vote by absentee ballot,

3  sort of like in the military.  It's not unusual at all.

4          MR. CHRISTIE:  In some states.

5          THE COURT:  Yeah, I guess you're right.  I

6  guess I haven't heard about it in all 50, but, I mean,

7  are you aware -- I mean, that's what absentee ballot

8  voting is for.  It's for when people travel.

9          MR. CHRISTIE:  It's for when people travel,

10  not when they've gone to another state for four years,

11  or three years for law school, and just the assumption

12  that that means that -- I mean, Mr. Galdieri's argument

13  on that point --

14          THE COURT:  You're raising a fair point, but

15  here's my response.  I really believe that in the

16  context of -- I can't believe this is the only college

17  kid voter suppression case in history, right?

18          MR. CHRISTIE:  Well, this state's unique.

19          THE COURT:  We're unique in what capacity?

20          MR. CHRISTIE:  Trying to suppress the vote of

21  college students.

22          THE COURT:  And you may be right about that.

23  I don't know if it's ever been -- this type of

24  legislation has ever been enacted elsewhere.  I guess I

25  was assuming it might have been.

1          It seems to me that -- I would assume the ACLU
2    would be aware of it if there were states that -- if
3    there were states that burdened the right to vote such
4    that they were not permitting college students to vote
5    in their home states, I don't want to call it home
6    states but their state of origin, their prior state,
7    that would seem another example, right, and I just have
8    this assumption that you would be aware of it.  You say
9    you have no reason to believe it either way.  I think
10   common sense tells us that it's probably pretty likely
11   that most states allow absentee ballot voting by college
12   students or we'd hear about disenfranchising college
13   students by their own state, and I've never heard
14   anything like that.
15          It may be a little bit too commonsensical for
16   a litigation, but that's my take.
17          Your point, though -- so what's the point you
18   want to make about this?
19          MR. CHRISTIE:  The point I do want to make
20   about it is that, as highly as I think of him, Mr.
21   Galdieri has made a representation that any one of these
22   people can vote in the home state that they came from --
23          THE COURT:  And he hasn't proved it.
24          MR. CHRISTIE:  There's no evidence to support
25   that.  That's all.  It's not the main thrust of my

1    argument.  I didn't mean to get bogged down on it.

2              THE COURT:  My fault.  My fault.

3              MR. CHRISTIE:  But turning to just the main

4    point in response to the state's arguments.

5              You know, the core issue here, the Court has

6    stated when it started the hearing it's going to certify

7    questions to the New Hampshire Supreme Court.

8              A core statute -- or a core question of

9    statutory construction is going to be RSA 259:88, and it

10   is clear from the evidence in this hearing today that

11   259:88 has an impact on the issue before the Court,

12   which is what is the impact of HB 1264.  And

13   historically when sending out letters to people who have

14   used domicile affidavits to register to vote, the state

15   has informed people it may trigger an obligation to

16   obtain a New Hampshire driver's license, and they have

17   historically cited both 21:6 and 259:88.  That was

18   established through Mr. Scanlan's testimony.

19             And when shown the November 7th letter and the

20   lack of reference to 259:88 in that letter, whatever it

21   means, we think it means one thing, Mr. Galdieri -- and

22   I'll explain why he's wrong in a second but why he

23   thinks it means something else, Mr. Scanlan agreed it

24   could be confusing.

25             THE COURT:  Yeah, he did say that.

1          MR. CHRISTIE:  In response to the very letter

2     that the state is saying fixes everything.

3          THE COURT:  But as far as I know -- and he did

4     say that.

5          MR. CHRISTIE:  He did.

6          THE COURT:  As far as I know, though, that's

7     the only evidence in this case of any confusion over the

8     applicability or effect of 259:88.  There's no evidence

9     by any of your declarants that they were confused by it.

10         MR. CHRISTIE:  Well, I think our declarants

11    are confused about the impact of 21:6 --

12         THE COURT:  Yes.

13         MR. CHRISTIE:  -- as modified by 1264, and

14    21:6 interacts, at least historically, with 259:88.

15         THE COURT:  I know.  Good try.  But none of

16    your affidavits or testimony today said -- come on.

17         MR. CHRISTIE:  They don't, but --

18         THE COURT:  And I think you would have

19    elicited that if it was there.

20         MR. CHRISTIE:  Yeah.  Well, I think --

21         THE COURT:  Don't get me wrong.  I think

22    259:88 is very important.  I've made that clear.  That's

23    why I'm certifying it despite the state telling me,

24    look, these are simple questions.  I disagree.  I think

25    the canons of statutory interpretation can be tricky and

1   selectively applied -- I'll let you finish -- but that
2   to me is an interpretation question that lay people and
3   voters are probably not that concerned with.  That's --
4   I haven't heard any evidence that any of your
5   declarants, all of whom are registered to vote by the
6   way, are confused about that.
7          MR. CHRISTIE:  Well, I'll give you an example
8   why it is important.  One of the questions asked --
9          THE COURT:  One of the questions asked?
10          MR. CHRISTIE:  Hold on.  I'll get there.
11          -- by Betsy McClain in her initial e-mail
12   exchange with Mr. Scanlan was -- I can't find it.  I'll
13   paraphrase it.  We have a whole group of people who
14   registered to vote before July 1, 2019, using
15   out-of-state driver's licenses who have never gotten New
16   Hampshire driver's licenses.  As of July 1, 2019, do
17   those people now need to run out and get driver's
18   licenses?
19          He refused to answer the question in the
20   e-mail and nobody has answered that question up till
21   today.
22          So you have a whole class of people out there
23   who may think under the guidance under the November 7th
24   letter now have to do it except that 259:88 applies to
25   them.

1          THE COURT:  That's got nothing to do with

2   whether they're going to vote.

3          MR. CHRISTIE:  It has to do with the impact on

4   people registering to vote in this state if the state

5   can't even explain to people who have registered to vote

6   if they need to get driver's licenses now, and if

7   another college student is sitting there trying to

8   wonder if I should register to vote if that obligation

9   applies to me.  And under the statutory scheme as laid

10  out in the November 7th letter the state appears to be

11  saying, yes, you do have to get a driver's license.

12  However, it ignores 259:88.  And the answer to the

13  question in 259:88, especially if you couple it with the

14  domicile statute about college students, the answer very

15  well, or in my view for what it's worth, is no, and that

16  is not in any guidance provided by the state in this

17  case anywhere.

18          The second problem with the state's -- Mr.

19  Galdieri's interpretation of 259:88 is his claim -- or

20  the state's claim is that no person shall be deemed a

21  resident who claims residence in any other state for any

22  purpose.

23          The state assumes that term "resident in any

24  other state" is the definition of residence here in New

25  Hampshire.

1          THE COURT:  I think I was, too.

2          MR. CHRISTIE:  As opposed to the definition of

3     residence in the state where the person is claiming

4     residence.

5          THE COURT:  The other state where they're

6     claiming residence.

7          MR. CHRISTIE:  Right.  Exactly.  So that

8     clearly was not amended, nor would the state have power

9     to do that.

10          So what we have here, I think the evidence

11     establishes in response to the arguments from the state,

12     the November 7th letter, you have a record in front of

13     you of voter confusion and confusion by others prior to

14     the November 7th letter.  The November 7th letter is an

15     attempt to clear up that confusion only filed in

16     response to this lawsuit.

17          The letter at the very least is a confusing,

18     and very well could be inaccurate -- in our view is an

19     inaccurate statement of law.  That is exactly the

20     situation that the New Hampshire Supreme Court

21     confronted in Guare dealing with the exact same issue.

22     If you're domiciled, do you have to get a driver's

23     license in 60 days?  It's the exact same issue.  It was

24     on a voter registration form as opposed to just being in

25     a statute, but --

1          THE COURT:  Yeah, I agree, but that addresses

2     the question about whether this kind of burden is a

3     burden.

4          MR. CHRISTIE:  Yes.

5          THE COURT:  Although I'm not sure which way

6     that case cuts because it involved a form.

7          MR. CHRISTIE:  It involved one sentence, so

8     one short paragraph in a form.  I mean, it's not a long

9     form.  It was short.

10          THE COURT:  But the thing about that case

11     is -- it's not that I disagree with you.  It's just that

12     it doesn't implicate the Eleventh Amendment which is the

13     elephant in the room for any kind of injunctive relief,

14     especially the injunctive relief you want.  I know it

15     was my idea when I floated it in the certification order

16     and I really thought the state should agree to it, but

17     the fact is they're right.  If I'm going to order it, it

18     can't violate the Eleventh Amendment, and that's what

19     you want me to order, right?  So Guare doesn't help.

20          MR. CHRISTIE:  Well, Guare does help because

21     it is a violation -- Guare said in that case, because it

22     was brought in state court, a violation of the state

23     constitution.

24          The same issue is in front of you with an

25     allegation of a violation of the Federal Constitution.

1   If the same problem is in front of you that was in front

2   of Guare and it's a violation of the Federal

3   Constitution, your Eleventh Amendment problem doesn't

4   exist.

5            THE COURT:  That's true.  Okay.  That's true.

6            MR. CHRISTIE:  So what we have here is a

7   record of confusion, and a record of confusion brought

8   on not simply by the enactment of the statute itself in

9   the failure to address 259:88 and other statutes, but we

10  believe a record of confusion caused by the

11  implementation of the statute that just compounds the

12  issue.

13           And I just want to crystalize what we're

14  asking for here is that --

15           THE COURT:  I know what you're asking for.  It

16  was my idea, remember?

17           MR. CHRISTIE:  I do, but it is an incredibly

18  narrow form of relief.

19           THE COURT:  That's true.

20           MR. CHRISTIE:  In my view, based upon this

21  evidence we could be asking to strike down the entire

22  statutory scheme.

23           THE COURT:  Well, you are.  You are asking

24  that.

25           MR. CHRISTIE:  No.

1          THE COURT:  You're not asking it for

2     injunctive relief.

3          MR. CHRISTIE:  Not today, that day will come,

4     but we're asking you very simply for them to do

5     something -- to not do something, as you've elicited

6     from them, they've never done, which is --

7          THE COURT:  Well, he doesn't know that.  The

8     interesting thing about all this, though, is that what

9     you're requesting, right, again it was my idea, I'm not

10    blaming you --

11         MR. CHRISTIE:  That's why it's such a good

12    idea, Judge.

13         THE COURT:  -- but it was not only a temporary

14    prohibition on use of this voter registration

15    information for these prosecutions, but also you want a

16    clarification about that, you want that to be

17    publicized, and it just seems to me -- I don't want to

18    throw another curve ball on this, but that seems to be

19    the type of announcement that, you know, the

20    admissibility of evidence in a certain proceeding about

21    derived from a -- that seems to be the type of thing

22    that might confuse voters as much as anything else we've

23    talked about today.

24         MR. CHRISTIE:  In the SB3 case that was in

25    state court a couple years ago, Judge Temple did

 1    something very similar.  It was a TRO hearing just

 2    before an election and he -- there was a lot of

 3    confusion here, I'm going to strike down -- I'm going to

 4    stay the criminal penalties.  So the state can tell

 5    people, listen, you're not going to be criminally

 6    prosecuted if you register and you shouldn't have done

 7    it this way and it allows the process to go forward.

 8            What this process here would do, and that was

 9    in the state court, and that law is still in effect in

10    the state court, we're having a PI final hearing on the

11    merits in that case in December, and the state in that

12    case has agreed that the judge doesn't have to rule

13    before the election.  That can all stay in place to give

14    the judge time.

15            THE COURT:  Yeah.

16            MR. CHRISTIE:  So we're asking for you to do

17    something even more --

18            THE COURT:  That's no longer with Judge

19    Temple, right?

20            MR. CHRISTIE:  It's now in front of Judge

21    Anderson.

22            THE COURT:  Everybody is willing to work with

23    Judge Anderson and they're not willing to work with me,

24    I don't get it.  My great proposal, it would have made

25    things so much easier for certification.  Instead we're

1    doing this, which is difficult to do on a very limited

2    record, but okay.

3            MR. CHRISTIE:  But what we're asking you to do

4    here is even narrower than what the state court was able

5    to do with the other statute where they said, we're

6    going to stay the criminal penalties because that is

7    what causes most of the confusion here.  And here the

8    Court can issue a similar even narrower order that says

9    for the time being if someone registers to vote the

10   state was not going to use -- cannot use that in a

11   prosecution under state law on these issues, and if at

12   some point in the future -- that's very narrow relief.

13   If at some point in the future they sufficiently cure,

14   either the supreme court clarifies or their frequently

15   asked questions cures that, they could always come back

16   and say, we fixed it, lift your order, and so --

17           THE COURT:  But the only fix you would accept

18   there would be that 259:88 exempts college students from

19   these domestication requirements, right?

20           MR. CHRISTIE:  Well, I think the fact that

21   they -- it sounds like their frequently asked questions

22   is not even going to address 259:88, if I understand it

23   correctly, and we have no testimony on it.  I don't mean

24   to be glib, but it would have been more appropriate to

25   hear that from Mr. Scanlan or another witness that these

1    plans were in place.  But since we don't know for sure

2    what it's going to say and it sounds like 259:88 is not

3    going to be addressed, in our view that's not a proper

4    cure to this problem.

5              THE COURT:  First of all, I do accept Mr.

6    Galdieri's representations.

7              MR. CHRISTIE:  I do, too, but --

8              THE COURT:  Is he gone?

9              MR. GALDIERI:  Yes.  He had to go.

10             THE COURT:  Okay.  Okay.

11             MR. CHRISTIE:  Thank you.

12             THE COURT:  Hold on a second.  Let me just

13   check my notes.

14             Sticking with 259:88 for a minute, and anybody

15   can answer this.  I'm not just trying to put Mr.

16   Christie on the hot seat.  Anybody can.

17             If I disagree with your interpretation of

18   259:88, because reasonable minds can differ about what

19   that means and its effect, I can't grant your injunction

20   if I disagree with your interpretation of 259:88, right?

21             MR. CHRISTIE:  I think it makes it easier for

22   you to grant it if you agree with us.

23             THE COURT:  If I agree with you.

24             MR. CHRISTIE:  If you disagree, I don't think

25   it precludes you from granting it, because it's still an

1    unresolved question and there are letters that are going

2    out that go out to people who signed the domicile

3    affidavit, at least up through the latest batch of

4    letters that we have, still cite that statute.  So the

5    issue is in some documents that are going out to voters

6    they're telling people that statute is part of the

7    analysis, but here in the letter they're ignoring it,

8    and so I --

9          THE COURT:  Maybe I missed this evidence or

10   maybe I'm not understanding you now.  In what

11   correspondence that's going out are they saying 259:88

12   does have effect?

13         MR. CHRISTIE:  I think we marked it as

14   Plaintiffs' 15.

15         THE COURT:  That new piece of evidence --

16         MR. CHRISTIE:  Right.  When it goes out and

17   they explain the obligation to register to vote, they

18   cite 21:6 and 259:88.

19         THE COURT:  Yep.

20         MR. CHRISTIE:  So that they're citing it in

21   some circumstances and then not citing it in other

22   circumstances I just think adds to the confusion claim,

23   the confusion issue.  And so even if we're wrong and the

24   Court thinks that Mr. -- that the state's evidence is

25   right on that, the fact that that evidence is still --

1  that that correspondence is still out there and that

2  issue is unresolved as a matter of state law because

3  it's going to go to the New Hampshire Supreme Court

4  still would give the Court a basis to issue the relief

5  that we're asking for at least temporarily.

6          THE COURT:  All right.  Give me a chance to

7  read this before I ask you this question.

8          MR. CHRISTIE:  And also the fact that, you

9  know, we have the issue -- up until last week we had,

10  you know, the wrong information up on the state's

11  website telling people that domicile and residence are

12  two different things under New Hampshire law, which is

13  expressly wrong based upon the amendment to 1264 under

14  their theory of statutory construction.

15          THE COURT:  Yeah.  What about it, that there

16  was an incorrect interpretation there for a while until

17  last week?  So it's been corrected.  How am I supposed

18  to address past stuff that's been addressed now?  What

19  order can I make to address that?

20          MR. CHRISTIE:  It's not past.  It is going on

21  now.  There's a presidential election in this state on

22  February 11.  There are campaigns in this state

23  investing exorbitant resources in trying to register

24  people to vote in that election, and we have an

25  affidavit in this case that they were unable to do so

1  for the past several months because of the confusion in

2  this law.

3          THE COURT:  They can have several months to do

4  it when the law is clarified.  To an extent, it's

5  already been clarified now.

6          MR. CHRISTIE:  Except that it doesn't cite --

7          THE COURT:  259:88.

8          MR. CHRISTIE:  -- one of the most relevant

9  statutes to the analysis.  Nor does it cite -- I'll

10  stop.

11          THE COURT:  No, no, I wasn't trying to express

12  limitations at all.

13          MR. CHRISTIE:  Nor does it cite in the letter

14  the fact that college students -- you know, the

15  interpretation that you brought up earlier that's going

16  to be one of the certified questions, I think, the

17  statute that says a college student is domiciled in this

18  state for voting purposes, and I'm paraphrasing the

19  statute, there's a reasonable interpretation of that

20  statute that none of this applies to them.  It's not

21  explained in the letter.  It's not explained in the

22  letter that goes to Betsy McClain, who is administering

23  the election in one of the two biggest college towns in

24  the state.

25          THE COURT:  Yep.  All right.  Let me say this,

1    and I'm going to ask one more question.  I think Mr.

2    Klementowicz is going to want a crack at this one.

3                Let me just say to you, I hope I haven't given

4    you the impression that you need to rush or cut off or

5    truncate your arguments.

6                MR. CHRISTIE:  You have not.

7                THE COURT:  Okay.  You practice here a lot of

8    time.  There are a lot of lawyers that walk into this

9    courtroom and waste my time, but you have never done

10   that.  So when you're talking, believe me, I'm

11   listening.

12               MR. CHRISTIE:  I understand.  Thank you.

13               THE COURT:  Mr. Klementowicz, let me ask you a

14   question.  So does Anderson-Burdick mean in your opinion

15   that any incorrect interpretation of state election law

16   is actionable in federal court?

17               MR. KLEMENTOWICZ:  I think any inaccurate

18   dissemination of state election law that causes

19   confusion is actionable, yes.

20               THE COURT:  All right.  I would ask you if you

21   have authority for that, but I think you would point me

22   to the same case as the Florida case.

23               That case in Florida, though, that didn't seem

24   like a -- I skimmed it during the break and it seemed

25   like -- it seemed like the court in Florida, though,

1   thought for sure that the state -- that that

2   interpretation, that representation about the law was

3   clearly unconstitutional, and there's no Eleventh

4   Amendment problem there, unless I'm misinterpreting that

5   case.  It seemed to be not the case that -- it didn't

6   seem to be on sort of four legs with this.  But you're

7   telling me then if state election law has been misstated

8   by a state in a way that would have caused confusion,

9   actionable in federal court?

10          MR. KLEMENTOWICZ:  Yeah, and I know it's a

11  state court case, but I really do think that the

12  analysis from <u>Guare</u> where they say -- basically the

13  analysis was there's inaccurate language about the

14  obligations on the registration form.  The trial court

15  found that could cause people not to vote.  Therefore,

16  it's a violation of their right to vote.  End of the

17  analysis.  And if that's the case here, that gets you

18  well within the Eleventh Amendment.

19          I just wanted to respond briefly to a couple

20  of points that were made and then touch on the FAQs that

21  we've just heard about.

22          First, the defendants minimized the magnitude

23  of the number of people impacted by Dr. Herron, who

24  finds, to be clear, that there were over 8,000 people

25  who used out-of-state ID at some point in their voting

1    process in the 2016 general election.  That 2016 general

2    election had a senate race in New Hampshire decided by

3    1100 votes, had a presidential election decided by about

4    3,000 votes.  These are significant numbers of people.

5    So it's not a miniscule problem.

6              I just wanted to touch briefly on the FAQ that

7    the state has raised and why that can't provide a basis

8    for this Court to decline to issue an order.  First of

9    all, we don't know what it's going to say.  The state

10   can't represent to you that it's going to address

11   259:88.  They can't represent to you that it's going to

12   address 654:1-1a, the student domicile statute that you

13   were talking about.  They haven't told us when it's

14   going to happen, we don't know what it's going to say,

15   and it's coming so late in the process.

16             There is an election scheduled for February

17   11th, I think it's going to be, 2020.  That's in like

18   two months.  The state has known about the confusion

19   from Betsy McClain, she testified, at least since the

20   fall of 2017 when the bill was introduced.  She's given

21   them multiple opportunities to provide information about

22   what the law does and doesn't do.

23             The express confusion over these statutes has

24   been in our complaint since we sought to amend prior to

25   the deadline of October 14th.  The state has known that

1   we were seeking preliminary relief at least since our

2   response to the Court's order on October 19, 2019.

3   That's over a month and we haven't seen the FAQ yet.  We

4   didn't have testimony about it.  We don't know what it's

5   going to be.  They've had this time --

6           THE COURT:  Well, had you heard about it

7   before today?

8           MR. KLEMENTOWICZ:  No.

9           THE COURT:  Okay.

10          MR. KLEMENTOWICZ:  No.  So maybe they could

11  have addressed confusion earlier, but we're running out

12  of time.  There's a trial scheduled for January.  This

13  is a month that had the FAQ been released, then maybe it

14  would have been fine, you know, could have obviated the

15  need for all of this, we wouldn't have spent a month

16  litigating this, we wouldn't have put off the

17  certification motion for a month, putting this January

18  trial date in serious jeopardy with the certification.

19          THE COURT:  I could have done a certification

20  motion anytime I wanted.  Nobody has put it off.  If

21  you're under the impression that you put it off, let me

22  disabuse you.  You didn't put it off.  I put it off

23  because I wanted more information, and I've gotten more

24  information.  It's going to be a better certification

25  now because now it's all about the new statute, right?

1    And maybe it's a state constitutional argument and the

2    like, but I'm skeptical about the idea that -- about two

3    ideas.

4           I think -- I'm having difficulty with the idea

5    that the remedy for this confusion is the order -- the

6    order enjoining use of evidence in a criminal case.

7    That's No. 1.

8           Number two, I think there's been some

9    clarification now, I'm not sure how complete it needs to

10   be, but -- well, I'm also struggling with this -- when

11   was this lawsuit brought?

12          MR. KLEMENTOWICZ:  February 13, 2019.

13          THE COURT:  What took it so long to get

14   traction?  We haven't started really getting at it until

15   a couple months ago.

16          MR. KLEMENTOWICZ:  Well, the defendants moved

17   to dismiss and there was a hearing --

18          THE COURT:  I guess I took too long to decide

19   that, is that the issue?  Because I don't think I sat on

20   it for too long, but it seemed like nothing happened for

21   a while.

22          MR. KLEMENTOWICZ:  So the motion to dismiss,

23   you orally denied it at the hearing on July 30th.  So

24   it's been since then August, September, October, and

25   we've been doing --

```
 1                THE COURT:  When was it filed; do you
 2   remember?
 3                MR. KLEMENTOWICZ:  February 13th.
 4                THE COURT:  Yeah.  It should have been decided
 5   sooner.  All right.
 6                MR. KLEMENTOWICZ:  But so all this to say, I
 7   think, we can't rely on the FAQs.  If that had been a
 8   serious plan, it would have happened before we all had
 9   to come and spend a month getting ready for this and
10   coming into federal court on an emergency preliminary
11   injunction.
12                THE COURT:  Give me a moment.
13                Mr. Bissonnette, if you wanted to say
14   something, go ahead.
15                MR. BISSONNETTE:  I'm just consulting with
16   co-counsel, your Honor.
17                MR. KLEMENTOWICZ:  I have one last point just
18   about the 259:88.  The declaration of Mary Dineen, which
19   is document No. 73-6, paragraph 16, she says:  I don't
20   know if I need to get a New Hampshire driver's license
21   or register my mother's car that I drive in New
22   Hampshire because I don't understand the requirements
23   under 1264 or if the New Hampshire Department of Motor
24   Vehicle law applies to me because I maintain my
25   residence in North Carolina for motor vehicle and
```

1   insurance purposes.

2            It doesn't explicitly say 259:88, but I think

3   that's pretty clear and she's filing one of the 1Ls.

4            THE COURT:  Okay.  You're countering my point

5   that we don't have anybody raising 259:88.

6            MR. KLEMENTOWICZ:  Right.  I am.

7            MR. BISSONNETTE:  Your Honor, I did have one

8   point in response to a comment that you just made.

9            THE COURT:  Go ahead.

10           MR. BISSONNETTE:  So you've referenced twice,

11  this is a question for the Court, an issue about a state

12  constitutional question you would certify, and I can

13  just say at the outset I'm not quite sure what that

14  means.

15           There isn't a state constitutional claim

16  raised in this case supplemental to our federal claim.

17  Certainly I think we agree with the fundamental premise

18  that state statutory law questions that may need to be

19  resolved to address the federal constitutional claim,

20  perfectly appropriate for certification.

21           THE COURT:  Oh, yeah.

22           MR. BISSONNETTE:  But I wanted to get some

23  clarity on what state constitutional claim issue you

24  were thinking about raising because --

25           THE COURT:  I can't remember now as I read

 1    this so don't concern yourself.

 2              Okay.  Wait a minute, though.  Okay.  I have a

 3    motion to dismiss here in May.  Didn't you say February

 4    a minute ago?

 5              MR. KLEMENTOWICZ:  The complaint was filed in

 6    February.

 7              THE COURT:  The motion to dismiss was filed in

 8    May, and I decided it in July.

 9              MR. KLEMENTOWICZ:  Yeah.

10              THE COURT:  I didn't take too long to decide

11    that.

12              MR. KLEMENTOWICZ:  We're not suggesting

13    anything of the sort, your Honor.

14              THE COURT:  Don't mind me.  Go ahead.

15              MR. GALDIERI:  Your Honor, just a few things.

16              The November 7, 2019, letter, that analysis is

17    consistent with the statutory construction analysis that

18    we have in our papers.

19              THE COURT:  That's true.

20              MR. GALDIERI:  I didn't hear -- and it's been

21    a long day and maybe it was said, but I didn't hear

22    Clerk McClain say and I don't read Ann Shump's

23    declaration to say, although the letter came out after

24    Ann Shump's declaration, saying that we need RSA 259:A

25    in this letter.  That's what I need for clarification.

1          I hear Clerk McClain saying, we need something

2    like a series of FAQs.  And then I hear the plaintiffs

3    saying, well, that's not going to be any good because

4    you don't agree with our legal position, so it's going

5    to just confuse people and make matters worse.

6          And it highlights the problem of

7    individualized subjective confusion.  Different people

8    are potentially confused about different things.  We

9    could put more citations in this letter, but that may

10   confuse more people.  People may not understand what

11   that means.

12          THE COURT:  Sure.

13          MR. GALDIERI:  And you have the added issue

14   that we talk about also, the licensing statute, RSA

15   263:35.  It says within 60 days of establishing a bona

16   fide residency, a nonresident has to get a licence.

17          That statute doesn't use the word resident in

18   it.

19          So when you start to try to make all these

20   links and you're going to load this letter with various

21   statutes and maybe you're going to explain it in detail,

22   maybe you're not, you're going to run the same risk that

23   you're going to confuse more people by doing that.  But

24   if there's a certain level of statutory citation that

25   would help dissipate confusion, we could add it to the

1    letter or we could add it to something that would do

2    that.

3              It's difficult to get a grip on what many

4    different people think is confusing all at one time and

5    supply --

6              THE COURT:  I certainly don't think statutory

7    citations make things less confusing for lay people

8    generally.  Just short declarative sentences that

9    explain things, they generally do the trick.  That may

10   or may not be possible with 259:88.  Are you

11   representing that you're going to add something about

12   that to this letter anytime soon?

13             MR. GALDIERI:  I'm not representing that we

14   would add it.  I wouldn't say that that's out of the

15   realm of possibility that we couldn't put the citations

16   in that lead to these conclusions.

17             THE COURT:  Let me ask you this, though.  I

18   have to ask this.  I mean, like for example, why is it

19   drip, drip, drip of information to the clerk in Hanover?

20   Why is it drip, drip of information to me in this

21   lawsuit?  Like why aren't these things just clearly

22   represented?  There have been times in this lawsuit

23   where I've asked you questions -- today has, frankly,

24   been a breath of fresh air.  You have very succinct,

25   clear answers to all these questions I have.  But in

1    prior hearings it's always been sort of, well, we're not

2    sure, well, we don't know, and that's how it was with

3    the clerk.  I'm trying to understand for motivations

4    other than political, okay, why things have been this

5    way, why has this information been so slow to sort of

6    crystalize and be clearly presented to the public?

7            MR. GALDIERI:  Well, your Honor, I think, for

8    example, when the lawsuit began everyone was operating

9    under the impression that we all knew how the law worked

10   and that it worked this way.  That was the plaintiffs'

11   position.  That was their counsel's position in the New

12   Hampshire Supreme Court, and that's kind of how it sort

13   of arises here.

14           And then slowly over time -- not slowly

15   because this lawsuit's been moving quickly, but as this

16   lawsuit has been progressing, we start to have very

17   public statements about this lawsuit and things of

18   confusion and things that start arising.  And, you know,

19   the state is not necessarily a swift machine, but it

20   moves, and it's been trying to get back and address this

21   and it involves multiple departments and agencies and

22   impacts different facets of state government.  So it

23   takes a little time to do that.

24           THE COURT:  I'll admit you're right, when the

25   lawsuit started, everybody agreed about what the law

1    meant, and one side said that violates the Constitution,

2    it's a burden, this domestication fee structure, and the

3    other side said it didn't.

4           The Court's the one that kind of injected

5    these statutory interpretation questions in, and I plead

6    I'm guilty, but I'm not just talking about that.  I'm

7    talking about just questions about, you know, what does

8    this require.

9           And, you know, the clerk seemed to have to

10   pull teeth out of the Secretary of State's Office and

11   get snarky letters.  Yeah, I'm saying they're snarky.

12   Maybe there's a relationship I don't know about, but it

13   sort of surprises me to read that.

14          Can you explain that at all?  Not the

15   snarkiness.  That's not for you to worry about, or even

16   for me, but the sort of slow drip of information, what

17   seemed to be the reluctance to just say things in

18   English in very clear terms.  Do you understand what I'm

19   asking?

20          MR. GALDIERI:  Yes.  I believe the complexity

21   comes in because somebody poses a question to somebody

22   within the Secretary of State's Office about an issue

23   that's not necessarily within the jurisdiction of the

24   Secretary of State.  The Secretary of State gives

25   information which is the typical information they give,

1   which Clerk McClain admitted she doesn't advise people

2   on all of the consequences of registering to vote

3   because doing that can be problematic.  You don't know

4   all the answers.  Somebody comes in, if I do this, do I

5   lose my health insurance, do I lose my scholarship, do I

6   have to pay any taxes here or anything, and they begin

7   to encounter all sorts of problems, and that may be

8   problematic for them.  It may be problematic for the

9   Secretary of State's Office.

10          THE COURT:  I read you, yeah.

11          MR. GALDIERI:  So their general position is

12  not to do that, and now we're developing an area where

13  maybe, and maybe the plaintiffs are even saying this,

14  maybe this is an area we should recede from that and we

15  should reevaluate that, and I think that's been an

16  evolution.

17          THE COURT:  I think I read you here that when

18  the Secretary of State is getting these questions from a

19  clerk that have ramifications for DMV and safety and law

20  enforcement, for lack of a better way of saying it, they

21  don't want to say the wrong thing, right?

22          MR. GALDIERI:  Correct.

23          THE COURT:  That's actually a straight answer.

24  I appreciate it.  It makes sense, too.

25          I've got what I need.  Do you want to say

1  more?

2          MR. CHRISTIE:  Can I say one more thing?

3          THE COURT:  Yes.  I just told you I would

4  listen to you no matter what you said, so I have to

5  listen to you now.

6          MR. CHRISTIE:  I'm going to remember that.

7          THE COURT:  I should never have said that.

8          MR. CHRISTIE:  One final thing.  I actually

9  meant to say this earlier.

10          Paragraph 4 of the November 7th letter.

11          THE COURT:  Yeah, I'm looking at it right now.

12          MR. CHRISTIE:  That's what Mr. Scanlan cited

13  to as the main clarification.  And it states, and I

14  won't read the whole thing into the record, but under

15  the motor vehicle code an individual has 60 days upon

16  establishing residence to obtain a New Hampshire

17  driver's license if they drive in the state and to

18  register a vehicle if they own a vehicle in this state.

19  That letter could very well have stated:  Except that

20  that person shall be deemed --

21          THE COURT:  Shall not be deemed a resident if

22  that person --

23          MR. CHRISTIE:  Claims a residence in another

24  state, and they don't say it.  That's the confusion.

25          THE COURT:  I get it.  Okay.  Look, thank you.

1    Let me just say this to all of you, and we'll reconvene

2    if necessary in the jury room so we can talk about

3    discovery, and it will only take us five or ten minutes,

4    but I just want to say this.  I very much appreciate the

5    way you've conducted yourselves today, especially, you

6    know, there's some younger lawyers here.  They were

7    allowed to do important things in an important case.

8    That's the way it should be done and both sides did it.

9    It's very much appreciated by the Court, and also the

10   arguments by the old grizzled hands.

11             That's important and not enough people do it.

12   Not enough civil litigants do it.  So thanks for doing

13   that.

14             We're in recess.

15             (Conclusion of hearing at 4:30 p.m.)

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3

4              I, Susan M. Bateman, do hereby certify that

5      the foregoing transcript is a true and accurate

6      transcription of the within proceedings, to the best of

7      my knowledge, skill, ability and belief.

8

9
       Submitted: 12-4-19        /s/   Susan M. Bateman _____
10                               SUSAN M. BATEMAN, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25