*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO MARCH 10, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * * *
                                  *
                                  *
CAROLINE CASEY AND                *
MAGGIE FLAHERTY, ET AL,           *
                                  *
             Plaintiffs,          *   19-cv-149-JL
                                  *   November 21,
          v.                      *   9:53 a.m.
                                  *
NEW HAMPSHIRE SECRETARY OF        *
STATE, ET AL.                     *
                                  *
             Defendants.          *
* * * * * * * * * * * * * * * * * *
```


TRANSCRIPT OF MOTION HEARING
MORNING SESSION
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


Appearances:

For the Plaintiffs:    Henry Klementowicz, Esq.
                       Gilles R. Bissonnette, Esq.
                       Julie A. Ebenstein, Esq.
                       Theresa J. Lee, Esq.
                       American Civil Liberties Union

                       William E. Christie, Esq.
                       Shaheen & Gordon


For the Defendants:    Anthony Galdieri, Esq.
                       Samuel R.V. Garland, Esq.
                       Seth Michael Zoracki, Esq.
                       Office of the Attorney General (NH)



Court Reporter:        Liza W. Dubois, RMR, CRR
                       Official Court Reporter
                       U.S. District Court
                       55 Pleasant Street
                       Concord, New Hampshire 03301
                       (603) 225-1442

```
1                    I N D E X

2

3    WITNESS:           Direct   Cross   Redirect   Recross

4

5    ELIZABETH MCCLAIN        6      42        65

6    MARY CATHERINE SUSKIE    73      86       101

7    DAVID SCANLAN           106     116

8

9    EXHIBITS:                       FOR ID              IN EVD

10   Plaintiff's Exhibit 15                              149

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2           THE CLERK:  The Court has before it for

3   consideration today a preliminary injunction hearing in

4   civil case number 19-cv-149-JL, Caroline Casey, et al,

5   vs. New Hampshire Secretary of State, et al.

6           THE COURT:  Mr. Klementowicz, you're on your

7   feet.  What's up?

8           MR. KLEMENTOWICZ:  I was just going to say,

9   your Honor, we reviewed your email and confirmed --

10          THE COURT:  Oh, yeah.

11          MR. KLEMENTOWICZ:  -- with counsel and I think

12  there are large areas of agreement we've been able to

13  reach.

14          There were two discovery issues that arose

15  separately.  I wasn't sure if your Honor wanted to take

16  those first or second.

17          THE COURT:  The ones that you emailed me

18  about?

19          MR. KLEMENTOWICZ:  Yes.

20          THE COURT:  I was going to do it after,

21  depending on how this plays out today.  And, you know,

22  under the -- I planned on addressing those issues after

23  the hearing.

24          MR. KLEMENTOWICZ:  Okay.

25          THE COURT:  Is there any reason we should do

1   it now?

2                MR. KLEMENTOWICZ:  No.

3                THE COURT:  No.  Okay.  Yeah, we can take it

4   up.  We can take it up after the hearing.  I mean, I

5   think the -- the thing you have to remember and what's

6   going to matter to me as we discuss it is you need to

7   understand this case is getting certified.  That's going

8   to happen.

9                So I don't want anyone to be laboring under

10  the illusion that it's not going to happen.  And whether

11  and the extent to which that affects those two discovery

12  questions -- it may or may not, depending on how you

13  view it.

14               So keep that in mind, but we'll take it up

15  after, I promise.

16               And I apologize for being late.  I had a 7:30

17  meeting that took longer than it should have and I kept

18  you waiting.  Sorry about that.

19               MR. GARLAND:  One other initial matter.

20               I have to be over at the Legislature, with

21  your permission, at 11 o'clock.  So I was hoping that if

22  you didn't mind, I could leave here shortly before that

23  and if the hearing's proceeding, I'll come back.

24               THE COURT:  As long as the state has

25  representation, you're free to go and come as you

1   please.

2           MR. GARLAND:  Thank you, your Honor.

3           THE COURT:  Anything else?

4           MR. KLEMENTOWICZ:  No.  We've reached an

5   agreement with the state that the motion for PI can be

6   decided largely on the papers with the exception of a

7   few live witnesses who we intend to call.  We filed

8   witness --

9           THE COURT:  Yeah.

10          MR. KLEMENTOWICZ:  -- and exhibit lists last

11  night.

12          We've also agreed that of the exhibits that

13  have been submitted, everything except Plaintiff's

14  Exhibit 14 may be admitted as a full exhibit.

15          THE COURT:  Yeah.  That's -- that's -- I

16  appreciate the effort.  Thank you.

17          MR. GALDIERI:  That's the agreement, your

18  Honor.

19          THE COURT:  That's great.  Thanks for taking

20  the time and using it wisely while I was keeping you

21  waiting.

22          All right.  Well, it is the plaintiff's

23  motion.  You may proceed.

24          MR. KLEMENTOWICZ:  Your Honor, the plaintiffs

25  call Elizabeth McClain.

1          THE CLERK:  Right this way here.  Step into

2   the witness box and remain standing.

3          Please raise your right hand.

4          **ELIZABETH McCLAIN**, having been first duly

5   sworn, testified as follows:

6          THE CLERK:  Could you please state your name

7   for the record and spell your last name.

8          THE WITNESS:  It's Elizabeth Ann McClain,

9   M-c-C-l-a-i-n.

10          THE CLERK:  Thank you.  Please be seated.

11          MS. LEE:  Your Honor, I have the same binder

12   that you've been given, the exhibits for the witness.

13          THE COURT:  That's fine.  You can --

14          MS. LEE:  Can I approach?

15          THE COURT:  Sure.

16          MS. LEE:  Thanks.

17                    DIRECT EXAMINATION

18   BY MS. LEE:

19      Q.   Good morning, Clerk McClain.  What is your

20   job?

21      A.   I am employed by the town of Hanover as the

22   director of administrative services and also I am

23   beginning -- I'm in the beginning of my third elected

24   term as Hanover town clerk.

25      Q.   And so the beginning of your third term, how

1    long has -- have you been town clerk?

2        A.    It -- over six years.  I'm into my seventh and

3    I also served as deputy town clerk for several years

4    before that.

5        Q.    Okay.  And what does being a town clerk

6    entail?

7        A.    In Hanover, the town clerk's office provides a

8    host of services:  Registering motor vehicles, licensing

9    dogs, issuing certified vital records, and, no surprise,

10   election -- election business.  Our office is the staff

11   support for many of our election officials.

12            I, as town clerk, have responsibility to staff

13   the elections and help the select board with the

14   logistics and, again, as I said, I'm the staff that

15   helps on the office front all the other election

16   officials.

17       Q.    And does that include accepting voter

18   registration forms on behalf of the supervisor --

19       A.    It does.

20       Q.    -- of the checklist?

21       A.    It does.

22       Q.    And in your role as town clerk, do you

23   interact with many people who are thinking about

24   registering to vote or registering to vote?

25       A.    Yes, I do.

1      Q.    Are you aware of the law that's being

2 challenged in this case?

3      A.    I am.

4      Q.    Okay.  When did you first hear about that law?

5      A.    Probably in the fall of 2017 and, again,

6 through listservs and local folks who come in and have

7 heard wind of pending legislation.  I think I first

8 caught wind of it in the fall of 2017.

9      Q.    Okay.  And so now you've just said that you

10 first heard about it in fall of 2017.  What was your

11 view of it at that time?

12     A.    At that time, I shared my -- my feelings with

13 our state senator, and my feelings were -- were kind of

14 a déjà vu.  I was immediately thrown back to 2012 when

15 we had -- again, I guess I should preface my

16 interpretation of the law was it was going to bring back

17 the notion of licensing requirements, driver's license

18 requirements, as it -- you know, in relation to voter

19 registration.

20          MR. GARLAND:  Your Honor, I'm going to object

21 to this line of testimony.  Her feelings about 1264 and

22 her interpretation of what it means I don't think is

23 relevant to the inquiry that's before you today.

24          THE COURT:  I disagree.  Overruled.

25          Go ahead.

1          MS. LEE:  Thank you, your Honor.

2     Q.    Thank you, Clerk McClain.

3          If you could turn to the first tab of the

4    binder in front of you, which we've marked as an

5    exhibit, as Plaintiff's Exhibit 1.

6          Do you recognize this document?

7     A.    I do recognize this document.

8     Q.    And what -- what is this?

9     A.    This -- this -- this is the response from our

10   state senator to my sharing of my feelings in terms of

11   the proposed legislation which became HB 1264.

12    Q.    Okay.  And in that first paragraph of your

13   email of November 30th, 2017, what were you referring

14   to?

15    A.    I was referring to the -- the disruption in

16   our office when there was a paragraph included in a

17   voter registration form in 2012 as part of the voter --

18   as part of the registration affidavit that specifically

19   said part of the obligations of establishing residency

20   is to license -- secure a driver's license.  I'm

21   paraphrasing that badly, but, in essence, that's what it

22   said.

23          And I just -- you know, again, sort of it was

24   a very stressful time in our office because we had

25   several people that -- that turned around and walked

1  away after sort of spending time there chewing their

2  pencil to try to, you know, execute the form and then

3  get to that paragraph and say no and walk away.

4          We also had folks that executed the form and

5  then wondered, well, what if I don't do it; who's going

6  to -- who's going to know.

7          And, again, it was a stressful time for the

8  staff to be able to navigate those questions.

9      Q.  Okay.  And the law you're referencing to in

10  these concerns in 2012, is that the law that was

11  eventually struck down in state court in the *Guare*

12  decision?

13      A.  I know that the voter registration form with

14  that language was in place for a short time and then was

15  deemed not to be appropriate.

16      Q.  Okay.  And when the bill, HB 1264, was passed

17  in July of 2018, what was your understanding of its

18  provisions at that time?

19      A.  It's painfully clear I'm not an attorney, so

20  my -- my -- my impressions were that, again, it was

21  going to bring back the specter of whether or not

22  registering to vote would invoke in explicit terms the

23  need for a driver's license.

24      Q.  All right.  And before the law was in effect,

25  before July 1st, 2019, what was your understanding as to

1    whether a voter needed to, after registering to vote,

2    obtain a New Hampshire driver's license or vehicle

3    registration?

4        A.    Again, once the language was stricken from the

5    2012 forms, that was -- basically my understanding was

6    folks could elect New Hampshire as their voting domicile

7    and -- and that was the end of the discussion.

8        Q.    Okay.  And after the bill was passed, but

9    before its effective date, before July 1st, 2019, what

10   did you tell voters who asked whether if they registered

11   to vote, did they need to obtain a New Hampshire

12   driver's license or vehicle registration?

13       A.    We did have several questions that came in

14   before the effective date and right out of the box, my

15   response was it's not effective until July 1st.  And

16   then -- and then they said, well, will I have to get a

17   driver's license?  And I said, well, we're -- I don't

18   know; we don't issue licenses here; but I'm hoping we'll

19   be able to have more guidance from the Secretary of

20   State's office to respond to those questions once it's

21   in effect.

22       Q.    Okay.  And before this law was being

23   considered and enacted, did you receive questions from

24   people registering to vote about whether they had to

25   obtain a driver's license?

1        A.     Not -- once the -- again, once the language

2  was struck from the voter registration form in 2012,

3  there was a long dry spell where the questions did not

4  come up.

5              But once HB 1264 -- there was a lot of press

6  about, you know, various -- various things about it in

7  the press and that elicited questions.  Yes, I did

8  receive questions about that.

9        Q.     Okay.  And since the law's passage, were you

10 ever personally confused that the law did not change the

11 actual procedure to register to vote?

12       A.     No, that was never at question.

13       Q.     Okay.  And so since that was not your concern,

14 what was then your concern regarding the law?

15       A.     My concern was -- was -- was rooted in being

16 able to provide clear answers as to what the

17 consequences of voter registration are when asked

18 directly by voter registrants.

19              And, again, as backdrop to that concern to be

20 able to completely respond to that question, I know we

21 capture out-of-state driver's license information in

22 ElectioNet, which is the statewide voter database.

23 Prior to the midterm elections in 2018, it was just

24 aggregate numbers that we reported, but in the midterm

25 elections, we're now capturing that information,

1  out-of-state driver's license information, by the

2  individual voter.

3        So, again, I -- I am -- it's clear that

4  driver's licensing has some -- some footprints through

5  the ElectioNet system and when people ask me, do I now

6  need to get a New Hampshire driver's license, I want to

7  be able to provide a complete answer to them so --

8  because I know ultimately -- ultimately driver's

9  licenses have -- are making -- making an impression in

10  ElectioNet.

11     Q.    Okay.  If you could please turn to tab 2 of

12  your binder, where we've marked Plaintiff's Exhibit 2.

13        Do you recognize this document?

14     A.    I do.

15     Q.    And who is Jeremy Eggleton?

16     A.    Jeremy Eggleton is our elected moderator.

17     Q.    And do you recall the purpose of your email?

18     A.    The purpose of this email was to schedule a

19  meeting that Jeremy had requested in response to my

20  sharing the joint statement on supreme court advisory

21  opinion on HB 1264.

22        So this message was to schedule a meeting with

23  the moderator, the supervisors, my -- what I call my

24  logistical team, my super, super volunteers, so that we

25  could sort of circle the wagons and get consistent

1    messaging around what we say with 1264.

2         Q.    Okay.   And in the second paragraph in this

3    email, you say:   The delicacy will be how much we offer

4    up to folks when they register to vote with us, as in do

5    we affirmatively tell them they will need to change

6    their driver's license or do we simply answer this

7    question if it is posed to us.   We will be working with

8    the supervisors and the SOS office to try and navigate

9    this balance appropriately.

10         What did you mean by that statement?

11         A.    This -- what I meant was there is -- clearly,

12   when people ask -- well, the town clerk's office, which

13   is right on Main Street where the -- you know, the front

14   door to local government for our residents, we get asked

15   all sorts of questions.

16         And -- and so -- and, again, so you can't

17   answer them all, but certainly where somebody's filling

18   out a voter registration form, has heard that driver's

19   licenses has something to do with it, we understand

20   that, you know, how much do we provide information

21   before they might ask the question, do we wait for them

22   to ask the question, and then what do we provide -- what

23   answer do we provide.

24         And, again, that's because in our town, we

25   have -- there have been instances where the law has been

1    clear, such as the law is clear that one can -- now one

2    can execute a domicile affidavit, yet we've been sort of

3    pulled on both sides; we've been sort of -- I wouldn't

4    say reprimanded, but the Secretary of State's office has

5    encouraged us not to freely give the domicile -- not to

6    put them on a -- you know, in a basket on the counter.

7            But -- but so the domicile affidavit, the law

8    is clear and we've been sort of, you know, we're kind of

9    damned if we do make them too easily available, because

10   then -- then -- and the specific instance here is

11   Dartmouth students.

12           I live in Hanover.  Dartmouth College is

13   there.  Dartmouth students can walk up the block and get

14   a letter saying that they live in a dormitory on campus.

15   And that's usually what we do.  Some say, well, I've got

16   class in five minutes and then we may say, oh, well, you

17   can execute a domicile affidavit if you want to.

18           So -- so -- and then there are other students

19   where we were saying, well, you know, ORL is right up

20   the street, and then we would get complaints saying, no,

21   well, there's a domicile affidavit, why are you making

22   me do that.

23           So I just use that as an example of the

24   balance of do we even bring up the driver's license

25   issue when it's an issue for so many other voters or are

1  we silent on that question.

2       Q.   Okay.

3            THE COURT:  Hold on a minute, Counsel.  I

4  didn't really follow that answer, so I just want to

5  review it.

6            I'm going to ask the witness to explain.  I

7  just want to make sure I --

8            THE WITNESS:  Sure.

9            THE COURT:  Can you -- can you elaborate a

10 little bit on this idea that you've been -- you say you

11 wouldn't say reprimanded, but encouraged you not to

12 freely give the domicile affidavit out.

13           THE WITNESS:  Yeah.

14           THE COURT:  I'm not sure I understand what --

15 I think I understand what you mean, but I want you to be

16 more specific --

17           THE WITNESS:  Absolutely.

18           THE COURT:  -- and explain exactly what's been

19 communicated to you by the Secretary of State.

20           THE WITNESS:  Oh, well --

21           THE COURT:  To the extent you can remember.

22           THE WITNESS:  Well, I know we've had a couple

23 of emails back and forth over the years about the use of

24 domicile affidavits.

25           And so -- so my -- my -- my -- the -- the

1   point I was trying to make was that it's clear we -- it

2   was -- my impression of what guidance we got from the

3   Secretary of State is that we shouldn't lead with the

4   domicile affidavit.

5          For example, if a voter registrant comes in

6   and says -- and we ask them for proof of their domicile

7   and they say, well, I don't have anything on me, our

8   immediate -- you know, we say, well, can you get

9   something instead of, here, have a domicile affidavit.

10         And, again, the issue for me was I was seeing

11  inconsistencies amongst our clerks.  Some people would

12  say, you have to go to ORL and get a letter, and some

13  students would do that fine and come back and it would

14  be great; and other students would say no and, yes, you

15  do need to go up, whereas the other clerk would say, oh,

16  well, we have a domicile affidavit for that.

17         So over the years, I've tried to get -- you

18  know, can't we just lead with that if people don't have

19  something on their person?  And, again, I don't believe

20  I have anything in writing, but the counsel that I have

21  been given over the years from the Secretary of State's

22  office is if they can get something and present it,

23  that's what we would like.

24         THE COURT:  Understood.  Sorry to interrupt,

25  Counsel.

1          MS. LEE:  Not at all, your Honor.

2      Q.   And so with the sorts of questions that you

3  were -- were flagging in your email to Mr. Eggleton, did

4  you directly ask those questions of the Secretary of

5  State at this same time?

6      A.   I did not.  Again, a couple of things were at

7  play.  The -- this was in the early summer of 2018, July

8  of 2018.  The law was not going into effect until

9  July 1st of 2019.  And it was assumed that there would

10 be more opportunity for discussion and clarification

11 over that year.

12     Q.   Have you consistently attended trainings

13 conducted by the Secretary of State's office?

14     A.   I have tried to attend regional trainings in

15 my area and now I know the Secretary of State's office

16 is making modules available online, which is wonderful.

17          So, yes, I would say as -- to the extent

18 possible, I have attended trainings.

19     Q.   Okay.  And did you attend an August 3rd, 2018,

20 training by the Secretary of State's office?

21     A.   Yes, I did.

22     Q.   Okay.  And did that August 3rd training

23 address the questions you had of whether people had to

24 get a driver's license if they registered to vote?

25     A.   It did not.

```
1          Q.    Okay.  If you could please turn to tab 3 of
2    your binder.  This is marked as Plaintiff's Exhibit 3.
3               Do you recognize this document?
4          A.    I do.
5          Q.    Okay.  And who is Colleen McCormick?
6          A.    Colleen McCormick is an employee of the
7    Secretary of State's office who is very -- very -- very
8    proactive in providing information and resources to the
9    clerk's world.
10         Q.    Why did you write this email?
11         A.    This email was written the afternoon of
12   August 3rd, which was the day of the training that you
13   mentioned.  And as part of that training, it was
14   suggested -- because I believe it was the first training
15   that was going to be rolled out as the road show to sort
16   of describe -- address some of the law changes, not just
17   HB 1264, but other law changes and cybersecurity
18   concerns and a host of other issues.
19              So I believe this was the first training
20   session and we were encouraged to provide some
21   constructive feedback to the Secretary of State's office
22   so they could continue to, you know, tweak it as it went
23   forward.  So this email was intended to provide that
24   feedback.
25         Q.    Okay.  And what was the feedback you wanted to
```

1   provide to the Secretary of State's office after

2   attending that training?

3       A.   I was -- I was disappointed that there was not

4   adequate time for question and answers in that -- in

5   that session.  There was -- Secretary Gardner attended

6   and, again, it was wonderful to see him there and have

7   him thank us all as election volunteers and workers

8   throughout the state, but there was a lot of time spent

9   listening to his comments and the time evaporated and

10  there was no time for explicit Q and A.

11      Q.   Okay.  And in sort of the last sentence of

12  that big second paragraph, you refer to 16 upcoming

13  sessions --

14      A.   Oh, yeah.

15      Q.   -- is that correct?

16           And was it your understanding that that was

17  the same training offered 16 different times regionally

18  throughout the state or were those 16 substantively

19  different trainings?

20      A.   It was my understanding that it was the same

21  training being taken on the road 16 times.

22      Q.   Thank you.

23           Have you attended other trainings or webinars

24  offered by the Secretary of State's office or the

25  New Hampshire Municipal Association?

1        A.    I have.

2        Q.    Okay.  And in any of those trainings, did you

3   ever receive a direct answer to your question about

4   advising voters of motor vehicle obligations if they

5   registered to vote?

6        A.    No, I have not received that answer.

7        Q.    Okay.  So you've testified that your question

8   was not answered in the trainings you've attended.  Did

9   you then at any point directly ask the Secretary of

10  State's office what the response should be when

11  individuals register to vote and ask if they need to get

12  a New Hampshire driver's license?

13       A.    I have asked that question, yes.

14       Q.    And if you'll please turn to tab 4 of your

15  binder, which we have marked as Plaintiff's Exhibit 4.

16            Do you recognize this document?

17       A.    I do.

18       Q.    Okay.  And what is this document?

19       A.    This document is an email exchange between me

20  and Deputy Scanlan from the security -- Secretary of

21  State's office, where I have specifically addressed two

22  questions -- some questions related to HB 1264 to them.

23  And this is Deputy Scanlan's response.

24       Q.    And if you're -- you would direct your

25  attention to the second email down the page sent from

1    you to Mr. Scanlan at 1:50 p.m. on July 19th, 2019, is

2    this the email in which you were directly asking the

3    Secretary of State's office what the response should be

4    when individuals register to vote and ask whether they

5    need to get a New Hampshire driver's license?

6         A.    Yes, I asked for the proper response.

7         Q.    Okay.  And did you receive an answer to that

8    question?

9         A.    I did receive an answer.

10        Q.    Okay.  And what was the response?

11        A.    I interpreted the response to be the response

12   was no response, meaning be silent on the issue.

13        Q.    Okay.  What was your view of that answer?

14        A.    I -- I certainly -- and I -- I think I

15   responded that I certainly understand that issue, that

16   if we can compartmentalize the questions that we want to

17   answer that come to us, that would be wonderful, but the

18   reality is a voter, you know, registering comes into the

19   office, might stand behind somebody in line in our

20   office where somebody's registering a vehicle and we say

21   very explicitly, oh, now that you've registered your

22   vehicle with us, you have 60 days to get your

23   New Hampshire driver's license.

24             So this -- the next person in line walks up,

25   fills out a voter registration form and says, huh, does

1   this mean I need to get a New Hampshire driver's

2   license?  And then for us to be mum is -- is

3   uncomfortable from a customer service point of view and

4   unsatisfactory from a citizen point of view.

5        Q.   Okay.  If you'll please turn to tab 5 in your

6   binder, which we've marked as Exhibit 5.

7        A.   Oh, yeah.

8        Q.   Do you recognize this document?

9        A.   I do.

10       Q.   And why did you write this email to

11  Mr. Scanlan?

12       A.   Again, I -- I very much appreciate everything

13  that the Secretary of State's office is trying to do for

14  everybody.  And so this -- my email to Deputy Scanlan

15  was just an acknowledgment of thanks for taking the time

16  out to let us know something.

17            And then -- but I do make the note that

18  it's -- it's -- you know, that I get the notion that we

19  shouldn't respond to nonpertinent residential laws,

20  but -- but, again, we're the same people that register

21  vehicles.

22       Q.   Sure.  And so, in general, do you and your

23  employees in the town clerk's office receive questions

24  as to whether voters need to comply with motor vehicle

25  licensing and registration obligations?

1    A.   Yes.  We've got license plates mounted on the

2  wall.  We've got real ID information available in

3  pamphlet form at the counter.  So, yes, we do.

4    Q.   And do these questions ever arise when a

5  person is registering to vote?

6    A.   Yes.

7    Q.   Okay.  And approximately how many of these

8  questions have you fielded since July 1st, 2019?

9    A.   Probably between 20 and 30.

10    Q.   Okay.  Did you find the guidance not to answer

11  registrants' questions, when you know you're going to

12  receive them, satisfactory?

13    A.   No.

14    Q.   Okay.  And you indicated that the July 2019

15  answer that you not advise voters on other laws was not

16  particularly satisfactory.  Did you later reach out to

17  receive further guidance?

18    A.   I did.

19    Q.   Okay.  If you'll please turn to tab 6 of your

20  binder, which is marked Plaintiff's Exhibit 6.

21         Do you recognize this document?

22    A.   I do.

23    Q.   Who is Elaine in the first email in this

24  document?

25    A.   Elaine is our -- one of our supervisors of the

1  checklist, the most senior supervisor who's served

2  probably for several decades.

3        Q.   Why did you send Elaine this email?

4        A.   I -- I sent her this email because -- also as

5  part of Exhibit 6 is -- is the email string where I,

6  again, am trying to get a simple answer to what is posed

7  by folks in what they believe to be a simple question.

8             And, again, I'm back to the -- you know, if

9  voting -- if registering to vote is a trigger the same

10 way registering a motor vehicle is, there should be a

11 simple answer for that.  And so I'm -- this is a thread

12 that's me sort of barking up that tree, trying to get

13 that simple answer.

14            And so I -- Elaine -- I shared -- shared where

15 I was in that process because Elaine -- well, the

16 supervisors of the checklist were going to be in session

17 on the Dartmouth College campus and they were anxious to

18 get a consistent message and know what to tell students

19 at that registration.

20        Q.   Okay.  And if you'd please flip with me to the

21 second page of the email as you were just referencing,

22 do you see your email of September 3rd?

23        A.   I do.

24        Q.   Why did you send this email to the Secretary

25 of State's office?

1      A.    I guess I -- again --

2            THE COURT:  Excuse me.  What exhibit are we

3  on?

4            MS. LEE:  Oh, sorry, your Honor.  We're on

5  Exhibit 6.

6            THE COURT:  Got it.

7      A.    This email was sent because it was the

8  beginning of the academic year, a couple months ago,

9  and, again, as I mentioned, our supervisors of the

10  checklist were going to be in session on the Dartmouth

11  College campus registering voters.  And I -- again, we

12  were just trying to get our ducks in a row in advance of

13  that session to get clarity and consistency in what we

14  tell our voters.

15      Q.    Okay.  And as of September 10th when you

16  emailed Elaine, had you yet received a reply to your

17  September 3rd question?

18      A.    Not yet.

19      Q.    And did you eventually receive an answer to

20  that question?

21      A.    I did.

22      Q.    Okay.  If you'll please flip with me to tab 7

23  of your binder, which is marked as Plaintiff's

24  Exhibit 7.

25            Do you recognize this document?

1      A.   I do.

2      Q.   Is this a continuation of the email chain that

3 you had shared with Elaine on September 10th that we

4 just looked at in Exhibit 6?

5      A.   Yes, it is.

6      Q.   Okay.  At the third email down the page, your

7 email to Nicholas Chong Yen -- who is Mr. Chong Yen?

8      A.   Mr. Chong Yen is the attorney that was --

9 lateralled the ball from the attorney -- the Secretary

10 of State's office when I addressed the question to them.

11 I got a very -- on September 3rd I got a very prompt

12 answer from the Secretary of State's office, indicating

13 that they had passed the inquiry on to the Attorney

14 General's Office and it was my understanding that

15 Attorney Chong Yen or employee Chong Yen in the Attorney

16 General's Office was the person that was working on that

17 response.

18      Q.   Okay.  And why did you send this email?  The

19 third email down the page at 1:25 p.m. on

20 September 18th, why did you send that email?

21      A.   Again, because I was getting questions from

22 the supervisors and because their voter registration

23 drive or event was coming up and I still hadn't gotten

24 an answer.  And so basically I was just being a nudge,

25 frankly.  Yeah.

1        Q.    And at the second email down the page, the one

2    right above the one you were just discussing, is this

3    the email then conveying the response to your then, at

4    that point, consistent question?

5        A.    It is the response that I received, yes.

6        Q.    And is that the first time you received a

7    response to the questions you started asking on

8    September 3rd?

9        A.    Yes to the questions on September 3rd.  Yes.

10       Q.    So to be clear, it took the state just over

11   two weeks to respond to your question; is that right?

12       A.    That's correct.

13       Q.    Okay.  I'd like to flip to the next tab in

14   your binder, tab 8, which is marked as Plaintiff's

15   Exhibit 8.

16            Do you recognize this document?

17       A.    I do.

18       Q.    Is this the guidance that was sent to you from

19   the Secretary of State's office in the September 18th

20   email?

21       A.    This -- this is, yes.

22       Q.    Okay.  And did this letter dated

23   September 18th provide a clear answer to your question

24   about what to advise voters?

25       A.    It -- in my estimation, it did not help me

1    with a clear, simple answer to my voters, no.

2         Q.   And as to the third page of this exhibit --

3         A.   Well, again, as I mentioned earlier, the

4    purpose of my -- my persistence in trying to get

5    something from my September 3rd message was an on-campus

6    voter registration event.

7              So this third page, which basically is some

8    RSA language, we ended up watermarking that as an

9    exhibit -- you know, an attachment to the September 18th

10   letter from the Attorney General's Office and that is

11   what we made available to people that would have that

12   question at that event.

13        Q.   Okay.  And when asking for any of this

14   guidance that we've discussed, did you ever indicate

15   that you thought individuals -- excuse me.

16             Did you ever think that you need -- that

17   individuals needed the driver's license in the first

18   instance in order to register to vote?

19        A.   No.  All -- all along, we've been very --

20   we've been very careful in our office that -- that --

21   that there is not the need for a New Hampshire driver's

22   license to register to vote or to vote.

23        Q.   Okay.  If you'll please turn to tab 9 of your

24   binder, which is marked as Plaintiff's Exhibit 9.  And

25   it's another exhibit that's a couple pages.

1        A.    Oh, thank you.

2        Q.    Do you recognize this document?

3        A.    I do.

4        Q.    And what is this document?

5        A.    This is, in essence, sharing what -- sharing

6    the response to -- that was provided to me to my

7    September 3rd inquiry with the broader election official

8    community.  Again, Colleen McCormick, whose name we

9    mentioned before, blasted this to the New Hampshire

10   Votes listserv.

11       Q.    And with this cover message from the Secretary

12   of State's office in the email from Ms. McCormick, did

13   this response provide a satisfactory answer in order for

14   you to respond to the questions from those registering

15   to vote?

16       A.    In my estimation, no.

17       Q.    Does the Dartmouth community make up a large

18   part of the residence of your town?

19       A.    It does.

20       Q.    Okay.  And do students make up about

21   40 percent of the people who live in Hanover?

22       A.    I would say between undergraduate and graduate

23   students, that is probably a fair enough assumption,

24   yes.

25       Q.    Okay.  Do you communicate with the college

1  about issues surrounding voter registration and

2  elections?

3      A.   We communicate with the public at large

4  through our -- our -- the town's website, through our

5  eNews service.  There's no special pneumatic tube to

6  the -- to Dartmouth College in terms of voter

7  information.  So there's no established channel for

8  that -- for that.

9      Q.   And so putting aside whether there's sort of a

10  specialized channel for that, do you ever sort of field

11  questions specifically from the college itself?

12      A.   Yes, we do.  Yes.

13      Q.   Okay.  If you'll please turn to tab 10 of your

14  binder, which is marked as Plaintiff's Exhibit 10.

15          Do you recognize this document?

16      A.   I do.

17      Q.   What is it?

18      A.   Again, I -- I'm sort of seeing the same

19  email -- it's yet that thread from September 3rd

20  culminating in the sharing of the September 18th letter.

21  That -- that -- all of that then I had forwarded to the

22  communications officer, I forget her specific title, at

23  the college.  And this email -- forwarding this email to

24  her and then -- then basically the top portion of this

25  document is her saying thanks, basically, to that.

1           This is in response to the Dartmouth

2    communications office reaching out through the

3    established town-gown channel, reaching out to our town

4    manager, requesting a meeting between Dartmouth College,

5    the communications office there, and other officials and

6    the town.

7           So we -- we had a meeting with the

8    supervisors -- myself, representatives from Dartmouth

9    communications office and provost's office -- to sit

10   down and they were trying to get a clear message to try

11   to respond to some of the angst on campus about, again,

12   whether or not students were required, upon registering

13   to vote, to get a New Hampshire driver's license.

14       Q.   And does your email of October 30th at

15   2:38 p.m. in this chain reflect your consistent view on

16   the guidance that you'd received to that point?

17       A.   I believe it does.

18       Q.   Okay.  Did you swear out a declaration related

19   to this case?

20       A.   I did.

21       Q.   And as far as you know, was that declaration

22   filed with this court?

23       A.   As far as I know, yes.

24       Q.   Do you know if there was any response to your

25   declaration?

```
 1              THE COURT:  What number are we on?  If you
 2   want to tell me something, just tell me.  You don't need
 3   to get your witnesses to --
 4              MS. LEE:  Oh, I just wanted to know if she'd
 5   received any communications upon filing her declaration.
 6   I'm moving to the next exhibit, so we can skip the
 7   question if you want as well, your Honor, I --
 8              THE COURT:  You don't have to skip it.
 9   That's -- the witness can explain.
10        A.   No, I got no receipt.
11              THE COURT:  Go ahead.
12        Q.   Okay.  If you'll please turn to tab 11 of your
13   binder, which is marked as Plaintiff's Exhibit 11.
14              Do you recognize this document?
15        A.   Yes, I do.
16        Q.   Did you receive this document after your
17   declaration was filed?
18        A.   Yes, I did.
19              THE COURT:  Time out.  You're going to have a
20   copy of these documents, Alex?
21              THE LAW CLERK:  I don't.  My understanding is
22   they --
23              MS. LEE:  There's another binder right there,
24   your Honor.
25              THE COURT:  Thanks.  Please proceed.
```

1    Q.   Sorry.  Do you recognize this document?  I'm

2  not sure if I asked.

3    A.   I do recognize it.  Thank you.

4    Q.   Okay.  And what was your view of this

5  November 7th letter?

6    A.   My -- my reaction to this letter was -- was

7  multifaceted.  I -- I, again, appreciate the time taken

8  to help me in my quest for a simple answer, but in terms

9  of my -- my immediate impressions, I was surprised to

10  get a -- this information directed to me specifically

11  when I did because I had not posed any new question

12  directly and when I did pose a direct question, there

13  was no direct response to me.  So this direct

14  response -- frankly, this letter came out of the blue to

15  me.

16           And then when I read the letter, I was

17  struck -- and I know this is superficial, but it's what

18  went through my mind -- that I liked the layout of it.

19  I'm an accountant by trade and so I liked the bullet

20  points.  I thought it was much better -- you know, more

21  easily organized.

22           And then my other impression was that it

23  seemed to have taken some of the sort of cover or

24  discretion or possibilities of, you know, extenuating

25  circumstances that it was silent to some of the -- I

1   don't know how to say this tactfully -- some of the

2   wiggle room or discretion that was expressed in the

3   September -- the September 18th letter seemed to have

4   been stripped away, which, in essence, is what I want;

5   it's like a very simple response, but, again, it

6   doesn't -- it doesn't -- it doesn't come down to a yes

7   or no.

8          Q.   And did this November 7th letter explicitly

9   rescind the guidance that you received and that all the

10  clerks received from the September 18th letter?

11         A.   There was no such mention of that.

12         Q.   Okay.  How do you reconcile the language in

13  the November 7th letter referencing voter obligations

14  with the September 18th letter stating that the

15  obligations are determined on a case by case basis?

16         A.   I -- I haven't reconciled those.

17         Q.   Okay.  And how do you reconcile the language

18  in the November 7th letter suggesting an ability to

19  actually discuss these motor vehicle obligations with

20  the September 18th letter and the September 23rd cover

21  email stating that the question should be referred to

22  other agencies?

23         A.   How do I reconcile that?

24         Q.   Yes.

25         A.   I -- I don't --

1      Q.   Okay.

2      A.   -- I guess.

3      Q.   So in light of all of the guidance you've

4  received up to and including the November 7th letter,

5  what will you do if asked, if I register to vote, do I

6  need to get a New Hampshire driver's license?

7      A.   What -- what I have done is -- is I've now --

8  because we've had another -- another voter registration

9  out-of-the-office event and so we now have copies of

10  this letter, along with the watermarked sort of RSA

11  references, and we make that packet available to voters.

12          But, again, what I've been doing is, again,

13  appreciating the brevity of this, of the November 7th

14  letter, but pulling our voter -- our registrants'

15  attention to the final sentence.  Again, not so much

16  because they cannot -- you know, no one can be denied

17  the right to register to vote or vote, that, again, has

18  always been known by our office, but I want our

19  registrants, you know, to sort of read the "for failing

20  to meet the requirements of the Motor Vehicle Code."

21  And, hopefully, with the several pieces of paper that we

22  thrust upon them, they will make an informed choice.

23      Q.   Okay.  Have you ever seen any guidance on

24  RSA 259:88?

25      A.   Not that I can recall or am aware.

1      Q.   Do you have staff members who are designated

2  municipal agents with the state?

3      A.   I do.  We are -- we are a municipal agent.  We

4  do register vehicles and transact motor vehicle business

5  on behalf of the state.  Two employees report to me and

6  are both municipal agents.

7      Q.   Have these designated staff people received

8  training from the Department of Safety on HB 1264's

9  impact on motor vehicle obligations?

10     A.   To my knowledge, they have not received

11  training, but I believe it was last week the

12  department -- the motor vehicle division -- I'm not sure

13  I'm referencing the agency correctly -- but there was an

14  email to all municipal agents with a one-sentence

15  transmittal that basically said, dear agents, enclosed

16  is a communication from the AG's office about 1264.  And

17  in that was the letter directed to me personally.

18     Q.   Okay.

19     A.   So they did receive that.

20     Q.   Okay.  But was there any training beyond the

21  November 7th letter, as far as you know?

22     A.   Not that I'm aware of.

23     Q.   Okay.  Has anyone asked about any of the other

24  obligations of registry -- of residency other than motor

25  vehicle requirements to your office?

1      A.    Not on a consistent basis, no.

2      Q.    Okay.  And as we've now discussed, are you an

3  elections official?

4      A.    I am.

5      Q.    Okay.  And taking everything together, do you

6  think you've been given a clear answer on whether anyone

7  who registers to vote in New Hampshire has to then get a

8  New Hampshire driver's license?

9      A.    No, I have not been given what I consider to

10  be a satisfactory answer.  And, again, I'm struck

11  because we're the same office where the trigger event of

12  registering a motor vehicle, very simple.  And, again,

13  the -- is it a trigger event to register to vote, and if

14  it is, what are -- does that mean you have to get a

15  driver's license.

16      Q.    And so as we've discussed, you've spoken with

17  many potential voters and registrants in your career.

18  Based on that experience, do you think that voters would

19  know the answer to this same question of whether

20  registering to vote requires them to get a New Hampshire

21  driver's license?

22      A.    I know -- no.

23      Q.    Okay.  And from your experience, what is your

24  view on the impact of the inability of folks to answer

25  those questions?

1          A.     The -- I know from -- from neighbors and

2    faculty acquaintances the word on the street is, oh, you

3    need a New Hampshire driver's license to vote in

4    New Hampshire.  And, again, that's clearly not what 1264

5    says, but that's how it's been -- been lazily --

6               MR. GARLAND:  Your Honor, I'm going to object.

7    This is based on word-of-mouth that she's received on

8    the street.  That's hearsay.

9               MS. LEE:  She's not --

10              THE COURT:  It's not offered for the truth

11   anyway.  Overruled.  It's clearly not offered for its

12   truth.

13              MS. LEE:  Sorry.

14              THE COURT:  Am I supposed to assume in all

15   these -- you keep asking these questions about does

16   someone who registers to vote have to get a driver's

17   license.  Should I assume that your question implicitly

18   assumes that the person intends to drive a vehicle in

19   this state or -- right?  I mean --

20              MS. LEE:  Yes, your Honor.  If someone has an

21   out-of-state driver's license.

22              THE COURT:  But the person might have an

23   out-of-state driver's license and not intend to drive in

24   New Hampshire.  That person, I think, everybody here

25   agrees does not have to domesticate their driver's

1     license, right?

2              MS. LEE:  Yes.

3              THE COURT:  So your questions don't say or

4     assume that, so I'm asking you, should I be making that

5     assumption about your questions?

6              MS. LEE:  Yes, your Honor.

7              THE COURT:  Okay.

8              MS. LEE:  Apologies.

9              THE COURT:  No, no need to apologize.  I just

10    need to know what you're talking about.

11             MS. LEE:  Sure.

12             THE COURT:  Go ahead.

13        Q.   Sorry.  There was -- were you finished your

14    question when counsel -- I mean your response -- when

15    counsel objected?

16        A.   My -- the point being that -- that, again,

17    the -- the confusion that's being conveyed to me,

18    directly or indirectly, is that folks don't -- don't

19    realize they don't need a New Hampshire driver's license

20    to register to vote and vote.

21        Q.   And so, Clerk McClain, if the law was very

22    clear that if individuals who intend to drive in

23    New Hampshire, when they register to vote they had an

24    obligation to get a driver's license, in your

25    experience, do you believe that would cause people not

1    to register to vote?

2         A.   I know it -- yes, I do.

3         Q.   And what's that based on?

4              MR. GARLAND:  Your Honor, I'm going to object

5    to that.  That's speculation.

6              THE COURT:  She just asked what it's based on.

7              MR. GARLAND:  She did, your Honor.  I was

8    standing when she asked the question.

9              THE COURT:  Why don't you lay a foundation

10   before you ask the question.  Go ahead.

11        A.   It's based on my experience with the driver's

12   licensing language on the voter registration form in

13   2012.

14             MS. LEE:  Okay.  No further questions at this

15   time, your Honor.

16             THE COURT:  Well, is it based on the language

17   in the form or is it based on your observations of

18   people who --

19             THE WITNESS:  Walked away?  Yes.

20             THE COURT:  Why don't you explain that.

21             THE WITNESS:  My -- my feelings are based on

22   the fact that when there was driver's license language

23   that made it clear on the face of the voter registration

24   form in 2012, people walked away after they had filled

25   out the form and did not register to vote.

1          MS. LEE:  No further questions at this time.

2          THE COURT:  Thank you, Counsel.

3          Cross-examination.

4          MR. GARLAND:  Thank you, your Honor.

5                    CROSS-EXAMINATION

6   BY MR. GARLAND:

7          Q.   Good morning, Clerk McClain.  How are you?

8          A.   Hi.  Good, thank you.

9          Q.   We met earlier.  My name is Sam Garland from

10  the AG's office.

11         A.   Yes.

12         Q.   So I just have a few questions I'd like to ask

13  you this morning.

14         THE COURT:  Can I ask you a couple questions

15  before you start --

16         MR. GARLAND:  Yes, your Honor.

17         THE COURT:  -- just about what's going on so

18  far?

19         This Exhibit 11, this November 7th letter --

20         MR. GARLAND:  Yes, your Honor.

21         THE COURT:  So it appears to have been -- it

22  appears to have been sent to the clerk, the witness,

23  basically in response to their injunction filing in this

24  case on the 6th, right?

25         MR. GARLAND:  The declaration attached to -- I

```
1    believe it was actually attached to --
2              THE COURT:  Yeah.
3              MR. GARLAND:  -- the response to the order.
4    The procedural order on certification is where that
5    declaration was first.
6              THE COURT:  Oh, is that where?
7              MR. GARLAND:  Yeah.
8              THE COURT:  All right.
9              All right.  So this November 7th letter -- I
10   just need to ask you.
11             MR. GARLAND:  Yeah.
12             THE COURT:  To your knowledge, has this been
13   disseminated to any other state officials?
14             MR. GARLAND:  Yes, your Honor.  I think
15   Attorney Galdieri can speak specifically to that.
16             MR. GALDIERI:  Yes, your Honor.  It's on the
17   Attorney General's website.  It's on the Secretary of
18   State's website.  I don't know if it's on Safety's
19   website, but it's been disseminated through ElectioNet
20   to all the state, local election officials in the state.
21   Yes.
22             THE COURT:  Thank you.
23             MR. GALDIERI:  You're welcome.
24             THE COURT:  All right.
25             MR. GARLAND:  Do you mind if I approach the
```

44

```
1   witness, your Honor, just to give her --
2           THE COURT:  You may approach and do so
3   throughout your examination.
4           MR. GARLAND:  Thank you, your Honor.
5           THE WITNESS:  Thank you.
6       Q.   So, Clerk McClain, what I just gave you is a
7   folder that has the state's exhibits in it.
8           THE COURT:  Hold on a minute, Mr. Garland.
9           Mr. Galdieri, you just told me about
10  ElectioNet --
11          MR. GALDIERI:  Yes.
12          THE COURT:  -- and how it can be used to
13  disseminate this -- I don't know if it's this letter,
14  but information contained therein.
15          MR. GALDIERI:  Yes.
16          THE COURT:  Just hum me a few bars about
17  ElectioNet.  How's that work and -- who runs it and
18  how's it work?
19          MR. GALDIERI:  So we have Dave Scanlan here
20  who, when he testifies, I think he might be a better
21  person to ask how that works.
22          THE COURT:  Okay.
23          MR. GALDIERI:  My understanding is that that
24  is a mechanism that all the local officials are plugged
25  into.  They input data into ElectioNet, which gets it
```

1   into the statewide database and there's the ability to

2   disseminate --

3            THE COURT:  So is it like -- is that like an

4   intranet for election officials, basically?

5            MR. GALDIERI:  Yes, that's my --

6            THE COURT:  Yeah.

7            MR. GALDIERI:  -- my high-level understanding.

8            THE COURT:  Thank you.  Go ahead, Counsel.

9            MR. GARLAND:  Thank you, your Honor.

10       Q.   So, Clerk McClain, the first exhibit in the

11   binder is -- or excuse me, in the folder -- is your

12   declaration, which, again, I believe was submitted with

13   the opposing side's response to the judge's procedural

14   order.

15            But, in any event, this is a declaration that

16   you signed in the middle of October, October 18th,

17   correct?

18       A.   That's correct.

19       Q.   All right.  And so in that declaration, you

20   point out that -- on paragraph 4 that you personally

21   assisted hundreds of people registering to vote.

22            Did I read that correctly?

23       A.   That's what it says and it's true, yes.

24       Q.   And you indicate in paragraph 6 that it used

25   to be very -- excuse me.  It says that it used to be

1    very clear that or -- excuse me that clear.  I think

2    this should say "it used to be very clear that," but it

3    says "it used to be very that clear" that college

4    students, transient workers, and others could select

5    New Hampshire to be their voting domicile.

6              So assuming that that should be after the

7    clear, is that -- is that that should be before the

8    clear -- I made a mess out of this, but did I read that

9    somewhat correctly?

10        A.    So that's not clear.

11        Q.    Yeah.

12        A.    Okay.  I see where you're reading.

13        Q.    Okay.  And so it should say it used to be very

14   clear that college students, transient workers, and

15   others could select New Hampshire to be their voting

16   domicile.  Correct?

17        A.    That's correct.

18        Q.    All right.  And you testified earlier that

19   it's -- you understand and it's been your understanding

20   that 1264 didn't change the process for registering to

21   vote within the state, correct?

22        A.    That's correct.

23        Q.    And that 1264 did not amend any of the

24   statutes that would govern the process of registering to

25   vote, is that correct, or is that your understanding?

1        A.    That's my understanding.

2        Q.    Okay.  And so that process is the same now.

3   So a person who comes in to register vote, now that 1264

4   is in effect, would have to go through the same process

5   they did prior to 1264 being in effect?

6        A.    That's correct.

7        Q.    Okay.  And this is, in fact, consistent with

8   guidance you've received from both our office and the

9   Secretary of State's office throughout -- in the emails

10  that were referenced by opposing counsel and in the

11  November 7th communication from the Attorney General,

12  Secretary of State, and the Department -- Commissioner

13  of the Department of Safety?

14       A.    What --

15       Q.    I can pull that part a little bit.

16       A.    If you would, yeah, rephrase, that would --

17       Q.    Yup.

18       A.    -- be helpful.

19             THE COURT:  And maybe go a little bit slower.

20             MR. GARLAND:  Sorry, your Honor.

21             THE COURT:  No problem.

22       Q.    Defendant's Exhibit C, which I believe is also

23  Plaintiff's Exhibit 4, if it's easier to go through that

24  binder, in -- this is an email that you received from --

25       A.    Oh, yeah.

1      Q.    -- Deputy Secretary --

2      A.    Yeah.

3      Q.    -- of State Scanlan?

4      A.    Yeah.

5      Q.    And in that email, Deputy Secretary of State

6    said:  The bill did not change any election law and all

7    of the processes related to registering to vote --

8            THE COURT:  You've got to slow down.

9            MR. GARLAND:  I'm sorry.

10           THE COURT:  Yeah.

11     Q.    "The bill did not change any election law and

12   all of the processes related to registering to vote and

13   voting remained the same under the legislation."

14           Did I read that correctly?

15     A.    That's correct.

16     Q.    Okay.  And then going to Defendant's Exhibit

17   F, which is the November 7th letter that you received.

18   That's also in the plaintiff's binder.

19           There's a statement in that letter that

20   says --

21           THE COURT:  Hang on.  I'm having a hard time

22   finding it.

23           MR. GARLAND:  Oh, sorry, your Honor.

24           THE COURT:  Exhibit F?

25           MR. GARLAND:  Excuse me, Exhibit E.  I'm

```
1    sorry.  I got confused.  There's also an Exhibit F on it
2    from when we filed it.  My apologies.  Exhibit E.
3              THE COURT:  So --
4              THE WITNESS:  The November --
5              THE COURT:  See, I have -- in my pile here,
6    I've got two Exhibit Es.
7              Oh, wait a minute.  Which exhibit sticker am I
8    looking at, the one --
9              MR. GARLAND:  The one on the right, your
10   Honor.
11             THE COURT:  The one on the right.
12             MR. GARLAND:  But if it would be easier for
13   the purposes of this line of questions, Exhibit 11,
14   Plaintiff's Exhibit 11 in the binder, is the same
15   letter.
16             THE COURT:  Oh.  But -- oh.
17             MR. GALDIERI:  Your Honor, just to clarify,
18   our designations for the PI exhibits have a (PI) for the
19   preliminary injunction.
20             THE COURT:  Thank you.
21             What were the other exhibits for?  Was that
22   for a deposition or some kind of --
23             MR. GALDIERI:  They were attached to the --
24             THE COURT:  To the filings.
25             MR. GALDIERI:  To the filings, yes.
```

```
1              MR. GARLAND:  Yes.

2              THE COURT:  Okay.  Go ahead.

3        Q.   And so in that letter in -- in paragraph 2 of

4  that letter, bullet number 2, it says:  As has been

5  previously communicated in written guidance and at

6  election official training, HB 1264 made no changes to

7  New Hampshire's election laws.  It remains the law that

8  to vote in New Hampshire one must be a United States

9  citizen at least 18 years old and a domiciliary of the

10 ward or town.

11             Correct?

12       A.   That's what it says.

13       Q.   Okay.  So I'd like to touch a bit on -- on

14 some of the testimony you gave toward the end of the

15 direct examination about confusion that you have -- have

16 experienced or that's been conveyed to you by -- or that

17 you perceived, I should say, by members of the Hanover

18 community.

19             So I want to ask quickly about establishing

20 domicile.

21             Are you familiar with the statute for

22 establishing domicile that regulates domicile for the

23 purposes of voting in New Hampshire?

24       A.   I can't cite it, if that's what you're asking.

25       Q.   Are you familiar with what it says?
```

1        A.    I guess I can't paraphrase it either, so ...

2        Q.    Okay.  Well, I -- I would point you to -- it's

3   Plaintiff's Exhibit 13 and it's on page -- starts on the

4   bottom of page 3 of that exhibit.  And this is a quote

5   from RSA 654:1 I.

6             THE COURT:  Hold on a second.

7        A.    So --

8             THE COURT:  Are you talking about a statute

9   right now?

10            MR. GARLAND:  Yes, your Honor.

11            THE COURT:  Where -- where are you directing

12  us?

13            MR. GARLAND:  Well, the statute is 654:1 I --

14            THE COURT:  All right.

15            MR. GARLAND:  -- but it's quoted on

16  Plaintiff's Exhibit 13, pages 3 and -- it's the bottom

17  of page 3 and the top of page 4.

18            THE COURT:  Got it.

19       Q.    So I just want to read this briefly to you:

20  Inhabitant's domicile for voting purposes is the one

21  place where a person, more than any other place, has

22  established a physical presence --

23            THE COURT:  Slow down.

24            MR. GARLAND:  Sorry, your Honor.

25       Q.    -- and manifests an intent to remain a single

1    continuous presence for domicile -- domestic, social and

2    civil purposes relevant to participating in democratic

3    self-government.

4             Correct?  Did I read that correctly?

5        A.   I see that citation here, yes.

6        Q.   Okay.  Thank you.

7             And so is it fair to say, based on that

8    definition, that establishing domicile is a

9    fact-specific, intent-driven inquiry?

10       A.   Is it fair to -- is it fair to say that -- I

11   mean, it --

12       Q.   I'll pull that apart for you.

13            THE COURT:  Hold on.

14            You're on your feet, Counsel.  What is it?

15            MS. LEE:  He's asking the witness for -- a lay

16   witness for legal analysis.

17            THE COURT:  Yeah, I'm not sure if he is or

18   not, actually, so I'm going to let him do it --

19            MR. LEE:  Okay.

20            THE COURT:  -- but I had the same concern.

21       Q.   So you register people to vote, correct?

22       A.   That's right.  That's right.

23       Q.   And you have to confirm -- or they have to be

24   domiciled in order to register to vote?

25       A.   That's correct.

1    Q.   And so based on this statute that we just read

2  or the section of the statute we just read, that

3  determination is a fact-specific inquiry, right?  It

4  depends on, based on the language of the statute,

5  physical presence and intent to remain -- a manifested

6  intent to remain in a single continuous presence for

7  domestic, social, and civil purposes relevant to

8  participating in democratic self-government.

9    A.   Our assessment is fact-specific in that we ask

10 do they live in Hanover and we ask for their -- proof of

11 their domicile.

12   Q.   And the determination of that one is a

13 domiciliary of Hanover and of the state of New Hampshire

14 would be something that was fact-specific to that

15 individual, correct?

16   A.   That's correct.

17   Q.   And based on their own intent, correct?

18   A.   That's correct.

19   Q.   Okay.  So that's a determination that most

20 people would actually make before they came to your

21 office, correct?

22   A.   Absolutely.

23   Q.   So it would happen before they came to

24 register to vote?

25   A.   That's correct.

1        Q.    So they would have had to make up their mind
2  about whether they're domiciliaries of New Hampshire
3  prior to registering?
4        A.    I know that they -- that they have made up
5  their mind they want to register to vote.
6        Q.    Okay.
7        A.    That's what I know.
8              THE COURT:  Which is not your question, but
9  your question is sort of -- I understand the import in
10 the case.  I do.
11             THE WITNESS:  Yeah.
12             THE COURT:  But it's a little metaphysical,
13 you know.  It's highly unlikely anybody is undergoing
14 that sort of examination of conscience before they
15 register to vote.  I don't know.
16             MR. GARLAND:  That's the point I was trying to
17 make, your Honor.  So --
18             THE COURT:  Yeah.  Okay.
19       Q.    And so, based on that point, the timing of
20 when a person needs to get a registration to register
21 their vehicle or to get a driver's license, assuming
22 they're obligated to do so when they decide that their
23 domiciliaries for voting purposes, would depend on when
24 they make that decision, not when they come into your
25 office to register to vote, correct?

1    A.    Are you telling me -- I don't know.

2    Q.    It's a question.

3    A.    Oh.

4    Q.    Do you agree with that statement?

5    A.    I don't know.  I guess I -- I don't understand

6  it, I guess.  If you could say it again maybe.

7          THE COURT:  I'm struggling, too.

8    Q.    Okay.  So if someone --

9          THE COURT:  Tell me what difference it makes

10  before you ask the question.

11          MR. GARLAND:  Yes, your Honor.

12          So the line of questioning on direct

13  examination really went to this -- this contention that

14  no one has provided clear guidance as to whether when

15  you come in to register to vote, within 60 days of that

16  date --

17          THE COURT:  Yeah.

18          MR. GARLAND:  -- you have to get a driver's

19  license, you have to register a vehicle.

20          And the point that I'm trying to make is the

21  determination of whether you're a domiciliary and, in

22  our view, whether you're a resident under 1264, happens

23  at some time prior to that.  So there wouldn't be any

24  clear answer that you could give, saying, you stamp --

25  you know, you signed a voter registration, you are

1    registered to vote, you have to do 60 days from that

2    moment.  It would have to be 60 days from whenever you

3    decided you were a domiciliary.

4           I understand it's metaphysical, but I think

5    it's an important distinction because the argument on

6    the other side is that there's no direct answer that

7    we're providing.  And I think our response to that is

8    it's a fact-specific determination.  We can't provide

9    the direction --

10          THE COURT:  But might not the requirement of

11   domesticating my license and auto registration inform

12   that decision-making by the respective voter?

13          MR. GARLAND:  I think it could, your Honor,

14   but I think the confusion argument, as it's been framed,

15   or at least how the testimony came out earlier, was we

16   are not -- part of this confusion is we're not providing

17   a clear answer to this question.  Right?  And we're --

18   and what I'm trying to get at is there is not a clear

19   answer to this question for the purpose -- for the

20   reason that you just said; the answer cannot be --

21          THE COURT:  If there's not a clear answer to

22   this question, doesn't that really support their

23   inherent confusion argument, if there's not a clear

24   answer to the question under the law?

25          MR. GARLAND:  I think anytime there's a

```
 1   fact-specific, your Honor, an intent-driven question,
 2   that's going to depend on factual circumstances.  And
 3   our guidance has been that --
 4               THE REPORTER:  I'm sorry.  Could you please
 5   slow down.
 6               MR. GARLAND:  I'm sorry.  I'm very sorry.
 7               And so that's the point I'm trying to make,
 8   but --
 9               THE COURT:  Okay.  All right.  I get it.
10               MR. GARLAND:  And just it --
11               THE COURT:  The witness doesn't get it, but
12   you should move on because she's not going to get it.
13   No offense.
14               THE WITNESS:  Hey, none taken.
15               THE COURT:  Yeah.
16       Q.    Just briefly on that last point, but not that
17   specific question, as the judge indicated earlier -- or,
18   actually, strike that.
19               Some people who register to vote likely do not
20   drive in the state of New Hampshire, correct?
21       A.    That's probably very true, yes.
22       Q.    And some people that register to vote likely
23   do not own cars within the state of New Hampshire?
24       A.    That's probably true, yes.
25       Q.    And so those individuals, there would,
```

1  likewise, not be a clear answer as to whether -- whether

2  they -- whether they -- I guess the -- there would not

3  be a specific answer that they need to register their

4  vehicle or obtain a driver's license within 60 days,

5  correct?

6      A.    There is not a clear answer to that question,

7  that's correct.

8      Q.    And so the answer to that question would be --

9  depend on case by case, correct?

10     A.    Yes.

11     Q.    And it would depend on the specific facts

12 surrounding a person, surrounding an individual who

13 asked you whether they have to get a license, whether

14 they have to get a registration?

15     A.    Yes, I suppose.  I'm -- again, I'm still --

16 it -- I'm not -- a hesitant yes, because I'm not really

17 sure I'm following where you're taking me, but ...

18         THE COURT:  It seems to me you're trying to

19 drive the question of what's the deadline, what's the

20 triggering event for the obligation to domesticate

21 license and registration, right?

22         MR. GARLAND:  I'm driving at -- related to

23 that, your Honor.  I think they are driving at that

24 there's no clear answer to that and the point I'm

25 driving at -- or that we haven't provided a clear

1   answer -- and what I'm driving at is there is no clear

2   answer; that that answer -- what we've said; that it's

3   case-specific, that it's fact --

4           THE COURT:  It's case-specific as to the

5   triggering event, but there's -- but there's clarity, in

6   your view, that there is an obligation to domesticate

7   license and registration once one is a domiciliary.

8           MR. GARLAND:  Yes, your Honor.  I'm not

9   disputing that.  I mean, I think how the -- the Count

10  One has now been framed, at least for the purposes of

11  the preliminary injunction motion --

12          THE COURT:  Yup.

13          MR. GARLAND:  -- isn't that those things are

14  necessarily the burden.  It's that the burden is from

15  the confusion as to whether you need to do those things

16  in the first place.

17          THE COURT:  I think you're right about that.

18  That seems to be the argument here for injunction

19  purposes, that it's a confusion argument based partially

20  on the -- what they call the inherent confusion created

21  by the statutory regime and, secondly, confusion created

22  by the state actors, election officials and the like,

23  that's been described here today, so not -- not focused

24  on whether the registration domestication requirements

25  are a burden or not.  I know that's part of the lawsuit,

60

1   but for today.

2           MR. GARLAND:  Right.

3           THE COURT:  There's not -- couldn't the state

4   provide clear guidance, though, about whether these

5   obligations attach, even though the question of when

6   they attach, what the triggering event is, is determined

7   on a case by case basis, as you've been trying to

8   establish?

9           MR. GARLAND:  Yes, your Honor, and I

10  believe -- and I know this isn't argument time --

11          THE COURT:  You think the November 7th letter

12  does that.

13          MR. GARLAND:  I think it does that.  And I'd

14  have to --

15          THE COURT:  Well, it does or it doesn't.  I'll

16  be the judge.  I understand.

17          MR. GARLAND:  Okay.

18          THE COURT:  You don't have to make the

19  argument I know you're making.  I'll get to it.

20          MR. GARLAND:  I'll move on from that line of

21  questioning.

22          THE COURT:  Okay.

23      Q.  Clerk McClain, I'd like to touch briefly on

24  testimony that you recently gave in another matter.

25          THE COURT:  Certainly, though, you'd agree

```
1   with me -- before you go on --
2           MR. GARLAND:  Yup.
3           THE COURT:  -- whatever the triggering event
4   is, it's certainly -- the -- it certainly is no later
5   than 60 days from registration to vote.
6           MR. GARLAND:  I believe that's correct, your
7   Honor, unless there's some intervening circumstance.  I
8   mean, it's certainly possible that a person would no
9   longer be a domiciled --
10          THE COURT:  If they moved away.
11          MR. GARLAND:  If they moved away or if they --
12  yeah, or -- yes, exactly.  You get it.
13          THE COURT:  Understood.  Go ahead.
14      Q.   I want to move on briefly to testimony that
15  you recently gave in another matter, in League of Women
16  Voters vs. William Gardner.  Are you familiar with that
17  case?
18      A.   I know I was -- I gave testimony a couple
19  weeks ago, so --
20      Q.   Okay.
21      A.   -- yeah.
22      Q.   And that was on, to the best of your
23  recollection, October 31st of this year?
24      A.   That's correct.
25      Q.   Okay.  And you gave that deposition testimony
```

1    under oath, correct?

2         A.   That's correct.

3         Q.   And at that deposition, you were asked by

4    Attorney Ann Edwards of our office:  Do you believe as

5    the town clerk, when an individual comes to register to

6    vote at town clerk's -- at the town clerk's office, it

7    is your responsibility or your staff's responsibility to

8    explain all of the direct consequences of what

9    registering to vote means to that person?

10             Do you recall being asked that question?

11        A.   I do.

12        Q.   And you answered no to that question, correct?

13        A.   Well, again, I -- I know that -- I have the

14   testimony and I have not had a chance yet to review it

15   for accuracy and have it notarized.  But, again, that

16   question strikes me and I sort of -- you know, we're the

17   front -- the front door of local government, so we get

18   all sorts of questions.  And we can't -- and that goes

19   to do we anticipate every question, and the answer to

20   that is no, we can't possibly anticipate every question

21   that they might have.

22             So that seems to be at the root of the

23   question that you referenced and so that's -- that is a

24   hard no.  We can't.

25        Q.   And you, in fact, went on to say that -- there

1  to explain that you and your staff can't possibly

2  presume to know all of the consequences that someone

3  might be curious about; is that correct?

4      A.   That's consistent, yes.  That's true.

5           THE COURT:  Do I have the impeachment --

6           MR. GARLAND:  No, your Honor.  We were -- we

7  brought the deposition transcript solely to refresh her

8  recollection; we didn't bring it to submit as an

9  exhibit.

10          THE COURT:  Okay.

11          MR. GARLAND:  Okay.  Bear with me for one

12  second.

13          THE COURT:  No problem.  Take your time.

14      Q.   So you did testify quite a bit at the

15  beginning about the domicile affidavit, correct?

16      A.   Yes.

17      Q.   Now, that affidavit is something that

18  someone -- that implicates the act of registering to

19  vote, correct?

20      A.   Implicates?

21      Q.   Or it's something that someone would have to

22  fill out or that someone would be exposed to through the

23  act of registering to vote?

24      A.   That's correct.

25      Q.   So it's part of your role as an election

64

1    official that you would be conveying information about

2    that, correct?

3         A.   That's correct.

4         Q.   Okay.  And briefly, also on RSA 259:88,

5    counsel asked you about that statute.  Do you recall

6    being asked about that statute?

7         A.   I remember being asked about a statute that I

8    was not familiar with --

9         Q.   Okay.

10        A.   -- what it meant, so --

11        Q.   Do you recall anyone ever having asked you

12   about that statute since -- before or after 1264 went

13   into effect?

14        A.   Again, the numbers are -- I -- I don't know

15   what the numbers mean, so I -- no, I guess I don't

16   recall.

17        Q.   So you have no specific recollection of

18   someone saying --

19        A.   259:64.

20        Q.   -- 259:88?

21        A.   There you go.  So no, I don't.

22             MR. GARLAND:  I have nothing further, your

23   Honor.

24             THE COURT:  Thank you.  Just give me a moment

25   here.

1            Are you going to have any redirect, Counsel?

2            MS. LEE:  Very short one, your Honor.

3            THE COURT:  Hold on a minute.

4            You can proceed, Counsel.

5                      REDIRECT EXAMINATION

6    BY MS. LEE:

7        Q.    Just following up a couple things, was any --

8    was your confusion or your effort to seek clarity about

9    the criteria for domicile or about whether someone

10   declaring domicile when registering had to get a

11   driver's license if they drive?

12       A.    I'm sorry.  Could you --

13       Q.    Sorry.

14       A.    The last clause of that threw me.

15       Q.    Sure.  Were you confused ever about what the

16   criteria for domicile were?

17       A.    No.

18       Q.    Okay.  And was what you sought guidance on

19   whether once someone declared domicile when registering,

20   whether they then had to get a driver's license?

21       A.    Those were the questions that we were getting.

22       Q.    Okay.

23       A.    Are getting.

24            THE COURT:  What'd you just say, are getting?

25            THE WITNESS:  Are getting.  I said past tense,

1    but that's -- it goes -- it lives, yeah.

2         Q.   Okay.  And so Mr. Garland just referenced some

3    earlier questions you were asked in October, whether --

4    you were asked and answered whether it's your

5    responsibility or your staff's responsibility to explain

6    all of the potential consequences of what registering to

7    vote means to that person, but they did not ask you and

8    so I'm wondering, do you believe then as -- when an

9    individual comes to your office to register to vote,

10   it's your responsibility or your staff's responsibility

11   to answer the questions that they ask you as their

12   elected official?

13        A.   I believe as a government employee and local

14   official, that is a paramount responsibility.

15        Q.   Okay.

16        A.   And if we can't -- if we don't know the

17   answer, we should be able to refer them officially to

18   the right place.

19             MS. LEE:  Okay.  Thank you, your Honor.  No

20   further questions.

21             THE COURT:  Hold on a second.

22             MR. GARLAND:  Okay.  I have two very quick

23   questions, your Honor.

24             THE COURT:  Yeah.

25                     RECROSS-EXAMINATION

1    BY MR. GARLAND:

2         Q.   As to the domicile inquiry, have you ever

3    asked someone who registers to vote when they became a

4    domicile of the state of New Hampshire?

5         A.   No.

6         Q.   Okay.  And I would like to turn your attention

7    to -- actually, strike that.

8              Do you feel that you've received clear

9    guidance from the -- from the state, from the Secretary

10   of State's office, from the Attorney General's Office,

11   the Department of Safety, from one of those entities, as

12   to whether you should be providing guidance on motor

13   vehicle laws or other -- other responsibilities of

14   residency?

15        A.   Yes.  I think the answer is to not provide

16   that guidance.

17        Q.   And you're simply uncomfortable with that

18   answer?

19        A.   I -- I am uncomfortable with that answer

20   because as I said, our office is branded with license

21   plates and driver's license information and so clearly

22   our citizens have an expectation.

23             And if it -- and, again -- and sending them to

24   the 1-800 help desk number for the Department of Motor

25   Vehicle is very unsatisfactory with the person that

1    you're trying to say, call this number.  They -- they

2    don't like that.

3        Q.   But you're under no obligation that you're

4    aware of, other than the personal feeling that you

5    should do it, that you provide answers to those

6    questions?

7        A.   And I -- I take that -- you know, again, it's

8    more than just a personal feeling.  I feel it's a civic

9    duty.

10       Q.   You've received no direction from a state

11   official and you're aware of no statute that requires

12   that you answer those questions?

13       A.   That's correct.

14            MR. GARLAND:  Thank you.  Nothing further,

15   your Honor.

16            THE COURT:  Okay.  Is it clear to you now that

17   for a person who intends to drive in New Hampshire,

18   registering to vote is a triggering event for

19   domestication of driver's license and registration if

20   that obligation hasn't already been triggered in some

21   other way?

22            THE WITNESS:  It has been clear, but I don't

23   know my responsibility to determine whether or not that

24   person is going to drive.

25            And, again, my concern with this is we're

1   putting the building blocks into ElectioNet to be able

2   to connect those dot -- registration dates and scanning

3   in out-of-state licenses.  So that if there is an

4   implication that this voter may be doing something

5   wrong, I feel like we should be assertively letting them

6   know.

7              And may I share something else?

8              THE COURT:  Of course.

9              THE WITNESS:  And I did mention the domicile

10  affidavit.  And, again, I'm so -- I'm so focused on this

11  because when -- when one is recorded in ElectioNet as

12  having filled out a domicile affidavit, the Secretary of

13  State's office is required to send that voter a

14  letter saying, we understand you -- you filled out a

15  domicile -- domicile affidavit.  Oh, and by the way, as

16  a New Hampshire resident, you have certain obligations.

17  And in that letter it specifically references motor

18  vehicle licensing.

19             THE COURT:  And how long have you been sending

20  that letter out?

21             THE WITNESS:  We don't send it out.  The

22  Secretary of State's office sends it out.  I believe it

23  started in 2016 and it's only to those people who

24  execute -- well, execute domicile affidavits.

25             So, again, my point is that ElectioNet is

Case 1:19-cv-00149-JL   Document 90   Filed 12/09/19   Page 70 of 151

70

1   already being used to mail information about motor

2   vehicle licensing and motor vehicle laws to voters and I

3   just have -- I just am skeptical about when we -- when

4   we're scanning out-of-state license information and

5   we've got all -- you know, if they're going to get a

6   knock on the door saying, hey, you're registered to

7   vote, we see you used your California license, you know,

8   a year later, you know, here's your summons or here's

9   your violation.  And I -- that -- that's -- that is at

10   the heart of my concern, that we should be clear to

11   people, get down and get your New Hampshire license.

12          THE COURT:  So the -- the confusion that you

13   think remains then is determining if they intend to

14   drive in New Hampshire?

15          THE WITNESS:  That's correct.

16          THE COURT:  But is that something that the --

17   that determination, is that something that any law can

18   help you resolve in your position?

19          THE WITNESS:  Any law?

20          THE COURT:  Yeah.  We're talking about the law

21   here.  It's -- you know, and -- that's not your problem.

22   I just -- you just need to answer the question.

23          The point is if that's what you say you're --

24   you remain confused about or there's some confusion

25   about, I'm not sure what could be done about that.

```
1              THE WITNESS:  Well, I think a perfect example
2    is part of me feels a responsibility to say oh, well,
3    congratulations, you've just registered to vote here; if
4    you intend to drive, you need to go to the Department of
5    Motor Vehicles and get a driver's license.
6              THE COURT:  I see.
7              THE WITNESS:  If I could say that, that would
8    be clear, but I know that would -- that would turn some
9    people away.  And I have not -- and that is not clear to
10   me that I can say that without disenfranchising voters.
11             THE COURT:  If anybody wants to follow up on
12   that, this is your opportunity.
13             You go first, obviously.
14             MS. LEE:  No, your Honor.
15             THE COURT:  Counsel?
16             MR. GARLAND:  Nothing further, your Honor.
17             THE COURT:  Thank you.
18             THE WITNESS:  Okay.  Thanks.
19                   (Witness excused.)
20             MR. KLEMENTOWICZ:  Your Honor, the plaintiffs
21   call Mary Catherine Suskie next.
22             THE COURT:  Please.
23             MR. GARLAND:  Your Honor, I'm going to have to
24   step out.
25             THE COURT:  Understood.
```

1          MR. GARLAND:  Thank you very much.

2          THE COURT:  Since we're between witnesses, I

3    guess it's probably time to take the morning break.  We

4    usually take a break every 90 minutes for the court

5    reporter, so probably a good time to do it now.  I'll

6    take a recess.

7          Discuss with each other during the recess

8    whether you'd like to work through lunch or break for

9    lunch.  I'm up for either.  I just want to do whatever

10   makes counsel most comfortable and the witnesses.

11         MR. GALDIERI:  Thank you, your Honor.

12         THE COURT:  All right.

13      (Recess taken from 11:15 a.m. until 11:32 a.m.)

14         THE COURT:  All right.  The deputy clerk

15   informed me that what you've decided to do is complete

16   presenting all your evidence before any kind of break --

17   before any kind of lunch break.  And that's fine with

18   the Court.

19         Is that what you want.

20         MR. KLEMENTOWICZ:  Yes.  Thank you, Judge.

21         MR. GALDIERI:  Yes, your Honor.

22         THE COURT:  All right.  Let's proceed.

23         THE CLERK:  Please raise your right hand.

24         **MARY CATHERINE SUSKIE**, having been first duly

25   sworn, testified as follows:

```
 1              THE CLERK:  Would you please state your name
 2    for the record and spell your last name.
 3              THE WITNESS:  Mary Catherine Suskie,
 4    S-u-s-k-i-e.
 5              THE CLERK:  Thank you.  Please be seated.
 6                      DIRECT EXAMINATION
 7    BY MS. EBENSTEIN:
 8        Q.   Good morning, Ms. Suskie.
 9             Good morning, your Honor.
10             THE COURT:  Good morning.
11        Q.   Thank you for being here with us today,
12    Ms. Suskie.  Where are you from?
13        A.   Little Rock, Arkansas.
14        Q.   Could you bring the microphone closer?
15        A.   Sorry.  Little Rock, Arkansas.
16        Q.   Okay.  And where do you currently live?
17        A.   75 Washington Street, Concord, New Hampshire.
18        Q.   How long have you lived in Concord,
19    New Hampshire?
20        A.   Since the end of July.
21        Q.   And what brought you from Arkansas to Concord,
22    New Hampshire?
23        A.   I'm a first-year law student at UNH Law.
24        Q.   Are you a full-time student?
25        A.   I am.
```

1      Q.    And when do you expect to complete your law

2  degree?

3      A.    2022.

4      Q.    Why did you choose to go to UNH Law for your

5  legal education?

6      A.    They are in the top five in the country for

7  intellectual property, and I'm wanting to do copyright

8  and trademark.

9      Q.    And have you been involved in the UNH

10  community since you started law school?

11      A.    Yes.  I am in two groups at the school, Young

12  Democrats and the Mental Health Alliance.

13      Q.    Okay.  What are your plans for after you

14  finish your law degree?

15      A.    I'm not completely sure, but I know I want to

16  do art law and the top two places are probably New York

17  or Washington, D.C.

18      Q.    Do you expect to move back to Arkansas after

19  law school?

20      A.    I do not.

21      Q.    And you said you were a full-time student.

22  What is the cost of tuition per year for law students at

23  UNH?

24      A.    I think it's 44,000.

25      Q.    Does that include your room and board and

1  books?

2        A.    No.

3        Q.    Okay.  Is there a difference between tuition

4  for in-state students versus out-of-state students?

5        A.    Yes.

6        Q.    And are you considered an in-state student or

7  an out-of-state student, as far as it relates to

8  tuition?

9        A.    Out-of-state.

10        Q.    Do you know the rate of tuition for in-state

11  students?

12        A.    I think it's 38,000.

13        Q.    And do you know if you get the benefits of

14  in-state tuition later on in your legal career or law

15  degree?

16        A.    I do not.

17        Q.    Okay.  Are you currently employed, Ms. Suskie?

18        A.    No.

19        Q.    Have you been employed since you started your

20  legal studies?

21        A.    No.

22        Q.    And why haven't you sought employment while

23  you're a first-year law student?

24        A.    Well, UNH Law has a pretty strict rule that

25  1Ls can't get a job and also I'm very busy studying all

1    the time.

2        Q.    Okay.  How do you pay for your legal

3    education?

4        A.    I have two scholarships and student loans.

5        Q.    And what scholarships do you have?

6        A.    I have an IP scholarship and a Dean's

7    Scholarship.

8        Q.    Are either of those merit-based scholarships?

9        A.    They both are.

10       Q.    Okay.  Do you receive any other type of

11   financial support?

12       A.    My parents help me with utilities sometimes.

13       Q.    And other than that?

14       A.    Not really.

15       Q.    Is it fair to say you're on a strict budget

16   while you're a full-time law student not currently

17   employed?

18       A.    Yes.

19       Q.    And do you have flexibility in your budget for

20   unexpected expenses?

21       A.    Not much.

22       Q.    Ms. Suskie, are you registered to vote?

23       A.    I am.

24       Q.    When did you first register to vote?

25       A.    When I was 18.

1       Q.    And where did you first register to vote?

2       A.    Little Rock, Arkansas.

3       Q.    Have you changed your registration since you

4   registered in Little Rock, Arkansas?

5       A.    Yes.

6       Q.    And when did you change your registration?

7       A.    The week of October 21st.  I don't know the

8   exact date, though.

9       Q.    In what way did you change your registration?

10      A.    I changed it to Concord, New Hampshire.

11      Q.    How did you register to vote in Concord,

12  New Hampshire?

13      A.    I went to the city clerk's office.

14      Q.    Can you walk us through the process of

15  registering to vote?

16      A.    I went there in person and they asked me what

17  I was there for.  And I said I would like to register to

18  vote and they gave me a sheet of paper and I had to fill

19  out my information.  They asked to see my license and a

20  piece of mail that had my address on it.  And that was

21  pretty much it.

22      Q.    Okay.  Ms. Suskie, are you familiar with the

23  term domiciliary as it's used in New Hampshire with

24  relation to voter registration?

25      A.    Yes.

1    Q.    What -- just in broad terms, what is your

2  understanding of the term domiciliary?

3    A.    It means that where somebody is present with

4  an intent to remain is what I understand.

5    Q.    And are you -- do you consider yourself a

6  domiciliary of New Hampshire?

7    A.    Yes.

8    Q.    Okay.  Do you maintain residence in Arkansas

9  for any other purposes?

10    A.    For my driver's license.

11    Q.    And when did you last renew your driver's

12  license, if you recall?

13    A.    2018, I think.

14    Q.    Do you know when it expires?

15    A.    2026.

16    Q.    And do you own a car?

17    A.    Yes.  Well, my parents own it, but I drive it.

18    Q.    Where is that car currently?

19    A.    It is here in Concord.

20    Q.    Okay.  So am I correct that you're a

21  domiciliary of New Hampshire, but you maintain Arkansas

22  as your residence for purposes of your driver's license?

23    A.    Yes.

24    Q.    Ms. Suskie, are you aware of a law that

25  changed the definition of resident in New Hampshire that

1    went into effect this past summer?

2        A.   Yes.

3        Q.   If I refer to HB 1264, will you understand

4    that I'm speaking about that law?

5        A.   Yes.

6        Q.   What is your understanding of -- in general

7    terms of what that law did?

8        A.   I believe it changed the definition of

9    resident to be the same as domiciliary.

10       Q.   Okay.  And were you aware of HB 1264 when you

11   registered to vote the week of October 21st?

12       A.   No.

13       Q.   How did you become aware of the requirements

14   of HB 1264?

15       A.   On November 1st, I went to a meeting for the

16   Young Democrats and one of the other 1L students asked

17   about it.  And the person who was doing the meeting

18   couldn't really give her solid information on it.

19       Q.   Once you learned of the new requirements from

20   HB 1264, did that raise any concerns for you?

21       A.   Yes.

22       Q.   Could you explain for the Court what specific

23   concerns you had related to HB 1264 and its

24   requirements?

25       A.   I was concerned that I would have to change my

1    license or there would be some kind of repercussions.

2         Q.    Do you know what it costs to domesticate your

3    Arkansas driver's license to a New Hampshire driver's

4    license?

5         A.    I believe it's $50.

6         Q.    And do you know what it costs -- what it would

7    cost to register your car in New Hampshire?

8         A.    I think $100.

9         Q.    Aside from the financial cost of domesticating

10   your driver's license and car registration, did you have

11   any other concerns related to these requirements?

12        A.    Yes.  I was concerned that if I didn't change

13   my driver's license that there would be some kind of

14   repercussion against me, but I wasn't really sure.  And

15   I'm concerned about taking the Bar Exam and filling out

16   the character and fitness part of it and what I would

17   have to put there.

18        Q.    Any other specific concerns?

19        A.    The cost and the time to change everything.

20   And I wasn't sure how it would affect my healthcare if I

21   changed my residency.  I'm not -- I'm not sure.

22        Q.    Okay.  What did you do after you became aware

23   of the requirements of HB 1264 and had these concerns

24   raised about how that would affect other parts of your

25   life?

1    A.    Well, first I looked it up and read it.  And

2    it didn't really clear up anything and so then I asked

3    one of my professors if he knew anything about it and if

4    there would be any kind of repercussions.  And he wasn't

5    really able to tell me either.

6        Q.    When you say you read it, what --

7            THE COURT:  Which professor was that?  Which

8    professor was it?

9            THE WITNESS:  He was my torts professor.

10           THE COURT:  Yeah, name.

11           THE WITNESS:  Oh, sorry, Professor Simon.

12           THE COURT:  Thank you.

13           THE WITNESS:  You're welcome.

14       Q.    When you say you read it, what did you read

15   specifically?

16       A.    I read the bill.

17       Q.    Okay.  And after you read the bill and spoke

18   to your professor, did you take any additional steps?

19       A.    Yes.  I looked up how to unregister to vote so

20   I could possibly just avoid any kind of trouble.  And

21   it -- when I looked that up online, it told me to call,

22   I think, the Secretary of State's office.

23           And so I called that number that I got from

24   online and they -- when I told them I was concerned

25   about it and I wanted to maybe unregister to vote, they

1    connected --

2            MR. GALDIERI:  I'm going to object, your

3    Honor.  This calls for hearsay.

4            THE COURT:  Hold on.  That doesn't -- it's not

5    offered for its truth.  It's offered -- well, I'm not

6    sure why it's offered.  Let me hear it about it first --

7            MR. GALDIERI:  Sure.

8            THE COURT:  -- and then I'll revisit it,

9    Mr. Galdieri.

10           Go ahead.  You can finish your answer.

11           MS. EBENSTEIN:  Okay.  Thank you.

12       Q.  Go ahead.

13       A.  Well, they connected me to somebody else and

14   when I asked them how I could unregister, they said to

15   call where I had registered and see about unregistering

16   there.

17           And so then I called the Concord City Clerk's

18   Office and asked how I could unregister.  And she -- the

19   woman who answered the phone told me that she would have

20   to check the system that they put the voters in and if I

21   had been processed, then she couldn't unregister me.

22           And so when she checked, I had already been

23   processed and she said that to unregister, I would need

24   to wait two to three weeks and call the registration

25   office in Little Rock, Arkansas, and see if I could

1   reregister there and then they would send notification

2   that I had reregistered back to New Hampshire and then I

3   would be unregistered.

4         THE COURT:  Well, I can't imagine that's

5   offered for its truth, frankly; and, secondly, it's

6   offered apparently to contribute to her claim of

7   confusion.  And I think that's -- I'll allow it for that

8   reason.

9         Let me just ask counsel here -- go ahead,

10  Mr. Galdieri.

11        MR. GALDIERI:  I don't think that we dispute

12  that there's a way to unregister --

13        THE COURT:  That was my next question,

14  actually.

15        MR. GALDIERI:  Yeah.

16        THE COURT:  What is -- if we know, what is the

17  way to unregister?  I doubt it's that, but why don't you

18  tell me.

19        MR. GALDIERI:  My understanding is you have to

20  reregister to vote somewhere else.

21        THE COURT:  And prove that you've reregistered

22  to vote somewhere else, too, and then New Hampshire

23  would, for lack of a better word, unregister you?

24        MR. GALDIERI:  It --

25        THE COURT:  Or is it automatic?

1          MR. GALDIERI:  If there's a communication to

2    the state where you're previously registered, they can

3    then, I believe, take you off.  They never take you out

4    of having registered at some period of time, but you're

5    no longer active.  You're now registered somewhere else

6    is my high-level understanding.

7          MS. EBENSTEIN:  Your Honor, I realize

8    New Hampshire is not subject to the requirements of the

9    NBRA, but I can say in most states you can just put in

10   writing that you'd like to cancel your registration and

11   a state does not require you to remain registered;

12   you're permitted to cancel your registration in writing.

13          I would suspect --

14          THE COURT:  Why are you telling me that?  He's

15   telling me what the rule is in New Hampshire, right?

16          MR. GALDIERI:  And there may be some nuance to

17   that.  We could ask Dave Scanlan that, but yes.

18          THE COURT:  All right.  So let me ask this

19   question of the witness then.

20          When you registered in New Hampshire, did you

21   provide evidence of that to -- were you previously

22   registered in Arkansas?

23          THE WITNESS:  Yes.

24          THE COURT:  Did you -- when you registered in

25   New Hampshire, did you communicate in any way with

1    Arkansas to unregister in Arkansas?

2              THE WITNESS:  No.

3              THE COURT:  No.  All right.  It might not be

4    here nor there, but I'm just curious about it.

5              Please proceed.

6              MS. EBENSTEIN:  Thank you, your Honor.

7         Q.   Ms. Suskie, you've described the steps that

8    you took to get registered to vote and to make sure that

9    your registration was proper.  Could you take a moment

10   to just explain to the Court why voting in New Hampshire

11   is important to you?

12        A.   I think it's important to be politically

13   connected to where you're living, and I'm planning on

14   living here for at least the next three years, and I

15   think it's important to have a say in what's happening.

16             MS. EBENSTEIN:  Okay.  Thank you very much,

17   Ms. Suskie.

18             THE WITNESS:  Thank you.

19             THE COURT:  Cross.

20             MR. GALDIERI:  Thank you, your Honor.

21             THE COURT:  Let me ask you a question.

22             THE WITNESS:  Yes.

23             THE COURT:  Are you -- you can't work while

24   you're up here, right?  They don't let you work at UNH

25   Law the first year?

```
 1                  THE WITNESS:  Right.
 2                  THE COURT:  Have you ever held a job in
 3   New Hampshire?
 4                  THE WITNESS:  No.
 5                  THE COURT:  All right.  Did you pay taxes last
 6   year?
 7                  THE WITNESS:  No.
 8                  THE COURT:  Have you ever?
 9                  THE WITNESS:  No.
10                  THE COURT:  Never filed an income tax -- not
11   pay, but never filed an income tax return?
12                  THE WITNESS:  No.
13                  THE COURT:  Thank you.
14                  You may have been -- maybe you were going to
15   ask her that.  I don't know.
16                  MR. GALDIERI:  Sure.
17                        CROSS-EXAMINATION
18   BY GALDIERI:
19       Q.   Good morning, Ms. Suskie.  My name is Anthony
20   Galdieri and I'm going to ask you some follow-up
21   questions.
22                  So you testified earlier that you're a
23   first-year student at the University of New Hampshire
24   Franklin Pierce Law School, correct?
25       A.   Yes.
```

1       Q.    You're domiciled in Concord, New Hampshire,

2   correct?

3       A.    Yes.

4       Q.    And the law school you attend is located in

5   Concord, New Hampshire, correct?

6       A.    Yes.

7       Q.    And you live close enough to the law school to

8   be able to walk there, correct?

9       A.    I do.

10       Q.    And you have a 12-month apartment lease; is

11   that correct?

12       A.    Yes.

13       Q.    And you entered into that lease on July 1st of

14   2019; is that correct?

15       A.    Yes.

16       Q.    And when did you move into that apartment?

17       A.    I believe it was July 27th, but that date may

18   be slightly off.

19       Q.    Okay.  Is that when you began sort of living

20   in New Hampshire full time?

21       A.    Yes.

22       Q.    And you plan on renewing that lease at least

23   for the extent of your law school career; is that

24   correct?

25       A.    Yes.

1      Q.    And you don't know at this time where you'll

2   get a job after law school, correct?

3      A.    No.

4      Q.    And you have no definite plans at this time to

5   leave New Hampshire; is that correct?

6      A.    That's correct.

7      Q.    You do know, however, that you're not going to

8   go back to Arkansas after law school, correct?

9      A.    That's the plan right now.

10     Q.    Okay.  When did you decide that you didn't

11  have an intention of moving back to Arkansas?

12     A.    Probably when I applied up here.

13     Q.    Okay.  Do you know when you applied up here,

14  approximately?

15     A.    I -- I think it was the beginning of this year

16  or the end of last year.  I don't know the exact date.

17     Q.    Okay.  So either the beginning of 2019 or the

18  end of 2018, about?

19     A.    Yes.

20     Q.    Okay.  And you drive a car in New Hampshire;

21  is that correct?

22     A.    I do.

23     Q.    Okay.  And how many times a week do you

24  believe you drive your car in New Hampshire?

25     A.    Probably twice.

1       Q.    And where do you usually go?

2       A.    Grocery shopping mostly.

3       Q.    Okay.  And you get your groceries in Concord?

4       A.    Yes.

5       Q.    So you drive short distances mainly?

6       A.    Mostly.

7       Q.    And your parents own the car that you drive?

8       A.    They do.

9       Q.    And that car is registered in Arkansas,

10    correct?

11      A.    It is.

12      Q.    And you don't have any ownership interest in

13    that car, correct?

14      A.    Not at this time.

15      Q.    Okay.  And during the week of October 21st,

16    2019, you --

17            THE COURT:  Can I just ask one more question

18    about that?

19            MR. GALDIERI:  Yes.

20            THE COURT:  Where's the car parked?

21            THE WITNESS:  In my garage.

22            THE COURT:  At your residence in Concord?

23            THE WITNESS:  Yes.

24            THE COURT:  Go ahead.

25      Q.    During the week of October 21st, 2019, you

1    registered to vote in New Hampshire, correct?

2        A.   Yes.

3        Q.   And you went through the voter registration

4    process, correct?

5        A.   Correct.

6        Q.   And you used your out-of-state driver's

7    license to register to vote, correct?

8        A.   Yes.

9        Q.   And you indicated that you used a piece of

10   mail to also register to vote, correct?

11       A.   Yes.

12       Q.   And did you use that piece of mail to

13   establish your domicile address?

14       A.   Yes.

15       Q.   And you're under the age of 26; is that

16   correct?

17       A.   Yes.

18       Q.   And for health insurance purposes, you remain

19   dependent on your parents, correct?

20       A.   I do.

21       Q.   Okay.  You're covered by your parents' health

22   insurance; is that correct?

23       A.   I am.

24       Q.   And you state in your declaration that you

25   supplied in this case, quote:  I am unaware if I would

1   be able to stay covered by my parents' health insurance

2   if I am not a resident of Arkansas, even if I am a

3   dependent of my parents and under 26 years old.

4           Is that correct?

5       A.   Yes.

6       Q.   Did you ever call your health insurance

7   company to ask them whether establishing domicile in

8   New Hampshire would affect your ability to remain on

9   your parents' health insurance?

10      A.   I have not found time yet.

11      Q.   You certainly didn't do that before you

12  registered to vote, correct?

13      A.   No.

14      Q.   And you haven't done it since you've

15  registered to vote?

16      A.   No.

17      Q.   And did you ever call your parents and ask

18  them if they knew whether you could remain on their

19  health insurance plan now that you had changed your

20  domicile to Concord, New Hampshire?

21      A.   Yes, I called them with my concerns and they

22  did not know the answer either.

23      Q.   Okay.  Did you ask -- did you ask them to look

24  into it?

25      A.   I honestly don't remember --

1     Q.   Okay.

2     A.   -- so ...

3     Q.   Did you ever do any basic research on the

4  Internet to try to figure out whether establishing

5  residency in a state other than Arkansas would affect

6  your ability to remain on your parents' health

7  insurance?

8     A.   No.  I was going to call my actual insurance

9  company.  I just have not had time yet.

10    Q.   Okay.  I'd like to show you an exhibit that

11  we've marked as Exhibit J.  I don't know if you have a

12  green folder up there still.

13         THE COURT:  Mr. Galdieri, are you still on

14  health insurance or are you moving on?

15         MR. GALDIERI:  Yeah, I'm still on health

16  insurance.  Yeah.

17         THE COURT:  Please.

18         MR. CHRISTIE:  J?

19         MR. GALDIERI:  J, yes.

20    A.   I don't have one.

21    Q.   Let me make sure it's in here.

22    A.   Okay.  Thank you.

23    Q.   That's the designation right there?

24    A.   Okay.

25    Q.   And you can take a minute, if it's helpful to

1    look at that document.  I would represent to you that it

2    is a printout of a series of frequently asked questions

3    from the government website of the Centers for Medicare

4    and Medicaid Services that concerns young adults and the

5    Affordable Care Act.

6              And where I'd like to direct your attention is

7    to question 4, which I think is at the bottom of page 1

8    and spans on to page 2.

9              Have you had a chance to look at that?

10   A.    Yes.

11   Q.    Okay.  Question 4 on this website of

12   frequently asked questions states:  Can plans or

13   insurers who offer dependent child coverage impose

14   limits on who qualifies based upon financial dependency,

15   marital status, enrollment in school, residency, or

16   other factors.

17             Did I read that correctly?

18   A.    Yes.

19   Q.    And the answer that's provided is:  No.  Plans

20   and insurers that offer dependent child coverage must

21   provide coverage until a child reaches the age of 26.

22             Did I read that correctly?

23   A.    Yes.

24   Q.    Okay.  Does that official CMS guidance resolve

25   your concerns about your health insurance coverage?

1      A.    I'm probably -- I would probably still like to

2   go to my health insurance, but it's nice to see that.

3      Q.    Okay.

4            THE COURT:  Let me ask you -- I touched on

5   this a little bit.  And I don't want to cut you off.  I

6   just want to maybe get to it.

7            Is the plaintiff's position here that the

8   change in the law in New Hampshire or that -- let me put

9   it a different way -- that registering to vote and

10  voting in New Hampshire actually places the plaintiff's

11  health insurance through her parents in jeopardy or just

12  that she's confused about it?

13           MR. KLEMENTOWICZ:  Certainly for the purposes

14  of this PI, it's just that she's confused about it.

15           THE COURT:  All right.  So you're not actually

16  claiming here that her health insurance is in danger.

17           MR. KLEMENTOWICZ:  No.

18           THE COURT:  Okay.  I don't know if that helps.

19           I don't mean to knock you off.  You proceed as

20  you want, Mr. Galdieri.

21           MR. GALDIERI:  Thank you, your Honor.

22           THE COURT:  Yeah.

23      Q.    On November 1st of 2019, you went to a Young

24  Democrats meeting on the law school campus, correct?

25      A.    Correct.

1      Q.    And who was at that meeting?

2      A.    There were a lot of people at that meeting.  I

3  don't --

4      Q.    Okay.  And who informed you at that meeting

5  that because of HB 1264, if you don't get a driver's

6  license and register your car in New Hampshire within

7  60 days of registering to vote that you could get some

8  kind of mark against you or that you could get in some

9  kind of trouble?

10          MS. EBENSTEIN:  Your Honor, objection.  That

11  mischaracterizes her testimony about the meeting.

12          THE COURT:  Well, that's up to the witness.

13  If it mischaracterizes her testimony, she cannot accept

14  it, but it's not an unfair question.

15          Do you understand?

16          THE WITNESS:  I think so.

17      A.    I don't remember the name of the person.  I

18  know he -- he was presenting the meeting.  It was an

19  introductory meeting to the group and one of the other

20  1Ls asked about the bill and if it would affect her and

21  he said he was unclear and so I -- but I don't remember

22  his name exactly.

23      Q.    Okay.  And I -- and I would just like to

24  direct you to Exhibit B in that folder.  And if you're

25  having -- if you have difficulty, it should be the

1    second one down and it's your declaration that you filed

2    in this case.

3         A.    Uh-huh.

4         Q.    And I just want to direct you, if you have

5    that document in front of you, to paragraph 13 of that

6    declaration.

7              And in paragraph 13, you say that:  On or

8    about November 1st, 2019, I went to a Young Democrats

9    meeting on campus and I learned that because of HB 1264,

10   if I don't get a New Hampshire driver's license and

11   register my car in New Hampshire within 60 days of

12   registering to vote that I could get some kind of mark

13   against me and I could get in some kind of trouble.

14             Did I read that correctly?

15        A.    Yes.

16        Q.    Okay.  And what steps did you take to

17   determine this information that you were given was true

18   or accurate?

19        A.    Well, I read HB 1264 and the language in it

20   did not clear anything up for me.  And then I contacted

21   my professor and asked him if he knew anything about it

22   or could give me any kind of information if there would

23   be any kind of repercussions.  And he couldn't really

24   tell me one way or the other.

25        Q.    Okay.  So you don't know if that information

1    is true or accurate, correct?

2         A.   I mean, the -- the 60 days part, I remember it

3    being said, but I don't remember it in any of the

4    subsequent research that I did.

5         Q.   Okay.  Are you aware that in New Hampshire you

6    only need to register motor vehicles that you personally

7    own?

8         A.   I -- no, I don't know.  I don't know that.

9         Q.   Okay.  If that were the case, that in

10   New Hampshire you only need to register motor vehicles

11   that you personally own, does that help alleviate --

12   would that help alleviate some of your confusion about

13   whether you need to register your parents' vehicle in

14   New Hampshire?

15        A.   Yes.

16        Q.   Okay.  And how would that alleviate your

17   confusion?

18        A.   Well, since I -- I don't own it, then I

19   wouldn't have to register it.

20        Q.   Okay.  I'd like you to just -- on that same

21   page of your declaration, you state in paragraph 14,

22   quote:  I do not know if I need to get a New Hampshire

23   driver's license or register my parents' car that I

24   drive in New Hampshire because I do not understand the

25   requirements under HB 1264, or if the New Hampshire

1    Department of Motor Vehicles law applies to me because I

2    maintain my residence in Arkansas for motor vehicle and

3    insurance purposes.

4              Did I read that correctly?

5         A.   Yes.

6         Q.   Now, you don't know whether Arkansas law

7    permits you to maintain a residence in Arkansas for

8    motor vehicle and insurance purposes, do you?

9         A.   I don't know if I understand the question.

10        Q.   Okay.  Does Arkansas law permit you to

11   maintain a residence in Arkansas solely for motor

12   vehicle and insurance purposes?

13        A.   I don't know.

14        Q.   Okay.  And you don't know whether under

15   Arkansas law you legally remain a resident of Arkansas

16   now that you have established New Hampshire as your

17   domicile, do you?

18        A.   Well, I believe that my residence is Arkansas

19   because it is where my license is.

20        Q.   So you believe that solely because you have an

21   Arkansas license that you are, therefore, a resident of

22   Arkansas?

23        A.   I guess.  I don't -- I don't know.  I haven't

24   done research on that.

25        Q.   Okay.  And you don't have a motor vehicle

1   insurance policy in your name, correct?

2        A.   Correct, but I'm under my parents'.  I'm named

3   under theirs.

4        Q.   Okay.  So you're named in the policy, but you

5   don't own the policy --

6        A.   Right.

7        Q.   -- correct?

8             And you have no reason to believe that if you

9   get a New Hampshire driver's license, you'll lose your

10  current health insurance, correct?

11       A.   Well, based on the previous thing, the

12  exhibit, I -- I guess not, but I would still like to

13  contact my health insurance personally to make sure --

14       Q.   All right.

15       A.   -- so ...

16       Q.   And you state in your declaration that you are

17  concerned that if you don't get a New Hampshire driver's

18  license that I won't be allowed to vote on election day.

19            Is that correct?

20       A.   I'm sorry.  Where are you?

21       Q.   I'm going to paragraph 17 of your declaration.

22  It's on the next page.

23       A.   Okay.

24       Q.   That paragraph states:  I am also concerned

25  that if I don't get a New Hampshire driver's license

1    that I won't be allowed to vote on election day or that

2    it would look like I was trying to commit voter fraud,

3    which I am absolutely not.

4              Did I read that correctly?

5        A.   Yes.

6        Q.   Okay.  You don't know that -- strike that.

7              You haven't asked anyone whether or not you'd

8    be allowed to vote on election day if you didn't get a

9    New Hampshire driver's license, correct?

10       A.   Correct.

11       Q.   And so you don't know whether or not you'd be

12   permitted to vote in New Hampshire even if you did not

13   have a New Hampshire driver's license, correct?

14       A.   Correct.

15       Q.   Okay.  And you didn't ask the Concord City

16   Clerk's Office that question when you called it on

17   November 1st of 2019, did you?

18       A.   Not that specific question.

19       Q.   Okay.  And you didn't ask the Secretary of

20   State's office that question when you called it, either,

21   did you?

22       A.   No.

23       Q.   And you haven't called the New Hampshire

24   Attorney General's Office to ask that question, have

25   you?

1      A.    No.

2      Q.    Okay.  And you state in that same paragraph of

3   your declaration that you're concerned about it looking

4   like you've committed voter fraud.

5      A.    Yes.

6      Q.    Why would you be concerned that it looks like

7   you've committed voter fraud?

8      A.    I was concerned whenever I heard about the

9   bill that it would be like I was trying to register

10  without meeting the requirements of being able to

11  register, because I wasn't sure how it worked and I

12  didn't want it to look like I was doing something that I

13  wasn't permitted to do.

14     Q.    Okay.  Are you aware that in order to register

15  to vote and vote in New Hampshire, you do not need to

16  meet any of the requirements of the Motor Vehicle Code?

17     A.    No.

18           MR. GALDIERI:  Okay.  I have no further

19  questions, your Honor.

20           THE COURT:  Any redirect?

21           MS. EBENSTEIN:  Brief redirect, your Honor.

22                    REDIRECT EXAMINATION

23  BY MS. EBENSTEIN:

24     Q.    Ms. Suskie, are you likely to move away from

25  New Hampshire after graduating?

1      A.   I'm not sure.

2      Q.   Okay.  With regard to your health insurance,

3  do you have any specific health concerns that make you

4  cautious about interfering with your current insurance?

5      A.   Yes.  I have annual checkups in Arkansas at an

6  oncologist.

7      Q.   Okay.  And if you could turn to Exhibit J, the

8  cms.gov web page that's printed out there --

9      A.   Yes.

10      Q.   -- have you been to this Center for Consumer

11  Information and Insurance Oversight web page before?

12      A.   No.

13      Q.   And in the top left where it says, Centers for

14  Medicare and Medicaid Services, is the insurance that

15  you have Medicare or Medicaid?

16      A.   No.

17      Q.   All right.  You were asked a moment ago

18  whether you asked a specific question to the city clerk

19  with regard to your registration and you said "not that

20  specific question."

21           Did you ask whether you'd be penalized for

22  having registered in New Hampshire?

23      A.   I did.  I -- I asked the city clerk first if I

24  could unregister.  And then after she told me to go

25  through the steps of reregistering in Arkansas, I asked

1   her whether or not she knew if I would be still be

2   penalized in any way, even if I did reregister, or if

3   reregistering and unregistering so fast, if there would

4   be any kind of repercussions for any of that.  And she

5   did not know.

6       Q.    Thank you.

7           Did you ask similar questions to the

8   Secretary of State or just to the city clerk?

9       A.    Just to the city clerk.

10          MS. EBENSTEIN; okay.  Thank you very much,

11  Ms. Suskie.

12          THE WITNESS:  Thank you.

13          MR. GALDIERI:  No other questions, your Honor.

14          THE COURT:  Yeah, I'm sorry to hear you have

15  to monitor your health situation so closely.

16          THE WITNESS:  Thank you.

17          THE COURT:  A couple more questions.

18          Have you had this -- have you had to seek any

19  healthcare in New Hampshire since you -- or anywhere,

20  really, since you registered to vote?

21          THE WITNESS:  Not yet, no.

22          THE COURT:  Okay.  Do you intend to vote in

23  the election?

24          THE WITNESS:  I would like to, yes.

25          THE COURT:  Do you intend to is my question.

1          THE WITNESS:  If --

2          THE COURT:  I know you'd like to.  You

3  registered.

4          THE WITNESS:  If I can.

5          THE COURT:  I mean, is it -- I guess that's

6  what I'm wondering.  If -- you said you tried to

7  unregister in New Hampshire.

8          THE WITNESS:  Uh-huh.

9          THE COURT:  If you unregistered in

10 New Hampshire, would you vote in Arkansas?

11         THE WITNESS:  If I was -- if I had to

12 reregister in Arkansas, then I would try to send in an

13 absentee ballot.

14         THE COURT:  I see.  But that would be only if

15 you couldn't vote in New Hampshire?

16         THE WITNESS:  Right.

17         THE COURT:  Now, I ask these questions of

18 someone who's had -- has -- I had three kids in college,

19 right, and I just think about how they live and what

20 they do.  And, I mean, do you maintain bank accounts?

21         THE WITNESS:  Yes.

22         THE COURT:  Do they have New Hampshire

23 addresses or do they have Arkansas addresses?

24         THE WITNESS:  Arkansas.

25         THE COURT:  You told me you've never filed a

```
 1    tax return.
 2              THE WITNESS:  I -- I don't think so.
 3              THE COURT:  Okay.
 4              THE WITNESS:  I'm sorry.
 5              THE COURT:  No, no need to apologize.
 6              THE WITNESS:  My parents help me with my
 7    finances.
 8              THE COURT:  Yeah.  And the health insurance
 9    you maintain is through your parents?
10              THE WITNESS:  It is.
11              THE COURT:  That's Arkansas?
12              THE WITNESS:  Yes.
13              THE COURT:  All right.  Thank you.
14              I'm very glad to hear you've chosen this
15    profession.  I wish you luck in it.
16              THE WITNESS:  Thank you.
17              THE COURT:  A lot of good apples in this room
18    of how to conduct yourself.  I mean that sincerely.  So
19    good luck with it.
20              THE WITNESS:  Thank you.
21              THE COURT:  You're excused.
22                      (Witness excused.)
23              MR. KLEMENTOWICZ:  Your Honor, the individual
24    plaintiffs rest, again on the understanding that the
25    other evidence can be considered from the papers.
```

1          THE COURT:  Of course.  That's your agreement.

2    All right.

3          I've got questions, but we can wait till

4    argument for those questions.

5          MR. GALDIERI:  Okay.

6          THE COURT:  Please.

7          MR. GALDIERI:  The defendants would call

8    Deputy Secretary of State David Scanlan.

9          THE COURT:  Thank you.

10         THE CLERK:  Pleas step into the witness box

11   and please remain standing.

12         Raise your right hand.

13   **DAVID SCANLAN**, having been first duly sworn,

14   testified as follows:

15         THE CLERK:  Would you please state your name

16   for the record and spell your last name.

17         THE WITNESS:  David Scanlan, S-c-a-n-l-a-n.

18         THE CLERK:  Thank you.  Please be seated.

19                    DIRECT EXAMINATION

20   BY MR. ZORACKI:

21     Q.   Deputy Scanlan, where are you employed?

22     A.   In the Secretary of State's office in

23   New Hampshire.

24     Q.   And what is your job title?

25     A.   Deputy Secretary of State.

1       Q.    How long have you served as the Deputy

2   Secretary of State?

3       A.    17 and a half years.

4       Q.    Okay.  And what is the role of the Secretary

5   of State's office with respect to elections in

6   New Hampshire?

7       A.    The Secretary of State is responsible for the

8   administration of the elections in New Hampshire.

9       Q.    And could you describe the relationship

10  between the Secretary of State's office and local

11  election officials?

12      A.    We work very closely with local election

13  officials, particularly the town clerks, the moderators,

14  and the supervisors of the checklist, helping them to

15  understand the election laws, training them on the

16  administration of the election laws, and -- and training

17  them on things like ElectioNet, which we've heard of

18  earlier today.

19      Q.    And is the guidance that the Secretary of

20  State's office provides to local election officials

21  limited to the election laws?

22      A.    No.  We also have relationships with -- with

23  the town clerks in particular, with Vital Records, which

24  is one of the divisions within our department.

25      Q.    As a general matter, does the Secretary of

1    State's office provide guidance to local election

2    officials on how any other laws other than the election

3    laws might impact registrants or voters?

4         A.    No, other than the vital records statutes that

5    I just mentioned.

6         Q.    And why is that?

7         A.    Because those are the two areas within our

8    department that we have jurisdiction that reaches out to

9    local election officials, municipal officials.

10        Q.    You heard testimony earlier this morning from

11   Clerk McClain about an August 3rd, 2018, election law

12   training in Newport, New Hampshire?

13        A.    Yes.

14        Q.    And were you present at that training?

15        A.    Yes.

16        Q.    And just to summarize Clerk McClain's

17   testimony on this point earlier, she -- she testified to

18   the effect that she perceived there to be an inadequate

19   opportunity for Q and A at that -- at that training.

20            Do you agree with that testimony?

21        A.    No.

22        Q.    And why not?

23        A.    We -- whenever we have the training sessions,

24   we try to keep them within a certain time period and we

25   let the local election officials know what that

1    expectation is.

2           But after the training session is over and, in

3    fact, during the training session, we have numerous

4    staff from the Secretary of State's office that are

5    present and able to answer any questions that were not

6    answered during the presentation at some point while

7    we're still present.

8        Q.    Now, we also heard testimony earlier from

9    Clerk McClain about the use of a domicile affidavit.

10   What is a domicile affidavit?

11       A.    A domicile affidavit is a document that a

12   voter can use in lieu of having a presumptive form of

13   documentation that they are domiciled in that town.

14       Q.    Okay.  And Clerk McClain described earlier

15   what she perceived to be her understanding of the

16   guidance from the Secretary of State's office about the

17   use of domicile affidavits.  Did you agree with her

18   testimony on that point?

19       A.    No.

20       Q.    And why not?

21       A.    We -- in our training, which has been --

22   excuse me.

23           In our training, which we have trained

24   consistently over the years -- excuse me.

25           We train that when a person registers to vote

1    that they be asked for some proof of domicile.  If they

2    don't have the proof -- the proof might be the address

3    on their driver's license, it might be a piece of mail

4    that has come to their address, or some other item that

5    shows a domicile address on it.  If they don't have

6    that, then as part of that we instruct the clerks to

7    offer a domicile affidavit, which can be filled out.

8    And once the voter signs it, that is treated in the same

9    manner as if they had provided a presumptive form of

10    domicile evidence.

11         Q.   Okay.  Now, we also heard testimony earlier

12    about ElectioNet.  Can you explain what ElectioNet is?

13         A.   ElectioNet is the statewide centralized voter

14    database where local election officials, specifically

15    the supervisors of the checklist and the town clerks,

16    can enter data into the system related to voters that

17    have registered in their individual cities and towns.

18              As part of ElectioNet, there is a -- I'll call

19    it kind of an intranet for the users of that system to

20    communicate.  It's an easy way for the Secretary of

21    State and the Attorney General's Office to convey

22    information that we believe the local election officials

23    need to see.

24         Q.   Okay.  And is there a binder of documents in

25    front of you?

1    A.    I have a green folder.

2         MR. ZORACKI:  May I approach, your Honor?

3         THE COURT:  You may, throughout your

4    examination.

5    Q.    Now, directing your attention to what's been

6    marked as Plaintiff's Exhibit 11, this is a letter dated

7    November 7th, 2019, to Elizabeth McClain.  Could you

8    describe how this -- how this letter, which there was

9    testimony on earlier, was disseminated to local election

10   officials?

11   A.    This letter was disseminated through

12   ElectioNet.

13   Q.    Okay.  And you -- and ElectioNet -- through

14   that process on ElectioNet, does the Secretary of

15   State's office reach essentially all election officials

16   throughout the state?

17   A.    It -- it reaches all town clerks and all

18   supervisors of the checklist.

19   Q.    Okay.  Now, I'd like to direct your attention

20   to exhibits -- Plaintiff's Exhibits 12 and 13 in that

21   same binder.

22         Do you recognize these documents?

23   A.    Yes.

24   Q.    And what are they?

25   A.    These are documents that are posted on our

1   website.  It's just information on registering to vote

2   in New Hampshire.

3        Q.   Okay.  And the plaintiffs have represented

4   that the -- the Exhibit Number 12 is the document -- the

5   document at the link for Voting as a College Student on

6   the Secretary of State's website as of September 18th,

7   2019; and then the second -- sorry -- Exhibit 13 is the

8   document at that same link, Voting as a College Student,

9   as of November 20th, 2019.  If I could direct your

10  attention to page 4 of each of the documents.

11       And what's the difference between these two

12  documents?

13       A.   On document 12, there's a section on page 4

14  that is titled as "Is domicile the same as resident?"

15  and on document 13, on page 4, that section, "Is

16  domicile the same as resident?" has been removed.

17       Q.   Okay.  And to be clear, which version --

18  version of the document between 12 -- Exhibit 12 and

19  Exhibit 13 is the document -- is the document that's

20  currently on the Secretary of State's website?

21       A.   Exhibit 13.

22       Q.   And on Exhibit 13, down in the footer, it says

23  July 2019.  What does that date mean?

24       A.   That is the date that reflects when House Bill

25  1264 went into effect.

1        Q.    Okay.  And this document in Exhibit 13, when

2    was that -- approximately when was that posted to the

3    Secretary of State's website?

4        A.    Exhibit 13?

5        Q.    Yes.

6        A.    Within the last week.

7        Q.    Okay.  Now, Deputy Scanlan, the plaintiffs in

8    this case, as you know, claim that there is confusion

9    surrounding HB 1264.  In your role as Deputy -- Deputy

10   Secretary of State, what is your sense of whether there

11   is confusion among local election officials about HB

12   1264?

13       A.    Generally --

14             MR. CHRISTIE:  Objection --

15       A.    -- I don't believe there is any confusion.

16             MR. CHRISTIE:  -- I think he needs to lay some

17   foundation for that.

18             THE COURT:  Whoa, whoa, whoa.  You've got to

19   let him finish his objection.

20             Go ahead.

21             MR. CHRISTIE:  He's got to lay some foundation

22   for that.

23             THE COURT:  Yeah, you do.  It's similar to the

24   clerk's situation, but, yeah, you should lay some

25   foundation.

1          MR. ZORACKI:  Okay.  Well, earlier he

2   testified about the -- the relationship between the

3   Secretary of State's office and local election

4   officials, so I think that foundation's been laid, but

5   I'm happy to go into a little more detail.

6          THE COURT:  Yeah.  You need to do that.

7          MR. ZORACKI:  Okay.

8      Q.   So can you describe what --

9          THE COURT:  He said we have -- we have the

10  evidence, an exhibit, where it says -- I don't think my

11  sense is that there's no -- you know, I know he has to

12  lay a foundation, but he doesn't give to give a

13  foundation.  Just let him answer.

14         Go ahead.

15     A.   Generally, my sense is that there is very

16  little confusion related to local election officials

17  understanding the statute.

18     Q.   And what do you base that -- that

19  understanding on?

20     A.   Just my conversations with local election

21  officials, both on the phone -- they call us as a

22  resource.  There's really been a lack of questions that

23  come in suggesting that there's any type of confusion.

24         We have ongoing training sessions, especially

25  with the town clerks, which is a very organized group of

1    election officials in the state.  They have an annual

2    meeting.  They have regional meetings.  The executive

3    committee of the clerks meets on a monthly basis and --

4    and we conduct our ongoing training sessions with them.

5            Those are all opportunities for them to ask

6    questions of us about any legislation that's pending

7    before the legislature and how to administer those

8    statutes that have been passed into law.

9            And except in a couple of isolated instances,

10   there have -- there really has been no confusion and

11   concerns that I'm aware of related to the implementation

12   of House Bill 1264.

13       Q.   And in your role as Deputy Secretary of State,

14   do you -- do you field telephone calls from members of

15   the public with questions about election laws?

16       A.   Yes.

17       Q.   And how often do you get those types of calls?

18       A.   I get calls daily from citizens of

19   New Hampshire about items related to anything within our

20   department, but specifically elections in this case.

21           In terms of questions specifically about 1264,

22   I can recall receiving five or six calls.

23       Q.   Okay.  And so to sum up, did HB 1264 change

24   anything about how the Secretary of State's office

25   implements, administers, monitors, or enforces the

1    election laws?

2         A.    No.

3         Q.    Does a person need to have a driver's license

4    to register to vote in New Hampshire?

5         A.    No.

6         Q.    Does a person need to have a driver's license

7    to vote in New Hampshire?

8         A.    No.

9              MR. ZORACKI:  Nothing further, your Honor.

10             THE COURT:  Hold on a second, Counsel.

11             THE COURT:  What were your last two questions?

12   Does a person need to have a driver's license to --

13             MR. ZORACKI:  To register to vote in

14   New Hampshire was the first one --

15             THE COURT:  And then to vote in.

16             MR. ZORACKI:  -- and then -- the second was to

17   vote.

18             THE COURT:  Okay.  Thank you.

19                      CROSS-EXAMINATION

20   BY MR. CHRISTIE:

21        Q.    I was going to say good morning, but good

22   afternoon, Mr. Scanlan.

23        A.    Good afternoon.

24        Q.    How are you?

25        A.    Fine, thanks.

1        Q.    Obviously, as you've testified on direct

2   examination, the Secretary of State's office administers

3   the election laws in this state, correct?

4        A.    Yes.

5        Q.    It does not administer the motor vehicle laws

6   in this state?

7        A.    That's correct.

8        Q.    And do town -- and in town clerk -- people who

9   have the role of town clerk, part of their role is they

10  also are involved in the implementation and

11  administration of the election laws in this state,

12  correct?

13       A.    Yes.

14       Q.    And they're also involved in the

15  administration of the motor vehicle laws of this state,

16  right?

17       A.    Yes.

18       Q.    All right.  So they sort of have a little bit

19  of broader role than the secretary -- the strict

20  portfolio of the Secretary of State's office; would you

21  agree with that?

22       A.    They have responsibilities that go beyond our

23  work with them.

24       Q.    Okay.  And you heard Ms. McClain's testimony

25  that people will come in and ask questions about motor

1    vehicle laws, right?

2         A.    Yes.

3         Q.    And will ask questions about if I register my

4    motor vehicle in this state, do I need to get a driver's

5    license in this state, right?

6         A.    Yes.

7         Q.    And you heard her testimony that she knows the

8    answer to that question, right?

9         A.    Yes.

10        Q.    And you heard her testimony that if asked a

11   similar question about registering to vote, she doesn't

12   necessarily know the answer to that question, right?

13        A.    I heard her say that, yes.

14        Q.    Okay.  You also testified on direct

15   examination about your sense of the confusion about

16   election law amongst local officials, correct?

17        A.    My sense was lack of confusion, yes.

18        Q.    All right.  And Ms. McClain has filed an

19   affidavit in this case and testified about her

20   confusion, right?

21        A.    She did.

22        Q.    All right.  And what town is she the clerk

23   for?

24        A.    Hanover.

25        Q.    And what -- is there a significant university

1   in Hanover?

2        A.   Dartmouth College.

3        Q.   Okay.  And does Dartmouth College have a

4   significant amount of same -- because of Dartmouth

5   College, are there a significant amount of same-day

6   registrations in this state -- in Hanover on a general

7   election day?

8        A.   I think that's fair in any college town.

9        Q.   Okay.  And, similarly, the supervisor of the

10  checklist in Durham has filed an affidavit in this case,

11  hasn't she?  Have you seen it?

12       A.   I don't believe I've seen it.

13       Q.   All right.  I'll represent to you -- do you

14  know who Ann Shump is?

15       A.   Yes, I do.

16       Q.   And do you know that she's the supervisor of

17  the checklist in Durham?

18       A.   Yes.

19       Q.   And what is in Durham?

20       A.   UNH.

21       Q.   All right.  And are there a large number of

22  same-day registrations in Durham because of the presence

23  of UNH?

24       A.   Yes.

25       Q.   And are you aware that she has filed an

1    affidavit that she is confused regarding the

2    implementation and impact of HB 1264?

3         A.   I don't believe I've actually seen her

4    affidavit.

5         Q.   But -- all right.  If she has, would you

6    dispute that she has -- if I represent to you she has

7    filed, that would you dispute that?

8         A.   No.

9         Q.   All right.  So the two biggest college towns

10   in the state have both had their election officials file

11   affidavits in this case that they are confused regarding

12   the impact of 1264, correct?

13        A.   If they filed affidavits, yes.

14        Q.   Yes.  And these are the two biggest

15   communities in the state -- two of the two biggest

16   communities in the state -- where there's same-day

17   registration, right?

18        A.   Yes.

19        Q.   And so they would be the two communities in

20   the state where voters may ask questions on the day

21   they're registering to vote about the impact of 1264 if

22   they register to vote in this state, right?

23        A.   They may ask questions, yes.

24        Q.   Okay.  So as far as the towns or the election

25   officials expressing confusion, it's coming from the two

1   biggest college towns in the state, right?

2        A.   The affidavits have been filed by election

3   officials in those two towns, yes.

4        Q.   All right.  And the -- were you provided a --

5   an interview with NPR around the time that the law was

6   pending before the legislature?  Do you recall that?

7        A.   I have spoken with NHPR in the past.  I don't

8   know whether I gave them an interview or whether they

9   were taking testimony from a public hearing.

10       Q.   Okay.  Well, what -- okay.  Thank you.

11            You recall testifying on behalf of HB 1264

12  when it was before the legislature, correct?

13       A.   Yes.

14       Q.   All right.  And you testified in support of

15  the bill, right?

16       A.   Yes.

17       Q.   And, by the way, you testified before the

18  Election Law Committee?

19       A.   I testified before the Election Law Committee,

20  I believe in both the House and the Senate.

21       Q.   All right.  Not the Transportation Committee?

22       A.   That's correct.

23       Q.   Not the Public Safety Committee, right?

24       A.   No.

25       Q.   It was the Election Law Committee considering

1    this bill, right?

2        A.    Yes.

3        Q.    And you testified before the legislature:  Our

4    position would be that just being domiciled here and not

5    being a resident is an absurd result.  You should be a

6    resident to have your domicile in the locality where

7    you're going to vote.

8              Do you recall that?

9        A.    Yes.

10       Q.    All right.  You also testified:  A student

11   would have to decide whether they want to claim if they

12   are a resident of the state of New Hampshire and if they

13   do, they're subject to whatever else would be required

14   of any other resident of the state of New Hampshire.

15             Right?

16       A.    I believe I would have said that, but in a

17   much broader context.

18       Q.    Okay.  So your testimony -- when you were

19   testifying in support of 1264, you directly referenced

20   the impact that 1264 would have on students, right?

21       A.    During my testimony before the legislature, I

22   spoke in broad terms, talking about voters in general,

23   unless I was asked a specific question by a legislator

24   on the committee.

25             In this case, somebody asked me a specific

1   question about college students.

2        Q.   All right.  And you answered what the impact

3   on the student would be, right?

4        A.   I answered the question yes.

5        Q.   Yeah.  And, in fact, how the law would impact

6   students was on the mind of a lot of the legislators at

7   that -- at those committee meetings, right?

8             MR. ZORACKI:  Objection.  There's no

9   foundation.

10            THE COURT:  Lay a foundation.

11       Q.   You attended committee meetings, right?

12       A.   I attended the committee meetings, yes.

13       Q.   Yeah.  And you were asked questions by various

14   committee members, right?

15       A.   Yes.

16       Q.   And committee members -- and you attended

17   the -- the meetings other than the times that you were

18   specifically there to testify, right?

19       A.   Sometimes, yes.

20       Q.   Okay.  And there were questions by various

21   committee members regarding the impact of 1264 on

22   students and students registering to vote, correct?

23       A.   Yes.

24       Q.   Okay.  And, in fact, the question that -- the

25   testimony I asked you a couple minutes ago was in

1   specific response to one of those questions, right?

2        A.    Yes.

3        Q.    So the impact of 1264 was on the mind of the

4   legislators who were considering the bill, right?

5        A.    Some of them, yes.

6        Q.    Okay.  And, in fact, some of them wanted to

7   pass the law to make it harder for students to register

8   to vote, right?

9        A.    I'm not aware of that.  I was --

10        Q.    Okay.  And just to button this up then -- and

11   again here, the -- the record in this case, the two

12   biggest college towns in the state have their election

13   officials who have filed affidavits in this case stating

14   that 1264 has caused confusion in their communities,

15   correct?

16        A.    They have filed affidavits to that effect,

17   yes.

18        Q.    Okay.  So when you say it's your sense that

19   there's very little confusion out there, there's

20   actually a lot of confusion in the two towns that 1264

21   could have the greatest impact in; isn't that correct?

22        A.    There are hundreds of towns in the state of

23   New Hampshire.  We're talking about two --

24        Q.    Yeah.

25        A.    -- and specific individuals, election

1   officials, within those communities.

2       Q.   And it's the college towns where people rely

3   on same-day registration, right?

4       A.   Same-day registration is available in any

5   public place.

6       Q.   It's relied more heavily in the college towns

7   than in, let's say, Allenstown, right?

8       A.   Typically, there's more same-day registrants

9   in a college town than anywhere else.

10      Q.   And when same-day registrants in college towns

11  are asked to produce identification, oftentimes the

12  identification that they produce are out-of-state IDs,

13  right?

14      A.   They can produce an out-of-state ID to obtain

15  a ballot, yes.

16      Q.   And if they declare New Hampshire under 1264

17  as their domicile for purposes of voting and they

18  present an out-of-state ID, have the election officials

19  in Durham, in Hanover, been provided guidance from your

20  office what they should tell a student regarding the

21  obligation to obtain a New Hampshire driver's license

22  after registering to vote?

23      A.   The guidance is the same that -- that I

24  expressed to Ms. McClain in our earlier comments and

25  guidance is the same that has been trained during our

1    training sessions and the guidance has been the same in

2    the correspondence from the three agency heads, Attorney

3    General's Office, Secretary of State, and Safety.

4              And that is the election laws have not changed

5    in terms of the processes and the procedures for a

6    person to register to vote.  The law, as it stands right

7    now, requires a person to be a resident of the state of

8    New Hampshire to vote here and that if they -- if a

9    voter has questions about how laws impact them, how the

10   laws impact residents of New Hampshire, I don't think

11   election officials generally are in a position to answer

12   those.

13             Maybe they have a little bit more information

14   on motor vehicles, but, you know, certainly they don't

15   know tax law --

16        Q.   I'm not asking about tax law.  I'm not

17   asking -- you know what the question is about.  It's

18   about driver's license.

19             And does an election official -- the student

20   registers to vote, hands them their driver's license

21   from Arkansas and says, I am declaring New Hampshire as

22   my domicile; I'm using my out-of-state driver's license

23   to register to vote; do I need to get a New Hampshire

24   driver's license within 60 days of today?  Do local

25   election officials have guidance from your office about

1   what to say in the answer to that question?

2       A.   The answer that we provide to them is that a

3   person that is registering to vote is a resident of

4   New Hampshire and they have to follow the same laws of

5   New Hampshire that any other resident does.

6       Q.   And so is the answer yes or is the answer no?

7       A.   If the person -- again, depending on that

8   individual's specific circumstances, if they have -- if

9   they are going to drive a car in the state of New

10  Hampshire, they're registering to vote, claiming they're

11  a resident or claiming to establish residency, then

12  they're obligated to follow the motor vehicle laws.

13          THE COURT:  The question wasn't the

14  obligation.  The question was what guidance your office

15  provided.

16          THE WITNESS:  The guidance that our office has

17  been providing is that if you are a resident, you have

18  to follow the laws of the state of New Hampshire.

19      Q.   So yes or no?

20      A.   If you're going to --

21      Q.   I'm sorry.  I thought you were done, sir.  I

22  apologize.

23      A.   No.  If you're going to drive a car here as a

24  resident, then you have to follow the motor vehicle

25  laws, which would mean getting a New Hampshire driver's

128

1   license.

2       Q.   Okay.  So let's go to -- and has that been

3   provided in writing?

4       A.   I'm sorry.  I didn't hear that.

5       Q.   Has that guidance been provided in writing?

6       A.   The guidance is in the -- I'm trying to

7   remember which exhibit that was, but there was a -- a

8   recent letter that was submitted, Exhibit 11.

9       Q.   Okay.  Exhibit 11, which is the November 7th,

10  2019, letter, correct?

11      A.   Yes.

12      Q.   Okay.  And that was issued in response to

13  Clerk McClain's affidavit that was filed in this case, I

14  think we established, right?

15      A.   Yes.

16      Q.   Okay.  So where does it say in this letter if

17  you register to vote in the state of New Hampshire, you

18  need to get a driver's license within 60 days of that

19  date?

20      A.   It would be number four.

21      Q.   So that is the one that says:  Once one

22  establishes residency in New Hampshire, New Hampshire

23  law requires new residents to take certain actions.

24  Obligations for new residents have not changed and these

25  obligations should be very familiar to municipal

1   officials.

2          Under the Motor Vehicle Code, an individual

3   has 60 days upon establishing residence to obtain a

4   New Hampshire driver's license if they drive in the

5   state and to register a vehicle if they own a vehicle.

6          Correct?

7    A.   That's what that says, yes.

8    Q.   Okay.  The question -- I don't know if you

9   follow the question, but the question I have is that --

10   is there any written document that tells people that the

11   act of registering to vote if you have a driver's

12   license, an out-of-state driver's license -- let me

13   rephrase.

14          Is there a written document that says the act

15   of registering to vote requires you to obtain a

16   New Hampshire driver's license within 60 days if you

17   drive in this state?

18    A.   No, and I don't think there should be guidance

19   like that that's issued.  Registering to vote is

20   evidence that a person has established their residency,

21   but residency is determined before a person actually

22   registers.

23    Q.   I understand.  But the intent of the law,

24   1264, that you testified in support, was to make clear,

25   was to change a difference between the definition

1    between domicile and residency, correct?

2        A.    The -- the intention of 1264 was to line the

3    definitions up of residency and domicile so they mean

4    the same thing.

5        Q.    Prior to 1264, someone could be a domiciliary

6    of New Hampshire, but not a resident, right?

7        A.    It depends on how far prior.  I mean, there

8    was -- up until the mid 2000s, the law was, as I

9    understand it --

10       Q.    Well, let's talk about June 2019.

11       A.    Well --

12             MR. ZORACKI:  Objection.

13             THE COURT:  You can ask him that, but let him

14   finish his answer.

15       Q.    All right.  If you want to go back to the

16   early 2000s, go ahead.

17       A.    Sure.

18             THE COURT:  Well, don't belittle --

19             MR. CHRISTIE:  I'm not.  I'm not.

20             THE COURT:  Go ahead, sir.

21             THE WITNESS:  The statute, as I understood it

22   at the time, was that you had to be a resident of

23   New Hampshire to vote here and that, you know, all of

24   the laws that would apply to residents applied to them

25   at that time.

1          It wasn't until there were legislative changes

2    starting in roughly 2006, 2007 leading up to the *Guare*

3    case that things got confused and we ended up with a

4    situation where the judge in *Guare* said you don't have

5    to be a resident of New Hampshire to vote here, you

6    merely have to have your domicile.

7          Q.   So for the last five -- let's try to cable it

8    in the last five to ten years or so.

9          You could -- a person could be domiciled in

10   New Hampshire for voting purposes, but not be a resident

11   of the state for other purposes, right?

12         A.   That was what the judge concluded, yes.

13         Q.   Yeah.  And that -- so that meant a person

14   could register to vote in New Hampshire and if they

15   considered themselves domiciled here, but not a resident

16   here, there was no obligation for them -- they were not

17   declaring their residency by registering to vote, right?

18         A.   That was the state of the law, yes.

19         Q.   Okay.  And the intended -- the purpose of

20   1264, in significant part, was to remove that

21   distinction so if somebody registered to vote in

22   New Hampshire, they were not only declaring their

23   domicile on election day or the day they registered to

24   vote, they were declaring their residency as well,

25   right?

1      A.   They were declaring that they were a resident

2  of the state of New Hampshire.

3      Q.   Right.  And so at the very least, and they --

4  they could declare their residency of the state of

5  New Hampshire the day they're registering to vote,

6  right?

7      A.   They could if that's when that event occurred.

8      Q.   Yeah.  So the act of registering to vote then

9  under 1264 is an official act and within -- you're

10 declaring your residency and domicile at that point and

11 within 60 days of that date, under your interpretation

12 of 1264, are you required to obtain a New Hampshire

13 driver's license?

14          MR. ZORACKI:  Objection, your Honor.  It's a

15 compound question.  It also asks for a legal conclusion

16 about residency.

17          THE COURT:  Well, isn't his job to draw those

18 kind of legal conclusions?

19          MR. ZORACKI:  Well, about the election laws.

20 He's talking about residency, not about --

21          THE COURT:  Overruled.  Overruled.  It is

22 compound, though, and it -- he's having some difficulty

23 with it.

24          MR. CHRISTIE:  All right.  I'll try to clean

25 it up.

1          THE COURT:  So to that extent, sustained.

2      Q.    Under 1264, a person -- do you agree that a

3  person who registers to vote is declaring both their

4  domicile and their residence?

5      A.    They're declaring that they established --

6  that they have established their domicile and residency.

7      Q.    Okay.  And under your -- under -- so then if

8  they were to declare their residency, do they then, to

9  your understanding, have a requirement to obtain a

10  New Hampshire driver's license within 60 days of

11  declaring their residency by registering to vote?

12          THE COURT:  If they intend to drive.

13          MR. CHRISTIE:  If they intend to drive.

14      A.    The law says that -- again, the motor vehicle

15  law says they have 60 days to do that upon becoming a

16  resident, whenever that occurred.  If it happened on the

17  day that they -- on the day of an election, then they

18  would have 60 days from that point.

19      Q.    Okay.

20          THE COURT:  So I -- for what it's worth, I

21  take that as a yes to his question then.  Is that how

22  you meant it?

23          THE WITNESS:  The -- the -- if they

24  established their residency --

25          THE COURT:  On that day.

1          THE WITNESS:  -- on that day, then they --

2          THE COURT:  If it was prior, then it would

3     have been a prior deadline.

4          THE WITNESS:  Yes.

5          THE COURT:  Okay.  But certainly no later than

6     60 days from the -- registering to vote.

7          THE WITNESS:  Correct.

8          THE COURT:  Yeah.

9     Q.   Okay.  So -- and would you agree that the

10    November 7th, 2019, letter does not contain a paragraph

11    that has -- that state -- that informs clerks with --

12    informs clerks that if a person registers to vote, they

13    have declared their residency and have 60 days from the

14    date of that declaration to obtain a driver's license?

15    A.   I think number four says that as clear as it

16    can be said.  And it's 60 days from the point in time

17    that the person establishes their residency.  If they do

18    it on the day of the election, when they vote, then

19    that's what they did.  If they did it a week before or a

20    month before, that's when the clock starts ticking.

21    Q.   Okay.  So in -- do you -- do you recall what

22    statute or what law you're relying on for that

23    interpretation that you testified is in the official

24    guidance letter of November 7th, 2019?

25    A.   Just repeat the question.

```
 1        Q.   Sure.  So you've talked about 1264.  1264
 2  amended the law, right, of residency.  And do you recall
 3  that it amended RSA 21:6?
 4        A.   Yes.
 5        Q.   Okay.  And it -- in fact, when -- the intent
 6  of the law was only to amend the terms resident,
 7  inhabitant, residence, and residency as defined in
 8  RSA Chapter 21, correct?
 9        A.   Yes.
10        Q.   It was not the intent of the law to change the
11  definition of residency, resident, inhabitant, anywhere
12  else in the New Hampshire code, right?
13             MR. ZORACKI:  Objection.  That's really a
14  question for the legislature, not for Deputy Scanlan.
15             THE COURT:  Uh-huh.
16             MR. ZORACKI:  It's --
17             THE COURT:  I know what you mean.  Yeah.  I'm
18  going to let him answer it anyway.
19             MR. CHRISTIE:  I can ask it differently,
20  Judge.
21             THE COURT:  Okay.
22             MR. CHRISTIE:  I think it'll clear it up.
23        Q.   During the Opinion of the Justices case, did
24  the Secretary of State's office file a brief to the
25  New Hampshire Supreme Court explaining its official
```

1    interpretation of what HB 1264 established?

2        A.    The Secretary of State filed a brief, yes.

3        Q.    Yeah.  And in that brief, did the Secretary of

4    State inform the New Hampshire Supreme Court, HB 1264

5    amends only the terms resident, inhabitant, residence,

6    and residency, as defined in RSA Chapter 21?

7        A.    I don't have --

8              MR. ZORACKI:  If that's -- I mean, if you're

9    referring to a document, could you put it in front of

10   him so he can see --

11             MR. CHRISTIE:  I think the proper way is to

12   ask him --

13             THE COURT:  Yeah, you --

14             MR. CHRISTIE:  -- and if he doesn't

15   remember --

16             THE COURT:  Is that an objection, putting the

17   document in front of him before he answers?  Come on.

18             Go ahead.

19       Q.    I'll read it again.

20             Did the Secretary of State in its brief state:

21   HB 1264 amends only the terms resident, inhabitant,

22   residence, and residency as defined in RSA Chapter 21?

23             THE COURT:  If you know.

24       A.    It sounds like something that would have been

25   in that brief.

```
1          Q.    All right.  Do you want to see it to make sure

2    I'm right about that?

3          A.    It would be helpful, yes.

4          Q.    Sure.

5                THE COURT:  Why don't you represent to him

6    what the document is so it's clear to the Court.

7          Q.    First page of the document -- we'll start

8    again.

9                You filed a declaration in this case, right?

10         A.    Yes.

11         Q.    And Exhibit A to your declaration filed with

12   this court is the brief that was filed by the Secretary

13   of State's office --

14               THE COURT:  Oh.

15         Q.    -- with the New Hampshire Supreme Court,

16   right?

17         A.    Yes.

18         Q.    Okay.  And so this is in the record in this

19   case.  And on page 2 of the brief, what I've highlighted

20   there in pink for you, is what I just read into the

21   record, right?

22         A.    Yes.

23         Q.    Okay.  And so you agree that was the official

24   position the Secretary of State's office took?

25         A.    Yes.
```

1      Q.    That HB 1264 only amends the terms of

2  residence in RSA Chapter 21 --

3      A.    Yes.

4      Q.    -- right?

5            That was true then, right?

6      A.    That is true today.

7      Q.    And it's true today.

8            THE COURT:  Can I see that, Counsel?

9            MR. CHRISTIE:  Yes, your Honor.

10           THE COURT:  Just for a moment.  I know it's in

11  the record, but I just want to -- got it.

12           Thank you.

13           MR. CHRISTIE:  Thank you.

14     Q.    So are there other provisions of the code that

15  define the term resident or residence for motor vehicle

16  purposes?

17     A.    Just can you repeat that question?  I --

18     Q.    Sure.  Are there other -- are there other

19  New Hampshire statutes or chapters that define the term

20  resident or residence for motor vehicle purposes?

21     A.    There may be, but Chapter 21 is the -- that

22  particular statute that we just spoke about is in the

23  statutory construction part of the statute.

24     Q.    All right.

25     A.    I'm not sure what -- what may be the motor

```
1    vehicle statutes, you know, related to residence --
2         Q.   Okay.
3         A.   -- or, you know, other statutes related to
4    other areas of law.
5         Q.   Sure.  Are you aware of RSA 259:88?
6         A.   Not without seeing it.
7         Q.   All right.  Let me -- I'll approach.  I'm
8    going to show you --
9              I'm showing him RSA 259:88.
10             And RSA 259:88 is from Title 21 of the Motor
11   Vehicle Code.  Do you see that at the top?
12        A.   Yes.
13        Q.   All right.  And that's obviously not the
14   same -- excuse me.
15             It's from Chapter 259 of the Motor Vehicle
16   Code.  Do you see that?
17        A.   Yes.
18        Q.   Okay.  And that's obviously not the same as
19   Chapter 21?
20        A.   Correct.
21        Q.   Okay.  And in this definition it says:
22   Resident shall mean a resident of the state as defined
23   in RSA 21:6 except that no person shall be deemed to be
24   a resident who claims residence in any other state for
25   any purpose.
```

1          Correct?

2      A.    That's what that statute says.

3      Q.    Okay.  So HB 1264, according to the Secretary

4  of State's brief, amended RSA 21:6, right?

5      A.    Yes.

6      Q.    It did not amend RSA 259:88, according to the

7  Secretary of State's brief?

8          MR. ZORACKI:  Objection, your Honor.  This

9  calls for a legal conclusion.  I think we've briefed

10  this in connection with the certification question to

11  some extent already in this court.  It's a conclusion of

12  law that says --

13          THE COURT:  It's actually an argument in the

14  brief that's attached to his affidavit.

15          Go ahead.

16      Q.    So the according to the Secretary of State's

17  brief --

18          THE COURT:  Conclusions of law -- conclusions

19  of law are what's at issue here.  I don't know how that

20  would ever be an objection to this man's testimony.

21  He's Deputy Secretary of State.  The law is his

22  business.  It's what we're doing here.

23          What -- why would it -- so in the normal

24  context -- it's not like we're asking him for a legal

25  opinion in terms of a layperson offering a legal

1   opinion.  He administered these laws and he's attached

2   to his affidavit a brief and referred to it.  So why

3   isn't the questioning fair?

4           MR. ZORACKI:  Well, I would agree with respect

5   to the election laws, yes, but we're talking -- we're

6   now in Chapter 259 of the Motor Vehicle Code.

7           THE COURT:  Yeah, that's true.  Point taken.

8           And, you know, I'm not a jury.  I'm a judge.

9   And I'll sort it out.  It's a fair point.

10          Go ahead.

11          MR. ZORACKI:  Thank you.

12      Q.   So in your -- the Secretary of State's brief

13  does not claim that Chapter 259 was implicated by the

14  adoption of HB 1264, correct?

15      A.   Not that I'm aware of.

16      Q.   Okay.  And so HB 1264 did not amend the

17  statute, right?

18      A.   This is -- this is RSA 659:88.

19      Q.   Right.  And in your letter or the Secretary of

20  State and the Attorney General and the Commissioner of

21  Safety's letter of November 7th, 2019, nowhere does it

22  reference RSA 259:88, does it?

23      A.   No.

24      Q.   It doesn't tell election officials about that

25  statute, right?

1       A.    No.

2       Q.    And if you go back -- let's go back to some of

3    the other exhibits that have been -- if you could go to

4    Plaintiff's 8, please.

5       A.    I'm assuming that's the black binder, is it?

6       Q.    It should be in the binder.

7       A.    Okay.

8       Q.    And it should be at tab 8.  I think the -- if

9    you go to tab 8, you'll see Plaintiff's 8.  Do you have

10   it?

11            Let me stand next to you for a second to make

12   sure I'm not --

13       A.    The September 18th, letter.

14       Q.    -- make sure I'm not messing it up.

15            Yes, that's it.  Thank you.

16            This is the September 18, 2009, letter that

17   went from the Attorney General's Office to Secretary

18   Gardner, correct?

19       A.    September 18th, 2019, letter.

20       Q.    Yup.  And then this letter was disseminated to

21   local election officials, if I understand the fact

22   pattern correctly?

23       A.    Yes.

24       Q.    All right.  And this letter --

25            THE COURT:  Do I have this letter as an

```
 1    exhibit today or is it just part of the record?
 2              MR. CHRISTIE:  Yes.  It's Plaintiff's 8 and
 3    should be in your --
 4              THE COURT:  Thanks.
 5              Oh, this letter.  Okay.
 6              MR. CHRISTIE:  Yeah.
 7        Q.   And attached to this letter is a summary
 8    that's --
 9              THE COURT:  Let me ask you a question.
10              MR. CHRISTIE:  Yes.
11              THE COURT:  Respectfully.
12              Because I understand the -- I understand, you
13    know, the -- the sort of rhetorical thrust of this, that
14    there was definitely a period -- I don't have any
15    problem finding at all there's definitely been a period
16    of confusion here.
17              But how important is a letter like this, given
18    the November 7th letter, which I realize was filed --
19    was written the day after your injunction papers were
20    filed, which was a little troubling.  But it does have a
21    tendency to clarify, wouldn't you say?
22              MR. CHRISTIE:  No.
23              THE COURT:  You don't think so?
24              MR. CHRISTIE:  No, not at all.
25              THE COURT:  I won't make you explain it now.
```

1   If that's your good faith position, I'll let you

2   continue.

3           MR. CHRISTIE:  Okay.

4           THE COURT:  All right.

5       Q.   The September 18th, 2019, letter contains an

6   attachment to it, right, on -- it's the third page of

7   the document?

8       A.   Yes.

9       Q.   And the attachment identifies the statute for

10  domicile for voting purposes, right?

11      A.   Yes.

12      Q.   And it identifies this RSA 21:16 as amended on

13  July 1, 2019, right?

14      A.   21:6.

15      Q.   Yup, 21 -- thank you, 21:6.

16           And it states that domicile and the definition

17  of resident under 21:6 may be equivalent, right?

18      A.   I'm sorry.  I didn't hear the question.

19      Q.   I'm sorry.  It's on -- the last paragraph

20  says:  Domicile under RSA 645:1 and the definition of

21  resident under RSA 21:6 may be equivalent, right?

22      A.   Yes.

23      Q.   Nowhere in this letter or in the attachment is

24  there any reference to 259:88, right?

25      A.   No.

1          Q.    And at no time has the Secretary of State's

2    office informed -- or the Attorney General or the

3    Department of Safety -- informed town or local officials

4    that 259:88 may be relevant to this analysis, right?

5          A.    No, there's not -- none of those people were

6    informed, no.

7          Q.    Right.  Up until this day?

8          A.    Yes.

9          Q.    Has the Secretary of State's office asked the

10   Department of Safety or the Department of Motor Vehicles

11   to provide guidance on the impact of registering to vote

12   in light of HB 1264?

13         A.    You mean beyond the letter that was

14   Exhibit 12?

15         Q.    Yeah, beyond the November letter.

16         A.    There were conversations between those

17   agencies about making sure that -- you know, that we

18   were communicating the right message in terms of

19   elections.  And the result of that was Exhibit 12, which

20   was all three agencies getting together and issuing

21   one --

22         Q.    All right.

23         A.    -- statement.

24         Q.    And you would -- I think we've established

25   Exhibit 12 does not reference 259:88, right?

1        A.    Yes.

2        Q.    There was some testimony by Clerk McClain

3    about 60-day letters.  Do you recall that testimony?

4        A.    Why don't you tell me a little bit more.

5        Q.    Do you know what a 60-day letter is?

6        A.    Well, not specifically.

7        Q.    Okay.

8        A.    I thought I heard 90-day letter.

9        Q.    90-day letters?  Do letters go out to people

10   who have used domicile affidavits to register to vote?

11       A.    There's a verification mailing that is

12   required anytime a voter uses an affidavit to either

13   register to vote or obtain a ballot, and that includes

14   domicile affidavits.  And the statute -- the statute

15   requires that those letters are issued within a certain

16   period of time.  It may be 60 or it may be 90 days after

17   an election.

18       Q.    Okay.  And do those letters inform people that

19   a nonresident driver of a motor vehicle who holds a

20   valid driver's license in another jurisdiction, upon the

21   establishment of a bona fide residency in this state,

22   shall have a maximum of 60 days from the date his

23   residency was established to obtain a driver's license

24   issued by the state of New Hampshire?

25       A.    That language is there because it's prescribed

1    in the statute.

2        Q.    All right.  And when those letters issue to

3    people, does the letter cite RSA 21:6?

4        A.    The letter simply cites what's in the statute.

5        Q.    All right.  Let me show you --

6              Can I show him the --

7              MR. ZORACKI:  Can I have a copy?

8              MR. CHRISTIE:  Your Honor, this has not been

9    marked for ID.  If we need to, we can.

10       Q.    Mr. Scanlan, I'll show you a letter that's

11   dated May 1, 2019, from Secretary Gardner.  It's

12   redacted who it was sent to, but is this -- are you

13   familiar with this letter?

14       A.    This letter goes out as -- as required in the

15   statute, this letter has been sent out for several

16   election cycles.

17       Q.    Right.  And this is the letter that notifies

18   individuals if they have established a residency in --

19   strike that.

20             This letter gets sent out to individuals who

21   have signed domicile affidavits when they register to

22   vote?

23       A.    Yes.

24       Q.    And it notifies them after they've signed a

25   domicile affidavit if they register to vote, if they've

```
1    established residency in this state, they need to get a
2    driver's license, correct?
3         A.   Yes.
4         Q.   Okay.  And as the authority for that, the
5    Secretary of State cites RSA 21:6, right?
6         A.   I see that here, yes.
7         Q.   Okay.  And he also cites RSA 259:88, right?
8         A.   Yes.
9         Q.   So when informing voters who have
10   previously -- who have registered to vote through a
11   domicile affidavit that RSA 21:6 and RSA 259:88 may
12   determine their residency requirement, why in the
13   guidance letters, including the one on November 7th,
14   that go out do they fail to reference RSA 259:88?
15        A.   I don't have the answer to that question.
16        Q.   Do you think that could be confusing to
17   people?
18        A.   Perhaps.
19             MR. CHRISTIE:  So I'd move to admit this.  It
20   was not premarked because it came up because of
21   Ms. McClain's testimony.  I move to admit this, I guess
22   as Plaintiff's 15.
23             THE COURT:  Counsel?
24             MR. ZORACKI:  No objection.
25             THE COURT:  It's admitted.
```

```
1                    (Plaintiff's Exhibit 15 admitted.)

2                    THE CLERK:  Plaintiff's Exhibit 15?

3                    MR. CHRISTIE:  15.

4                    THE COURT:  Can you pass that up so I can read

5       it?  Thank you.

6                    So is the practice 60 days or 90 days with

7       these letters, do you know?

8                    THE WITNESS:  I'm sorry?

9                    THE COURT:  Is the practice 60 days, 90 days?

10                   THE WITNESS:  I believe it's 90, but it could

11      be 60.

12                   MR. CHRISTIE:  That's correct, Judge.  We --

13      we agree.

14          Q.   And, again, just for -- just -- I want to make

15      sure we've clarified that that letter goes to everyone

16      who has signed the domicile affidavit, correct?

17          A.   Yes.

18          Q.   Okay.  Then I want to go to --

19                   THE COURT:  Before you do that,

20      Mr. Christie --

21                   MR. CHRISTIE:  Yes.

22                   THE COURT:  -- and this is not an attempt to

23      rush you.  I want you to take all the time you need.

24      But how much more time do you have with the witness, do

25      you think?
```

1           MR. CHRISTIE:  I'd say maybe another five or

2   ten minutes.

3           THE COURT:  But you're going to do redirect.

4           Oh, I'm sorry.  You're going to do redirect,

5   right?

6           MR. ZORACKI:  Yes.

7           THE COURT:  Yeah.  I want -- the reporter's

8   been going over 90 minutes.

9           MR. CHRISTIE:  Do you want to take a --

10          THE COURT:  We should take a break.

11          MR. CHRISTIE:  Perfectly fine.

12          THE COURT:  So we're in recess.

13          Off the record.

14              (Off-the-record discussion.)

15                  (Recess at 1:05 p.m.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate
transcription of the within proceedings, to the best of
my knowledge, skill, ability and belief.


Submitted: 12/9/19        /s/  Liza W. Dubois
                          LIZA W. DUBOIS, RMR, CRR